UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

09    367

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | )<br>)<br>) | No. |
| | ) | CLASS ACTION COMPLAINT FOR |
| Plaintiff, | )<br>) | VIOLATIONS OF FEDERAL SECURITIES LAWS |
| | ) | |
| vs. | ) | |
| | ) | |
| TEXTRON INC., LEWIS B. CAMPBELL, and TED R. FRENCH, | )<br>) | DEMAND FOR JURY TRIAL |
| | ) | |
| Defendants. | )<br>) | |
| | ) | |

## NATURE OF CASE

1.    This is a federal class action seeking to pursue remedies under the Securities and Exchange Act of 1934 (the "Exchange Act") on behalf of a class of all consisting of all persons, other than Defendants (defined below), who purchased or otherwise acquired the securities of Textron Inc. ("Textron" or the "Company") between July 17, 2007 and January 29, 2009 (the "Class Period").

2.    Defendant Textron is a manufacturer of aircraft and industrial products including such brands as Cessna Aircraft ("Cessna"), Bell Helicopter ("Bell"), and E-Z-GO golf carts, among others.  Through the Company's finance subsidiary, Textron Financial Corporation ("TFC"), Textron offers financing to facilitate purchases of the Company's products (sometimes referred to herein as "captive financing") and other commercial finance services, including asset-based lending to third-party borrowers secured by the borrowers' inventories.

3.    During the Class Period, Defendants made materially false and misleading statements concerning Textron's stability and profitability by repeatedly publicizing record "backlogs" of unfilled customer orders for aircraft generated primarily by Cessna.  In numerous press releases, news articles and SEC filings, Defendants highlighted the stability of the Company's current and future operations, epitomized by Defendant Lewis B. Campbell's promise of Textron's "continued uninterrupted growth well into the next decade" made during a January 2008 meeting with analysts, by pointing to Cessna's "backlogs."  Unfortunately for Textron's public shareholders, Campbell's promises of uninterrupted growth fell short by several years.

4.    Furthermore, Defendants failed to disclose the deterioration in the "managed receivables" portfolio of Textron's Finance segment, primarily related to TFC's asset-based lending business, which grew by more than $2 billion since 2006.  At the latest by mid-2007, the market value of these assets had materially declined due to the onset of the sub-prime lending crisis and

subsequent "de-leveraging" of the credit markets. Defendants knew or recklessly disregarded that a sell-off of these assets was inevitable as obtaining long-term debt to fund the assets would devastate Textron and TFC's earnings and credit ratings. The scheme forestalled the recognition of hundreds of millions of dollars in losses until December 2008 when Defendants were forced to admit TFC would exit virtually all of its commercial finance lines.

5.      By the start of the Class Period, Textron was attempting to extricate itself from a series of setbacks related to Bell's deployment of several helicopter projects under development for the United States Marine Corps ("USMC") and a 'payment for profit' scheme engaged in by several of the Company's French affiliates in connection with the United Nation's Oil for Food Program in Iraq. Contracts obtained by Textron's affiliates funneled illegal kickback payments to Saddam Hussein's regime in the form of "after-sales service fees" added to sales contracts for humanitarian goods.

6.      To offset these continuing problems Defendants knowingly or recklessly engaged in a scheme which misrepresented Textron's Cessna and Finance segments operations by failing to disclose that:

(a)      Textron was accepting orders for business-jets from a growing number of customers that were mere startup and/or financially distressed fleet operators who neither intended to, nor possessed the financial resources to, pay for or take delivery of aircraft during 2008-9 and beyond. This practice materially inflated Textron's "backlog" of unfilled orders for the Company's Cessna segment, which in turn materially overstated the Company's current financial condition and future prospects;

(b)      Hundreds of orders reported as "backlog" at Cessna for future business-jet production were subject to deferral and cancellation causing the Company to overstate its projected

fiscal 2008-9 business-jet production and causing the Textron to initiate costly production cutbacks and worker reduction programs, which eroded Textron's revenues and earnings;

      (c)    The Company's Finance segment had incurred material losses in the fair market value of its finance receivables and other financial assets, these unrealized market losses were omitted from or misrepresented in the Company's periodic reports of earnings and income; and

      (d)    Textron's credit ratings were deteriorating in light of its Finance segment's losses and the additional debt the Company would incur in connection with its Finance segment's distressed asset base.

      7.    On or about September 16, 2008, in advance of the Company's October 16, 2008 (third quarter 2008) earnings release, the truth began to emerge when analysts downgraded Textron to "Hold" from "Buy" citing deteriorating profit margins in Textron's manufacturing segments and higher debt indicating "poor debt management" within the Company's Finance segment. Following this downgrade, Textron common stock fell in price by $3.31 per share (nearly 10%) to close at $31.51 on September 17, 2008.

      8.    On September 26, 2008, *Reuters News* published a diary of impending earning releases indicating analysts' consensus earnings for Textron were down $0.06 ($0.89 v. $0.95) for the third quarter 2008 compared to the same period last year. In response, Textron common stock fell $4.89 per share (15%) from $31.86 to close at $26.97 on volume of more than 10 million shares.

      9.    On October 16, 2008, Textron announced that it would downsize its finance unit by at least $2 billion by exiting its "Asset Based Lending and Structured Capital segments, and several additional product lines" leading to losses of $169 million for goodwill impairment. However, TFC's financial assets still remained grossly overstated as the Company failed to report these financially distressed assets were impaired at fair market value. Textron also announced "restructuring" charges of $25 million for worker layoffs and consolidations. The Company reported

earnings of $0.84 per share, $0.05 below analysts' estimates, and $0.16 below the same period last year. Over the next several trading sessions Textron shares fell to a new 52-week low closing at $11.46 on October 23, 2008.

10.    Then on December 22, 2008, Textron announced that its board had approved plans to exit the Finance segment's commercial lending activities except for "captive financing" activities related to product sales in the Company's manufacturing segments. Approximately $7.9 billion of TFC's $11.4 billion total financial assets were put on the blocks for "orderly liquidation" or "selective sales." Textron, belatedly, reported that $3.5 billion of TFC's "managed receivables," $1.5 billion of which were sold to investors through securitizations, had degraded in value resulting in prospective fourth quarter 2008 pre-tax charges of $250-$300 million and requiring Textron to inject $600 million in capital to TFC under an existing support agreement. The Company announced further workforce reductions resulting from production cutbacks bringing total estimated restructuring costs to $65 million.

11.    Following this announcement, Textron common stock fell $3.12 per share, more than 20%, to close at $12.15 on December 23, 2008.

12.    On January 29, 2009, the last day of the Class Period, Textron announced that an estimated $30 million of the $65 million in "restructuring" costs would be incurred by the Company's Cessna segment due to production cutbacks and worker layoffs planned for the first quarter of 2009.

13.    After this announcement, Textron common stock traded to a new low of $8.83 per share before closing at $9.05 on volume of more than 26 million shares, a one day decline of $4.19 per share, or 31%.

14.    Prior to the announcement of these adverse events Textron insiders, including Defendants Lewis B. Campbell and Ted R. French, sold more than 1 million shares of their

- 4 -

personally held Textron common stock generating illicit proceeds of more than $67.1 million, with many of these sales executed near the Class Period high of $70.69 per share reached on December 7, 2007.

## JURISDICTION AND VENUE

15.    The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder. Jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16.    Venue is proper here pursuant to Section 27 of the Exchange Act. Textron maintains its principal executive offices in this district.

## THE PARTIES

17.    Plaintiff City of Roseville Employees' Retirement System purchased Textron securities during the Class Period as set forth in the attached certification which is incorporated herein by reference and was damaged thereby.

18.    Defendant Textron is a manufacturing and financial services company with offices at 40 Westminster Street, Providence, Rhode Island.

19.    Defendant Lewis B. Campbell ("Campbell") was Textron's Chairman, President and Chief Executive Officer ("CEO") at all relevant times. Campbell resigned his position as the Company's President in January 2009.

20.    Defendant Ted R. French was Textron's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times. French also served as TFC's President and CFO during the Class Period. French resigned his positions with the Company in February 2009.

21.    Defendants Campbell and French are referred to herein as the "Individual Defendants."

## BACKGROUND

22.    Textron currently manages its operations through five business segments: the Cessna segment, operating primarily through the Cessna Aircraft Company ("Cessna Aircraft") with manufacturing facilities in Witchita, Kansas, among other locations.  Cessna Aircraft, purchased by Textron from General Dynamics Corp. in 1992 for $600 million in cash, manufactures piston, turbo and business-jets. Sales of business-jets drive Cessna's revenues and market-share in competition with such producers as General Dynamics/Gulfstream and Canadian producer Bombardier; the Bell segment manufactures and markets Bell helicopters for military and commercial applications; Textron Systems Group develops and markets products to the defense market; the Industrial segment manufactures a number of linked product lines for the leisure/resort/golf industry and automotive industry; and the Finance segment participates in the financial services markets through TFC.

## CLASS PERIOD EVENTS AND STATEMENTS

23.    On or about July 19, 2007, the first day of the Class Period, Textron issued a press release announcing its financial results for the second quarter ended June 30, 2007. The Company's reported revenue was $3.2 billion, up 15% from 2006, with income from continuing operations of $1.69 per share, compared to $1.34 in the second quarter of 2006.[1]  Textron reported that Bell's profits declined due to a $48 million charge on a helicopter program for the U.S. military.  The Company reported higher profits in both its Cessna and Finance segments.  Textron reported that Cessna's backlog had increased to $10.4 billion at the end of the second quarter of 2007, compared to $9.0 billion for the last quarter.  The Finance segment's revenues and profits increased compared

---

[1]    Textron also announced that its Board of Directors approved a two-for-one split of its Common Stock shares. The stock split will be effected through a 100% stock dividend, payable on August 24, 2007 to shareholders of record as of the close of business on August 3, 2007. Textron's Common Stock will begin trading at the split-adjusted price on August 27, 2007.  All prices of Textron common stock referenced herein have been adjusted to reflect the stock split.

- 6 -

to the prior year due in part to "higher average finance receivables." Defendant Campbell commented on the strong demand for Textron's products, stating in pertinent part as follows:

> Campbell added, *"Given the strength of demand for our innovative products and our progress in execution improvement thus far, we are raising our earnings and cash flow outlook for the year."*
>
> Textron expects full-year 2007 revenues will be up about 12% from last year, while earnings per share from continuing operations are now expected to be between $6.35 and $6.55, $0.25 per share higher than its previous guidance. Third quarter earnings per share from continuing operations are expected to be between $1.45 and $1.55. The company now expects full-year 2007 free cash flow to be in the range of $550 - $600 million, up $50 million from its previous expectation. [Emphasis added.]

24.     On or about August 23, 2007, the SEC filed Foreign Corrupt Practice Act charges against Textron for improper payments to Iraq under the U.N. Oil for Food Program. The Company agreed to pay the SEC more than $3.5 million in penalties and fines to settle the charges and paid additional fines of $1.15 million pursuant to a non-prosecution agreement with the U.S. Department of Justice, Fraud Section.

25.     On or about October 8, 2007, Textron issued a press release announcing its financial results for the third quarter ended September 30, 2007. The Company reported revenue was $3.3 billion, up 15% from last year. Third quarter 2007 income from continuing operations was $0.95 per share, up 40% compared to $0.68 in the third quarter of 2006. Defendants raised Textron's 2007 earnings guidance for the second quarter in a row, increasing 2007 earnings estimates by $0.22 to $3.40-3.50 per share. Textron reported 608 new orders for business-jets during the quarter, increasing Cessna's backlog to an "all-time high of $11.9 billion." The Finance segment reported higher earnings due in part to a "decrease in the provision for [loan] losses." Defendant Campbell commented on Textron's "strong" third quarter results stating in pertinent part as follows:

> "Once again, we delivered an excellent quarter with strong organic revenue growth and improved profitability," said Textron Chairman, President and CEO Lewis B. Campbell. "Our sustained strong operating performance allowed us to exceed our financial targets while continuing to invest in our longer-term growth."

\*       \*       \*

Campbell added, "We see strong end-market demand continuing through the rest of the decade, which in concert with the benefits of our ongoing Transformation strategy, positions us to deliver significant growth in earnings, cash flow and shareholder value."

26.    On or about January 24, 2008, Textron issued a press release announcing its financial results for the fourth quarter ended December 29, 2007. For the quarter, the Company reported a 32% increase in earnings per share from continuing operations on an 18% revenue increase. For the full year, Textron's earnings of $3.59 per share exceeded the high-end of its guidance range by $0.09. Cessna's reported backlog at year-end was $12.6 billion, up 48% from $8.5 billion at year-end 2006. The Finance segment reported "[p]ortfolio quality continues to be strong with a 60-day delinquency rate of 0.43%, non-performing assets of 1.34% and net charge-offs of 0.45%." Defendant Campbell commented in pertinent part as follows:

Our fourth quarter culminates a year of powerful performance at Textron on many fronts. The positive impact of our ongoing journey to become the premier multi-industry company is apparent in our top-line growth and our ability to convert that growth into profits and premium shareholder returns.

27.    Textron also issued earnings guidance for 2008. The press release stated in pertinent part as follows:

2008 Outlook

Textron expects 2008 revenues to be about $15 billion, up 13%, and earnings per share to be between $3.75 and $3.95. First quarter earnings per share are forecasted to be between $0.75 and $0.85 per share. Textron's outlook fully includes the 2008 development costs for the large cabin Citation program.

The company expects 2008 free cash flow in the range of $700 - $750 million, reflecting expected capital expenditures of about $550 million.

Campbell commented, "While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, *we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial.* Even with the softer U.S. economy, we expect another banner year of business jet orders exceeding current year deliveries. Given

that our jet backlog already extends well into 2009, this bodes well for continued, uninterrupted growth well into the next decade at Textron." [Emphasis added.]

28. On or about April 17, 2008, Textron issued a press release announcing its financial results for the first quarter ended March 29, 2008. The Company reported earnings of $0.93 per share, exceeding the high-end of Defendants' guidance range by $0.08, up 19% compared to the previous year. Cessna reported 235 new business-jet orders, bringing its backlog to $14.5 billion, up $1.9 billion from year-end 2007. Textron reported lowers profits in its Finance segment due to an increase in the provision for loan losses, primarily in the asset-based lending and distribution finance businesses. Defendants increased Textron's forecast for 2008 earnings by $0.05 per share to a range of $3.80 and $4.00. The Company's second quarter 2008 earnings were expected to be between $0.90 and $1.00 per share.

29. On or about June 13, 2008, Textron issued a press release announcing that it was reducing its earnings forecast for the second quarter 2008, due to lower earnings in its Finance segment. The Company reaffirmed its full year earnings forecast. The press release stated in pertinent part as follows:

> Textron Inc. reported today that it now expects 2008 second quarter earnings per share from continuing operations to be in the range of $0.93 to $0.98, compared to its previous forecast of $0.90 to $1.00.
>
> The company continues to forecast full-year earnings per share from continuing operations in the range of $3.80 to $4.00 and free cash flow of $700 - $750 million.
>
> The company said that profit in its Finance segment would be significantly less than previously forecast. Lower profitability in Finance will result from higher second quarter pre-tax loan loss provisions of about $20 million and a pre-tax charge of about $10 million that will be recorded in the quarter related to Sale-In, Lease-Out (SILO) transactions previously challenged by the IRS.
>
> Weaker profit at Finance in the second quarter and for the full-year is expected to be offset primarily by higher profits in the aircraft and defense businesses.

30. On or about July 17, 2008, Textron issued a press release announcing its financial results for the second quarter ended June 28, 2008. The Company reported earnings of $1.03 per

- 9 -

share exceeding guidance by $0.05 per share. Cessna reported 437 new business-jet orders for the first-half of 2008 bringing its backlog to $16.0 billion. Textron's Finance segment reported lower profits due to the previously announced loan losses. Defendant Campbell commented stating in pertinent part as follows:

> We achieved 19% organic growth in our aerospace and defense businesses, as global demand remained very strong and led to another record level of backlog. Likewise, we had double-digit organic growth at E-Z-GO, where our new golf car has been well received, and Fluid & Power where our energy-related products are in high demand.

31.    The statements referenced above in ¶¶23 and 25-30 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    that Textron was accepting orders for business-jets from a growing number of customers that were mere startup and/or financially distressed fleet operators who neither intended to, nor possessed the financial resources to, pay for or take delivery of aircraft during 2009 and beyond, this materially inflated Textron's "backlog" of unfilled orders for the Company's Cessna segment, which in turn materially overstated the Company's current financial condition and future prospects;

(b)    that hundreds of orders reported as "backlog" at Cessna for future business-jet production were subject to deferral and cancellation causing the Company to overstate it projected fiscal 2009 business-jet production and causing the Textron to initiate costly production cutbacks and worker reduction programs, which eroded Textron's revenues and earnings;

(c)    that the Company's Finance segment had incurred material losses in the fair market value of its finance receivables and other financial assets which were omitted from or misrepresented in the Company's periodic reports of earnings and income. As a result, Textron was reporting artificially inflated financial results and its financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP");

(d)    that Textron's credit ratings were deteriorating in light of its Finance segment's losses and the additional debt the Company would incur in connection with its Finance segment's faltering asset base; and

(e)    that based on the foregoing Defendant's financial projections, opinions and positive statements concerning the Company's fiscal 2008 operations were lacking in a reasonable basis when made and therefore were materially false and misleading when made.

32.    During the Class Period, as detailed herein, Textron conducted several securities offerings in which it sold common stock, convertible notes and other securities instruments. In connection with these offerings, the Company filed and disseminated registration statements. These registration statements were materially false and misleading as they failed to disclose the adverse facts detailed herein. Under the rules and regulations governing the preparation of the registration statements, Textron was required to disclose the adverse facts detailed herein but did not do so. In addition, the financial statements contained in the registration statements were materially false and misleading and not prepared in accordance with GAAP for the reasons set forth herein.

33.    On or about September 16, 2008, in advance of the Company's October 16, 2008 (third quarter 2008) earnings release, the truth began to emerge when analysts downgraded Textron to "Hold" from "Buy" citing deteriorating profit margins in Textron's manufacturing segments and higher debt indicating "poor debt management" within the Company's Finance segment. Following this downgrade, Textron common stock fell in price by $3.31 per share (nearly 10%) to close at $31.51 on September 17, 2008.

34.    On September 26, 2008, *Reuters News* published a diary of impending earning releases indicating analysts' consensus earnings for Textron were down $0.06 ($0.89 v. $0.95) for the third quarter 2008 compared to the same period last year. Textron common stock fell $4.89 per share (15%) from $31.86 to close at $26.97 on volume of more than 10 million shares.

- 11 -

35.    On October 16, 2007, Textron announced that it would downsize its finance unit by at least $2 billion by exiting its "Asset Based Lending and Structured Capital segments, and several additional product lines" leading to losses of $169 million for goodwill impairment. However, TFC's financial assets still remained grossly overstated as the Company failed to report these financially distressed assets at fair market value. Textron also announced "restructuring" charges of $25 million for worker layoffs and consolidations. The Company reported earnings of $0.84 per share, $0.05 below analysts' estimates, and $0.16 per share below the same period last year. Over the next several trading sessions Textron shares fell to a new 52-week low closing at $11.46 on October 23, 2008. Defendants, however, continued to conceal the true facts about the Company.

36.    Then on December 22, 2007, Textron announced that its board had approved plans to exit the Finance segment's commercial lending activities except for "captive financing" activities related to product sales in the Company's manufacturing segments. Approximately $7.9 billion of TFC's $11.4 billion total financial assets were put on the blocks for "orderly liquidation" or "selective sales." Textron, belatedly, reported that $3.5 billion of TFC's "managed receivables," $1.5 billion of which were sold to investors through securitizations, had degraded in value resulting in prospective fourth quarter 2008 pre-tax charges of $250-$300 million and requiring Textron to inject $600 million in capital to TFC under an existing support agreement. The Company announced further workforce reductions resulting from production cutbacks bringing total estimated restructuring costs to $65 million.

37.    Following this announcement, Textron common stock fell $3.12 per share, more than 20%, to close at $12.15 on December 23, 2008.

38.    On January 29, 2009, the last day of the Class Period, Textron announced that an estimated $30 million of the announced $65 million in "restructuring" costs would be incurred by the

Company's Cessna segment due to production cutbacks and worker layoffs planned for the first quarter of 2009.

39.     After this announcement, Textron common stock traded to a new low of $8.83 per share before closing at $9.05 on volume of more than 26 million shares, a one day decline of $4.19 per share, or 31%.

## SCIENTER

40.     During the Class Period, Defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Textron stock during the Class Period.

41.     The Individual Defendants and other insiders directly profited from the fraudulent scheme by selling 1,044,883 personally-held shares of Textron common stock generating proceeds of $67,130,519, with many of these sales priced at or near the Class Period high of $70.69 per share reached on December 7, 2007, as illustrated in the following chart:

| Date | Insider/Title | Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| 15-Aug-07 | BOHLEN KENNETH C | 7,000 | $112.14 | $785,000 |
| 19-Oct-07 | BOHLEN KENNETH C | 26,800 | $66.23 | 1,775,000 |
| 22-Oct-07 | BOHLEN KENNETH C | 21,816 | $66.01 | 1,440,000 |
| 12-Feb-08 | BOHLEN KENNETH C | 1,383 | $56.40 | 78,001 |
| 15-Feb-08 | BOHLEN KENNETH C | 4,668 | $56.39 | 263,228 |
| 25-Feb-08 | BOHLEN KENNETH C | 1,554 | $57.36 | 89,137 |
| 15-Aug-08 | BOHLEN KENNETH C | 12,000 | $42.64 | 511,680 |
| | **Sub-Total BOHLEN** | **75,221** | | **$4,942,046** |
| | | | | |
| 7-Sep-07 | BUTLER JOHN D | 10,000 | $57.05 | $570,500 |
| 30-Jan-08 | BUTLER JOHN D | 4,668 | $54.35 | 253,705 |
| 12-Feb-08 | BUTLER JOHN D | 1,593 | $56.40 | 89,845 |
| 25-Feb-08 | BUTLER JOHN D | 1,385 | $57.36 | 79,443 |
| | **Sub-Total BUTLER** | **17,646** | | **$993,493** |

- 13 -

| Date | Name | Shares | Price | Amount |
|---|---|---|---|---|
| 20-Jul-07 | CAMPBELL LEWIS B | 10,980 | $121.95 | 1,339,000 |
| 20-Jul-07 | CAMPBELL LEWIS B | 23,141 | $122.21 | 2,828,000 |
| 20-Jul-07 | CAMPBELL LEWIS B | 8,879 | $122.65 | 1,089,000 |
| 30-Jan-08 | CAMPBELL LEWIS B | 22,000 | $54.35 | 1,195,700 |
| 12-Feb-08 | CAMPBELL LEWIS B | 7,130 | $56.40 | 402,132 |
| 12-Feb-08 | CAMPBELL LEWIS B | 6,958 | $6.77 | 47,105 |
| 25-Feb-08 | CAMPBELL LEWIS B | 5,552 | $57.36 | 318,462 |
| 28-Apr-08 | CAMPBELL LEWIS B | 27,645 | $60.59 | 1,675,000 |
| 28-Apr-08 | CAMPBELL LEWIS B | 36,825 | $60.86 | 2,241,000 |
| 28-Apr-08 | CAMPBELL LEWIS B | 104,983 | $61.08 | 6,412,000 |
| 28-Apr-08 | CAMPBELL LEWIS B | 236,988 | $61.21 | 14,506,000 |
| 28-Apr-08 | CAMPBELL LEWIS B | 108,582 | $61.30 | 6,656,000 |
| 28-Apr-08 | CAMPBELL LEWIS B | 77,019 | $61.44 | 4,732,000 |
| 5-May-08 | CAMPBELL LEWIS B | 3,225 | $61.98 | 199,885 |
| 19-May-08 | CAMPBELL LEWIS B | 75,301 | $63.53 | 4,783,872 |
| | **Sub-Total CAMPBELL** | **755,208** | | **$48,425,156** |
| | | | | |
| 11-Dec-07 | FRENCH TED R | 20,000 | $72.85 | $1,457,000 |
| 8-Jan-08 | FRENCH TED R | 20,000 | $63.15 | 1,263,000 |
| 30-Jan-08 | FRENCH TED R | 8,000 | $54.35 | 434,800 |
| 12-Feb-08 | FRENCH TED R | 2,616 | $56.40 | 147,542 |
| 25-Feb-08 | FRENCH TED R | 1,875 | $57.36 | 107,550 |
| 13-May-08 | FRENCH TED R | 20,000 | $61.65 | 1,233,000 |
| | **Sub-Total FRENCH** | **72,491** | | **$4,642,892** |
| | | | | |
| 24-Jul-07 | HOWELL MARY L | 5,000 | $117.80 | $589,000 |
| 19-Oct-07 | HOWELL MARY L | 22,168 | $67.08 | 1,487,000 |
| 30-Jan-08 | HOWELL MARY L | 4,668 | $54.35 | 253,705 |
| 12-Feb-08 | HOWELL MARY L | 1,548 | $56.40 | 87,307 |
| 25-Feb-08 | HOWELL MARY L | 1,353 | $57.36 | 77,608 |
| | **Sub-Total HOWELL** | **34,737** | | **$2,494,620** |
| | | | | |
| 30-Oct-07 | ODONNELL TERRENCE | 36,184 | $67.71 | $2,450,000 |
| 30-Jan-08 | ODONNELL TERRENCE | 4,668 | $54.35 | 253,705 |
| 12-Feb-08 | ODONNELL TERRENCE | 1,593 | $56.40 | 89,845 |
| 25-Feb-08 | ODONNELL TERRENCE | 1,385 | $57.36 | 79,443 |
| | **Sub-Total ODONNELL** | **43,830** | | **$2,872,993** |
| | | | | |
| 19-Oct-07 | YATES RICHARD L | 6,107 | $65.50 | $400,000 |
| 29-Oct-07 | YATES RICHARD L | 14,332 | $68.52 | 982,000 |
| 15-Jan-08 | YATES RICHARD L | 4,000 | $62.57 | 250,280 |
| 12-Feb-08 | YATES RICHARD L | 781 | $56.40 | 44,048 |
| 15-Feb-08 | YATES RICHARD L | 3,332 | $56.39 | 187,891 |
| 25-Feb-08 | YATES RICHARD L | 750 | $57.36 | 43,020 |
| 21-May-08 | YATES RICHARD L | 12,448 | $63.62 | 792,000 |
| 15-Jan-09 | YATES RICHARD L | 4,000 | $15.02 | 60,080 |
| | **Sub-Total YATES** | **45,750** | | **$2,759,319** |
| | | | | |
| | | **1,044,883** | | **$67,130,519** |

42.    Textron and TFC directly benefitted from the fraudulent scheme by issuing more than $2.6 billion of debt at lower effective interest rates than would have occurred if the truth were known. On December 4, 2007, Textron issued and sold $350,000,000 principal amount of its 5.60% Notes due 2017 (the "Notes") pursuant to a Registration Statement on Form S-3 (No. 333-113313), which was declared effective on August 4, 2004, and a Prospectus Supplement dated November 29, 2007 which was declared effective on August 4, 2004. TFC and Textron Financial Canada Funding Corp. ("Textron Financial Canada) have a joint shelf registration statement with the SEC enabling the issuance of an unlimited amount of public debt securities. During 2007 and 2008, $2.075 billion of term debt and CAD 220 million of term debt were issued under this registration statement. During the second quarter of 2008, TFC sold finance receivables to a special purpose entity ("SPE") which is a consolidated subsidiary of Textron Financial. These finance receivables were used by the SPE as collateral for the issuance of $300 million of secured notes to third-party investors under a 364 day revolving credit facility.

43.    In addition, the Individual Defendants were highly motivated to inflate Textron's earnings and common stock price in order to benefit from incentive compensation programs. On January 25, 2008, Textron's Board of Directors approved the overall design of the Company's annual and long-term incentive compensation program, including terms and conditions of the annual cash incentive arrangement under the Textron Inc. Short-Term Incentive Plan (As amended and restated effective July 25, 2007) (the "Incentive Plan") and the grant types and the terms and conditions of stock options, restricted stock units and performance share units to be granted under the Textron Inc. 2007 Long-Term Incentive Plan (amended and restated as of May 1, 2007) (the "2007 Plan"). Incentive payments to executive officers for 2008 under the Incentive Plan were be based on the following:

- Achieving earnings per share target: 45%

- 15 -

- Achieving enterprise return on invested capital target: 45%

- Achieving workforce diversity target: 5%

- Achieving specified leadership behaviors: 5%

44.    Target payouts for the named executive officers range from 65% to 100% of the executive's base salary, and the maximum payout on these components regardless of how much the targets are exceeded will be 200%.  In addition, performance share units granted for the 2008-2010 cycle were to be based 50% on achievement of earnings per share targets and 50% on enterprise return on invested capital minus weighted average cost of capital targets. The maximum payout on performance share units will be 150%.

## LOSS CAUSATION/ECONOMIC LOSS

45.    During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Textron securities and operated as a fraud or deceit on Class Period purchasers of Textron securities by misrepresenting the Company's business.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Textron securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Textron securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

46.    Textron's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

47.    The defendants are also liable for any false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by

an executive officer of Textron who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE:  FRAUD ON THE MARKET

48.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Textron stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

49.    At all relevant times, the markets for Textron stock were efficient for the following reasons, among others:

(a)    As a regulated issuer, Textron filed periodic public reports with the SEC;

(b)    Textron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major

news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(c)    Textron common stock was actively traded in an efficient market, namely the NYSE, under the symbol TXT.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Textron stock during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Textron and their families and affiliates.

51.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Textron had more than 242 shares million shares of stock outstanding, owned by thousands of persons.

52.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the prices of Textron stock were artificially inflated; and

- 18 -

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

53.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

54.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

55.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

56.    Plaintiff incorporates ¶¶1-55 by reference.

57.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Textron stock during the Class Period.

59.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Textron stock. Plaintiff and the Class would not have purchased Textron stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

60.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Textron stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

61.    Plaintiff incorporates ¶¶1-60 by reference.

62.    The Individual Defendants acted as controlling persons of Textron within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Textron, the Individual Defendants had the power and ability to control the actions of Textron and its employees. Textron controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 12, 2009

BARRY J. KUSINITZ (NO. 1404)

155 South Main Street, Suite 405
Providence, Rhode Island  02903
Telephone:  401/831-4200
401/831-7053 (fax)
bkusinitz@bdglawyers.com (email)

*Liaison Counsel*

COUGHLIN STOIA GELLER RUDMAN
    & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

VANOVERBEKE, MICHAUD
    & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201(fax)

Counsel for Plaintiff