UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) | Civil Action No. 09-cv-00367 |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TEXTRON INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

Lead Plaintiff Automotive Industries Pension Trust Fund ("Plaintiff" or "Lead Plaintiff"), has alleged the following based upon the investigation of Plaintiff's counsel, which included information obtained from confidential witnesses ("CW"), including former Textron Inc. ("Textron" or the "Company") employees, a review of the United States Securities and Exchange Commission ("SEC") filings by Textron, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class of all those who purchased or otherwise acquired the securities of Textron Inc. ("Textron" or the "Company") between July 19, 2007 and January 29, 2009 (the "Class Period") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Textron, founded in 1923, is a multi-industry company whose principal activity is to provide aircraft, industrial and finance solutions.  The Company operates through five segments – Bell Helicopter Textron, Inc. ("Bell"), Cessna Aircraft Company ("Cessna"), Textron Financial Corporation ("TFC"), Textron Systems Corporation ("Systems") and Textron Industrial. This case concerns materially false and misleading statements relating to TFC's underwriting practices and loan portfolio, Cessna's backlog and accounting fraud.

3.      By at least the start of the Class Period, TFC was engaged in extremely risky lending practices.  In an effort to expand its business and report increasing growth, TFC dramatically lowered its underwriting standards and risk profile for lending. As a result, TFC's finance receivables pool increased dramatically while the default risk associated therewith skyrocketed.

4.      Yet, throughout the Class Period, Defendants represented that TFC's immense portfolio of finance receivables was high quality, supported by sound underwriting practices and experiencing extraordinarily low levels of delinquencies.  Nothing could be further from the truth. Based on the accounts of numerous former employees of Textron detailed herein, throughout the Class Period, TFC was loosening its underwriting practices and extending credit to the riskiest of buyers and/or borrowers in effort to grow its business.

5.      Moreover, during the Class Period, the value of TFC's finance receivables portfolio had materially declined due to the onset of the sub-prime lending crisis and subsequent "de-leveraging" of the credit markets.  The Company's loan portfolios were highly concentrated in the aviation, golf and vacation resort, recreational vehicle and marine industries – industries that were the first to feel the impact of the impending credit crisis that would befall the nation.  The Company, however, did not properly account for the worsening credit quality of its loan portfolio or the severe decline in these industries, thereby materially understating Textron's provisions for loan losses in violation of Generally Accepted Accounting Principles ("GAAP").

6.      The same improvident lending practices that TFC was engaged in invaded Textron's Cessna division, causing it to vastly overstate the quality of its reported backlog.  Throughout the Class Period, Defendants represented that the backlog was growing and that it was comprised of *bona fide* purchase orders.  In truth and in fact, the backlog was grossly overstated for several reasons.  First, as Defendants knew, in an effort to increase the backlog, Textron loosened credit standards for prospective purchasers.  Starting in April 2007, Cessna Finance began financing the deposits of Cessna's customers.  Thus, not only was the Company extending financing to poor credit quality customers (as compared to the Company's traditional standards), but it was also permitting those same customers to finance their deposits.  The financing of deposits increased the likelihood

that the "buyer" would not complete the purchase.  Second, the backlog included a significant amount of uncertain orders subject to cancellation, including speculative international orders.  These orders were placed by customers who had no intention of ever taking delivery of a plane, as well as resellers who did not have a buyer at the time but hoped to have a buyer in the future when the plane was delivered.  Finally, the backlog was composed of indefinitely delayed, contingent orders where Cessna persuaded customers not to cancel delivery of aircraft outright, but to push back dates of delivery from 2008 to several years down the road.  By significantly delaying delivery dates for customers that actually wanted to cancel their orders, Defendants overstated both the quality and size of the Company's backlog.

7.      Prior to the disclosure of the true facts about Textron and its finance receivables, the Individual Defendants and other Textron insiders took advantage of the artificial inflation in the price of Textron stock and sold  more than $67 million of their personally held Textron shares to the unsuspecting public. At the time of these sales, Defendants knew what the market did not -- that TFC's finance receivables portfolio was composed of extremely risky loans that heightened the probability that borrowers would default; Textron's financial results were materially overstated due to its failure to properly account for loan losses and Cessna's reported backlog was vastly overstated.

8.      Defendants were also highly motivated to conceal the severity of problems with TFC's portfolio of financed receivables (i) in order to raise much needed capital, and (ii) forestall the inevitable support payments that Textron would have to make to TFC.  As detailed further herein, on December 4, 2007, Textron raised $350,000,000 in a public offering of debt.  This offering provided the Company with critical capital.  Had investors in the offering known the true facts about Textron, they would have not had purchased the debt at the prices they paid.

9.      Defendants also wanted to delay recognizing the problems at TFC in order to delay and hopefully avoid having to make any support payments to TFC.  Textron is party to several agreements with TFC, including a Support Agreement that required Textron to provide extensive financial support to TFC to ensure that TFC's earnings would not be less than 125% of its fixed charges.  Therefore, if TFC's immense portfolio of finance receivables ever declined substantially, Textron would be required to downstream significant amounts of cash to ensure TFC could meet its financial obligations.  Thus, it was imperative to Textron's financial well-being for TFC to maintain the highest levels of quality in its loan portfolios.  As it became obvious that TFC's pool of finance receivables was vastly overstated, Defendants were motivated to delay recognizing these losses in order to delay and hopefully avoid having to make any support payments to TFC.

10.      Ultimately the credit crisis struck and Defendants were unable to maintain their fraudulent scheme.  In a series of partial disclosures, detailed herein, Defendants' fraudulent scheme came to light.  Initially, on June 13, 2008, Textron disclosed that the Company's profit in its Finance segment would be significantly less than previously forecast.  Then, on August 6, 2008, Textron announced that the combination of margin compression over the past three years – which the Company claimed was exasperated by disruption in the capital markets that began in the Fall of 2007 – and an increase in loan losses, had hurt the Company's profitability.  Thereafter, on October 16, 2008, Textron announced that it would ***downsize TFC by $2 billion*** by exiting several product lines. The Company also announced it expected to take a fourth quarter 2008 impairment charge of $169 million to "eliminate substantially all of the goodwill at TFC. . . ."  The Company also disclosed that by wiping out TFC's goodwill, Textron would be required to make an estimated ***$200 million*** support payment to TFC in the first quarter of 2009.  On October 16, 2008, the Company also first revealed that an order downturn had occurred in the Company's Cessna division.

4

11.     More partial disclosures reached the market on November 4, 2008, when Textron issued a press release announcing that it was revising downward Cessna's jet production schedule. The following day, on November 5, 2008, Defendants revealed it was necessary for the Company to reevaluate production levels in 2009 to avoid significant variations and inefficiencies during the next couple years.

12.     On December 22, 2008, Textron revealed that the Company's Finance segment would be exiting all of its commercial lending activities, except for "captive financing" activities related to product sales in the Company's manufacturing segments.  Rather than exit previously announced $2 billion worth of business, the new exit plan applied to approximately *$7.9 billion* of TFC's managed receivable portfolio.  By exiting a significant portion of its Finance business, Textron announced it would record an approximate $250-$300 million pre-tax mark-to-market adjustment against owned assets held for sale, and recognize non-cash tax charges of about $31 million, in addition to the previously-announced $169 million charge caused by the write-off of all of TFC's goodwill.  In addition, the Company also revealed it would make an approximately *$600 million* support payment to TFC by the end of 2008.  Finally, at the close of the Class Period, on January 29, 2009, Textron revealed dramatic cuts to Cessna's production levels and an unprecedented level of deferrals and cancellations, as well as additional deterioration of its Finance division's finance performance.

13.     As a result of these and other disclosures detailed herein, the price of Textron stock declined from a Class Period high closing price of $73.38 per share to close at $9.09 on January 29, 2009.  Textron stock continued to fall in the following days, closing at a mere $6.09 on February 5, 2009.  All told, the price of Textron's stock dropped by more than *91%* from its Class Period peak. By the end of the Class Period, the Company's debt securities issued in the December 4, 2007 offering fell to $73.10, a decline of more than *27%* from their offering price of $100.60 per unit.  In

light of the foregoing, Plaintiff brings this action seeking to recover the billions of dollars in damages caused by Defendants' violations of federal securities laws.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act, and Section 22 of the Securities Act.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5, 20A of the Exchange Act (15 U.S.C. §78t-1), and Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

15.     Venue is proper in this district pursuant to Section 22 of the Securities Act (15 U.S.C. §77v), Section 27 of the Exchange Act (15 (U.S.C. §78aa), and 28 U.S.C. §1391(b).  Textron maintains its principal executive offices in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this district.

16.     In connection with the acts, conducts and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities market.

## PARTIES

17.     Lead Plaintiff purchased Textron securities during the Class Period, as set forth in its certification previously filed with this Court and incorporated herein by reference, and was damaged thereby.  Lead Plaintiff purchased 5.60% Notes due 2017 directly in a public offering of $350,000,000 principal amount of its 5.60% Notes due 2017 on November 30, 2007 ("the Notes Offering").

6

18.     Defendant Textron, Inc. ("Textron") is a multi-industry company whose principal activity is to provide aircraft, industrial and finance solutions.

19.     Defendant TFC is a commercial finance company that provides financing programs for products manufactured by Textron, and manages a portfolio of receivables which it previously originated in various businesses, including Asset-Based Lending, Distribution Finance, Golf Mortgage Finance, Resort Finance and Structured Capital.  TFC is a wholly-owned subsidiary of Textron and is sued herein as a direct and knowing source of many of the alleged false and misleading statements issued during the Class Period.

20.     Defendant Lewis B. Campbell ("Campbell") was, at all relevant times, Textron's Chairman, President and Chief Executive Officer ("CEO").  Campbell resigned his position as the Company's President in January 2009.  Campbell is currently the Chairman of the Board and has served on the Board of Directors of Textron since 1994.

21.     Defendant Ted R. French ("French") was, at all relevant times, Textron's Executive Vice President and Chief Financial Officer ("CFO").  French also served as TFC's President and CFO during the Class Period.  French resigned his positions with the Company in February 2009.

22.     Defendant Buell J. Carter, Jr. ("Carter") was, at all relevant times, TFC's President and Chief Operating Officer ("COO").  Like French, Cater left the Company in February 2009.

23.     Defendant Thomas Cullen ("Cullen") was, at all relevant times, TFC's Executive Vice President and CFO.

24.     Defendant Douglas Wilburne ("Wilburne") was, at all relevant times, Textron's Vice President of Investor Relations.

25.     Defendant Angelo Butera ("Butera") was, at all relevant times, an executive of TFC, most recently an executive vice president and TFC's Chief Credit Officer.  Butera reported directly to defendant Carter.

26.     Defendants Campbell, French, Carter, Cullen, Wilburne and Butera will collectively be referred to herein as the "Individual Defendants."

27.     Textron and the Individual Defendants will collectively hereinafter be referred to as "Defendants."

28.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Textron, were privy to confidential and proprietary information concerning Textron, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Textron, as discussed in detail below.  Because of their positions with Textron, the Individual Defendants had access to non-public information about Textron's business, finances, products, markets, lending practices, and present and future business prospects *via* access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

29.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct

complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Textron's business.

30.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit or prevent the fraudulent acts alleged herein.

31.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Textron's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects to correct any previously issued statements that had become materially misleading or untrue so that the market price of Textron's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Textron securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Textron's business, operations,

9

management, future business prospects, and the intrinsic value of Textron's securities; (ii) enabled the Company to complete a $350,000,000 debt offering; (iii) enabled the Individual Defendants and other Textron insiders to sell their personally-held Textron common stock to the unsuspecting public generating proceeds of more than $67 million; (iv) enabled Textron to delay making support payments to TFC; and (v) and caused Plaintiff and members of the Class to purchase Textron's publicly traded equity securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Textron securities during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.  In addition, this action is brought on behalf of all persons who purchased Textron debt securities pursuant or traceable to the Offering.

34.     Because Textron has hundreds of millions of shares of stock outstanding, and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable.  According to Textron's SEC filings, as of February 26, 2009 (shortly after the close of the Class Period), Textron had more than 242 million shares of common stock outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes Class members number at least in the thousands and that they are geographically dispersed.

35.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained herein.

36.     Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities fraud litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class it seeks to represent.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

38.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated federal securities laws as alleged herein;

(b)     Whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     Whether Defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(d)     Whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

(e)     Whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

11

(f)     Whether the Prospectus and Registration Statement issued by Defendants to the investing public in connection with the Offering omitted and/or misrepresented material facts about Textron and its business;

(g)     Whether the market price of Textron stock was artificially inflated during the Class Period due to the material nondisclosures and/or misrepresentations complained of herein; and

(h)     Whether Plaintiff and members of the Class sustained damages as a result of the decline in value of Textron stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## CONFIDENTIAL WITNESSES

39.     Lead Plaintiff makes the allegations herein, except as to allegations specifically pertaining to Lead Plaintiff and its counsel, based upon the investigation undertaken by Lead Plaintiff's counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Textron, interviews of former employees of Textron, press releases and other public statements issued by the Company, and media reports about the Company and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

40.     Moreover, the allegations made herein are supported by the first-hand knowledge of twenty-three (23) confidential witnesses ("CWs").  These witnesses are former employees of Textron, each of whom were employed during the Class Period and provided facts from various departments of the Company.  As detailed below, the CWs each served in positions at Textron which provided them with access to the information they are alleged to possess.

41.     Confidential Witness 1 ("CW 1") is a former Credit Manager at Cessna Finance.  CW 1 served as the Credit Manager from May 2005 until late 2007 and then served as Regional Service Manager ("RSM") at Cessna Finance from late 2007 until November 2008.  As a Credit Manager,

CW 1 was responsible for handling the review and approval of financing for purchasers of Cessna single-engine aircraft. Among other things, CW 1 has knowledge concerning TFC's liberalization of lending standards, including allowing customers to finance their deposits for Cessna aircraft purchases. CW 1 also has knowledge regarding high delinquency rates among jet purchasers during 2008.

42. Confidential Witness 2 ("CW 2") is a former Credit Manager at Cessna Finance. CW 2 served as Credit Manager from approximately 2002 until early 2009. CW 2 was responsible for receiving and reviewing the financial statements and documentation for prospective purchasers of Cessna airplanes. Among other things, CW 2 has knowledge concerning how, under the direction of TFC, Cessna Finance's credit standards were deliberately and significantly lowered so that the Company could greatly expand its lending business.

43. Confidential Witness 3 ("CW 3") is a former Production Superintendent and Production Foreman. CW 3 worked for Textron for approximately 17 years until approximately June 2009. As a Production Superintendent, CW 3 oversaw a crew of 130 workers, and was involved in strategic decision-making regarding production. Among other things, CW 3 has knowledge concerning order cancellations from the Company's backlog, how customers were deliberately delaying orders for Cessna planes, and how customers were "walking away" from "white tails" (*i.e.*, finished airplanes) that were ready for delivery.

44. Confidential Witness 4 ("CW 4") is a former Documentation Specialist at Cessna Finance. CW 4 served in this position from late 2005 until October 2008. CW 4 supported Cessna Finance's loan officers, and was responsible for verifying credit-related information in loan documents related to the purchase of Cessna aircraft. CW 4 was laid off in late 2008 because of a dramatic slowdown in loan applications. Among other things, CW 4 has knowledge concerning the

importance of Cessna Finance's performance to Textron's overall financial performance. CW 4 was also involved in attempting to collect on delinquent loans and experienced the increasing volume of delinquent loans within the Company.

45.    Confidential Witness 5 ("CW 5") is a former Senior Business Partner at Cessna Finance. CW 5 served in this position for two years, until December 2008. CW 5 worked with the tooling group, which was responsible for ensuring the availability of sufficient manufacturing resources for Cessna's production requirements. CW 5 was responsible for determining the anticipated costs of tooling, and has information concerning the inflation of the Company's backlog, including how the Company continued to count as backlog completed aircraft for which customers were refusing to accept delivery.

46.    Confidential Witness 6 ("CW 6") is a former Brand Manager for Customer Experience at Cessna. CW 6 served in this position from 2007 through April 2009. CW 6 was responsible for determining how the Cessna brand was perceived both internally and externally in the market. Among other things, CW 6 has information concerning how despite Cessna reporting large numbers of orders stemming from aircraft trade shows, many of these reported orders would end up being cancelled.

47.    Confidential Witness 7 ("CW 7") is a former Master Scheduler at Cessna. CW 7 served in this position from October 2004 until April 2008 and then served as a Flight Mechanic from November 2008 until March 2009. As a Master Scheduler, CW 7 participated in creating the production schedule for the anticipated number of Cessna aircraft that needed to be built in a given year. Among other things, CW 7 has knowledge concerning how Cessna's sales and marketing department managed the backlog, as well as knowledge of the growing volume of "white tails."

48.     Confidential Witness 8 ("CW 8") is a former Division Controller of TFC's Technology Finance Group.  CW 8 served in this position from December 2000 until October 31, 2008.  TFC's Technology Finance Group provided "floor planning" financing to the technology sector and CW 8 was responsible for all of the accounting operations of the Technology Finance Group.  Among other things, CW 8 has knowledge concerning the Company's internal decision in April 2008 to close TFC's Horsham, Pennsylvania facility, even though the facility was not actually closed until October 2008.  CW 8 also has knowledge concerning increasing delinquencies in 2007 and 2008.

49.     Confidential Witness 9 ("CW 9") is a former Customer Solutions Manager at Cessna.  CW 9 served in this position from approximately late 2006 until October 2009.  CW 9 was responsible for managing approximately 30 customer accounts from the time a purchase agreement was received from a customer to the time a finished aircraft was delivered to that customer.  CW 9 stated that if Cessna customers could not afford to pay their deposits with their own financial resources (*i.e.*, if their deposits were financed), it meant that they could not afford the aircraft regardless of what financing they received.

50.     Confidential Witness 10 ("CW 10") is a former Manufacturing Engineer at Cessna.  CW 10 served in this position from early 2006 until mid-2009.  In addition, in August 2008, CW 10 became a Customer Solutions Manager.  As a Customer Solutions Manager, CW 10 was responsible for overseeing fulfillment of customer jet aircraft orders from the time a contract was signed until delivery of the finished aircraft to the customer.  Among other things, CW 10 has knowledge concerning customers financing their deposits and Cessna's backlog of orders.

51.     Confidential Witness 11 ("CW 11") is a former Industrial Engineer at Cessna.  CW 11 served in this position from 1996 until mid-2009. CW 11 was responsible for setting work station

standards, implemented ergonomics for the assembly line workers, and came up with metrics for monitoring component inventory items used in production.  Among other things, CW 11 has information concerning the build-up of finished planes (the "white tails") that were being refused by customers, as well as increases in the cancellations and delay of orders for Cessna aircraft.

52.     Confidential Witness 12 ("CW 12") is a former Purchasing Specialist in Cessna's supply chain organization.  CW 12 served in this position from 2007 until August 2009.  CW 12's primary responsibility was to help Cessna outsource production of various parts that Cessna manufactured across the entire range of Cessna product lines.  Among other things, CW 12 has knowledge concerning elements of Cessna's order backlog, increases in customers cancelling orders, and the failure of Cessna to reduce the reported backlog for lost or canceled orders.

53.     Confidential Witness 13 ("CW 13") is a former Sales Director at Cessna Finance. CW 13 served in this position from 2000 until February 2008.  CW 13 was responsible for providing financing through Cessna Finance to purchasers of both Cessna and non-Cessna aircraft.  Among other things, CW 13 has knowledge concerning Cessna's international orders to Authorized Sales Representatives ("ASRs"), who often ordered Cessna aircraft without having an identified customer. CW 13 has information concerning the volume of international orders in the backlog, and insight as to whether those orders may have been subject to cancellation.  CW 13 also has information concerning Textron's loosening of lending standards for Cessna Finance, as well as the increased levels of control TFC exerted over Cessna Finance, such that Cessna Finance "became the sugar daddy for Textron."

54.     Confidential Witness 14 ("CW 14") is a former Regional Sales Director for Cessna Finance.  CW 14 served in this position from the fall 2005 until late 2008.  CW 14 was responsible for securing new business within the "North Central" territory, which included North and South

16

Dakota, Michigan, Indiana, Minnesota, and Iowa.  CW 14 also worked as a liaison between customers seeking financing and Cessna Finance's Credit Department, which performed loan underwriting and set loan terms.  CW 14 reported to Senior Vice President of Domestic Sales for Cessna Finance John King ("King") for approximately two to two-and-a-half years.  Among other things, CW 14 has knowledge concerning the customer finance process, TFC's control over Cessna Finance, and that shortly before the start of the Class Period, Cessna began providing customers with loans to finance their deposits on Cessna aircraft.  In addition, CW 14 has knowledge concerning Cessna's backlog.

54.     Confidential Witness 15 ("CW 15") is a former employee of Cessna that held several positions.  CW 15 worked for Cessna for nearly 17 years and was laid off after the close of the Class Period.  CW 17 held several positions at Cessna.  CW 15 joined the Sales and Marketing Department in early 2006, and became a Manager of Customer Satisfaction in early 2008. Among other things, CW 15 has knowledge concerning internal sales and marketing meetings, as well as weekly Monday morning sales and marketing staff meetings held in Wichita, Kansas.  CW 15 has information concerning how sales were added to Cessna's backlog, how the backlog was a "house of cards" supported by minimal customer deposits, and how Cessna was working during the Class Period to convince customers to delay delivery of their airplanes so that customers would not cancel their orders.

56.     Confidential Witness 16 ("CW 16") is a former Controller and Account Executive at TFC.  CW 16 served in this position from mid-2006 until October 2008.  Among other things, CW 16 has knowledge concerning the steady decline in aspects of TFC's business that began occurring as far back as 2006, and how the Company was exposed to the declining housing market.

57.     Confidential Witness 17 ("CW 17") is a former Vice President of Credit for TFC's Marine Division.  CW 17 served in this position from mid-2007 until shortly after the close of the Class Period.   CW 17 was responsible for overseeing the credit quality of data and the documentation for receivables for which TFC had a secured position in the form of liens.  CW 17 reported to Russel Baqir ("Baqir"), who was the President of TFC's Marine Division.  Baqir, in turn, reported to TFC Executive Vice President of Administration of Finance Receivables John Durnien ("Durnien"), who was based in St. Louis, Missouri. Among other things, CW 17 has information concerning, among other things, TFC's rapidly aging inventory and regular conference calls to discuss the ongoing failures in the marine market with members of the TFC Marine Division and TFC President and Chief Operating Officer Carter.

58.     Confidential Witness 18 ("CW 18") is a former employee of TFC who worked in several positions at TFC.  CW 18 worked at TFC from 1992 through 1997 and from 1999 until July 2008.  During CW 18's second stint with TFC, CW 18 worked first as a Director of International Business Development for Europe and then, after completing six-sigma training, worked in a sales management role for Textron's E-Z-GO golf vehicles, Jacobson turf equipment, and other golf-related products.[1]  In this role, CW 18 oversaw three finance sales specialists who sold TFC's "captive financing" for dealers of these Textron products across the United States.  Towards the end of 2007, CW 18 was reassigned to head up TFC's sales, marketing, and business development for financing construction equipment.  Among other things, CW 18 has knowledge concerning TFC's problems in the construction equipment, golf, and resort finance industries, the loosening of TFC's

---

[1]     According to the Company, six sigma is a "disciplined, data-driven process designed to eliminate waste, reduce variation and drive growth" and "consists of a proven set of tools and techniques that Textron businesses apply in a consistent, systematic fashion to delight customers and strengthen [Textron's] business."

credit standards so that the Company could "grow" its business, and the inadequacy of the Company's bad debt reserves, which did not grow in tandem with TFC's increasingly poor quality loan portfolio.

59.     Confidential Witness 19 ("CW 19") is a former Senior Vice President and Region Manager for TFC.  CW 19 served in this position from 2005 until 2008.  CW 19 was responsible for soliciting opportunities to originate new asset-based loans to financially distressed companies. Among other things, CW 19 has knowledge concerning TFC's poor underwriting, as well as the tremendous amount of growth experienced by TFC's Finance Company Services Division.  CW 19 also experienced how TFC made large amounts of risky financing available to "real estate rehab companies."  This involved providing financing to entities that would loan money to contractors who would buy impaired and neglected properties with the intention of refurbishing the properties and then selling them to individual purchasers for a profit.  CW 19 detailed how Textron/TFC was willing to do deals that no other lenders would touch, that the division was a "house of cards," and that the Company's lending practices exposed approximately $300-$400 million of Company financing to the high risk real estate market, including the subprime market.  CW 19 also has information concerning the Company's first quarter 2008 write-off related to the Finance Company Services Division, how the write-off was insufficient, and how the Company's bad debt reserves were inadequate.

60.     Confidential Witness 20 ("CW 20") is a former Vice President of Sales at TFC.  CW 20 served in this position from April 2007 until February 2009.  CW 20 was responsible for soliciting business with a variety of dealers across several industries, including marine, recreational vehicles, mobile homes, appliances, electronics, and automobile dealers.  CW 20 was responsible for a territory on the east coast of the United States that included Virginia, Maryland, Delaware, and the

District of Columbia, and worked with three main TFC offices: Alpharetta, Georgia; St. Louis, Missouri; and a Minnesota office. Among other things, CW 20 has information regarding problems the Company experienced with aging inventory in 2007 and 2008.

61.     Confidential Witness 21 ("CW 21") is a former Senior Vice President of Marketing for the Distribution Finance group at TFC. CW 21 served in this position from July 2004 until April 2008. CW 21 held two positions at TFC. First, CW 21 worked as a Senior Vice President of Marketing for the Distribution Finance group, which handled floor-plan financing. In approximately April 2006, CW 21 became the Senior Vice President of Field Services for Distribution Finance. In this role, CW 21 oversaw approximately 160 personnel who visited the various dealers throughout the United States and Canada to which TFC had provided financing in order to verify the existence of the inventory TFC financed. Among other things, CW 21 has knowledge concerning the aging inventory in TFC's loan portfolios and how the Company's Marine Division bought out several problematic marine loan portfolios in an attempt to grow TFC. In addition, CW 21 has information regarding monthly meetings, attended by Carter, among others, wherein Company personnel discussed the decline in TFC's Marine Division in May and June 2007.

62.     Confidential Witness 22 ("CW 22") is a former Business Finance Partner who worked at Cessna for well over a decade – including the entire Class Period – until April 2009. CW 22 reported to Cessna's Director of Financial Analysis Jody Noah ("Noah"), who reported to Cessna Executive Vice President and Chief Financial Officer Mike Shonka ("Shonka"). As a Business Finance Partner, CW 22 was assigned to work on managing the production of Cessna aircraft. This former employee has knowledge concerning speculative orders in Cessna's reported backlog, and how Shonka was a key individual who reported to French about Cessna's order backlog.

20

63.     Confidential Witness 23 ("CW 23") is a former Sales Director who worked at Cessna Finance on two different occasions, once from 1989 to 1999 and then again from 2005 until the end of 2008.   CW 23 was primarily responsible for selling financing for the purchase of aircraft, including floor-plan inventory financing to certain aircraft dealers or brokers.   CW 23's territory covered approximately eight states in the southeastern United States.   CW 23 has knowledge concerning how Cessna Finance lowered its credit standards and became an aggressive lending institution that would lend to purchasers of non-Cessna aircraft and dealers that would not have been approved for loans under the Company's old lending standards.   CW 23, who experienced the lowered lending standards resulting from Textron and TFC taking over Cessna Finance, recalled that the lowered credit standards allowed Cessna Finance to post seemingly impressive financial results, and knew that the Company's aggressive lending translated to a huge increase in credit risk to the Company.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

64.     Defendant Textron operates through its subsidiaries:  **Bell** manufactures military helicopters and aircraft for the U.S. Government and commercial helicopters for corporate, utility, police and medical helicopter operators; **Cessna** is a designer and manufacturer of business jets, utility turboprops and single engine piston aircraft.  Cessna accounted for approximately 40% of the Company's 2008 revenues; **TFC** is a commercial finance company that provides financing programs for products manufactured by Textron, and manages a portfolio of receivables which it previously originated in various businesses, including Asset-Based Lending, Distribution Finance, Golf Mortgage Finance, Resort Finance and Structured Capital.  TFC's aviation finance group consists of Cessna Finance Corporation ("Cessna Finance") and Bell Helicopter Finance Group ("Bell Finance"), which provide aircraft loans and leases for new Cessna and Bell Helicopter products,

21

respectively; and **Systems** is an indirect wholly owned subsidiary of Textron.  Systems manufactures

unmanned aircraft systems, armored vehicles, advanced marine craft, intelligent battlefield and

surveillance systems, intelligence software solutions, precision smart weapons, piston engines, test

and training systems, and total life cycle sustainment service.

65.     TFC describes itself as a "diversified commercial finance company."  TFC operated

in six segments:

(a)     Aviation Finance:  TFC provides financing for the purchase of new and used

Cessna business jets, single engine turboprops, piston-engine airplanes, Bell helicopters, and other

general aviation aircraft;

(b)     Asset-based Lending:  TFC provides revolving credit facilities secured by

receivables and inventory, related equipment and real estate term loans, and factoring programs

across a broad range of manufacturing and service industries

(c)     Distribution Finance:  TFC primarily offers inventory finance programs for

dealers of Textron manufactured products and for dealers of a variety of other household, housing,

leisure, agricultural, and technology products;

(d)     Golf Finance:  TFC primarily makes mortgage loans for the acquisition and

refinancing of golf courses and provides term financing for E-Z-GO golf cars and Jacobsen turf-care

equipment;

(e)     Resort Finance:  TFC primarily extends credit to developers of vacation

interval (timeshare) resorts, secured principally by notes receivable and interval inventory; and

(f)     Structured Capital:  TFC provides long-term leases of large-ticket equipment

and real estate.

66.     Textron owns 100% of the stock of TFC, and, during the Class Period, TFC derived a significant and material portion of its business from financing the sale and lease of products manufactured or sold by Textron.  TFC paid Textron $1.2 billion in 2007, $1.0 billion in 2006, and $0.8 billion in 2005 for the sale of Textron products to third parties that were financed by TFC.  At the start of the Class Period, TFC made up an enormous part of Textron's business, as TFC's total finance receivables exceeded $8.5 billion in 2007.

67.     Textron is a party to several agreements with TFC.  Pursuant to the Support Agreement, Textron is required to provide extensive financial support to TFC under certain circumstances.  Specifically, Textron is required to pay to TFC, on a quarterly basis, an amount sufficient to ensure that TFC's pre-tax earnings, before certain extraordinary items and fixed charges, will not be less than 125% of TFC's fixed charges.  Until late 2008, Textron never had to make any payments pursuant to the Support Agreement.  Textron also agreed to maintain TFC's consolidated shareholder's equity at an amount not less than $200 million, and pursuant to the terms of the Support Agreement, Textron must directly or indirectly own 100% of TFC's common stock. The Support Agreement also contains a third-party beneficiary provision entitling TFC's lenders to enforce the Support Agreement provisions against Textron.

68.     The practical result of the Support Agreement was that if TFC's business ever declined, Textron would be required to downstream substantial amounts of cash to ensure TFC could meet its financial obligations.  Thus, it was imperative to the financial health of Textron for TFC to maintain the highest levels of quality in its portfolio.

69.     As detailed below, however, in order to grow its business and report larger and better numbers (with the intent of doubling Textron's value), TFC lowered its lending criteria, creating a lending portfolio saddled with problematic and poor quality loans in industries beset by economic

problems, which resulted in extensive financial damages to Textron's business.  The damage inflicted on the Company was so bad that Textron was forced to bail out TFC with more than $600 million in support payments, and TFC abandoned multiple lines of its business with billions of dollars of finance receivables.  During the Class Period, however, Defendants never told investors that TFC was lowering its lending and underwriting guidelines, thus misrepresenting Textron's finances and future business prospects.  To the contrary, Defendants falsely represented that TFC's loan portfolios were of the highest quality and it employed sound underwriting policies.

**Defendants Lowered TFC's Underwriting
Standards In Order to Grow the Company's Business**

70.     Prior to and during the Class Period, TFC dramatically altered its lending risk profile by substantially lowering its underwriting and lending standards.  In order to rapidly grow TFC's size, Defendants led a top-down significant shift in TFC's appetite for risk.  Without lowering its lending standards, TFC would not have been able to rapidly grow its business as it did.

71.     **Cessna Finance**: Historically, Cessna Finance had a tradition of solid and prudent underwriting.  By the start of the Class Period, Cessna Finance lowered its underwriting standards by: (i) extending financing to customers who had previously been rejected by Cessna Finance; (ii) financing customer deposits on Cessna aircraft; (iii) extending financing for planes not manufactured by Cessna; and (iv) altering its amortization schedule for aircraft (at TFC's direction), by increasing the amortization period to 20 years from 12 years.

72.     According to CW 13, who served as the former Sales Director for Aviation Finance, in the 2005/2006 timeframe Textron management started to push for a relaxation of underwriting standards at Cessna Finance.  CW 13 stated that by 2006, Textron began "getting rid" of Cessna Finance personnel and replacing them with TFC personnel.  These newly-placed personnel were

24

more willing to implement the top-down changes to the underwriting criteria preferred by TFC management.

73.     As a result of TFC's oversight of Cessna Finance, Cessna Finance significantly lowered credit standards for airplane customers seeking to qualify for financing.  For example, Cessna Finance began extending financing to domestic customers that it had previously never extended financing to. According to CW 13, Cessna Finance agreed to sell and finance planes "purchased" by a large aircraft wholesaler/broker located in Fort Lauderdale, Florida called Aero Toy Store and provided them $60 million in financing.  CW 13 stated that Cessna's previous Vice President of Domestic Sales had prohibited any dealings with Aero Toys because the Company would not "touch" a company like Aero Toys because they were perceived as "sleazy" and "unreliable."  CW 23, also a former Sales Director for Aviation Finance, confirmed Cessna Finance became willing to extend financing to dealers that in the past would never have been approved.  Like CW 13, CW 23 described how, in the past, Cessna Finance did not and would not do business with Aero Toy Store.  Under the direction of TFC, however, CW 23 stated Cessna Finance extended a line of credit to the highly risky Aero Toy Store and described how the line of credit was more than any line of credit previously extended by Cessna Finance to any other dealer in the United States.

74.     Cessna Finance also began financing customer deposits on Cessna aircraft – which had not been done in the past.  This dramatic shift started in approximately April 2007, shortly before the start of the Class Period, and had the effect of further watering-down the Company's lending standards.  The practical effect of permitting customers to finance their deposits was that buyers had no economic incentive to follow through with their purchases, increasing the risk that "buyers" would simply walk away from their "purchases" at the first sign of trouble.

75.     TFC also caused Cessna Finance to expand its financing to the purchase of all kinds of aircraft, not just purchases of Cessna aircraft, which increased the risk associated with the loans as the Company did not know as much about the product that it was financing.

76.     Lastly, TFC also altered Cessna Finance's amortization schedule for aircraft, by increasing the amortization period to 20 years.  This had the effect of putting Cessna in a riskier financial position in the first year of such loans.  Specifically, Cessna Finance previously categorized customers into four credit categories – A, B, C, and D.  The A category was comprised of high net worth and very liquid customers that received the best credit terms available – which in the past (*i.e.*, prior to Textron assuming control) had been a loan with a 12-year amortization schedule.  Under Textron's control, virtually all customers, regardless of their credit category, became eligible to receive better loans with amortizations of 20-years.

77.     As a result of the lowered credit standards, during the Class Period, Cessna Finance declined far fewer loans than had previously been the case.  Indeed, employees in Cessna Finance saw their number of declined loans drop by as much as 90%.  When prospective borrowers were rejected, the rejections were escalated "up the ladder" only to be approved by supervisors.  This overriding of rejections occurred as a direct result of the Company's lowered credit quality standards.

78.     The facts described herein related to the deliberate lowering of lending and credit standards at Cessna Finance were detailed by several Confidential Witnesses.  CW 1, CW 2, CW 13, CW 14, CW 18, and CW 23 each described and independently corroborated each other's experiences when they detailed how Cessna Finance's underwriting standards were lowered leading up to the start of the Class Period.

79.     For example, CW 1, the former Credit Manager and Regional Service Manager, stated there was no doubt that TFC immediately liberalized the Company's lending standards.  CW 1 recalled that in the past, Cessna Finance had looked to borrowers with "high assets and strong cash flow."  But, under TFC's management, loans were extended to many borrowers with "marginal cash" and assets, as well as poor "debt to income" ratios.  Likewise, CW 2, the former Credit Manager, described Cessna Finance's lowered credit standards as "crazy" and "absurd."  Things were so bad that Cessna Finance began approving loans for customers who were "barely cash-flowing" and had limited liquidity with a real risk that they would not be able to make payments if something happened to them.  CW 2 saw her/his number of declined loans in a given year drop to as low as one or two a year, down from 10-15 per year.  Similarly, CW 23, a former Sales Director for Aviation Finance, stated Cessna Finance began much more aggressively lending money to purchasers of used and/or non-Cessna aircraft and to dealers that would previously not have been approved for loans.  CW 23 stated that the result was that Cessna Finance began "putting up huge numbers," but it was also simultaneously assuming huge levels of risk.

80.     **Other Lines of Business**: In 2006 and 2007, TFC also changed and relaxed the credit and lending standards in various lines of business thereby increasing the Company's exposure to risky loans.

81.     TFC aggressively grew its golf course construction business by relaxing its lending standards and financing extremely risky projects.  According to CW 18, the former Vice President of Sales and Business Development for TFC, it was impossible for TFC's golf resort business to grow from a $50 million line of business to more than $400 million without taking on much higher levels of (undisclosed) risk.  To attain this meteoric growth, CW 18 described how TFC's management

27

allowed the approval of loans and deals that would have been rejected under past, strict lending guidelines.

82.     Similarly, TFC aggressively expanded the timeshare business and increased the level and risk of that line of business.   According to CW 18, TFC's timeshare business had been increasingly engaged in "very dodgy" lending practices and TFC's credit policies were being "abused" to maintain the liquidity of TFC's timeshare developer customers.   CW 18 described that as of at least June 2008 – and prior to that as well – TFC's timeshare business as a "time-bomb" waiting to explode.

83.     One way that the Company abused its own lending standards was to lend money to finance "bad paper."   Specifically, TFC did not lend to individual timeshare customers, but instead lent money to timeshare developers based on the receivables owed to the developers from individual timeshare purchasers.   In order for a developer to borrow additional monies from TFC, a certain percentage (as specified in TFC's credit policies) of the developer's "consumer receivables" had to be "good paper."   This meant that the individual consumers were timely paying the developer what they owed.   If the developer's receivables began experiencing levels of defaults and delinquencies that exceeded TFC's policies, then that developer was not supposed to be able to draw additional monies (also referred to as "advances") from TFC based on that non-performing or delinquent collateral.   For TFC, however, there was a danger in shutting off a developer's access to credit, because the cut-off could be fatal to the developer and could drive the developer into bankruptcy. Moreover, if TFC shut off the credit pipeline, it could no longer grow its business.

84.     As part of its lowered lending standards and "abused" credit guidelines, TFC lent money to finance "bad paper" in the timeshare market.   This became a substantial problem for the Company because TFC had greatly increased its exposure in the timeshare lending business.   So,

28

TFC continued to advance money against the bad paper held by timeshare developers because TFC's timeshare business had no other way to make its numbers. In addition, because TFC touted itself as having expertise in the timeshare niche, TFC syndicated many of its timeshare loans to other lenders. As problems increased for TFC, however, these other lenders audited TFC's lending practices and determined during the audits that TFC was advancing money to developers to finance "bad paper." The problem of TFC advancing credit in spite of the poor creditworthiness of the timeshare purchasers involved virtually every large timeshare developer with whom TFC did business.

<b>Defendants Overstated the Quality<br>and Understated the Risk of Textron's Loan Portfolio</b>

85.      Leading up to and during the Class Period, Defendants repeatedly highlighted the soundness of the Company's underwriting standards and the strong credit quality of its lending portfolio. In so doing, Defendants led the market to believe that the Company's supposedly iron-clad lending procedures and sterling quality portfolios would protect Textron from the downturn in the economy. By way of example, during a pre-Class Period conference call on July 20, 2006, while describing TFC, Campbell pointed to its focus, strong profit, "great underwriting" and stated that the Company's "credit quality has never been better."

86.      Strict adherence to quality underwriting and lending standards was critical to the Company's success because many aspects of its business, especially its lending businesses through TFC, depended on markets driven by discretionary spending on the part of consumers. The markets included aviation, marine, recreational vehicles, and appliances. Unless the Company maintained only the highest of underwriting and lending standards, it would encounter significant financial problems if there was any downturn in the economy.

87.      Unfortunately for investors, however, during the Class Period, Defendants concealed the material consequences stemming from the Company's deliberately lowered underwriting

standards and omitted disclosures concerning material problems in the credit quality of TFC's and the Company's lending portfolios, such as: (i) the Company was exposed to extremely risky real estate loans which were over-valued and needed to be written off; (ii) the Company's marine finance division was saddled with tens of millions of dollars of over-valued inventory; and (iii) the Company's reported backlog at Cessna was materially inflated.

**Through Extremely Risky Real Estate Financing,**
**Textron Was Substantially Exposed to the Subprime Housing Market**

88.     Within TFC is the Company's Finance Company Services Division, which is involved in asset-based lending.  At all times relevant to the Class Period, poor underwriting was an area of critical concern in the Finance Company Services Division.  The reason for this was simple, but not known to the market: the Finance Company Services Division had extended a great deal of financing to so-called "real estate rehab companies" – to the tune of $300 to $400 million.  The amount of lending to such companies was so extensive that between 2005 and 2008, *this line of the Company's business expanded by approximately 60%*.

89.     Real estate rehab financing involves providing financing to an entity that, in turn, lends the money to contractors who buy properties in a state of disrepair.  A contractor would then refurbish the property and "flip it" by selling the property (which could include multiple individual units within a single development) to individual purchasers.

90.     One of the significant risks with these kinds of loans is that the individual purchasers are often sub-prime borrowers.  Thus, the entities to whom the Company lent money were reliant on the ability of sub-prime borrowers to purchase and finance properties.  If the sub-prime bubble burst – as it did in 2006 – then there was a great risk that TFC and Textron would not be paid for what they had lent to the entity funding the real estate rehab.  As a result, these types of real estate rehab deals created derivative sub-prime exposure for the Company should that market collapse.

91.     Financing real estate rehab companies was a subject of great concern within the Finance Company Services Division.  Internally, the Company's rehab financing was described as a house of cards.  Moreover, the risk to the Company was very high as the Company's Finance Company Services Division was willing to do deals that no other lenders would do.  Indeed, TFC's competitors had all been abandoning the real estate rehab business.

92.     Textron, through its Finance Company Services Division, was willing and eager to continue lending in a field that was increasingly shunned by other lenders because of its riskiness.  The real estate rehab lending business represented unique and significant risks for the Company.  Moreover, the Company had a material exposure to this line of business as the Finance Company Services Division was engaged in approximately $600-$700 million in total financing in 2007 and 2008.  Of this amount, approximately $300-$400 million involved real estate rehab loans.

93.     One of the Company's extremely high-risk real estate rehab loans was a $120 million loan that Textron/TFC and other lenders provided to an entity called Assured for real estate development in Minnesota.  Of the $120 million, Textron/TFC was responsible for $50-$60 million.  Assured lent out the money to various contractors and developers throughout Minnesota for separate rehab projects.  The $120 million credit facility was a "revolving" facility that Assured was able to draw down by bringing more and more collateral (property) to borrow against.  Assured, however, drew down the $120 million facility very quickly, and it was obvious within the Company that TFC was getting a very large amount of leverage in unfinished real estate being built purely on speculation.

94.     Assured's entire venture was so imprudent and highly risky that no "tier 1" lenders had been willing to extend financing to it, even prior to liquidity constraints in the market.  Textron

31

became involved in the deal because it was, put simply, a lender of last resort. "Seasoned" Company employees were in disbelief that Textron would engage in such a clearly dubious transaction.

95.     TFC's deal with Assured was so bad that in the first quarter of 2008, the Company wrote off $19 million of the $50-$60 million loaned out. This write-off, however, was nowhere near what it should have been. Indeed, the write-off itself was materially false and misleading because, when it was taken, the Defendants did not disclose that the appraisals on the development were "underwater" and had been from inception – when the deal was first contracted in 2007.

96.     The deal with Assured was extremely risky and poorly organized. Indeed, Assured managers initiated the simultaneous building of multiple projects, which were all decimated by a severe Minnesota winter snowstorm. When the snowstorm hit, Assured was already in default, and the storm ruined much if not all of the work that had been initiated but was unfinished and exposed to the elements. TFC then retained a collateral expert, who said TFC would have been better off if the properties had been left in an undeveloped state because it was now necessary to tear out the foundations that had already been laid down. While the snowstorm was by no means the primary factor that crippled the real estate rehab projects, it served to underscore the severity of risk involved in the loans – the loan was so bad that even weather could impact the quality of the credit.

97.     Around the time of the Company's $19 million write-down, TFC brought in a "turnaround expert" to assess the collateral of the Assured deal. The expert determined that there was no way to sell the collateral and that TFC was completely "underwater" on the deal. During the majority of 2008, however, the remnants of the Assured deal had still not been written down by the Company.

98.     Defendant Carter was fully aware of and, in fact, was overseeing the problematic $50-$60 million deal, which had been conceived and managed directly by Russ Brant ("Brant"), the head

of Finance Company Services.  Brant was fired in the March to April 2008 timeframe because of the significant losses associated with the $50-$60 million deal and other Finance Company Services transactions.  After Brant was fired, Robert Wagner ("Wagner") took over the Finance Company Services Division.  Approximately a week or so before the Company's scheduled earnings conference call for the third quarter 2008, personnel in the Finance Company Services Division were told not to initiate any new deals and to minimize any direct dealings with their clientele.  Prior to that, as far back as March and April 2008, deals in the Finance Company Services Division got much smaller than in prior periods.

99.     The facts described herein were detailed by the accounts and experiences of CW 19, a former Senior Vice President that worked in Finance Company Services.  CW 19 stated the Company's poor underwriting was an area of "huge concern."  CW 19 also recalled that in public statements such as conference calls, Textron executives falsely stated that the Company did not have any sub-prime exposure.  CW 19 confirmed that TFC's competitors had all abandoned the real estate rehab market, and that those same competitors thought TFC/Textron was "insane" for doing real estate rehab loans.  CW 19 stated that compared to other major companies where she/he had worked, she/he was dismayed with the degree of inexperience and incompetence at Textron/TFC.  For example, CW 19 stated that the volume of write-offs Textron undertook as it began exiting out of all of its non-captive financing lines of business "didn't happen all in one month."  CW 19 believed Textron/TFC had been "playing a game" for some time regarding the true levels of credit risk and exposure and write-offs the Company needed to take.

### The Company Was Saddled With
### Aging Inventory that Could Not be Sold

100.     During 2007 and throughout 2008, unsold inventory financed by Textron's TFC

Division – regardless of industry – was aging rapidly.  As inventory gets older, dealers become less

able to command selling prices equivalent to what the dealers borrowed from TFC for that inventory.

101.     In TFC's Marine Division, aging inventory reflected what were increasingly

deteriorating dynamics in the marine industry – most chiefly, rapidly declining sales and escalating

interest costs for marine dealers and declining value of inventory.  When inventory aged past 12

months, lenders like TFC increased the interest rate that they charged the dealers in an effort to

encourage dealers to "move inventory."  These increased charges are referred to as "curtailment

payments."  But, these increased interest costs for dealers clearly impact the dealers' cash positions

because the dealers pay out more cash in the form of interest.  The dealers are forced to do this

because they cannot sell older, less desirable inventory in a stalled marine market.

102.     In early 2008, upwards of 20% to 25% of the marine inventory held by the various

dealers that TFC had financed was more than a year old.  The Company's aging inventory problem

was compounded by a rapidly deteriorating marine market – which had been severely declining

since 2007.

103.     The prices this aging inventory could command increasingly dropped below what the

dealers had borrowed from TFC.  As 2007 drew to a close, the marine industry was skewing severely

downward, which was a reflection of the real estate meltdown.

104.     As time went on, problems with TFC's aging marine inventory only worsened.  By

August/September 2008, 50% of all the marine inventory that Textron had financed was older than

12 months.  On top of the foregoing, manufacturers were no longer shipping much new inventory to

dealers in 2008 – yet another reflection of the desperate condition of the marine industry.  During

2008, the amount of accumulating, unsold and aging inventory and desperate straits of the dealers meant that only the "best of the best" vessels were selling, but only at significant discounts which were less than what the dealers had borrowed for the boats.

105.    Dealers also resisted selling boats for less than what they owed on them.  As such, it became increasingly necessary for TFC and the manufacturers to take losses on boat sales.  A hypothetical scenario might be that if a dealer owed $100,000 for a boat, the dealer had probably hoped to sell the boat for a price near $120,000.  But in the difficult selling environment of the marine industry during the Class Period, the boat might only command a sales price of $50,000.  In such a situation, TFC would forgive $25,000 of the debt and the manufacturer would "kick in" the remaining $25,000 to TFC (the $50,000 received by the dealer would also be paid to TFC).  TFC absorbing a portion of each loss became necessary because the dealers did not have enough cash to pay the difference between what they owed -- $100,000 – and the actual price at which they were able to sell a given boat.

106.    In the Marine Division, the Company's reported financial performance belied the nature of its problems.  This was because many dealers were able to pay TFC what the dealers owed on a monthly basis (*i.e.*, interest payments).  Therefore, although there appeared to be no delinquencies, the financial performance of TFC's entire Marine Division was ready to implode during the Class Period.

107.    Market conditions were so bad that from at least May/June 2007 on, there was no reason for the Company or Defendants to be optimistic that the economic situation in the Marine Division would improve.  Rather, the economic decline was a subject of concern and discussion in regular conference calls with members of the TFC Marine Division and TFC President and Chief

Operating Officer Carter.  It was also internally recognized and discussed in monthly meetings that included Carter and other senior TFC personnel.

108.   These monthly meetings included personnel based in Providence, Rhode Island who participated by phone, as well as personnel in Alpharetta, Georgia who met in person.  At these meetings, every executive that directly reported to Carter was present or participated in the meetings, including the department heads for Cessna Finance, Resort Finance, Golf Finance, and so on.  Each department head was allotted a certain amount of time in which to present an overview of her/his department's performance.

109.   The upshot of these meetings was that there was no doubt that from May/June 2007 onward, TFC/Textron was facing major problems to its businesses from aging inventory and the declining economy.

110.   Another problem confronting the Company's Marine Division at TFC was purchases by TFC/Textron in 2007 of several marine loan portfolios from GE Capital.  In these transactions, TFC would pay off the original lender (GE Capital) to obtain the "first position" and thereby the first lien on the financed inventory.  According to CW 21, the dealers TFC/Textron targeted from GE Capital were of such poor standing that they had been on GE Capital "watch lists."  In other words, Textron, through TFC, was acquiring GE Capital's most troubled and problematic marine accounts.

111.   As with its other businesses, the Company was motivated to acquire the problem loan portfolios because of Defendants' desire to rapidly grow the Company at all costs.  For the Company, the transaction with GE Capital was about gaining market share, not about applying prudent underwriting and credit standards to obtain the highest quality loan portfolio.  Moreover, the poor credit quality of the portfolio was exacerbated by the fact that the marine industry was in a severe decline during 2007 and 2008, as a result of the implosion of the housing market.

36

112.    In one such deal, the acquired inventory represented approximately $100 million of boats located at multiple dealer locations throughout the United States, which GE Capital had previously financed.  Typical of marine financing arrangements, the dealers borrowed money – initially from GE Capital – against the collateral of the boats.  The dealers then paid monthly interest back to GE Capital and, following TFC's acquisition of the portfolio, to TFC.  When a boat was sold, the dealer paid the financing entity – ultimately TFC – the principal amount that had been borrowed.

113.    One disadvantage with this previously financed inventory was that marine manufacturers were far less inclined to repurchase the inventory from the dealers if the inventory could not be sold.  The far bigger issue for TFC, however, was the age of the inventory TFC acquired.  Although the marine inventory had been "projected to turn over in 12 to 18 months" it was increasingly clear towards the end of 2007 that the inventory was not turning over and that an increasing percentage of it was older than 12 months.

114.    The older marine inventory gets, the less desirable it is to a purchaser.  As a result, older inventory commands a lower price for a dealer selling the vessel.  By the end of 2007, 50% of the inventory acquired from GE Capital was older than 12 months.  Indeed, by the end of 2007, the critical problem of aging inventory involved not just the inventory that TFC had acquired from GE Capital, but *all of the marine inventory that TFC had provided financing for*.  Putting the Company's problem in perspective, it was normally desirable to have no more than 15% of total financed inventory be older than 12 months.  But by the end of 2007, the amount of marine inventory older than 12 months exceeded 30% and, as noted above, 50% of the GE Capital inventory was older than 12 months.  Thus, the Company faced the (undisclosed) prospect of rapidly aging

inventory in a marine market that had already been completely decimated by the economy.  Despite this, as discussed below, the Company did not adjust its bad debt reserves in 2007 or early 2008.

115.    The Company's problems were not only limited to the marine division, but were also experienced in aviation, recreational vehicles, and technology finance, among other areas.  For all the deteriorating conditions of the marine market, in late 2007 and early 2008, TFC and Textron faced much more formidable problems with at least two other divisions:  recreational vehicles and resort financing.

116.    The recreational vehicle division in particular was experiencing the same deteriorating dynamics of the marine market, but other problems as well that would later overtake the marine division.  In this regard, the marine market typically lags behind developments in the recreational vehicle market by about six months.  Like the Marine Division, the Company's recreational vehicle finance division was also plagued by aging inventory, as well as dealers that sold vehicles but then did not pay TFC they money owed for those vehicles.[2]

117.    The Company's TFC Technology Finance Division was also plagued by significant problems.  The appliance business, which Textron acquired from Electrolux and made up a portion of TFC's Technology Finance Division, had already experienced a significant slowdown in 2006.  The appliance industry closely follows trends in home sales because a home purchase is typically followed by major appliance purchases.  When home sales dropped in 2006, so too did appliance sales, which resulted in an immediate and sustained decline in new business for TFC's appliance lending business.  As such, from 2006 on, there was very little new account activity or growth

---

[2]      This situation was referred to as "sold out of trust" (or "SOTs").  During the Class Period, there were increasing instances and amounts of SOTs in the Company's Marine and recreational vehicle divisions.

related to appliances in the Company's Technology Finance Division. Indeed, by late 2007 and throughout 2008, delinquencies within TFC's Technology Finance Division were increasing.

118.    The facts detailed herein were confirmed and corroborated by the accounts of several Confidential Witnesses, including CW 8, CW 17, CW 20, and CW 21. CW 20, the former Vice President of Sales with TFC, confirmed that aging inventory was a serious problem across business lines and that it negatively impacted the Company in 2007 and throughout 2008.

119.    CW 21, the former Senior Vice President of Field Services for TFC's Distribution Finance Division, confirmed that the age of inventory – regardless of type – was a problem for TFC. CW 21 described how she/he voiced concerns regarding the Company's acquisition of problematic GE Capital marine inventory. Specifically, CW 21 discussed the problem with John Durnien ("Durnien"), the Director of Operations for Risk Management in the Distribution Finance group. CW 21 had personal knowledge regarding the poor quality of the GE Capital marine inventory portfolios because CW 21 had worked at GE Capital for 25 years and knew that the dealers Textron/TFC was going after were on GE Capital's internal watch lists. Ignoring CW 21's concerns, the Company went forward with the acquisition of GE Capital's troubled portfolios. CW 21 also recalled that Carter would have known about the issues because Carter had access to the same reports that CW 21 saw about the acquisitions which raised CW 21's concerns. Moreover, discussing the division review meetings attended by Carter, CW 21 stated French definitely knew about the economic dynamics negatively impacting TFC's different market segments, as well as TFC itself. CW 21 based this conviction from having known French for many years. At the very least, CW 21 understood that Carter briefed French on a quarterly basis as to TFC's economic condition.

120.     Similarly, CW 17, the former Vice President of Credit for Marine Inventory, stated that in approximately May 2007, TFC acquired a large bloc of "previously financed inventory" from GE Capital.  CW 17 recalled that the acquisition of this inventory was so ill-advised that CW 17 formally objected to it, and raised her/his concerns regarding that inventory.  CW 17's concern was that by the end of 2007, too little of the inventory acquired from GE Capital was "turning over", *i.e.*, being sold.  As a result, the inventory was rapidly aging on marine dealer lots.  CW 17 described how this was a problem, and how TFC's bigger problem was that the marine market overall was rapidly deteriorating during 2007.

121.     Describing the escalating levels of delinquent receivables, CW 17 said that while the Company's numbers "looked good" during most of 2008, those numbers masked the severity of the situation.  CW 17 stated that even though many dealers were still paying TFC what they owed (*i.e.*, interest payments), "we knew things were going to blow up."

122.     Regarding her/his objections to the aging inventory acquired from GE Capital, in late 2007, CW 17 sent Baqir an email expressing her/his concerns that "we were in too deep."  The situation was so dire that CW 17 recommended that TFC "shut off the weaker players," *i.e.*, not extend any additional monies to "marginal dealers" that were not moving sufficient amounts of inventory.

123.     In June 2006, Textron acquired Electrolux.  According to CW 8, the former Division Controller, Textron "rolled" the Electrolux inventory finance business into TFC's Technology Finance group.  CW 8 stated that by late 2007 and early 2008, delinquencies within TFC's Technology Finance group began to increase.

124.     According to CW 16, the former Controller and Account Executive at TFC, by late 2007, 70% of the accounts of TFC's Columbus, Ohio facility were legacy Electrolux accounts,

which comprised "mid-level" and "mom and pop" retailers of appliances and electronics. CW 16 stated that every single TFC operation, regardless of location, reported its financial results to the Providence, RI facility. This former employee stated that the appliance business, which Textron acquired from Electrolux, had already experienced a significant slowdown back in 2006. CW 16 explained that the appliance industry closely follows trends in home sales because a home purchase is typically followed by major appliance purchases. When home sales dropped in 2006, so too did appliance sales, which resulted in an immediate and sustained decline in new business for TFC's appliance lending business. As such, from 2006 on, there was very little new account activity or growth at the Columbus, OH facility where the former Controller worked.

### The Company's Backlog Was Overstated

125.    Prior to, during, and throughout the Class Period, Textron pointed to its backlog as a strong signal of the Company's financial prowess and future business prospects. Indeed, the market and market analysts alike focused on the Company's backlog of orders as a bellwether for the Company's financial success. For example, in a pre-Class Period earnings conference call on April 20, 2006, Campbell stated that it was "worth noting how strong the backlog [was] because it gives you visibility into the next two or three years." On March 19, 2007, in an article titled "Finally, Airborne and Ready to Soar," *Barron's* reported, in relevant part, that:

> Its backlog alone provides a lot of thrust for Textron's shares. With customers plunking down $250,000 deposits for business jets that won't arrive until 2010, the aircraft maker doesn't have to do much more than deliver those orders to lift its profits over the next five years.

126.    Because so much of the Company's backlog was for periods beyond the close of the Class Period, when the Company reported its ever-expanding backlog of orders, it signaled to the market that Textron was poised to withstand the financial turmoil existing in the capital markets. By way of further example, the Company's 2007 Annual Report, filed with the SEC on Form 10-K on

February 20, 2008, stated that Textron's backlog at the end of 2007 was more than $19 billion, and that approximately 56% of the total backlog represented orders not expected to be filled in 2008, including $1.2 billion for orders to be filled in 2010.  In other words, the Company reported it had strong business prospects for years to come.  Thus, reporting orders to be added to the Company's backlog, even if such orders were not likely to be filled, was critical to Defendants' fraudulent scheme.

127.    Moreover, Campbell described himself as taking a direct interest in the Company's Cessna segment, which generated a substantial portion of the Company's revenues and backlog.  For example, in a pre-Class Period earnings conference call on July 20, 2006, Campbell stated "I spend a lot of time at Cessna. . . ."

128.    Although the Company highlighted the strength of its backlog, it was, in reality, substantially and materially comprised of speculative, contingent orders founded on poor quality underwriting and 100% financing.  Thus, its use by Defendants as a barometer of the Company's success was misleading at all relevant times.

129.    For example, a significant percentage – approximately 70% in the first half of 2008 compared with 45% in the first half of 2007 – of the Company's Class Period backlog was made up of international orders, and many of these orders placed by Authorized Sales Representatives ("ASRs").  ASRs operated like car dealerships – they ordered aircraft without having identified an end-user/buyer.  The reality was that rather than purchasing aircraft for a particular use, the ASRs were reserving a certain number of aircraft for future delivery with the hope that they could eventually be sold to customers.  Because the ASRs did not have an end user, and because the ASRs were not always required to put down deposits at the time they ordered aircraft, the immense volume of international orders reported in the Company's backlog were, in actuality, subject to cancellation.

These international orders, however, were a major factor in the Company's increased backlog figures reported during the Class Period.  In other words, what appeared to be booked orders supported by deposits to actual customers were, in reality, speculative "orders" to ASRs.

130.    Moreover, because the orders were made through ASRs, Cessna Finance did not know if or when the customer paid its deposit on the plane to the ASR.  Nor did Cessna Finance know if the customer missed the Company's deposit schedule.  Therefore, regardless of the payment of deposits on time (or at all), orders were booked into the Company's backlog and reported to the market as a sign of long-term financial strength for the Company.

131.    A significant portion of Cessna's orders in the backlog were not firm during the Class Period.  They were speculative, subject to cancellation, and enhanced by poor underwriting and the Company's newfound policy of allowing customers to finance their deposits.  During the Class Period, Cessna would lose orders that had been in the order backlog, and these orders were not replaced with new orders.  Internally, director-level personnel knew Cessna was losing more orders on a weekly basis than it was replacing with new orders.  Nonetheless, the Company's senior executives, including the Individual Defendants, claimed publicly during 2008 that the backlog of plane orders was increasing.

132.    Cancellations of orders reported in the Company's backlog occurred throughout 2008.  By summer 2008, a material number of customers were looking for any excuse to walk away from their orders.  As a consequence, throughout 2008, completed but not yet delivered planes began to stack up at the Company's facilities.  Finished but undelivered planes were referred to as "white tails" because they did not have personalized markings on them.

133.    The inclusion of speculative orders subject to cancellation in the Company's backlog meant that the reported backlog was, at all relevant times, artificially inflated.  One tactic Defendants

employed for customers that wanted to cancel their orders during 2008 was to persuade the customer to not cancel delivery of the aircraft outright, but to push back the delivery from 2008 to *several years* down the road (for example, until 2014). By pushing out the delivery date by several years – indeed, no matter how far out – the Company would disguise what otherwise should have been disclosed as a cancellation and keep the order in its inflated backlog, even though the completed aircraft would just be sitting at Cessna. This practice of pushing orders off (thereby "negotiating away" what were, in reality, cancellations) was nothing more than a shell game designed to minimize and hide the true extent of the Company's problems. Thus, the Company's backlog was inflated and presented a misleading picture of the Company's financial strength and future business prospects to the market.

134.    In addition, the Company's backlog was a house of cards because it was based on very small deposits, which as of April 2007, could be financed in part by Cessna Finance. With financed deposits, customers had zero economic incentive to follow through with their orders. The result was that many orders in the backlog were highly speculative and would never be filled. Customers faced minimal risk and could back out of orders at any time.

135.    The Company's backlog was a topic of discussion at Senior Vice President of Sales and Marketing Roger Whyte's ("Whyte") 8:00 am Monday morning meetings. Whyte's Monday morning meetings typically lasted 90 minutes and were attended by the Vice Presidents within Sales and Marketing and some Directors. The main purpose of these meetings was to go over the sales figures for the previous week, and Whyte's assistant, Pam Dinwiddie ("Dinwiddie"), reported the numbers obtained at these meetings to Pelton, who would ultimately reported to Textron executives.

136.    There were, on average, seven or eight people in attendance at Whyte's Monday morning meetings. At the meetings, the Vice Presidents and Directors reported the number of new

orders, existing orders, and orders scheduled for delivery in their respective areas.  The numbers reported at Whyte's Monday morning meetings were immediately added to the backlog.  The sales and backlog were then placed into a spreadsheet by Dinwiddie.  The spreadsheet was sent by email following the meetings to make sure everyone who attended the meeting was "in agreement" as to the numbers Whyte would be reporting to Pelton.

137.    The information provided herein concerning the speculative nature of the Company's artificially inflated backlog was provided by several Confidential Witnesses, including CW 3, CW 5, CW 6, CW 9, CW 10, CW 12, CW 13, CW 14, CW 15, and CW 22.  For example, CW 5, the former Senior Business Partner, believed the Company should have been much more forthright in conceding to the public that it had a real problem with its backlog of orders.  CW 5 also believes that the speculative nature of many of the orders reported in the Company's backlog was likely known internally by Textron executives well before the customers actually refused delivery of the completed aircraft.  In that regard, this former employee pointed to the fact that Cessna Finance had been laying off personnel as far back as late 2007.  Likewise, CW 22 described how it was definitely known in 2007 and 2008 that orders in the backlog were speculative and that customers were actually buying "delivery positions" with no intention of actually purchasing an aircraft from Cessna.  Rather, CW 22 stated these customers hoped to sell their positions to other Cessna customers.  Therefore, the reported backlog included contingent, placeholder orders that had a strong likelihood of being cancelled.

138.    CW 12, a former Purchasing Specialist, described how based on the order cancellations she/he observed, she/he "pushed for answers."  As a result, CW 12 had conversations with director-level personnel who conceded that Cessna was definitely losing more orders week-to-week than it was replacing with new orders.  Given this information, the former Purchasing

Specialist did not understand how Textron continued reporting publicly that Cessna's backlog was increasing. CW 12 described how getting more specific details and responses to her/his inquiries was difficult because of the "secretive" environment at Cessna that made getting information from more senior personnel like "pulling teeth."

139.     CW 12's observations regarding lost orders were based in no small part on the Master Schedule issued from Cessna's Master Scheduling group. According to CW 12, the Master Schedule was issued approximately once a week and reflected changes in terms of the number of planes in the backlog, as well as orders that had been received and orders that had been lost since the last Master Schedule had been issued. Based on her/his experiences, CW 12 stated that during 2008, Cessna's new orders were exceeded by the greater number of cancelled orders that were lost.

140.     Numerous Confidential Witnesses described how delinquencies and cancellations increased during 2008, particularly during late summer 2008. For example, CW 3, the former Production Foreman/Production Superintendent for Cessna, recalled hearing about cancellations in meetings with her/his Director and believed that it was at this same time that the Company began talking about employee layoffs. CW 3 knew that customers were ready to walk from their orders and that finished, but not delivered, planes were piling up in the Fall 2008. CW 14, the former Regional Sales Director, confirmed that delinquencies started to increase in spring 2008, between March 2008 and May 2008, and pointed to quarterly "all hands" meetings where the issue would have been discussed.

141.     Likewise, CW 5, the former Senior Business Partner, recalled cancellations increasing in late summer 2008. Regarding whether the Company's backlog was inflated, CW 5 stated, "hell yeah." For example, one particular job CW 5 was tasked to perform involved assembling a monthly report of individual reports prepared by other Business Partners assigned to different business units

throughout Cessna.  One of these reports that the former Senior Business Partner consolidated into her/his report included a list of finished aircraft, identified by their unique "tail number" designations, that were not being delivered to the customers who had ordered the aircraft.  As of late summer 2008 and thereafter, the list of undelivered aircraft "got bigger and bigger."  In late summer 2008, the number "doubled and tripled suddenly" and continued swelling.

142.    CW 15 recalled that Textron's backlog was a "house of cards" because it was based on very small deposits, which could be financed.  CW 5 also stated that orders were added to the backlog once the customer signed a contract and paid an initial deposit – which could be financed.  She/he also recalled that in or around April 2007, the Company, through Cessna Finance, began providing loans to customers seeking to finance their jet deposits.  Prior to this time period, Cessna Finance did not provide loans for customer deposits on jet planes.  If a customer could not afford to pay the deposit with his or her own resources, it meant that the customer could not afford the aircraft regardless of what financing he or she received.

143.    The corroborating accounts of the many Confidential Witnesses described herein confirm that the Company's backlog was not only inflated, but that it was also a misleading (although purportedly leading) indicator of the Company's financial strength and future business prospects.  Despite partial revelations of the truth revealed towards the end of the Class Period, as described below, it was not until after the close of the Class Period, however, that Defendants revealed additional information concerning the real "strength" of the Company's backlog.  In Textron's 2008 Annual Report, filed with the SEC on Form 10-K on February 26, 2009, the Company added the following disclosure:

> An initial customer deposit is required upon entering into a definitive purchase agreement with subsequent additional deposits at certain milestone dates.  Orders remain in backlog until the aircraft is delivered or the customer requests cancellation.  Upon cancellation, deposits are used to defray costs including remarketing fees, cost

47

to reconfigure the aircraft and other costs incurred as a result of the cancellation. Remaining deposits, if any, may be refunded at our discretion.  The deepening recession and turmoil in the capital markets have significantly impacted many of our customers during the second half of 2008.  As a result, a significant number of Cessna's customers have requested deferral of their scheduled jet delivery date, transition to a smaller or less expensive jet model, or in some cases, to cancel their order.  We also identified customers interested in accelerating their aircraft delivery date to replace deferrals or cancellations.  As a result, we have lowered our planned jet production level for 2009.  We expect ongoing volatility in the timing of fulfillment of our Cessna backlog until economic conditions stabilize.

**Defendants' Class Period Materially
False and Misleading Statements**

144.   The Class Period begins on July 19, 2007.[3]  On that date, Textron announced its financial results for the second quarter ended June 30, 2007, in a press release titled, "**Textron Reports Strong Second Quarter Results on 15% Year-over-Year Revenue Growth**."  The press release stated, in pertinent part:

**2007 Outlook**

(*Per-share amounts are stated on a pre-split basis.*)

Campbell added, **"*Given the strength of demand for our innovative products and our progress in execution improvement thus far, we are raising our earnings and cash flow outlook for the year.*"**

***Textron expects full-year 2007 revenues will be up about 12% from last year, while earnings per share from continuing operations are now expected to be between $6.35 and $6.55, $0.25 per share higher than its previous guidance. Third quarter earnings per share from continuing operations are expected to be between $1.45 and $1.55.  The company now expects full-year 2007 free cash flow to be in the range of $550 - $600 million, up $50 million from its previous expectation.***[4]

Second Quarter Segment Results

*        *        *

---

[3]   On July 18, 2007, the Company's Board of Directors approved a two-for-one split of Textron's common stock.

[4]   Defendants' false and misleading Class Period statements are **bolded and italicized.**

**Cessna**

Revenues at Cessna increased $198 million in the second quarter due to higher volume, primarily related to Citation jets, and pricing.  Cessna delivered 95 Citation business jets in the quarter compared to 76 in the second quarter of 2006.

Segment profit increased $47 million due to higher pricing and the impact of the higher volume, partially offset by inflation and increased product development expenses.

***Cessna's backlog increased to $10.4 billion at the end of the second quarter of 2007, compared to $9.0 billion for the last quarter.***

145.    Later that morning, Textron held an earnings conference call to discuss the Company's second quarter 2007 financial results.  The Individual Defendants, participating in the call on behalf of the Company, used this time to mislead investors concerning several aspects of Textron's business:

**<u>Lewis Campbell – Textron, Inc. – President, CEO</u>**

*     *     *

Turning to Textron financial.  ***We recorded record earnings as our commercial finance business also achieved all-time credit records for both nonperforming assets and delinquent account percentages***.

*     *     *

***But the really big news out of Cessna is the continued strong demand for their jets***. We broke an incredible 282 orders during the quarter. 282 orders. Based on these additional orders we're now pleased to announce that we're essentially sold out of next year's delivery plan where we're targeting 470 jets including about 100 Mustangs. ***So as we see it, order and demand will continue strong for the foreseeable future and we're expecting an increase in deliveries in 2009 as well***.

In summary, our strategy of investing in organic growth is driving demand across our enterprise. ***In fact, combined backlog of Cessna and Bell has hit another all-time record high of $14 billion*** [...] As we continue to invest in new products and execute on our many, many opportunities, we're confident that we can achieve our long-term outlook for 7% to 10% annual revenue growth topline, which would leverage to strong double-digit bottom line growth through at least the rest of the decade. You can be sure that we will not waiver from our focus on our vision and transformation strategy. And given our strong forecasted growth, I would predict our shareholders will continue to benefit from that focus as far into the future as we can see. With that I'll turn the call over to Ted.

49

*     *     *

**<u>Ted French – Textron, Inc. – CFO</u>**

*     *     *

Now, let's review the details of the major drivers in each segment and I'll start with Cessna. Revenues at Cessna were up $198 million in the second quarter, due to favorable [C]itation jet volume and pricing. Cessna profits increased $47 million due to higher pricing and the impact of higher volume, partially offset by inflation and increased product development expenses. ***With the strong order intake, Cessna's backlog reached $10.4 billion at the end of the second quarter, up $1.4 billion from the first quarter***.

146.    Later, in response to an analyst question regarding loan loss provisions at TFC, French misleadingly described how Textron's loan loss provision had actually been coming down, stating:

> ***Well, actually, our provision has been trickling down. It has been fairly stable, but if anything it has come down just a little bit***.  But it is -- we do have the pull-up every year with the level of growth that we're also experiencing. ***But net-net it has been fairly stable and kind of $90 million, $100 million area***.

147.    In response to the false and misleading statements made by Defendants on July 19, 2007, the price of Textron stock rose from a July 18, 2007 close of $57.72 to close at $61.10 on July 19, 2007, an increase of nearly ***6%*** on a volume increase of approximately ***85%***.  By July 23, 2007, the stock had reached a closing price of $62.75, a nearly ***9%*** increase over its July 18, 2007 closing price.

148.    The statements referenced in ¶¶144-46 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders.  While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm"

50

booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

- Because Cessna's "strong order intake" was due in large part to the Company's decision to significantly grow its business by lowering the Company's underwriting standards, financing deposits and taking on larger and larger amounts of extremely risky loans, the supposedly "strong order intake" was illusory, misleading and a wholly unreliable indicator of Textron's financial strength and future business prospects. Indeed, the illusion created by Defendants concerning the strong order intake for Cessna's aircraft was revealed to be false and misleading when Textron announced dramatic cuts to its Cessna production levels and an unprecedented level of deferrals and cancellations at the end of the Class Period.

- As a result of TFC's mandate to liberalize financing standards, Cessna Finance was, without disclosing it to the market, financing deposits (which it had never done before TFC required it to be done), such that purchasers had no incentive to follow-through on an order should financial circumstances change. This resulted in orders being included in the Company's backlog that were by no means firm, despite the fact that Textron repeatedly assured the market that orders were not included in the backlog until "non-refundable" deposits were paid. The fact that many of the non-refundable deposits were actually paid by Cessna Finance should have been disclosed, and would have materially altered the total mix of investor information.

149. On July 27, 2007, Textron filed with the SEC its Quarterly Report on Form 10Q. The July 27, 2007 10Q parroted many of the false and misleading claims made in the Company's July 19, 2007 statements.

150. On September 27, 2007, Cessna held an analyst meeting at the National Business Aviation Association Convention. Shortly thereafter, and based upon the Company's representations at that convention, J.P. Morgan issued an analyst report indicating that "*[e]ncouragingly, the company is not seeing any impact from financial market turbulence in demand. . . . *"

151. On October 18, 2007, Textron announced its financial results for the third quarter ended September 29, 2007, in a press release titled, "**Textron Reports Strong Third Quarter Results on 15% Year-Over-Year Revenue Growth**," Campbell was quoted in the press release as stating "***[w]e see strong end-market demand [for the Company's products] continuing through the rest of the decade, which in concert with the benefits of our ongoing Transformation strategy,***

51

*positions us to deliver significant growth in earnings, cash flow and shareholder value.*"   The

October 18, 2007 press release also noted that "*Cessna's backlog hit another all-time high of $11.9*

*billion at the end of the third quarter of 2007, up $1.5 billion from the end of the second quarter.*"

152.    Later that morning, the Company held an earnings conference call to discuss the

Company's third quarter 2007 financial results.  The Individual Defendants participated in the call

on behalf of the Company.  Defendants continued to misrepresent to the market the strength of the

Cessna backlog and the ability of TFC to weather the financial markets and prosper:

### <u>Lewis Campbell – Textron Inc. – CEO</u>

Thank you, Doug, and good morning everyone. We had another very strong quarter
as our 40% growth in earnings during the quarter reflected not only strong organic
revenue growth but also continuing improvement in operational execution. And we
foresee continued positive operating results again in the fourth quarter and have
increased our earnings and cash flow estimates accordingly. As we continue to
emphasize, the Company remains committed to value creation through a balanced
strategy of investing and growth and returning cash to our shareholders. At the
beginning of October, the Company paid shareholders a $0.23 per share dividend
reflecting the 19% increase in the annual dividend rate approved by our board during
the third quarter.

*            *            *

*At Textron financial we weathered the less friendly capital markets that developed*
*this summer and maintained excellent credit quality within our portfolio. In fact,*
*recent credit market disruptions are providing some growth opportunities in*
*certain segments as weaker competitors are either unable or unwilling to follow*
*through on loan commitments*.

*            *            *

In summary, our strategy of investing in organic growth is driving demand across our
Enterprise. *In fact, combined backlog at Cessna and Bell Helicopter has hit*
*another all time record high of more than 15.5 billion*. And this number excludes
the one billion of order interest in the Bell 429. *I am very bullish on our Company*
*as we move to complete another solid year of delivering solid earnings growth and*
*outstanding total shareholder returns*. And you should note that momentum on both
the top and bottom lines, coupled with the growth opportunities afforded by our
recent strategic acquisitions are perfectly in line with our overall transformation
strategy. We remain confident that we will achieve our long-term outlook of 7% to
10% annual organic revenue growth, and with recent value-grading acquisitions we

should be able to do even better. You can be sure that we fully intend to leverage this revenue expansion into strong double-digit earnings growth and as a result, I would predict that our shareholders will continue to benefit significantly as far out as we can see.

153.    As the call continued, French discussed TFC's financial performance and misled the market by touting the Company's decreased loan loss reserves, the purported quality of TFC's portfolio, and low loan delinquency rates, stating, in relevant part:

The decrease in provision for losses is primarily attributable to lower growth in the receivable portfolio during the third quarter of '07. ***Portfolio quality continues to be very good***, as non performing assets were 1.37%, and 60 day plus delinquencies were 1.07%.

***The delinquency rate is higher this quarter versus last quarter, reflecting three specific accounts in the Golf Finance business.*** Net chargeoffs as a percentage of average finance receivables remained very low, at 0.38% for the first nine months of '07 as compared to 0.37% for the corresponding period last year.

154.    Continuing, French stated that "***recent financial market turmoil*** . . . had a very minimal impact on [Textron's] ability to access capital markets at either TFC or the corporate level." In other words, the Individual Defendants portrayed Textron as unaffected by declining market conditions.

155.    Later on the call, during the question and answer period with analysts, Defendants continued to misrepresent the delinquency level at TFC.  For example, in response to an analyst's question regarding delinquencies at TFC, French stated, in relevant part that "***[t]he delinquencies was really -- we're down to such a low level right now, that it's very lumpy and that entire increase in delinquencies was only three accounts in the Golf business.***"

156.    Market analysts and commentators bought into the façade that was Textron's October 18, 2007 earnings report and conference call.  *The Street.com* reported that Textron was a "*winner, with shares climbing 4.24% after the industrial giant beat earnings targets and lifted its full-year*

*guidance.*"  J.P. Morgan analyst Stephen Tusa noted that "*[t]hey [Textron] beat guidance, and more importantly the underlying trends in the business bode well for future earnings.*"

157.    In response to false and misleading statements made by Defendants on October 18, 2007, the price of Textron stock rose from a close of $64.13 on October 17, 2007 to close at $66.85 on October 18, 2007 – an increase of approximately ***4.2%*** on a significant increase in trading volume of ***117%***.

158.    The statements referenced in ¶¶149, 151-55 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- TFC had not "weathered" the less friendly capital markets that developed in the Summer of 2007.  Rather, Defendants were staring down a sea of red flags concerning the future prospects of TFC.  For instance, TFC was having a difficult time reselling loans to investors due to the poor loan quality in TFC's portfolio (which was caused by undisclosed deteriorating underwriting criteria).  Additionally, TFC was exposed to the faltering subprime housing market through extremely risky real-estate financing deals, having expanded lending to "real estate rehab companies" by approximately 60% since 2005.  Such rehab loans were so risk-ridden that very few lenders would even make them.

- TFC was becoming inundated with aging inventory that was no longer commanding prices equivalent to what the dealers had borrowed from TFC to finance the inventory.  For example, throughout 2007, the value of the inventory in the Company's Marine Division was rapidly decreasing such that many boat dealers who borrowed from TFC owed more on their loans than the inventory was worth.  Though the immediate impact of this aging inventory was masked in Textron's reporting of TFC's delinquency rates because many of the borrowers continued to make their interest-only payments, as the economy continued downward, Defendants were well aware that the financial performance of TFC's entire Marine Division was a ticking time bomb waiting to explode.  In fact, TFC eventually had to cut deals with borrowers and accept payment of less principal than had been loaned in the first place.

- TFC's portfolio quality was anything but "good" as it was built upon significantly lowered credit standards and poorly underwritten loans.  Indeed, Textron employees were expected to approve even marginal borrowers, and those that were not approved were often escalated up the ladder to be approved by a superior.  Further, as part of

the Company's attempt to make more loans, Defendants revised TFC's amortization schedule, making virtually all customers, regardless of their credit category, eligible to receive better loans with longer amortization periods. This had the practical effect of putting the Company in a more adverse financial position in the first year of such loans

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders founded on deteriorating underwriting standards, financing of buyers who were not creditworthy, and undisclosed financing of "nonrefundable deposits." While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm" booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

- Textron trumpeted to investors that recent credit market disruptions were providing opportunities for growth despite the credit crisis and economic downturn because "weaker competitors" were either unable or unwilling to follow through on loan commitments. The reality was that Textron's "growth" was being driven by self-deteriorating underwriting criteria, artificially inflated backlog, and the acquisition of an increasingly risky loan portfolio.

159.   On October 29, 2007, Textron filed with the SEC its Quarterly Report on Form 10Q. The October 29, 2007 10Q parroted many of the false and misleading claims made by Defendants in the Company's October 18, 2007 statements.

160.   On December 4, 2007, Textron issued and sold $350,000,000 principal amount of its 5.60% Notes due 2017 pursuant to a Registration Statement on Form S-3, which was declared effective on August 4, 2004, and a Prospectus Supplement dated November 29, 2007 to a Prospectus dated August 4, 2004.

161.   On December 6, 2007, following a meeting with Campbell, French and other members of Textron's senior management team, Credit Suisse issued an analyst report indicating that the "*[p]ace of business at [Textron's] Aircraft finance unit is very healthy despite credit crunch.*"

162.   In a December 12, 2007 article, Reuters quoted Campbell as stating, "***[t]he next few years in the business jet market look to be awesome***." The article also quoted Campbell as stating

55

"*[i]f we were running on a very low backlog, I'd be nervous, but the converse is true. I'm bullish on Cessna's growth and contribution to EPS and topline growth well into the next decade*."

163.     In response to false and misleading statements made by Campbell on December 12, 2007, the price of Textron took a positive turn.  On December 11, 2007, the stock closed at $69.79, representing a nearly 4.4% decrease from December 10, 2007.  Campbell's false and misleading statements stopped the decline, with the stock rising to a close of $70.96 on December 13, 2007, an increase of more than 1.5% from December 12, 2007.  Thus, despite Defendants' knowledge that Cessna's backlog was anything but firm and that demand for their airplanes was slowing, Defendants were able to maintain and even expand the amount of artificial inflation in the Company's stock.

164.     The statements referenced in ¶159 and ¶162 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The majority the Cessna backlog was purportedly made up of international orders. However, a substantial amount of the "orders" were not firm orders at all.  Instead, they were placed by ASR's who – at the time of the "orders" – did not have identified end-users to sell the aircraft to (there were no buyers!).  As the ASR's often did not have a buyer (and in many instances were not even required to put down a deposit), many of the orders in Cessna's backlog were subject to cancellation, especially when the economic crisis emerged.  Further, Cessna Finance did not closely monitor the ASRs to determine if and when a customer paid a deposit or made payments on aircraft, leading to Textron not being able to reasonably know whether orders that the Company was placing into its backlog were in fact firm.

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders founded on deteriorating underwriting standards, financing of buyers who were not creditworthy, and undisclosed financing of "nonrefundable deposits."  While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm" booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

56

165.    On January 24, 2008, Textron announced its financial results for the fiscal year and quarter ended December 29, 2007, in a press release titled, "**Textron Reports 32 Percent Increase in Fourth Quarter Earnings Per Share on 18 Percent Revenue Growth**."   The press release stated, in pertinent part,

\*        \*        \*

Providence, Rhode Island – January 24, 2008– Textron Inc. (NYSE: TXT) today reported strong fourth quarter results with a 32% increase in earnings per share from continuing operations on an 18% revenue increase. Cash flow provided by continuing operations for the full-year was $1.2 billion, resulting in free cash flow of $796 million.  The company generated a 24.8% return on invested capital for 2007, up 800 basis points from last year.

"Our fourth quarter culminates a year of powerful performance at Textron on many fronts. The positive impact of our ongoing journey to become the premier multi-industry company is apparent in our top-line growth and our ability to convert that growth into profits and premium shareholder returns," said Textron Chairman, President and CEO Lewis B. Campbell.

\*        \*        \*

***Combined backlog at Bell Helicopter, Textron Systems and Cessna at December 29, 2007 stood at $18.8 billion, up from $12.9 billion at December 30, 2006***.

\*        \*        \*

**2008 Outlook**

Textron expects 2008 revenues to be about $15 billion, up 13%, and earnings per share to be between $3.75 and $3.95.  First quarter earnings per share are forecasted to be between $0.75 and $0.85 per share. Textron's outlook fully includes the 2008 development costs for the large cabin Citation program.

The company expects 2008 free cash flow in the range of $700 - $750 million, reflecting expected capital expenditures of about $550 million.

Campbell commented, "***While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial. Even with the softer U.S. economy, we expect another banner year of business jet orders exceeding current year deliveries. Given that our jet backlog already extends well into 2009, this bodes well for continued, uninterrupted growth well into the next decade at Textron***."

\*      \*      \*

**Cessna**

Cessna revenues and segment profit increased $329 million and $75 million, respectively, in the fourth quarter of 2007. Revenues increased due to higher volumes and higher pricing. Segment profit increased due to the higher pricing, the impact of higher volume and favorable warranty performance, partially offset by inflation and increased product development expense.

*Cessna backlog at year-end was $12.6 billion, up 48% from $8.5 billion at year-end 2006.*

166.   Later that morning, Textron held an earnings conference call to discuss the Company's fourth quarter and fiscal year 2007 financial results. The Individual Defendants participated in the call on behalf of the Company and continued to misrepresent the backlog at Cessna and the strength of the TFC portfolio. For example, Campbell stated, in relevant part:

> *And if the value investing new products needed any validation, our ending aircraft backlog of 16.4 billion, up 41% from a year ago, should be convincing.* On top of that, at systems we have a $2.4 billion backlog, plus we have $1 billion worth of Bell 429 customer purchase agreements not yet in backlog.
>
> *So if you add all that together, we have nearly 20 billion in existing customer orders at Cessna, Bell and Systems*.

\*      \*      \*

> *In fact, we're expecting another banner year of new orders at Cessna all around.* Based on our current customer activity, our marketing plans, and assessment of the marketplace, we expect to book over 570 total jet orders this year, well above our delivery forecast of 470. *Given that our delivery schedule is completely booked out well into 2009, and supported by the diversification of our order book, we expect continued uninterrupted growth at Cessna well into the next decade.*

167.   As the January 24, 2008 conference call continued, Campbell went on to make additional false and misleading statements concerning the Company's financial condition and future business prospects in the face of tough economic times. Campbell stated, in relevant part:

> *But I have to say that we're puzzled at Textron by the degree with which our shares have fallen compared to our peers in the market overall. We believe that a significant amount of our enterprise is relatively unaffected by the economy, and that we are well-positioned for this environment.*

58

\*        \*        \*

At Cessna, we've analyzed the 2001, two, three, that period, that jet downturn, which was the worst downcycle we've ever experienced. And we carefully modeled our next three years' deliveries on the basis of annual percentage cancellations and percent reductions in new orders during that prior period, to really understand specifically how a similar downturn could affect our 2008 through 2010 delivery outlook. ***Even subjected to the severe 2003 scenario, our delivery outlook for 2008 and 2009 remains unaffected and we would expect 2010 to be no worse than flat with 2009***.

***Now, this is simply a function of the unprecedented backlog which currently stands at 1,418 units and compares to 811 units at the end of 2000. Yet keep in mind we do not believe the extreme 2003 scenario will repeat, in terms of cancellation rates or order in-take, because both our backlog and orders have been better diversified by customers, specifically we have less dependence on fractional and by market, with a significantly higher international mix***.

Furthermore, the 2003 downturn was also magnified by the 9/11 disruption, that among other things halted business jet travel in 2001, placing unique uncertainty into the marketplace. ***So in summary, we continue to have confidence in our increasing deliveries in 2008, 2009, and 2010, even given the current economic uncertainty***.

\*        \*        \*

***Finally at TFC we're not involved in sub prime or other misunderstood or high-risk products, and we expect our portfolio credit performance to remain within normal historic ranges, in the softer economic environment***.

168.    Following Campbell's remarks, French made additional false and misleading

statements concerning the Company's financial condition and outlook, stating, in relevant part:

I want to start by reinforcing Lewis' optimism for growth. Obviously, the U.S. economy is now weaker and it's certainly more uncertain. ***However, we have good revenue visibility based on our solid growing backlogs, plus we continue to observe positive forward signals in the business jet marketplace***.

\*        \*        \*

***Continued strength in orders gives us conviction in our outlook, as we now have another record Cessna backlog at 12.6 billion, that's up 4.1 billion or 48% from a year ago***.

\*        \*        \*

***Portfolio quality continues to be absolutely excellent***, with a 60-day delinquency rate of 0.43%, nonperforming assets of 1.34% and net charge-offs of 45 basis points.

59

For the year, then, Textron Financial had record revenues and profits *while maintaining excellent credit quality*.

*Looking to 2008, we expect continued strong credit quality based on the product lines we're in, the creditworthyness of our customers, and the structures of our loans*.

169.    In closing, French touted the Company's 2008 outlook:

*Now for our '08 outlook. For the full year, we're forecasting earnings in a range of $3.75 to $3.95, and for the first quarter we're targeting EPS between 75 and $0.85.* These amounts fully reflect the 24% increase in ER&D that Lewis mentioned, which equates to 108 million or about $0.29 a share.

*          *          *

*In closing, our outlook at Textron remains very positive*. We're expecting strong growth again this year through the rest of this decade, and beyond. We have a large military backlog and our products are critical to our armed forces.

*We also have a large aircraft backlog, and it would take a major extended global downturn to interrupt the growth in deliveries that our customers have ordered and continue to order*. We believe the real growth opportunities that lie before us, coupled with our ever-improving ability to execute, will translate into increased shareholder value this year and for years to come.

170.    Later on the call, in response to an analyst question concerning Defendants' bullish outlook on Cessna, Defendants made false and misleading statements concerning the cancellation level at Cessna and  the ability of Textron to meet its projections.  For example, Campbell stated, in relevant part:

*We have not seen any absorbable deterioration in customer orders.  We have very low, actually I'd say almost unusually low cancellations versus normal years, so that's not there*.

*          *          *

And then Jack and his team recently had a sales meeting kickoff out in the west, and the sales force is really bullish on what they see and the customers they've contacted.

*Another interesting fact, which I find to be kind of cool, is that back in 2000, before we saw 9/11 and the downturn that ended up being just awful through 2003, our backlog for the next three years is now 82% higher than what the backlog was we had for the three-year period. So the three-year period, '01, '02, '03, we had 693 jets on order for delivery, and for '07, '08, '09, we have 1,260 on order*.  So

about every way we can look, you mentioned international versus domestic, that's also a strong point.

*So I tell you, if there's something coming at us, we can't see it, and if it comes at us as hard as it did in '01, '02, '03, we firmly believe that we'll be able to meet the numbers that we talked about on the call here.*

171.    Likewise, French went on to misleadingly point out the "depth and strength" of the

Company's backlog, stating:

*I think what's really misunderstood is the depth and strength of the backlog. We've taken this backlog and torn it apart, and we've modeled a scenario where order in-take rates fall -- and remember we've looked at every downturn in general aviation since the second world war, and this downturn post-9/11 is by far the worst of all of those.*

*We've taken this existing backlog and we've gone back and modeled the rate of order falloff that we saw in the 2001, '2, '3 time frame, and it's pretty radical by the way, orders fell 68% in the first year, so down two-thirds, came back to being down about a third in the second year and got back to about even by the third year.*

So we've modeled that in.  We've modeled the rate of cancellations, which in that last downturn were 160 some-odd over three years, but because our backlog is larger, we modeled a number twice that big into it.  *When you take that and take our production plans for '08, '09, and '10 which grow every year by the way, if that same event happens to us over that three-year period of time, we'll still end up with 20 months of backlog by the end of 2010.  So it's just very, very deep, and I don't think that's well-understood.*

172.    Textron's stock initially dropped by a little more than 6% on January 24, 2008, upon

release of the Company's fiscal year 2007 and fourth quarter 2007 earnings report.  But the price of

Textron stock quickly recovered as the impact of Defendants' false and misleading statements took

hold.  Indeed, the stock rose 4.1%, 0.77%, and 2.06% on January 25-29, 2008 (the next three trading

days), respectively.  Moreover, absent Defendants' false and misleading statements, the price of

Textron stock would have fallen even more on January 24, 2008.

173.    The statements referenced in ¶¶165-71 were each materially false and misleading

when made as they represented and/or omitted adverse facts which then existed and disclosure of

which was necessary to make the statements not false and/or misleading.  The true facts, which were

known to or recklessly disregarded by each of the Defendants, were:

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders founded on deteriorating underwriting standards, financing of buyers who were not creditworthy, and undisclosed financing of "nonrefundable deposits."  While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm" booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

- Defendants' purported "confidence" in their increasing deliveries of Cessna aircraft during 2008, 2009 and 2010 was misleading as Cessna's delivery schedule was based upon orders a substantial number of which had been placed by borrowers who had been approved using deteriorating underwriting criteria, had sub-standard credit and/or who were not even capable of making the "non-refundable" deposit (which TFC began financing contrary to Cessna Finance's longstanding policy against financing deposits), making the orders wholly unreliable.  Indeed, the fiction created by Defendants concerning the strong order intake for Cessna's aircraft began to be revealed as false on October 16, 2008 when Defendants first revealed to the market that an order downturn had occurred in the Company's Cessna division.

- TFC was, in fact, involved in subprime and other misunderstood or high-risk loan products.  Prior to and throughout the Class Period, TFC's Finance Company Services Division was extending substantial financing to "real estate rehab companies" – companies that were reliant on the continued success of the subprime market.  Internally at Textron, the Company's rehab financing was described as a "house of cards", and the house of cards began collapsing in mid to late 2007 when the housing market began to falter and these real estate rehab companies began defaulting on their loans.  Indeed, by the first quarter of 2008, Textron had already written off $19 million of an approximately $50 - $60 million loan to a real estate rehab company who was involved in an extremely speculative venture in Minnesota.  Further, TFC engaged in an increased volume of larger dollar value timeshare deals that involved "very dodgy" lending practices and TFC's credit policies were being "abused" to maintain the liquidity of TFC's timeshare developer customers.

- TFC's portfolio did not have strong credit quality as it was built upon significantly deteriorated underwriting criteria that resulted in loans to borrowers that were not creditworthy.  Indeed, Textron employees were expected to approve even marginal borrowers, and those that were not approved were often escalated to upper management to be approved by a superior.  Further, as part of the Company's attempt to do more loans, Defendants revised TFC's amortization schedule, making virtually all customers, regardless of their credit category, eligible to receive better loans with longer amortization periods.  This had the practical effect of putting the Company in a more adverse financial position in the first year of such loans.

174.    On January 28, 2008, J.P. Morgan, clearly buying into the Defendants' misrepresentations concerning the strength and quality of the Company's backlog, issued an analyst report indicating that Cessna's backlog was so strong that "*orders could show a dramatic decline, with 2X normal recessionary cancellations, and still have no impact on growth for 09, with flat performance from 2010-2012.*"  The report also noted that:

> More of an interest, *Textron provided an analysis that shows that a US downturn would have little impact on [Cessna's] segment performance over the next few years* . . . .  For the forward looking analysis, Textron modeled in a cancellation figure at twice that level to account for the larger backlog ($12.6 B today, versus $6.4 B in '00).  Even subjected to this, the outlook for '08 and '09 (another year of growth) would be unaffected, a function of the company's unprecedented backlog, with 2010 being flat at worst.

175.    In response to J.P. Morgan's January 28, 2008 analyst report – which was based upon false and misleading statements made by Defendants – the price of Textron stock rose from a close of $53.77 on January 28, 2008.  In the days that followed, Textron stock continued its steady ascent to close at $57.26 on February 1, 2008, an increase of approximately **6.4%** from the January 28, 2008 closing price, completely erasing the declines experienced on January 24, 2008.  Thus, Defendants' *modus operandi* of consistently tempering the impact of negative news with additional false and misleading statements in order to minimize stock drops continued to effectively mislead the market.

176.    On February 20, 2008, Textron filed with the SEC its Annual Report on Form 10K. The February 20, 2008 10K parroted many of the false and misleading claims made by Defendants in the Company's January 24, 2008 statements.

177.    On April 17, 2008, Textron announced its financial results for the first quarter 2008, in a press release titled, "**Textron Reports First Quarter EPS from Continuing Operations of $0.93, up 19.2 percent**."  The press release stated, in pertinent part:

Providence, Rhode Island – April 17, 2008 – Textron Inc. (NYSE: TXT) today reported strong first quarter results with a 19.2 percent increase in earnings per share from continuing operations on a revenue increase of 18.7 percent. Cash flow provided by operating activities of continuing operations for the quarter was $158 million, resulting in free cash flow of $78 million.

"***Global demand continues to be brisk across our aircraft and defense businesses, which led to another significant expansion in our backlog during the quarter***," said Textron Chairman, President and CEO Lewis B. Campbell.

*       *       *

***Reflecting strong demand in aircraft and defense, combined backlog at Cessna, Bell Helicopter and Textron Systems increased to $22.0 billion at the end of the quarter, up from $18.8 billion at the end of 2007***.

*       *       *

**Segment Results**

**Cessna**

Cessna's revenues increased $278 million in the quarter from last year's same period reflecting delivery of 95 business jets compared to 67 in last year's first quarter, improved pricing and revenues from the acquisition of Columbia Aircraft.

Segment profit increased $52 million, reflecting higher volumes, improved pricing and favorable warranty performance, partially offset by inflation and increased engineering and product development expense.

***Cessna backlog at the end of the first quarter was $14.5 billion, up from $12.6 billion at year-end 2007***.

*       *       *

**Finance**

*       *       *

The sixty-day plus delinquency percentage declined to 0.33 percent of finance receivables from 0.43 percent at the end of last year.  Nonperforming assets (NPA) increased to 1.84 percent of total finance assets from 1.34 percent, still within a normal range. The higher NPA primarily reflected softer credit performance in the asset-based lending and distribution finance portfolios.  NPA's remained favorable in our resort, aviation and golf portfolios.

178.   On April 17, 2008, Textron held an earnings conference call to discuss the Company's first quarter 2008 financial results. The Individual Defendants participated in the call on behalf of the Company and continued to make misrepresentations concerning strength of the backlog at Cessna and the growth opportunities available to the Company. For example, Campbell stated, in relevant part:

> ***Turning to Cessna, demand also continues unabated at our Cessna unit*** as we booked 235 new jet orders . . . ***Geographically, the overall order pace for business jets on the international front remains robust***. However, I have to be quick to point out that the U.S. demand is also strong as we took 80 orders during the quarter. ***So with another quarter of solid global demand, our expectation for increasing jet deliveries over at least the next three years remains solidly intact***.

179.   Discussing the Company's financial performance and outlook, Campbell continued:

> Coming into the year, we discussed our expectations for higher loan loss provisions and unfavorable borrowing spreads which was the primary reason our original outlook was flat on a year-over-year basis. As it turned out, the first quarter was worse than we had planned on both of these counts. Ted will get into the first quarter details in a minute, but let me continue with a few comments relative to the rest of the year at finance. Our revised outlook now reflects a more conservative view based on the expectation that the general economy continues to soften moderately and corporate financing markets remain challenging, but do not deteriorate too much further. ***On this basis, we're reasonably confident in our outlook reflecting the high quality of asset classes in our portfolio and the rigor of our traditional strong conservative underwriting process. However, we recognize in today's environment there is a risk to any finance outlook, but we believe our risk at TFC is manageable, and importantly, we believe the strength and opportunities in the rest of our enterprise substantially offsets this risk. That's a key point.*** In conclusion, we're very pleased with the first quarter both on the basis of what we've accomplished and in terms of what it signals for our future. We continue to work on our transformation journey, and our selection as one of the Fortune's most admired companies this year was confirmation that we are indeed making progress. But let me assure you that that recognition has not caused us to relax in any way relative to our commitment to continuous improvement and our strong determination to create increasing shareholder value well into the future. With that, I will turn the call over to Ted.

180.   As the call continued, French made additional false and misleading statements concerning Textron's future business prospects and financial condition:

*I want to start with a comment about our aircraft and defense backlog because as large as it is at $22 billion*, with the V-22 multi-year, it is really over $26 billion if you allow for the unfunded portion of the contract, and on top of that keep in mind we have another billion in potential backlog for the Bell 429. *So while we have to carefully navigate our way through the current economic challenges, we have tremendous growth ahead of us with excellent visibility*. Now let's move back to our analysis of what drove first quarter results.

*       *       *

Revenue in the finance segment increased $4 million. This increase reflects an increase in securitization gains and other fee income, higher revenues resulting from higher average finance receivables, and the impact of a residual value impairment charge last year partially offset by a decline in market interest rates. *Profit in the finance segment was down $10 million due to an increase in the provision for loan losses primarily in our asset-based lending and distribution finance businesses and an increase in borrowing costs caused by market conditions partially offset by the increase in securitization gains and other income.* The 60-day delinquency percentage declined to 0.33% of finance receivables from 0.43% at the end of last year. However, nonperforming assets increased to 1.84% of finance assets up from 1.34% but still well within a normal range. The higher NPA primarily reflected softer credit performance in the asset-based lending and distribution finance portfolios while NPA's remained favorable in our resort, aviation, and golf portfolios. Now for our earnings outlook.

*For the full year we're forecasting EPS in the range of $3.80 to $4.00 a share and for the second quarter we expect earnings between $0.90 and $1.00 a share*. Our cash flow provided by continuing operations forecast of about $1.3 billion remains unchanged and likewise, our '08 capital program forecast remains about $550 million which results in expected free cash flow between $700 million and $750 million. In closing, we're pleased with our performance in the first quarter, and in spite of remaining economic risk in our finance and industrial segments, we remain reasonably confident about the rest of this year. Now I am going to turn it over to Doug to give you some additional '08 modeling information.

181.   Later on the call, when asked about the Company's expectations for the rest of the year regarding TFC, French made additional false and misleading statements regarding the Company's credit exposure:

We've got about $8 billion out of our $11 plus billion is floating rate paper. Of that we have a little less than half of that that's got floor rates, though, so that's the positive as we go forward, and we probably have about over $2 billion of floors that have actually already been tripped by the rates levels that we have today, so going forward we have less exposure to the mismatch and also don't think we're going to see the kind of circumstances, of course, knock on wood we've -- every time we

66

think the credit markets are getting normal again something else goes squirrelly, but I don't think we're going to see just because I don't think the Fed has the room to do what they did on a repeat in the first quarter again, so I think that issue is largely behind us, but not to say there is zero risk, and I think the more interesting one is continuing to watch these portfolios where we have collateral that's getting stressed a little bit, and we think we've looked at it pretty well.

We've got a whole series of field reviews. We're going out to the field to every account in the whole financial company services group during the second quarter. We had a strict process around what type of appraisals we have to get on what types of properties, et cetera, so we'll continue to be all over it. We probably had two full day credit committee meetings that have only looked at these accounts*, so we think we have our hands around it. Could there be some more exposure, yes. Is it a big number? I don't think so*. That's kind of why we took the guidance down to the $200 million mark.

182.     In response to questions concerning Cessna orders, Defendants also continued to misrepresent the strength of the demand for Cessna's products (and its corresponding impact on backlog).  For example, Campbell touted the Company's domestic and international orders:

Obviously international is going like gang busters, but both are strong. I think it is coming from all over the world, and it has been very robust. *And again, with 1,555 orders in backlog, even if we do eventually see a slowdown in orders, we're still very comfortable with our outlook for growing deliveries over the next three years*.

183.     Joining in with Campbell's answer, French stated "*[o]rders is not really going to be the driver.  It is backlog.*"

184.     Analysts again bought into Defendants' lies.  That same day, a J.P. Morgan analyst report noted that Textron's "*aircraft/defense backlog now stands at $22 B and growing, offering an unprecedented and uncommon level of visibility.  Concerns around the quality of the quarter are overblown, and TFC is a side show, in our view.*"   The report went on to note that TFC's risks remained manageable:

Management sees a potential range of net income at TFC of $175-215mm this year – guidance is $200mm. The higher loss provisions were attributed to asset based lending, where they have some minor exposure to financial services companies with residential real estate collateral ($130mm, or 2% of total portfolio). It's about 6 accounts in total, and TXT now has $20mm in reserves against this. *Credit quality in the balance of the portfolio remains solid…*

67

185.    Although the price of Textron common stock fell from a closing price of $62.17 on
April 16, 2008 to a closing price of $60.44 on April 17, 2008, Defendants continued to mislead the
market.  Indeed, had Defendants not made false and misleading statements and, instead, revealed the
Company's true financial condition, market expectations would have been corrected and the
common stock price would have fallen further.

186.    The statements referenced in ¶¶176-83 were each materially false and misleading
when made as they represented and/or omitted adverse facts which then existed and disclosure of
which was necessary to make the statements not false and/or misleading.  The true facts, which were
known to or recklessly disregarded by each of the Defendants, were:

- The majority of the Cessna backlog was purportedly made up of international orders.
  However, a substantial amount of the "orders" were not firm orders at all.  Instead,
  they were placed by ASR's who – at the time of the "orders" – did not have
  identified end-users to sell the aircraft to (there were no buyers!).  As the ASR's
  often did not have a buyer (and in many instances were not even required to put
  down a deposit), many of the orders in Cessna's backlog were subject to
  cancellation, especially when the economic crisis emerged.  Further, Cessna Finance
  did not closely monitor the ASRs to determine if and when a customer paid a deposit
  or made payments on aircraft, leading to Textron not being able to reasonably know
  whether orders that the Company was placing into its backlog were in fact firm.

- Prior to and during the Class Period, the Company had dramatically altered its risk
  profile by substantially lowering its underwriting and lending standards such that a
  severe shift in Textron's appetite for risk had occurred.  Thus, at the time that
  Defendants were telling the market that their confidence in TFC's outlook reflected
  "the high quality of asset classes in [TFC's] portfolio and the rigor of [TFC's]
  traditional strong conservative underwriting process," Defendants knew that TFC
  was far less insulated and protected in the event of the then unfolding economic
  turmoil given that TFC had gorged itself on extremely risky and poorly underwritten
  loans.

- Cessna's backlog was artificially inflated because a material percentage of the orders
  included in the backlog were speculative, contingent orders founded on deteriorating
  underwriting standards, financing of buyers who were not creditworthy, and
  undisclosed financing of "nonrefundable deposits."  While Defendants gave the
  appearance to the market that the orders in the Company's backlog were "firm"
  booked orders, in reality, many of the orders were unlikely to be filled and subject to
  cancellation. Further, the backlog was based upon orders where the buyers were only
  required to place very small deposits relative to the purchase price, and these deposits

68

were often financed by Cessna Finance – providing buyers with zero economic incentive to follow through with their orders.

- Textron was failing to timely writedown the value of its loan portfolio in violation of GAAP as detailed herein at ¶¶265-92. As a result, the Company was materially overstating its reported financial results.

187. On April 25, 2008, Textron filed with the SEC its Quarterly Report on Form 10Q. The April 25, 2008 10Q parroted many of the false and misleading claims made by Defendants in the Company's April 17, 2008 statements.

188. On April 29, 2008, following an analyst meeting hosted by French and Carter, CreditSuisse issued an analyst report indicating that TFC's overall portfolio quality remained high. The report noted that CreditSuisse "*came away from today's meeting reassured about the strength of the TFC portfolio*," and that Textron management "*clearly maintains disciplined growth processes and strict risk management processes.*"

189. On April 30, 2008, prior to the first partial revelation of Defendants' fraud, and as a result of Defendants' false and misleading statements, Textron's stock, the price of which was artificially inflated, closed at $61.01 per share.

### On June 13, 2008, a Partial Revelation of Defendants' Fraud Occurred

190. On June 13, 2008, Textron issued a press release updating its forecast for second quarter earnings per share, and stated *that profit in its Finance segment would be significantly less than previously forecast.* Unfortunately for shareholders and the market, as described more fully below, Defendants combined this partial revelation of the truth with additional false and misleading statements which were designed to, and did, offset and minimize the impact of the partial disclosure.

191. Campbell attempted to mute the impact of this startling revelation (which contradicted many of Defendants' prior statements regarding the Company's Finance segment) by falsely stating on that same day that "*[d]espite further softening in our commercial finance*

***business, 2008 is shaping up to be another very good year for Textron overall as we continue to see strong demand and performance at Cessna, Bell Helicopter and Textron Systems.***"

192.    Notwithstanding Campbell's attempts to obfuscate the truth, the partial revelation of the Company's true financial condition and future business prospects, which partly corrected the market's expectations for the Company's financial performance and outlook, had a substantial impact on the price of Textron stock, which fell from a close of $58.18 on June 13, 2008 to close at $54.42 on June 16, 2000 (the next trading day), declining approximately ***6.5%*** on a whopping ***171%*** increase in trading volume.  On similar high volume numbers, the stock price continued its fall on June 17, 2008, when it closed at $52.19, representing a more than ***10%*** drop from the stock's June 14, 2008 closing price, as demonstrated in the chart below:



193.    If not for Defendants' false and misleading, hide-the-ball assurances that 2008 was shaping up to be a good year for Textron, the price of Textron's stock would have declined even further during this time period.  Indeed, had Defendants revealed the Company's true financial condition, market expectations would have been corrected.

194.    The statements referenced in ¶187 and ¶191 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Defendants knew that the Company's outlook for 2008 was in question and at risk given the speculative nature of the orders in the Company's backlog, and the rapidly deteriorating quality of the assets in TFC's portfolio which Defendants knew would create a drag on the Company's earnings which drag would be exacerbated should the economic downturn continue.

### After the June 13, 2008 Partial Revelation, Defendants Continued to Mislead the Market

195.    Then, on July 17, 2008, Defendants continued their false and misleading statements as Textron announced its financial results for the second quarter 2008, in a press release titled "**Textron Reports Second Quarter EPS from Continuing Operations of $1.03.**" While touting the Company's purported "*[r]ecord $23.5 Billion Aircraft and Defense Backlog,*" the press release noted the Company's guidance for a lower third quarter:

> "We achieved 19% organic growth in our aerospace and defense businesses, as global demand remained very strong *and led to another record level of backlog*," said Textron Chairman, President and CEO Lewis B. Campbell.

> \*        \*        \*

> *Reflecting continued strong demand in aircraft and defense, combined backlog at Cessna, Bell Helicopter and Textron Systems increased to $23.5 billion at the end of the quarter*, up from $18.8 billion at the end of last year.

> **2008 Outlook**

Textron continues to expect 2008 earnings per share from continuing operations to be between $3.80 and $4.00 per share. *The company is initiating its third quarter earnings forecast at $0.80 to $0.90 per share.* The company continues to expect free cash flow for the year will be in the range of $700 to $750 million.

\*       \*       \*

**Segment Results**

**Cessna**

\*       \*       \*

***Cessna backlog at the end of the second quarter was $16.0 billion, up $3.4 billion from the end of last year, reflecting 437 Citation jet orders in the first half.***

\*       \*       \*

**Finance**

Finance segment revenues decreased $62 million primarily due to lower market interest rates and a decrease in fee income, which reflected last year's $21 million gain from the sale of a leveraged lease, offset by $5 million in higher securitization gains this year. Revenues were also reduced to reflect the estimated impact on the company's leveraged lease portfolio related to a court decision involving other companies addressing the tax treatment of Sale-In, Lease-Out (SILO) transactions.

***Profit in the Finance segment decreased $55 million due to an increased provision for loan losses,*** the decrease in fee income, which reflected last year's $21 million gain, the impact of higher borrowing costs relative to various market rate indices and the SILO adjustment. These reductions in profit were partially offset by a benefit from increased receivable yields on loans with interest rate floors and a reduction in selling and administrative expenses. ***The increase in the provision for loan losses was primarily driven by a reserve established for one account in the golf finance portfolio and increased loan loss provisions in the distribution finance portfolio.***

The sixty-day plus delinquency percentage increased to 0.61 percent of finance receivables from 0.33 percent at the end of the first quarter. Nonperforming assets (NPA) increased to 2.31 percent of total finance assets from 1.84 percent at the end of the first quarter.

196.     Later on July 17, 2008, Textron held an earnings conference call to discuss the

Company's second quarter 2008 financial results. The Individual Defendants participated in the call

on behalf of the Company and continued to misrepresent the strength of the Cessna backlog and the

credit risks related to TFC. For example, Campbell stated in relevant part:

72

You know, even in the midst of prevailing economic weakness and challenges in our Finance segment, we achieved another solid overall result this quarter, ***and we continue to build backlog for our future, which is also important.*** Before I dive into the details, I'd like to go back and review what our initial economic assumptions were coming into 2008. I'd say our world has changed a bit, huh? I want to update you now on how we're thinking about the balance of the year and beyond.

In January, back then we were expecting modest world economic growth with commodity prices remaining at what was perceived to be, back then, pretty high levels. In the United States, credit and housing issues were expected to result in a mild downturn with soft corporate profits, at least mid year. Well, as we all know, since we first discussed our outlook, oil has been up by over $50 per barrel versus end of your last year, and other commodities are up significantly as well. This is having a direct impact on us through increased costs, particularly in our Industrial segment. Higher commodity costs have also further stressed the U.S. and global economies. ***Nonetheless, strong performance in our aircraft and defense businesses, the size and resiliency of our backlog, and actions we're taking give us the confidence to maintain our overall outlook for the rest of the year and beyond. A key point.***

So let's take a closer look at what's going on in each of our businesses and what we think it says about our future.

*I'll start with TFC where we encountered a number of late quarter developments.* ***Before I do that, I'd like to revisit what I said on our call in April when we discussed the risks around TFC and its forecast. What I said was, we believe our risk at TFC is manageable and strength and opportunities in the rest of our enterprise would substantially offset this risk. That's exactly what happened.***

\*       \*       \*

***Now let's finish with Cessna where the story remains extremely strong. And we say this against the backdrop of the current economic environment and its potential impact on order flow, cancellations and pricing.***

\*       \*       \*

Overall then, we've booked 437 total orders in the first half, most of which are earmarked for delivery in 2010 and beyond. ***Including citation shares, that brings our total backlog to 1,638 jets, which is about 3.5 times our current annual production.***

***The point here is, this backlog gives us complete confidence to raise production next year*** and we're currently targeting about 535 jets for which we're 95% sold out already. The question now becomes, where do deliveries go from here in 2010 and 2011? Obviously the answer is the function of three things--our current backlog, where net order rates go over the next three years, and one's view of global long-term business jet demand.

73

\*       \*       \*

*So, as we look at '08 orders, we're very encouraged that we will likely see our original forecast of 570 orders by a significant margin, although we expect second half orders will be less than the first half, obviously, reflecting the initial surge of Columbus orders and the two successful international biz jet shows early in the year.*

Looking to '09, we're not expecting a precipitous drop in orders, but we do expect rates will be less than next year's delivery plan based on the lack of availability of open slots, and also probably some softness in the economy. Beyond that, it's too early to call, as it will depend upon how the global economy develops over the next 18 months.

197.    Continuing his false and misleading statements, Campbell again touted the strength of

the Company's backlog, stating, in relevant part:

*So now we come to our third factor, and it's one we cannot overemphasize. And that is the size and resiliency of our current backlog. At 3.5 times our '08 production, this provides tremendous balance. As we shared in January, this backlog can be stressed as severely as the last business cycle and we would still need to expand capacity to service the systemic demand that we see in the marketplace for Citations over the next several years.* Yes, sure.

Portions of our backlog are susceptible to normal cancellations or deferrals. And we'll likely see cancellations. *However, within our backlog there's significant interest among customers to move up in their position and therefore we do not view cancellations as a significant risk to our outlook. So, in summary, even with the current global economic environment being what it is, we believe we'll have up delivery years in 2009 and again in 2010 and again in 2011.*

So let me close by saying we're pleased with our overall progress at Textron so far this year, both in terms of results and in preparing for the future, but from a management perspective, this is not a one-size-fits-all situation. Some of our businesses are entering a period of contractions where we're responding appropriate, while others are still very much in the growth mode. In fact, we continue to believe that Textron is somewhat unique in that the largest portion of our business should see sustained growth over the next several years. *Our total aircraft and defense backlog of $23.5 billion, another all time record, gives us visibility and confidence in this outlook.*

198.    Following Campbell's false and misleading statement, French further misled the

market, stating in relevant part:

74

Profits in the finance segment decreased $55 million due to an increase in the provision for loan losses, the decrease in fee income, again that $21 million gain from last year, on impact of higher borrowing costs relative to various market rate indices, and the silo adjustment. These reductions in profit were partially offset by a benefit from increased yields on loans with interest floors and a reduction in selling and administrative expenses.

The increase in the provision for loan losses was primarily driven by a reserve established for one account in the gulf finance portfolio and an increase in the overall loan loss provision in our distribution finance portfolio, as general U.S. economic conditions have continued to impact borrowers in certain industries. The 60-day plus delinquency percentage increased to 0.61% of finance receivables from 0.33 at the end of the first quarter, but still a very low number. Nonetheless, non-performing assets increased to 2.31% of total assets from our first quarter level of 1.84%.

Looking forward to the rest of the year at TSC, we've reduced our outlook to incorporate higher credit losses and continued pressure on interest margin. ***Based on the composition and quality of our portfolio, we do not believe that Textron Financial represents the level of risk that the markets have seen with other financial companies***. And we look forward to having a more detailed discussion about our view with all of you on August 6th.

***In conclusion, we believe our forecast properly reflects the additional stress our finance businesses will experience for the rest of the year***.

199.    Later on the call, during the question and answer period with analysts, Defendants downplayed the tightened third quarter guidance, blaming a variety of factors, but ultimately pointing to Textron's purportedly "very strong" backlog in order to once again assure the market, albeit falsely, of its financial strength and future business prospects. For example, Campbell stated, in relevant part :

And as I've said a couple times on calls in the past, it's certainly interesting to note, and should give our investors confidence, that so much of our business is very solidly locked into sector growth that doesn't relate to the economy. You take Bell, ***you take access [sic] Cessna***, you take Defense and Intelligence, ***those businesses are so solidly positioned and you really don't read anything these days that says anybody's got a better position in any of those markets than we do.***

***So I feel very good about Textron right now and our future, as a matter of fact. And our backlog, needless to say, is certainly very strong. I say that with a smile. I've never felt better about our backlog and that bodes well for our future, as well.***

200.    In response to an analyst question about why Defendants had confidence in their

projections regarding TFC, Defendants continued to deceive the market concerning the strength of

TFC's portfolio, representing that Textron's charge-offs were aggressively analyzed, giving the

market the false impression that its loan loss reserves were adequate.  For example, French stated, in

relevant part:

> We started a--let me just start by saying there's a lot of uncertainty in the markets
> that are out there. It would be naive to say otherwise. We spent the latter part of this
> quarter, as we started to see some things coming up, doing some very deep dives into
> some of our businesses, and really all our businesses, and doing it with some
> independent reviews where we send people from different businesses in to look at
> other people's businesses as opposed to their own to try to get an unbiased,
> unvarnished view of what can happen. We've run a whole series of models and
> scenarios around rate environments and around potential charge-offs in each of the
> businesses, potential non-performing assets in each of the businesses. And we've
> taken the number down pretty aggressively, ***and we have taken it down to a number
> that we think is the most likely case right now***.

> But I still say that, also, with the confidence that whichever way TFC moves around-
> -and I think we've put the number in at a guidance that's the mid point--the range of
> guidance for Textron in total is still quite significant, between $3.80 and $4. ***We have
> high confidence that that's what we're going to deliver in the end. If TFC is a little
> better or worse, it's not going to take us off that march***.

201.    Defendants also continued to misrepresent the strength of demand for Cessna planes,

with Campbell making the following false and misleading statements concerning a decision to

"move" orders and cancellations:

> ***I'll tell you, it's you know, with everything written, I'm going to be real frank with
> you. With everything that's been written about this time-I'll be real frank with you-
> -with everything that's been written about the slow down in business jets and the
> cycles coming at us, we have had two--one, two--cancellations, and both of those
> have been discussed with customers, two of which said, can you do us a favor?
> These are not business failures, these are not guys that have gone bankrupt,
> they're not businesses that have gone underwater. These are two good customers
> of ours. We decided to move something from year one to year two. And, by the way,
> it hasn't affected us a bit because we have people ready to step up to take those jets.
> We really only have two this year to date. Very low number***.

202.     Turning back to TFC, French made additional false and misleading statements about the quality of its portfolio, stating, in relevant part:

> Clearly, distribution finance and golf finance were the two that had the most difficulties. ***We have businesses like resorts and aviation that are ahead of plan and doing very very well***. But the big hits were in those two businesses--distribution finance, on account of a homogenous business basis because we did see higher levels of charge-offs and issues arise late in the quarter that are consumer durable related end markets. That's across a broad range of businesses where the golf business was all the single hit. The bottom line, yes distribution finance lost $3 million and golf lost $7 million.

203.     As the call continued, the discussion turned back to Cessna, where Campbell misled the market as to the Cessna's financial condition and future business prospects, stating, in relevant part:

> We have seen no absorbable deterioration in any of our prospective customers' financial situations. That's good. No major [in]solvents in fractional. ***As I said, order cancellations, only two***. Our sales force has come back and said they think our order rate for this year should exceed 570. That's not a forced number, that's up from the grass roots number kind of. So, and you're not seeing any big competitor looming out there that's getting ready to take our share away.
>
> ***So I think the concern over Cessna's future health is--anyone that has a concern like that is probably misplaced. As far as we can see, every factor we look at is at least neutral, if not positive***.

204.     Adding to the false and misleading statements regarding Cessna's backlog and lack of cancellations, Wilburne stated, in relevant part:

> [J]ust to clarify, on that basis, in the last down cycle, over a period of three years, we had a total of 170 orders cancelled, and we expect something less than that will occur over the next three years. ***Two quarters into it, we've got two. So I'd say we're tracking pretty well so far***.

As the call continued, the following exchange took place:

**<u>David Strauss – UBS – Analyst</u>**

Okay, great. And then you talked about you haven't seen really any cancellations, but are you seeing any more delivery slots being put up for sale in the market?

**<u>Lewis Campbell – Textron Inc. – CEO</u>**

77

*Nope.*

### **Doug Wilburne – Textron inc. – VP Investor Relations**

*That's not permitted at Cessna. Our customers aren't allowed to sell a slot.*

### **Lewis Campbell – Textron Inc. – CEO**

Occasionally one will sneak through on us. And I mean one out of maybe 570 orders so it's kind of a small number. *But that's really an anomaly because we don't allow it. We have a pretty darn good due diligence process on anybody that places an order. We just don't take the order and say, "Thank you very much." We know every one of our customers, we know why they're buying the plane, we know what they're selling. We know a lot about our customer base.*

205.    The statements referenced in ¶¶195-204 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- By Summer 2008, a material number of Cessna customers were attempting to cancel their orders.  In order to avoid publicly reporting a material number of order cancellations, Defendants aggressively convinced purchasers to defer purchases of the aircraft for several years, and in some cases indefinitely, all the while touting the Company's strong backlog and low number of order cancellations and deferrals.  By pushing out the delivery dates of orders (rather than allowing customers to cancel them), the Company kept its backlog artificially inflated, and hid from the market the true nature and extent of the Company's problems.

- Contrary to Defendants' statement that they were not seeing an increase in delivery slots put up for sale, throughout the Class Period, delivery slots were being sold with increasing frequency.

- TFC's portfolio was, in fact, not comprised of quality loans and the whole segment was rapidly deteriorating.  For instance, by the first quarter of 2008, Textron had already written off $19 million of an approximately $50 - $60 million loan to a real estate rehab company who was involved in an extremely speculative venture in Minnesota.  By the third quarter of 2008, the personnel in the Finance Company Services Division were being told not to initiate and new deals and to minimize dealings with their clientele.  In fact, real estate rehab loans were considered so risky that most of Textron's competitors would not make them at all.

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders founded on deteriorating

underwriting standards, financing of buyers who were not creditworthy, and undisclosed financing of "nonrefundable deposits." While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm" booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

- Because Cessna's "strong order intake" was due in large part to the Company's decision to significantly grow its business by lowering the Company's underwriting standards, financing deposits and taking on larger and larger amounts of extremely risky loans, the supposedly "strong order intake" was illusory, misleading and a wholly unreliable indicator of Textron's financial strength and future business prospects. Indeed, the illusion created by Defendants concerning the strong order intake for Cessna's aircraft was revealed to be false and misleading when Textron announced dramatic cuts to its Cessna production levels and an unprecedented level of deferrals and cancellations at the end of the Class Period.

- Textron was failing to timely writedown the value of its loan portfolio in violation of GAAP as detailed herein at ¶¶265-92. As a result, the Company was materially overstating its reported financial results.

### Later on July 17, 2008, an Additional Partial Revelation of Defendants' Fraud Occurred

206.    On that same day, CreditSuisse issued an analyst report questioning the veracity of Defendants' earlier statements concerning the Company's outlook for 2008:

> *There's a lot of head scratching over the chain of events at TXT which creates credibility issues.* First, TXT hosts a Finance mtg in late April where we hear all is well at Finance. The bullish story is reiterated at EPG and several other conferences throughout May. Then in mid-June TXT pre-announces on a Friday at 4pm that Finance will miss but Q2 is still on track. Now in mid-July we see a nice Q2 beat but the co. guides to a lower Q3. In early Aug we'll get another update on Finance. *Bottom line is that it's hard to have any degree of confidence in the outlook after all this*.

207.    The partial revelations of the Company's true financial condition and future business prospects, together with the questions involving management's veracity and integrity, provided to the market on July 17, 2008, which partly corrected the market's expectations for the Company's financial performance and future business outlook, had a significant impact on the price of Textron's stock. After seeing more than 6% gains on July 16, 2008, when the stock closed at $45.98, the stock fell sharply, declining nearly *6%* on July 17, 2008 – and on an *89%* increase in trading volume – to

close at $43.25.  The decline continued over the next two days, with the stock falling to a close of $40.16 on July 21, 2008, representing a drop of ***more than 12%*** from July 16, 2008.

208.    If not for Defendants' false and misleading statements on July 17, 2008 about Cessna and TFC, which were intended to and did minimize the impact of this partial revelation, market expectations would have been corrected and the price of Textron's stock would have declined even further during this time period.

**After the July 17, 2008 Partial Revelation,**
**Defendants Continued to Mislead the Market**

209.    On July 25, 2008, Textron filed with the SEC its Quarterly Report on Form 10Q.  The July 25, 2008 10Q parroted many of the false and misleading claims made by Defendants in the Company's July 17, 2008 statements.

**On August 6, 2008, an Additional Partial Revelation**
**of Defendants' Fraud Occurred**

210.    After the close of the market on August 6, 2008, TFC hosted a conference call to provide the market with an "updated review of [TFC's] portfolio and expected performance."  On the call, the Individual Defendants – while continuing to make false and misleading statements concerning the stability of TFC and the strength of TFC's portfolio – revealed to the market that TFC's financial strength and future business prospects were in worse shape than Defendants had previously led the market to believe.  For example, French stated, in relevant part:

> In the context of the challenging commercial credit environment that has evolved this year, we felt it was particularly important to provide an updated review of Textron Financial's portfolio and expected performance. ***Our goal is to give you a transparent framework by which you can be comfortable with our forecast of 130 million as a reasonable and achievable full-year net operating profit expectation for TFC in the absence of unpredictable single account surprises. We believe our forecast reflects expected loss provisions consistent with the environment that we're in, plus we're doing everything we can to maximize performance at TFC and at all of Textron.***

80

211.   As the call continued, Cullen disclosed to the market that TFC's profitability was

suffering, while attempting to assure the market (albeit, falsely) that the portfolio was still sound:

Here you can see in each of the last two cycles, that's exactly what happened. Economic downturn, higher charge-offs, but offset by improved pricing. This cycle is somewhat different. *The combination of margin compression over the last three years, which had an effect of declining margins about 100 basis points, and this sudden increase in loan losses has hurt TFC's profitability. The margin compression was exasperated by a capital markets disruption beginning last fall that increased borrowing costs on average by about 58 basis points and has made it more difficult for TFC to increase margins, despite higher pricing across all business lines.* **On the other hand, we don't believe we will see charge-offs in the range we experienced in 2002, simply because the composition of our portfolio is significantly different and we avoided most of the pitfalls that are plaguing many other financial institutions.**

Today, consumer spending has put pressure on several areas of TFC's portfolio that are related to consumer durables or leisure, and as a result, TFC has raised its charge-off forecast to be in the 75 basis points range versus 43 basis points in 2007. I'll move to the next slide.

TFC's historical performance reflects these economic cycles. In the early '90s, margin improvements and growth offset increases in charge-offs. In 2001 we had just completed several acquisitions which increased our profits, but higher margins were offset by higher losses, largely from – excuse the background noise – largely from new business initiatives and acquisitions, and this caused us to refocus on what we now call core businesses. Those core businesses perform significantly better through the cycles. Core and non-performing assets peaked at 2.5% in 2002 and peak charge-offs were 125 basis points in 2003. *That being said, this disruption in the capital markets has thwarted our ability to expand margins, even as we increased pricing, and combined with increased loan losses, we have lowered our forecast to $130 million.*

*           *           *

*Loss provision of $120 million is $88 million higher than last year. 31 million represents higher charge-offs, primarily related to distribution finance, and as I said earlier, we are now forecasting charge-offs of around 75 basis points compared to 43 last year.*

The loss provision also includes reserve increases of $57 million, including specific reserves of $27 million which we took in the first quarter and second quarters. You really have to go back to 2002 to see loss provisions at comparable levels.

*           *           *

81

*Overall, we feel 130 million is a fair estimate for the full year, but it's not without some risk, and it really depends to some extent on your outlook for the economy*.

212.     Following Cullen's statements, Butera made additional false and misleading statements:

*So if you look at the delinquency trend chart, you'll see that we're forecasting delinquency to remain relatively stable over the balance of the year, but to be at the lower end of our normal business cycle range*.

[O]nce loans become 90-days delinquent, the loans are automatically classified as non-accrual. In addition we have a well defined process for reviewing our portfolio and classifying loans as non-accrual as soon as we determine that the full collection of principal and interest is at risk. [...] This will often result in non-performing assets exceeding our delinquency level, as is the current case. NPA has increased during the first half of 2008 from the very low levels we achieved in 2006 and 2007. The increase was primarily driven by two large accounts that I'll discuss when we look at our operating businesses. *We expect NPA to increase during the second half of year, but not at the same pace as the increase during the first half of the year*.

*            *            *

Now on to our Aviation Finance Group [...] *This business continues to perform very well. As you can see from the chart, 74% of our portfolio is secured by Bell and Cessna aircraft. The credit performance and collateral values remain stable in this portfolio, and international growth is expanding as we leverage Bell and Cessna's global footprint*.

If we turn to Slide 23 and look at the credit statistics, *you'll see that trends remain relatively stable in this portfolio, and we expect non-performing assets and charge-offs to remain at the current levels in the near term*.

*            *            *

This is our floor plan or inventory financing business. These are primarily short cycle facilities, where the impact of economic slowdowns or upturns is felt relatively quickly. We have manufacturer inventory repurchase support that mitigates losses, and the risk in this portfolio is primarily from dealer sold and unpaid. We have heightened portfolio monitoring routines and floor checking routines now in place on this portfolio [...]

[T]his portfolio consists primarily of short cycle products focused in consumer durables. The result is the impact of the current recession is reflected quicker than in the balance of TFC's portfolios, but the recovery will be quicker as well. *So if you look at the NPA and charge-off trends, we're expecting that they're going to remain at their current levels at least through the balance of 2008*.

82

213.    Later on the call, Carter continued to falsely tout the Company's "excellent portfolio quality", stating, in relevant part:

*We went into this downturn with excellent portfolio quality, which positioned us better to be able to deal with the problem in front of us*. We have a tremendous team of people with a great deal of experience in this business. In fact I have often said, "I would not want to face these challenges with any other team." They are up to the task and we will work our way through the issues before us. *Finally through July our credit statistics are tracking to or slightly better than our current outlook*.

214.    Then, in response to an analyst question concerning growing TFC's asset base, Defendants continued misleading investors concerning the opportunities available to the Company, with Wilburne stating, in relevant part:

*[A]ctually these kind of times are the opportunistic times for a strong finance company to be able to come in and exploit the exit of weaker players, and so it's really an opportunity to go in and snatch up really very attractive business*.

215.    Following up, Carter stated, in relevant part:

*You know that's a good point, Doug [Wilburne]. . . . Because we will get through this and we perfectly -- let me restate that. We have no reason to believe at this point that we're not going to come out the other side stronger than we went in, and we're trying to position that while we're working on solving our problems*.

216.    The additional partial revelation of the Company's true financial condition and future business prospects, which partly corrected the market's expectations for the Company's financial performance and outlook, caused additional artificial inflation to come out of the price of Textron's stock.  The price of Textron's stock fell from an August 6, 2008 close of $42.70 to close at $41.90 on August 7, 2008, a modest decrease of approximately 1.8%.

217.    If not for Defendants' false assurances about the strong quality of TFC's portfolio (among other things), which were meant to and did minimize the market's reaction to this additional partial revelation, market expectations would have been corrected and the price of Textron's stock would have declined even further during this time period.

218.   The statements referenced in ¶¶209-15 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The composition of TFC's portfolio was not "significantly different" from the portfolios of financial institutions who were being damaged due to high leverage and credit risk.  Indeed, prior to and during the Class Period, TFC exponentially increased its exposure to high-risk lending and followed the mortgage market down by significantly lowering its lending standards and ignoring Textron's long-standing credit guidelines, causing TFC to significantly increase the credit risk and leverage in its portfolio.

- TFC did not go into the economic downturn with "excellent portfolio quality." Rather, TFC's portfolio was built upon significantly lowered credit standards and risky loans that were made as a result of TFC's self-deteriorated underwriting standards.  Indeed, Textron employees were expected to approve even marginal borrowers, and those that were not approved were often escalated to upper management to be approved by a superior.  Further, TFC rapidly expanded into fields – such as lending to "real estate rehab companies" – that were largely shunned by other lenders due to the extreme level of risk involved.

- TFC's default and delinquency forecasts were unsubstantiated and unreliable because, during the Class Period, TFC relaxed the default policies on certain loans so that TFC would not have to include them in its default category and disclose them. For instance, TFC was rewriting debt coverage covenants with ever-increasing frequency so as to not have to mark loans in default that would have otherwise been in default under the original debt covenant language.  By manipulating loans to avoid including them as defaulted, TFC misled the market as to Textron's financial strength and future business prospects.

219.   On September 3, 2008, Morgan Stanley issued an analyst report that further called into question the Company's true financial condition, as well as the veracity of Defendants' statements.  The reported noted that: "*[p]otential additional charge-offs at Textron Financial Corp. (TFC) are an overhang on the stock.*"  The report went on to note that "*we question whether the NPA [non-performing asset] allowances may yet be too low as over the past few quarters, allowance growth has not kept pace with NPAs.*"

220.    The impact of the questions raised by the Morgan Stanley report was severe.  On September 4, 2008, the stock fell more than 5% from the prior day's close of $41.31, to close at $39.19, on a 91% increase in trading volume.

**On October 16, 2008, Additional Partial Revelations
of Defendants' Fraud Occurred**

221.    Then, out of nowhere, on October 16, 2008, Textron announced in an 8K filed with the SEC that it would downsize TFC by approximately ***$2 billion*** by exiting its "asset Based Lending and Structured Capital segments, and several additional product lines," leading to losses of $169 million for goodwill impairment.  The October 16, 2008 release stated, in relevant part:

In recent weeks, volatility and disruption in the capital and credit markets have reached unprecedented levels. ***In light of current market conditions** and in order to reduce Textron's short term funding requirements, on October 13, 2008, the Board of Directors of Textron approved the recommendation of management to downsize Textron's commercial finance business, Textron Financial Corporation, ("TFC"). Under the approved plan, TFC will exit its Asset Based Lending and Structured Capital Divisions, as well as several additional product lines, through an orderly liquidation over the next two to three years, as market conditions allow. The assets in the businesses to be liquidated represent approximately $2 billion in managed finance receivables within TFC's $11.4 billion portfolio. In addition, TFC will also limit new originations in its Distribution Finance, Golf Finance and Resort Finance divisions.*

Based upon the Board of Directors' approval of management's recommendation, Textron has determined that an impairment indicator exists for TFC's goodwill and long-lived assets. *Based upon internal analysis performed, Textron expects to take a non-cash pre-tax impairment charge in the fourth quarter of up to $169 million to eliminate substantially all of the goodwill at TFC and to incur a restructuring charge in the range of $10 - $15 million for headcount reductions and consolidations at TFC.* Textron will continue to assess its estimate of total impairment and other charges from exiting these businesses and may adjust such amounts as appropriate.

This impairment charge will likely result in a fixed charge coverage ratio, at the end of 2008, of less than the 1.25 times required under the Support Agreement, dated as of May 25, 1994, between Textron and TFC. *As a result, Textron expects that, as required by the Support Agreement, it will make a capital contribution to TFC equaling the difference between pre-tax earnings before extraordinary items in the actual fixed charge coverage calculation and the amount that would have been required for pre-tax earnings before extraordinary items to meet the 1.25 times requirement for the year ending January 3, 2009. This cash payment is expected to*

*be required in the first quarter of 2009, and Textron currently estimates that it will be in an amount up to $200 million.*

*       *       *

222.     Accompanying the 8K on October 16, 2008 was a press release titled, "**Textron Reports Third Quarter EPS from Continuing Operations of $0.85**."  The press release provided the market with some additional detail about the liquidation of many of TFC's product lines, while continuing to attempt to mislead the market with regard to TFC:

Strategic Actions

Campbell announced, "**Given the sustained turmoil in world credit markets** we are taking a number of strong and measured steps, including:

•       *a downsizing of Textron Financial Corporation (TFC),*

•       *a strengthening of our already strong capital and liquidity positions,*

•       *and an accelerated cost reduction program across the company.*"

The first action is to reduce the size of TFC, Textron's commercial finance business. The company will be exiting its Asset Based Lending and Structured Capital segments, and several additional product lines through an orderly liquidation as market conditions allow. TFC will also limit new originations in its Distribution Finance, Golf, and Resort portfolios, consistent with maintaining franchise value and our commitment to service existing credit-worthy customers.

As a result of the decision to downsize TFC, Textron expects to take a non-cash impairment charge in the fourth quarter of up to $169 million, which represents the current goodwill balance at TFC. The company will also incur restructuring charges for headcount reductions and consolidations.

Textron will make capital contributions to TFC, as appropriate, to strengthen TFC's capital structure and to maintain certain minimum requirements under TFC's committed credit facilities and Textron's support agreement with TFC.

"**Going forward, we will continue to carefully evaluate the appropriate range of remaining lending activities at TFC in light of strategic fit and continuing developments in the capital markets, all in a manner that maximizes value for shareholders in any current or future financial market scenarios**," Campbell noted.

*In order to maximize funding predictability in the current environment, Textron has suspended its share repurchase program and is exploring a number of options to reduce a portion of its outstanding commercial paper funding.*

86

Finally, Textron is initiating an accelerated overhead cost reduction and productivity improvement program across the enterprise. Including restructuring costs at TFC, the company expects total restructuring charges of about $25 million, with most of the charges occurring in the fourth quarter. Annualized benefits associated with the charges are estimated to be $40 million.

223.    Yet, in an attempt to keep the Company's stock artificially inflated and minimize the impact of this additional partial revelation of Defendants' fraud, in the October 16, 2008 press release, Defendants continued to misrepresent the strength of the Cessna backlog.  For example, the release stated, in pertinent part:

> *Cessna backlog at the end of the third quarter was $15.6 billion, up $3 billion from the end of last year, reflecting 484 jet orders taken year-to-date, with 47 jet orders in the quarter*.

> \*       \*       \*

> **2008 Outlook**

> \*       \*       \*

> "The economic environment will continue to be uncertain over at least the next several quarters. *However, we believe the actions we are taking, combined with our government programs and aircraft backlog, position us to perform well through these difficult times*."

224.    Later on October 16, 2008, Textron held an earnings conference call to discuss the Company's third quarter 2008 financial results and the liquidation of TFC, and the Individual Defendants began by reiterating the partial revelation of the truth concerning TFC's financial strength and future business prospects.  For example, Campbell stated, in relevant part:

> These are unprecedented times in the US financial markets and around the world. *As a result*, we are taking immediate actions in three areas -- a downsizing of TFC, measures related to our funding needs, and steps to accelerate cost productivity across the enterprise.

> *I'll start with TFC. First, we'll be exiting our asset based lending and structured capital segments plus several additional product lines through an orderly liquidation over the next two to three years, as market conditions allow. These assets represent about $2 billion in managed receivables within TFC's $11.4 billion portfolio, and we estimate that these assets can be reduced by about $500 million by the end of 2009.*

87

Second, we are limiting new originations in our distribution finance, golf and resort portfolios consistent with maintaining franchise value and our commitment to serving existing credit worthy customers. This should contribute another $1 billion in asset reductions next year.

Taken together, then, these two actions should result in over a 10% reduction in managed receivables in 2009. *As a result of our decision to downsize, we expect to write-off, if not all, most of the goodwill of TFC as well as take a restructuring charge for head count reductions and consolidations in the fourth quarter.*

Going forward, we will continue to carefully evaluate the appropriate range of lending activities ***in light of the strategic fit and continuing developments in the capital markets***, and all in a manner that maximizes value to shareholders in any current or future financial market scenarios.

*While we are talking about TFC let me comment a bit on credit performance. Credit stats continue to soften in the third quarter, particularly in September. Given the historic events in the past several weeks, it's apparent that we are likely to experience a more difficult credit environment in this cycle.* However, we believe our credit losses in this tougher setting will be manageable and Ted will share much more of those details in just a minute.

Let me address capital funding. First, let me assure you that throughout these recent volatile times we've maintained daily access to funding from the commercial paper markets as well as other sources. However, given the possibility of continued volatility, we are taking additional steps to provide predictability in our funding outlook. Our first action, actually taken in September, was to suspend all share buy back activity which will remain in place until after financial markets stabilize. The suspension includes the remainder of the repurchase we announced in July as well as repurchases we had planned with the proceeds from our pending sale of Fluid & Power which, incidentally, is scheduled to close in November.

\*       \*       \*

Now I understand many of you attended MBAA last week where you heard how recent economic developments might impact the business jet industry. Market indicators such as used aircraft sales and jet utilization weakened depreciably during the quarter, especially in September. In this environment, we actually booked 47 jet orders last quarter, which was less than what we anticipated. *So the order downturn has arrived more quickly than what we were expecting, as the events of the past several weeks have put a big chill on the market.*

The last down cycle which began in 2001 provided us with critical experience in managing in a down environment. ***We are fortunate at this time to have that experience, but more importantly, to have a very large and robust backlog of over 1500 jets which includes many customers who are interested in taking deliveries earlier, if they can.*** To develop a very specific and dynamic plan to maintain

delivery continuity, our Cessna team is contacting customers in the order book now so we can be prepared early in the cycle in the case we need to move up delivers.

**So we remain comfortable with next year's production plan at this point**, but beyond that frankly, we are taking a wait and see attitude with respect to how demand develops from here. **On the other hand, with our backlog we don't need a lot of net orders to sustain our production in 2010 and 2011.**

225.   As the call continued, French further revealed information about the Company, but

also made additional false and misleading statements, as set forth in relevant part below:

Today I want to start with a discussion of the factors that pressured TFC in the quarter relative to our guidance. *We generated operating profits at TFC of $18 million, which was $12 million less than our forecast of about $30 million.* The three primary drivers were as follows: First, coming into the quarter, spreads between prime and LIBOR rates were already abnormally compressed. As we now know, those spreads continue to narrow. In fact, they are virtually nonexistent as we speak. That led to a $5 million impairment related to our distribution finance securitization facility.

Second, even though we were projecting abnormally high borrowing rates, they went up even further, and that cost us about $2 million.

*And third, as the consumer economy deteriorated, our loan loss provision cost about $5 million more than what we had planned for the quarter.*

*Now let's talk about TFC results going forward. Looking at the fourth quarter, we are assuming that credit performance continues to weaken, as well as a continuation of the current dislocation in the relationship among prime, LIBOR and Fed fund rates. On this basis, we are projecting a range of possible outcomes from a pre-tax profit of $5 million to a loss of $20 million, depending on how these two major factors play out. This may seem like a wide range for TFC, but in the current environment forecasting accurately has become much more difficult.*

*Looking forward to 2009, the goodwill charge and operating results in the fourth quarter will likely result in a capital contribution to TFC between $170 million and $200 million in the first quarter of next year to maintain certain requirements specified under our committed credit facilities and support agreement.*

With that, let's continue with our forecasting discussion by examining the factors that are going to affect 2009 at TFC. [...] Historically, TFC has experienced low charge-offs relative to delinquency rates because of high recoveries on defaulted loans. For example, in our distribution finance portfolio recoveries have been high because we have three avenues for recovery -- the underlying hard collateral of finished goods inventory, the guarantees of the dealers, and the repurchase agreements with manufacturers. In the case of aviation finance, we've had

extraordinary control over recoveries because of our intimate presence in the aviation markets. Moreover, the aviation portfolio currently has a loan-to-value ratio of about 70%, so there's significant collateral cushion from which to recover.

\*          \*          \*

***Cessna backlog at the end of the third quarter was $15.6 billion, up $3 billion from the end of last year, reflecting 484 Citation jet orders taken year-to-date, but down about $400 million sequentially from the prior quarter.***

\*          \*          \*

*For Textron financial, revenues were down $30 million due to lower market interest rates, partially offset by the benefits of higher volume and interest rate floors. Segment profit was down $36 million due to an increase in the provision for loan losses and higher borrowing cost, partially offset by the benefit of interest rate floors. The increase in the provision for loan losses was primarily attributable to the distribution finance portfolio, as general US economic conditions have continued to impact borrowers.*

\*          \*          \*

*With respect to credit quality, the 60 day plus delinquency percentage increased to 1.06% of finance receivables from 0.61% at the end of the second quarter. Our nonperforming assets of 2.67 was up from the second quarter level of 2.31.*

226.    Later on the call, during the question and answer period with analysts, Defendants, as they did throughout the Class Period, continued to tout the strength of the business at Cessna while downplaying partial revelation of the truth and resulting TFC wind-down. For example, in response to a question concerning Cessna's backlog and whether customers were deferring orders, Campbell stated, in relevant part:

***One of the unusual things about this environment we're in is we just haven't seen too much of that yet. Cancellations are not even noteworthy. We've had a few customers who have come and ask for different financing terms in the fourth quarter but basically we just haven't seen much movement as you might have expected by your question. So things are pretty steady at the moment***.

\*          \*          \*

***We have had a few customers, really in the month of September, during this high turmoil period of time, come to us and say their financing has fallen through, but it's less than a handful. And have asked if we would look at their credit from a TFC standpoint to step in from whatever financing they had previously arranged***

90

> *typically with a local bank or a regional bank. But too early to tell. Clearly if things continue to be as tight as they are, we may see more customers come in and look for alternate financing. And if they are creditworthy, we are happy to stand in and do that.*

227.    In response to questions regarding the potential deferral of Cessna deliveries to

customers in 2009, Campbell stated:

> *Well, as I've said in the earlier response to Ron, we are not seeing any number that I can even put my finger on. If there's any, I am not even aware of anybody asking to push back, and we review our numbers with Jack Pelton and his gang all the time. So specifically in '09 we have not seen much -- any pushback of any consequence.*

228.    Further commenting on whether Cessna customers were delaying delivery of planes,

French commented that:

> *I think maybe one follow on, Heidi. Relative to being proactive, the Cessna team is out proactively talking to everyone in the order book for '09 deliveries right now to try to get a sense, as early as possible, if anyone is going to come forward and ask us to push something out because we do have other customers who are continually expressing an interest in being pulled forward. The challenge, of course, is getting those to all balance out requires some advance planning. So the sales team at Cessna is out right now doing just now, trying to understand if they have someone that might slip so that they can work earlier rather than later on trying to pull someone forward for that aircraft.*

229.    Responding to an analyst question regarding whether Cessna customers would have

trouble financing their purchases, Campbell assured investors that Cessna's customers would not be

in trouble:

> *When someone places an order, not only do they have to put down a nonrefundable deposit but also we require an understanding of where they are going to get their financing, and knowing that, then, that database is really valuable as we can then look across the entire spectrum of customers and then have some understanding which customers might have the most difficulty. We also know their net worth, et cetera, so we have a pretty good understanding about this.*

230.    As the call continued, Campbell assured analysts and investors that Cessna had "*very*

*little cancellation*" of its orders.

231.    When an analyst asked questions regarding the size of international customers within Cessna's backlog and whether those customers would be able to pay for their jets, Campbell responded with additional false and misleading statements, stating in relevant part:

It's a big number, it's a good number. We have so many charts here. International orders and deliveries on the order side of 68% are international, and on the delivery side this year through the end of the quarter 57% are international. And if you look inside that and say where are they, Europe is by far the biggest. They're half of the international order backlog, and then Asia-Pacific is a little more than 10%, Middle East and Africa is a little less than 10%, Latin American is about 20-some percent. So it's a pretty darn good mix. *And, of course, remember, every time we finance somebody, no matter where in the world we finance them, they have to come forward with that nonrefundable deposit and also supply us with bank financing or whatever financing sources they have so we can get convinced they are not speculating, and also get convinced that they can make good on their order. So I think it's a very good backlog right now*.

232.    As the call continued, analysts questioned whether the future write-downs would result in the need for more capital to be down-streamed from Textron to TFC.  In response, French made additional false and misleading statements, pointing to the purported strength of the Company's portfolio, stating in relevant part:

*First of all, we believe that we have a very strong portfolio and a great recovery process*, and the reason that we don't mark our portfolio to market. So we are not pricing assets like you see some financial institutions under a scenario that assumes you would fire sale. Our expectation is that we will go out and exercise our recovery processes. And we do recognize charge-offs and additional loan loss provision when we make a determination that we are not going to be able to get full recovery of interest and principal, and clearly we've been doing that. Those numbers have been going up. We expect those numbers to continue to go up as you saw in the scenario analysis that we were looking at.

Within reason -- let me take this in two steps. The goodwill write-off, which is causing the initial requirement for additional capital infusion into TFC is really a non-cash event. It's a non-cash write-off in TFC, but under the support agreement requires us to make a cash contribution. All that is doing is having the effect of moving commercial paper requirements out of TFC to the parent, which as you know is not an all bad thing to have happen, up to a certain level. *To the extent that we do have higher levels of loan losses, as we modeled in a couple of scenarios that we shared with you today, obviously those are more cash oriented events, and at this stage depending on what range they are in, they are fundable out of the general cash flow of our industrial businesses. If they got to some extraordinarily higher*

92

*level, then obviously they could, at some point in time, require us to fund them, and we would likely have excess capital down in TFC as a result of these contributions so a lot of that funding probably would be at the parent.*

233.    Later on the call, in response to a question regarding Cessna's financial performance, French made additional false and misleading statements:

> We are seeing some impacts of this weakening economy in Cessna, **and it's not on new jet deliveries**, but we are seeing a slowing growth rate in the after market business. We are clearly seeing a reduction in volume in the single engine piston caravan side of the business. We did see for the first time a little bit of used valuation hit in Q2, but a little bit bigger number in Q3. So we have baked into our numbers that our used inventories are starting to grow on book at Cessna, and values are down a little bit. We have a much better process now than last time, so we think those will be much more limited, but we are seeing some of the used valuation impacts.

> And frankly at Cessna in the last quarter we have seen some productivity issues that I think really relate to the strain of stepping up to these larger volumes. So we have a little bit of cost performance weakness in there, as well. **So we do think the real driver of the business is jet deliveries and jet deliveries will be driven by the backlog.** But around the periphery of the business there are some impacts from the current economic environment.

234.    Then, in response to an analyst inquiring as to Defendants' current evaluation of Textron, Campbell falsely stated that Textron had been well protected from the downturn in the economy:

> Well, obviously with the situation we find ourselves in in today's global economic crunch, it really affects quite a bit of our portfolio, but let me say this. **If you really think about what is embedded inside of Textron currently, even with the current economic environment, a large portion of our company is well protected from -- appears to be so far -- well protected from the current fall off in the economy. Cessna, okay, margins off a little bit, but you have to admit they've really held up well. Some of that strained that we self imposed on ourselves to get the volumes up in the fourth quarter is necessary because we have to come out of January the third, or whenever we start next year, at the run rate to make 535. So if you take Bell Systems and Cessna, that piece of the portfolio is good.**

235.    These partial revelations of the Company's true financial condition, which partly corrected the market's expectations for the Company's financial performance and outlook, had a substantial impact on the price of Textron stock, causing part of the artificial inflation to come out of

the stock. The price of Textron stock fell from an October 16, 2008 close of $20.19 to close at $19.12 on October 17, 2008, representing a more than *5%* drop. The stock continued falling, sagging to a close of $18.81 on October 20, 2008 (the following trading day) – a decrease of nearly *7%*.

236. If not for Defendants' false and misleading statements referenced above, which were intended to and did minimize the impact of the additional revelations, the price of Textron's stock would have declined even further during this time period.

237. The statements referenced in ¶¶221-34 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The downsizing of TFC was not a result of the downturn in the capital markets. Rather, the downsizing was caused by the inevitable consequences of Defendants' earlier decision to significantly increase the Company's risk profile by making more and more poor quality loans in an attempt to boost its business. The end result of this decision, which had been masked at the time by Defendants through a Class Period long campaign of false and misleading statements, was magnified when the downturn in the economy arrived. As borrowers began to default, TFC was saddled with bad debt and a crush of delinquencies and defaults, rather than having a sound credit portfolio as Defendants led the market to believe.

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders founded on deteriorating underwriting standards, financing of buyers who were not creditworthy, and undisclosed financing of "nonrefundable deposits." While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm" booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

- By the Summer of 2008, a material number of Cessna customers were attempting to cancel their orders. In order to avoid publicly reporting a material number of order cancellations, Defendants aggressively convinced purchasers to defer purchases of the aircraft for several years, and in some cases indefinitely, all the while touting the Company's strong backlog and low number of order cancellations and deferrals. By pushing out the delivery dates of orders (rather than allowing customers to cancel

94

them), the Company kept its backlog artificially inflated, and hid from the market the true nature and extent of the Company's problems.

- TFC's portfolio was not "strong" as it was built upon loans to borrowers who were not creditworthy and who were only approved as a result of deteriorated underwriting standards. Indeed, Textron employees were expected to approve even marginal borrowers, and those that were not approved by lower level employees were often escalated to upper management to be approved by a superior. Further, as part of the Company's attempt to make more loans, Defendants revised TFC's amortization schedule, making virtually all customers, regardless of their credit category, eligible to receive better loans with longer amortization periods. This had the practical effect of putting the Company in a more adverse financial position in the first year of such loans.

## On October 21, 2008, an Additional Partial Revelation of Defendants' Fraud Occurred

238. On October 21, 2008, *Morgan Stanley downgraded Textron from Equal-weight to Underweight.* The analyst report accompanying the downgrade noted that:

> *Credit concerns at TFC have not yet troughed, and we believe Cessna aircraft deferrals will climb next year for potential disappointing 2009 aircraft deliveries vs. guidance. At TFC, net charge-offs and loan-loss provisions could climb, with added uncertainty around 455MM term debt due 4Q08 atop $2B of commercial paper outstanding which look to be near-term challenges.*

239. The downgrade of Company stock, which, even in the face of Defendants' ongoing campaign of false and misleading statements, served to reveal a portion of the Company's true financial condition and to partly correct market expectations for the Company's financial performance and outlook, had a swift and severe impact on the price of Textron stock, causing additional artificial inflation to be removed. Indeed, Textron stock plummeted from an October 20, 2008 close of $18.81 to close at $16.03 on October 21, 2008, representing a nearly *15%* drop on a *161%* increase in volume. The severe decline continued, with the stock falling an additional *18.7*% on October 22, 2008 (also on very high volume) and by *10.28%* on October 23, 2008, where it closed at $11.69.

### On November 4, 2008, an Additional Partial Revelation
### of Defendants' Fraud Occurred

240.    Then, on November 4, 2008, Textron issued a press release announcing that it was revising downward its Citation Jet production schedule.  The press release quoted Campbell as follows:

> "*[a]s we look out the next two to three years, it is prudent for us to evaluate the proper level of jet production and deliveries to avoid significant variations and inefficiencies in annual production.  We now believe that planning for more consistent levels of production during the next several years will best serve our shareholders, customers, and employees.*"

241.    Thereafter, J.P. Morgan issued an analyst report noting that the Company's downward revision for Cessna production was a "*negative surprise*", and indicating that the revisions were "*another hit to already low level of credibility [for Textron Management].*"

242.    On November 5, 2008, Defendants Campbell and French spoke at the Goldman Sachs Global Industrials Conference.  The Individual Defendants continued to misrepresent the strength and stability of the Company, while continuing to slowly leak to the market the truth regarding TFC's strength and future business prospects, partially revealing that their prior representations concerning demand at Cessna were false and misleading.  For example, Campbell stated, in relevant part:

> I bet every speaker today starts with a phrase that sounds something like these are challenging and in many ways unprecedented economic times. No doubt about that. We face significant challenges over the next year or two based on these very difficult times, **and yet we believe Textron's performance is very solid going forward**.
>
> *        *        *
>
> **As we look toward the next few years, we believe our record aerospace and defense backlog and pending customer orders of nearly $30 billion will provide a cushion and ballast to weather the uncertainties we face as we go forward**. And we remain committed to our transformation strategy; let me assure you of that.
>
> *        *        *

96

And knowing that they are probably top of everybody's mind this morning, I thought that is where we would start our business review today. Let me start with Cessna. We are expecting record revenues of about $5.9 billion this year, which represents a 17% year-over-year growth.

***Our current backlog still stands at $15.6 billion and reflects orders from more than 1,500 Citation jets***.

\*       \*       \*

On top of the challenging economic conditions, which we have dealt with in previous cycles, the current situation has developed very rapidly as a result of a single factor that was not present in a meaningful way in any of the past cycles, and that factor is the availability of customer financing. ***As I mentioned on our earnings call, we have been communicating with our customers to determine what degree of deferrals we may have to accommodate in 2009***.

*Based on very recent feedback we have received, it's now prudent for us to reevaluate production levels in 2009 to avoid significant variations and inefficiencies during the next couple years.* I hope you will ask me some questions about this once we finish our remarks. As a result, we have begun processing a revised 2009 production schedule. We had previously targeted, as you know, to produce and deliver about 535 jets in 2009. That would be up from 475 in 2008.

243.   As the conference continued, Campbell misleadingly exhorted the strength of the

Company's underwriting and its overall financial condition, stating, in relevant part:

Okay, next topic. Let's turn to TFC. Here are the six segments that comprise TFC's $11.4 billion of managed assets. We have built these businesses on three very important principles that should serve us well as we work our way through the current economic situation. First, our receivables are highly collateralized; ***second, we operate with a very rigorous underwriting philosophy***; ***and third, our funding strategy has been very conservative***.

\*       \*       \*

***Now let me discuss liquidity. We believe our outlook here is very solid***.

\*       \*       \*

In our golf portfolio, high recoveries reflect a significant level of new -- of owner equity in the assets, typically 25%. ***These owners are typically deep-pocket owners, plus ultimately the intrinsic value of the underlying real estate in the event of default also comes in play***.

***Finally, our resort portfolio has shown steady performance through every cycle in the past 20 years.*** For the largest portion of this business, we have three layers of loss

97

protection. Excess collateral, provided relative to the receivables note pools, collected from timeshare customers at a retail interest rate that is above the interest rate we are charging the developer, thereby creating an excess spread cushion. And we limit the amount we advance to the developer to 90% of the receivables value. So that is the first layer.

Second layer, the developer is required to repurchase any individual receivables the moment they become delinquent, and the final layer is the underlying real estate itself. So bottom line, while it's likely that the proportion of non-accruing assets in this cycle could exceed historic values, we believe our losses will still be manageable given these multiple levels of recovery in our structures.

In my discussion on TFC, we understand that the current environment will stress results, *but we believe that we can weather the storm without the catastrophic losses that seem to be reflected in our current stock price.* With actions we are taking and the $3 billion bank backstop, we believe we have adequate liquidity even in an environment where access to public markets would be totally unavailable.

Furthermore, we are confirmed that we are able to raise long-term capital through securitizations and we are hopeful that the unsecured bond markets will open up before long as the various government initiatives take hold. *Finally, based on our rigorous underwriting standards and multiple levels of asset assurance and recovery, we believe our credit losses will be manageable.* So combined with our pricing actions, we believe our performance will be better than many investors seem to be expecting today.

244.    When an analyst asked Campbell for an update of what Textron was seeing as far as cancellations and deferrals of Cessna orders, Campbell continued to make false and misleading statements minimizing the order cancellations that the Company was seeing, stating in relevant part:

Well, it's been an extremely unusual period at Cessna. I tried to highlight the fact that a single factor is something we have never seen in the past, and that is the fact that some of our customers are now coming to us for 2009 and saying -- and think about this, their aircraft could be 80% complete. It could have the interior in it already; it could be painted already.

They are saying, hey, would you mind if we slide that a quarter or two? We are having trouble getting financing. We need to go back and pursue some other avenues. We are trying to work with them as opposed to saying we will just keep your money. Thank you very much.

*But on the cancellations front, which is encouraging and interesting, we aren't seeing any more cancellations than we did last year or the year before at this time. So we don't have a huge buildup of cancellations.*

245.    As the conference continued, the following exchange took place:

**Unidentified Audience Member**

Where do you project [non-performing assets] to go over the next couple of quarters? I saw the spike here in this one and --?

**Ted French – Textron Inc. – EVP & CFO**

*Yes, somewhere in the range of 2% to 4%.* It's a wild environment out there right now, so it's hard to predict non-performers. We have some concentrated accounts out there. It doesn't take but one or two. That spike is really literally only a couple of accounts that were fairly sizable that jumped up, so it can have a lot more variability.

246.    These partial revelations of the Company's true financial condition, which partly corrected the market's expectations for the Company's financial performance and outlook, had a substantial impact on the price of Textron stock, and caused additional artificial inflation to come out of the stock. The price of Textron stock fell from a November 4, 2008 close of $18.64 to close at $16.93 on November 5, 2008, a drop of more than *9%* on a *66%* increase in trading volume. On November 6, 2008, the stock continued its decline, falling an additional *4.5%* to close at $16.16.

247.    If not for Defendants' false and misleading statements concerning the Company's manageable credit losses (among other things), which were intended to and did minimize the impact of these additional partial revelations, market expectations would have been corrected and the price of Textron's stock would have declined even further during this time period.

248.    The statements referenced in ¶¶242-45 were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- By the Summer of 2008, a material number of Cessna customers were attempting to cancel their orders. In order to avoid publicly reporting a material number of order cancellations, Defendants aggressively convinced purchasers to defer purchases of the aircraft for several years, and in some cases indefinitely, all the while touting the Company's strong backlog and low number of order cancellations and deferrals. By

pushing out the delivery dates of orders (rather than allowing customers to cancel them), the Company kept its backlog      artificially inflated, and hid from the market the true nature and extent of the Company's problems.

- Cessna's backlog was artificially inflated because a material percentage of the orders included in the backlog were speculative, contingent orders founded on deteriorating underwriting standards, financing of buyers who were not creditworthy, and undisclosed financing of "nonrefundable deposits." While Defendants gave the appearance to the market that the orders in the Company's backlog were "firm" booked orders, in reality, many of the orders were unlikely to be filled and subject to cancellation.

- Prior to and during the Class Period, the Company had dramatically altered its risk profile by substantially lowering its underwriting and lending standards such that a severe shift in Textron's appetite for risk had occurred. Thus, Defendants knew that TFC was not well insulated or protected in the event of the then unfolding economic turmoil given that TFC had gorged itself on extremely risky and poorly underwritten loans.

249.    On November 29, 2008, J.P. Morgan issued an analyst report indicating that Textron may need to raise an additional $1 billion in funding in 2009 to avoid TFC liquidity issues.

250.    On this additional partial revelation of Textron's true financial condition and future business prospects, Textron stock fell from a close of $15.23 on November 28, 2008 to close at $13.90 on December 1, 2008 (the next trading day), a decrease of approximately *8.7%* on more than a *130%* increase in volume.

## On December 22, 2008, an Additional Partial Revelation of Defendants' Fraud Occurred

251.    Then on December 22, 2008, Textron announced in an 8K filed with the SEC that the Company's Board of Directors had approved plans for the Company to exit all of TFC's commercial lending activities except for "captive financing" activities related to sales of products from the Company's manufacturing segments. The release stated, in relevant part:

**Item 2.05  Costs Associated with Exit or Disposal Activities.**

On December 22, 2008, the Board of Directors of Textron Inc. ("Textron") approved *a plan to exit all of the commercial finance business of Textron's finance segment, Textron Financial Corporation and its subsidiaries ("TFC"), other than that portion*

*of the business supporting the financing of customer purchases of Textron-manufactured products.*  Textron made the decision to exit this business due to continued weakness in the economy and in order to enhance Textron's long-term liquidity position in light of continuing disruption and instability in the capital markets.

Textron had previously indicated that TFC would be exiting its Asset Based Lending and Structured Capital segments, as well as several additional product lines, representing about $2.0 billion in managed receivables. *The revised exit plan now applies to approximately $7.9 billion of TFC's $11.4 billion managed receivable portfolio.  The exit plan will be effected through a combination of orderly liquidation and selected sales and is expected to be substantially complete over the next two to four years.*

Approximately *$3.5 billion* of the liquidating receivables are now designated for sale or transfer, of which about $1.3 billion are securitized receivables managed by TFC and $2.2 billion are owned assets classified as held for sale.  *Accordingly, as a result of the exit plan, in the fourth quarter, Textron will record an approximate $250 - $300 million pre-tax mark-to-market adjustment against owned assets held for sale. Also, due to this change in investment status relative to TFC's Canadian subsidiary, Textron will recognize non-cash tax charges of about $31 million. These adjustments are in addition to the previously reported $169 million non-cash, pre-tax impairment charge to eliminate TFC's goodwill.*

In addition to the actions at TFC, on December 22, 2008, the Textron Board of Directors also approved an expansion of Textron's previously announced overhead cost reduction and productivity improvement plan for estimated cost savings of approximately $100 million in 2009.  The program, along with other volume-related reductions in workforce, eliminates approximately 2,200 positions worldwide.

*Textron now expects to record pre-tax restructuring costs of about $65 million in the fourth quarter of 2008 related to the TFC exit plan and the restructuring program, inclusive of the restructuring charges previously reported.  In addition, Textron anticipates that it will likely have additional restructuring costs in 2009 and later, as a result of further headcount reductions and other actions in its various business units, including TFC, however, an estimate of these charges cannot be made at this time.*

*Textron estimates that approximately $45 million of the cumulative $65 million in pre-tax costs will result in future cash outlays, primarily from employee separation expense. Approximately $20 million of the cumulative pre-tax costs are non-cash, relating primarily to asset impairment charges for facilities to be closed.*

Textron previously reported that the charge for goodwill impairment at TFC would result in a fixed charge coverage ratio, at the end of 2008, of less than the 1.25 times required under the Support Agreement, dated as of May 25, 1994, between Textron and TFC, resulting in a required capital contribution by Textron to TFC in an

approximate amount of $200 million.  *Due to the actions at TFC discussed above, a larger capital contribution from Textron to TFC is necessary to maintain the fixed charge coverage ratio required by the Support Agreement and to maintain the leverage ratio required by TFC's credit facility.  Therefore, Textron is now required to make a capital contribution to TFC in an amount estimated at approximately $600 million; Textron plans to make this contribution by the end of 2008.  The contribution will not result in any increase in the consolidated amount of Textron and TFC debt outstanding.*

252.    These additional partial revelations of the Company's true financial condition, which partly corrected the market's expectations for the Company's financial performance and outlook, had a substantial impact on the price of Textron stock, and caused additional artificial inflation to leak out of the stock. The price of Textron stock plummeted from a December 22, 2008 close of $15.34 to close at $12.20 on December 23, 2008, representing a sharp fall of ***more than 20%*** on a ***141%*** increase in trading volume, as demonstrated in the chart below:



253.    On January 21, 2009, Textron belatedly issued a press release stating that Campbell had stepped down as the Company's President, but would continue as CEO of Textron and

Chairman of the Company's Board of Directors.  The press release revealed that **on January 16,**
**2009** – 5 days earlier – Textron's Board of Directors had appointed Scott C. Donnelly to replace
Campbell as President.  On the heels of the press release, the price of Textron's common stock fell
more than 4% to close at $12.38 on January 22, 2009.

### On January 29, 2009, the Truth is Finally Fully Revealed

254.    Defendants' ongoing fraud was finally fully revealed to the market on January 29,
2009.  On a conference call following the Company's release of its fourth quarter 2008 earnings, the
Defendants finally revealed to the market the true conditions at Textron.  Campbell stated, in
pertinent part:

> So now, let's move to the specifics, beginning with Cessna, where we delivered 131
> jets in the fourth quarter, bringing full year 2008 deliveries to 467 units. That's
> actually a new record for both the quarter and the year. *Unfortunately, the economy is*
> *having an especially egregious impact on the business jet industry, including Cessna.*
> *In the quarter, we only reported 30 gross orders, without about a 45/55 split, by the*
> *way, between United and international. In that same quarter, we also saw 23*
> *cancellations and an unprecedented number of deferrals. Combined, these*
> *developments affected deliveries in the quarter and more significantly, they will*
> *impact planned deliveries for 2009.*
>
>                        *            *            *
>
> **Scott Donnelly – Textron Inc. – President and COO**
>
> Thank you, Lewis. Good morning, everyone. Clearly, our focus this year in the
> manufacturing business is to maximize cash flow out of our operations, while at the
> same time preserving the critical product development efforts that will support our
> future growth when we come out of this economic slowdown. *Accordingly, we are*
> *aligning our '09 production to match expected lower commercial demand. Lowering*
> *our selling general and administrative costs through head count reductions.*
> *Curtailing most discretionary spending, including some reductions in product*
> *development.*
>
>                        *            *            *
>
> *Specifically, we've dramatically reduced our production plans at Cessna and*
> *industrial and to a lesser extent, at Bell Commercial to ensure we reflect our current*
> *view of customer demand to minimize our finished goods inventory.* Correspondingly

today, we announced an additional 2,000 head count reduction at Cessna, consistent with our reduced production level of about 375 jets.

*       *       *

**Ted French – Textron Inc. – CFO**

*       *       *

*The second part of our exit strategy involves sales of TFC assets. And in that regard, we've designated $2.9 billion of our managed receivables as now being held for sale.*

*       *       *

*Of our $2.6 billion in expected '09 liquidations, between $1.5 billion and $2 billion of that will go to pay off bondholders of our securitization vehicles. That leaves an available balance of between $600 million and $1.1 billion for TFC to meet $1.6 billion of term maturities in 2009.*

*       *       *

Now, let's turn our attention back to fourth quarter results. Looking at what drove the year-over-year changes. *Income from continuing operations, excluding special charges of $0.40, was down $0.57 from a year ago. $0.46 of the decline came from TFC, the details of which I'll go through shortly.*

*       *       *

Looking to '09. Based on revenues of about $4.6 billion, which would be associated with 375 jets, we estimate that we will be able to achieve full year margins in the 10% to 12% range. *However, the first quarter is going to be our most difficult at Cessna, as we anticipate less than 80 deliveries due to the inability to efficiently replace lost deliveries that affected the quarter.* Things should stabilize somewhat in the second quarter as we rearrange customer slots and cost savings from our downsizing actions take hold.

*       *       *

*Now, finishing with finance. Credit performance continued to deteriorate, with 60-day delinquencies increasing to 2.59% of financed receivables, up from 1.06% at the end of the third quarter. Nonperforming assets increased to 4.72% from the third quarter level of 2.67%.* Against this backdrop, revenues decreased $64 million in the fourth quarter due to lower market interest rates and lower securitization gains, which were partially offset by the benefit of interest rate floors. Segment profit decreased $171 million, as a result of increased loan loss provisions, higher borrowing costs and lower securitization gains. Again, partly offset by the interest rate floors.

*We recorded $133 million in loan loss provisions to reflect general weakening in market conditions, declining collateral values and the lack of liquidity available to our borrowers and their customers. This also incorporates our increased estimates of future losses, as we believe that our exit plan will negatively impact credit losses over the duration of our portfolio.* After $33 million in charge-offs during the quarter, our loan loss reserves rose to $191 million or 2.8% of our current $6.9 billion worth of owned receivables held for investment. Managed receivables ended the year at $10.8 billion versus $11.4 billion at the end of the third quarter.

255.    Analysts were quick to point out that the Company's current statements contradicted what Defendants had told the market during the Class Period.  In the question and answer session, Nicole Parent of Credit Suisse questioned Defendants about a large discrepancy between the August 6, 2008 TFC presentation made by Defendants, and the numbers that Defendants were now presenting.  French responded by attributing this discrepancy to external factors, despite Defendants' admissions that they made false and misleading statements during the Class Period:

> ***Well obviously, Nicole, the world did change in the fourth quarter in a big way for us. And we have taken substantial reserves in the quarter, higher than what we had previously expected. Both as a combination of the changes in the world and the impact it's had on our borrowers and their customers but also in the context of the fact that our business model largely blew up as a result of all the changes that have happened with the financial crisis. And we have changed strategies to move ourselves back to a captive position. And we believe that that will result in further losses, higher levels of losses because of that.***

256.    In response to an analyst question regarding whether Textron would be continuing to build their loan loss provision through 2009, French revealed that Defendants were expecting substantial charge-offs through 2009:

> *No, Jeff, I think we have substantial charge-offs that we expect in '09. We will continue to put up additional provisions as we go through the year but we expect charge-offs will be higher than provisions.* So that balance will come down, as will the overall asset balance come down. We're targeting to be down to just over $8.5 billion of receivables by the end of the year.

257.    In response to an analyst question regarding deferrals, Campbell revealed that many orders were being pushed out until at least 2010:

*It varies quite a bit but obviously, most of the folks that are in '09 slots and they talk about a deferral, they want to at least push it to '10. And they're looking at the economy, trying to understand where they'll be. So, I think that it's sort of fluid when you look at a deferral. You negotiate your work with the customer and we'll continue to work with them until they want to commit a firm date.*

258.   These additional revelations of the Company's true financial condition, which partly corrected the market's expectations for the Company's financial performance and outlook, had a substantial impact on the price of Textron stock, and caused the remaining artificial inflation to come out of the stock. The price of Textron stock fell from a close of $13.30 on January 28, 2009 to close at $9.09 on January 29, 2009, representing a tremendous decline of more than ***31%*** on heavy trading volume of more than 21 million shares traded – a ***417%*** increase over the prior day's trading volume. Textron stock continued to fall in the following days, declining more than ***7%*** on February 2, 2009, to close at $8.37, falling nearly another ***5%*** on February 3, 2009, then dropping an additional ***21%*** to close at $6.28 on February 4, 2009, and then falling ***3%*** more on February 5, 2009 to close at $6.09, as demonstrated in the chart below:



259.    By the close of the Class Period on January 29, 2009, the Company's common stock had dropped ***more than 87%*** from its Class Period high.  Including the additional decline to $6.09 on February 5, 2009, the stock suffered a total decline of ***more than 91%*** from its Class Period high.

260.    As indicated above, as numerous partial revelations of Textron's true financial condition and future business prospects were revealed to the market, a picture of the extent of Defendants' fraud and false and misleading financial reporting emerged.  While Defendants' misrepresentations dealt with several topics – primarily the Company's backlog, its deteriorated underwriting criteria, which substantially undermined the quality of its financed receivables portfolio, the decision to finance down payments of Cessna products, and the obfuscation of defaulted loans through delivery "deferrals" as well as loan "renegotiations" – a common underlying purpose and pattern connected them all.  The Defendants' motivation was to artificially inflate the price of Textron's common stock, thus manipulating market expectations and misleading the market into believing that Textron's business and prospects were first-rate, causing the market to expect and anticipate that Textron was primed to weather the storm.  It is thus reasonable to infer that all of Defendants' misrepresentations and omissions were designed to and, in fact, did contribute to misleading market expectations.  Thus, when the price of the Company's common stock dropped upon revelation of Textron's true financial condition concealed by the fraud, Plaintiff and the Class suffered losses proximately caused by Defendants' fraud.

261.    On February 5, 2009, J.P. Morgan issued an analyst report noting that "*[w]e are still scratching our heads as to how we go from 3.5 years of backlog six months ago to a 20% y/y production decline for 2009 that is only 80% sold out*."

262.    On February 9, 2009, Textron issued a press release titled "Textron Announces Finance Management Changes."  The press release announced the resignation of French and the

retirement of Carter.  Later that evening, a *Forbes* article titled "2 Leave Textron" noted "*[s]omeone has to take the blame for Textron's troubles – and it looks like Chief Financial Officer Ted French and Chief Operating Officer Buell Jay Carter of Textron Financial are stuck with the bull's eye*."

263.    On February 10, 2009, the *Fort Worth Business Press* reported that Campbell stated he would consider selling one of Textron's core businesses – such as Bell – if Textron failed to raise an additional $1 billion in cash in 2009.

264.    On December 1, 2009, Campbell stepped down as Textron's CEO and Chairman of the Company's Board of Directors, remaining on as non-executive Chairman of the Board.

### Textron's False Financial Statements

265.    During, at least, 2008, Defendants made numerous false statements of material fact and omitted to state material facts necessary to make Textron's reported financial position and results not misleading.  As set forth below, Textron published financial statements and information that violated Generally Accepted Accounting Principles ("GAAP") and SEC Regulations.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices.  The SEC has the statutory authority to promulgate GAAP for public companies, and has delegated that authority to the Financial Standards Accounting Board ("FASB").  The SEC requires public companies to prepare their financial statements in accordance with GAAP.  In fact, as set forth in SEC Regulation S-X (17 C.F.R. § 210.4- O1(a)(l)), financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. SEC Regulation S-X (1 7 C.F.R. 8 2 10.10-0 1 (a)(5)) also requires that interim financial statements comply with GAAP and "shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading."

266.     As set forth below, GAAP required Textron to establish a reserve to account for probable credit losses ensuing from the failure by borrowers to make their contractual loan payments. Textron referred to this loss reserve as its allowance for losses on finance receivables (the "Allowance").

267.     The Allowance was reported on the Company's balance sheet as a reduction of assets, specifically, finance receivables.  To properly account for the worsening credit quality of its loan portfolio, Textron is required under GAAP to record periodic provisions (which Textron referred to as its "provisions for losses") to increase the Allowance to reflect its estimate of incurred or probable credit losses.  Then, as uncollectible loans are written or charged off, the Allowance is reduced.

268.     Under GAAP, a provision for losses on finance receivables is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis.  Thus, Textron's reported Allowance was directly linked to its net income and earnings per share.

269.     As noted below, during, at least, 2008, Textron's accounting for its Allowance violated fundamental principles of GAAP and SEC regulations.  During, at least, 2008, in furtherance of their efforts to disguise the negative impact that the deteriorating credit quality of the Company's loan portfolio, ***which was highly concentrated in the aviation, golf and vacation resort, recreational vehicle and marine industries, which are extremely elastic to general economic conditions***, Textron and Defendants materially understated Textron's provisioning for losses, thereby overstating Textron's net income and earnings per share and understating the Allowance.

270.     Textron's Allowance was a critical metric for investors, for which management was directly responsible, particularly because Textron's finance receivables represented more than 40% of the Company's total assets during the Class Period.  Given their magnitude, to the extent the Allowance reduced the reported value of TFC's finance receivables by 1% during the first nine

months of 2008, TFC's reported equity was reduced by approximately 8%.  As a result of this extreme leverage, Defendants were motivated to understate their "estimate" of the Allowance, which was accomplished by understating Textron's provision for losses, particularly because the Support Agreement required Textron to fund TFC with cash if certain financial covenants, which are adversely impacted by any increase in the Allowance, were not maintained.

271.    In fact, as a result of the charges TFC recorded at the end of the Class Period, including an increase in the Allowance and a write down in the fair values of the finance receivables, the financial covenants specified by the Support Agreement were breached and Textron was forced to make a cash payment of $625 million to TFC.  Indeed, Defendants were motivated to delay recording appropriate increases in the Allowance because doing so would force Textron to make cash payments to TFC, thereby severely restricting Textron's use of capital during a time it was experiencing a particularly acute liquidity crisis.

272.    For example, on February 5, 2009, J.P. Morgan issued a research report, which stated, in pertinent part:

> The company has now tapped its full bank line ($1.2B in additional liquidity), which looks to buy the company time through the end of 2010 to come up with a longer-term financing solution.  However, to get there the dividend still needs to get cut.
>
> *       *       *
>
> **Liquidity concerns real, exacerbated by deteriorating fundamentals**
>
> These types of [earnings] fundamentals further compound an already challenging liquidity situation.  We had previously highlighted a $500mm-$1B funding gap for 2009, noting that even if the company makes it through 2009, there are large [debt] maturities in 2010.  The company yesterday announced that it would draw down its full bank line ($3B) and use that to pay down existing [commercial paper] (~$1.8B), given it has an additional $1.2B of liquidity that does not expire until 2012.  This appears to bridge the gap for 2009 and 2010, buying the company time to explore its longer-term financing options, such as renegotiating securitization facilities and

110

selling assets. However, this would mean relying on management to execute, which has not proven to be most successful investing strategy of the past 9 months.[5]  Note that CDS are already trading like it's over, out >1,000 bps.  [Footnote added.]



**Figure 1: TXT and TFC CDS Continue to Widen**

Source: J.P. Morgan.

273.     J.P. Morgan's February 5, 2009 research report also stated:

**TFC Needs to Be Liquidated as Fast as Possible**

Obviously, the faster the better with respect to TFC liquidations, but that could lead to substantial higher-than-expected losses in 2009  TFC is moving to accelerate the portfolio wind-down here as fast as possible without significant customer disruption. At the end of the day, the faster the wind-down happens, the better for Textron as a company.  It needs to get out of this business as fast as possible.  ***Unfortunately, this is likely to lead to much higher than expected losses in the portfolio in 2009.  Here, the company is guiding to $150-$175mm.  We now estimate a loss of $300mm for 2009 based on not only the portfolio acceleration plans, but also the fact that 60-day delinquencies (2.59% in 4Q, 1.06% in 3Q) and NPAs (4.72% in 4Q vs. 2.67% in 3Q) increased substantially in 4Q.  In 4Q alone, TFC lost $123mm, primarily as a result of stepping up provisioning in anticipation of further losses in 2009.  The 2009 guidance assumes a charge-off rate of 3.5% of receivables.  Conservatively, we have modeled 4.0% for 2009***.  We have receivables now shrinking to $8B by the end of 2009 and to $5B by 2010, which should help limit significant further loss provisions, which we now have at $130mm in 2010.  [Emphasis added.]

274.     On February 1, 2009, Morgan Stanley reported:

---

[5]     A CDS, or credit default swap, is a contract whereby the CDS buyer makes a series of payments to the CDS seller and, in exchange, receives a payoff if a credit instrument (typically a bond or loan) experiences a credit event, such as a restructuring, bankruptcy, or credit rating downgrade. CDS contracts have been compared with insurance, because the buyer pays a premium and, in return, receives a sum of money if one of the events specified in the contract occurs.  All things being equal, at any given time, if the maturity of two credit default swaps is the same, a company with a higher priced CDS is considered more likely to default by the market, as a higher fee is being charged to protect against this happening.

**Liquidity Remains A Concern At TFC** - We remain highly cautious regarding TFC portfolio quality in light of 4Q's spike in nonperforming assets, with a significant improvement unlikely through at least 2009, in our view. While we acknowledge mix shift in owned assets due to portfolio run-down may improve [Non-performing Asset] ratios (particularly if TFC is able to liquidate substantial portions of its fast-turning Distribution Finance portfolio), the worsening global economy makes us skeptical regarding dramatic near-term improvements in this metric.

275.    The February 1, 2009, Morgan Stanley report also stated:

Furthermore, it is not clear TXT's 2009 Provisions/Charge-Off ratio will be <1 as guided. Should economic weakness persist or worsen through 2009 as predicted by our economists, TXT may be ***compelled*** to step up provisioning, reducing TXT Finance's operating profit and necessitating further capital transfers from TXT parent to TFC. Our current estimates contemplate 2009 [non-performing loans] of approximately 4.25% compared to the company's guidance of about 3.5%, with a Provision/Charge-Off ratio of about 1:1 compared to guidance of <1. These assumptions portend a transfer of about $350MM from TXT parent to TFC as part of the 1.25X fixed rate support agreement, gross of any dividends paid by TFC to TXT. [Emphasis added.]

## Applicable Accounting Standards During the Class Period

276.    Statement of Financial Accounting Standards No. 5, "*Accounting for Contingencies*" ("SFAS No. 5"), states:

An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:

a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.      The amount of loss can be reasonably estimated. [Emphasis in original.]

277.    In the context of lending, Statement of Financial Accounting Standards No. 114, "*Accounting By Creditors for Impairment of a Loan*" ("SFAS No. 114"), provides a definition of "impairment" for individual loans under GAAP that is also instructive for pooled loans: "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."

112

278.    Further, the American Institute of Certified Public Accountants' ("AICPA") Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AICPA Guide"), instructs that although SFAS No. 5 indicates that losses should be recognized once the events causing the losses have occurred, there is an important caveat flowing from that rule: "[I]f a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

279.    The SEC also provides direct guidance on the proper accounting for loan losses.  SEC Staff Accounting Bulletin No. 102, "*Selected Loan Loss Allowance Methodology and Documentation Issues*" ("SAB No. 102"), states, in pertinent part: "It is critical that loan loss allowance methodologies incorporate management's current judgments about  the credit quality of the loan portfolio through a disciplined and consistently applied process." Therefore, pursuant to SAB No. 102, a loan loss allowance methodology generally should "consider all known relevant internal and external factors that may affect loan collectability . . . [and] be based on current and reliable data[.]"

280.    SAB No. 102 expressly provides that "[f]actors that should be considered in developing loss measurements" include:

(a)     Levels of and trends in delinquencies and impaired loans;

(b)     Levels of and trends in charge-offs and recoveries;

(c)     Trends in volume and terms of loans;

(d)     Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;

(e)     Experience, ability, and depth of lending management and other relevant staff;

      (f)     National and local economic conditions;

      (g)     Industry conditions; and

      (h)     Effect of changes in credit concentrations.

281.    The SEC further states in SAB No. 102 that "[f]or many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.  Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses."  Thus, in addition to evaluating loans for impairment at origination, lenders are expected to reevaluate their reserving methodology, and therefore their loans or loan portfolios for impairment, every financial reporting period thereafter.

282.    SAB No. 102 also approvingly references SEC Financial Reporting Release 28 ("FRR 28"), *"Accounting for Loan Losses by Registrants Engaged in Lending Activities*," which states, in pertinent part: "Because the allowance [for loan and lease losses] and the related provision are key elements of financial statements of registrants engaged in lending activities, it is critical that those judgments be exercised in a disciplined manner that is based on and reflective of adequate detailed analysis of the loan portfolio."

283.    In addition to the foregoing standards, according to the AICPA Guide §9.17:

Loan evaluations by management (and tests of such by independent accountants to the extent they are performed as part of the engagement) should avoid the following:

*Collateral myopia*. This is the failure to see beyond collateral values to a financial weakness in the borrower. . . .

*Inadequate collateral appraisals*. This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals.

114

284.    During, at least, 2008, Defendants violated the foregoing accounting standards and made materially false and misleading statements about the Company's Allowance.  For example, Textron's 2007 Form 10-K stated:

> Provisions for losses on finance receivables are charged to income in amounts sufficient to maintain the allowance at a level considered adequate to cover losses in the existing receivable portfolio. ***We evaluate the allowance by examining current delinquencies, characteristics of the existing accounts, historical loss experience, underlying collateral value, and general economic conditions and trends***.  In addition, for larger balance commercial loans, we consider borrower specific information, ***industry trends and estimated discounted cash flows***.  Finance receivables generally are written down to the fair value (less estimated costs to sell) of the related collateral at the earlier of the date when the collateral is repossessed or when no payment has been received for six months.  Finance receivables are charged off when they are deemed to be uncollectible.  [Emphasis added.]

285.    During, at least, 2008, Defendants never revealed that they were deviating significantly from the requirements of GAAP and the Company's publicly stated accounting policy for the Allowance.  Rather, Textron falsely represented that it was following appropriate accounting rules and that, among other things, "changes in economic conditions" and "events affecting specific obligors or industries" influenced the amount of the Allowance.

286.    Defendants knew, or recklessly ignored, that prior to and during 2008, Textron had, among other things: (1) significantly lowered its underwriting standards (*see, e.g.,* ¶¶70-79, *supra*); (2) rapidly increased its loan portfolio via the issuance of significantly higher risk loans (*see, e.g.,* ¶¶80-82, *supra*); (3) concentrated its loan portfolio in industries that are extremely elastic to general economic conditions, *i.e.*, aviation, golf and vacation resort, recreational vehicle, marine and construction equipment loans (*see, e.g.,* ¶¶100-24, *supra*); and (4) relaxed loan default criteria (*see, e.g.,* ¶¶83-84, *supra*).

287.    Because of these facts, which were known or recklessly disregarded by Defendants, Textron was required under GAAP and SEC guidelines to increase the Company's provisioning for its Allowance in a manner commensurate with the decreasing credit quality of Textron's loans.

Instead, Defendants, in order to avoid having to down-stream cash to TFC, maintained the Company's provisioning at its historic levels and knowingly or recklessly failed to appropriately consider the factors disclosed in publicly stated accounting policy, *i.e.*, "underlying collateral values," "general economic conditions and trends," "estimated discounted cash flows, "and "industry trends."   In so doing, Defendants violated Textron's publicly stated accounting policies and the requirements of GAAP as specified in SFAS No. 5, the Guide and SAB No. 102.

      288.    As shown in the chart below, this resulted in a significant increase in the amount of the Company's loan loss provisions in the fourth quarter of 2008:



      289.    As noted in the chart above, in the fourth quarter of 2008, Textron increased its provision for loan loss by more than 2.5 times the September 2008 quarter amount.  ***Significantly, this increase in Textron's loan loss provision excludes any provisioning on $1.7 billion of finance***

*receivables that the Company reclassified as being "held for sale" in the fourth quarter.*[6]  Had these $1.7 billion of finance receivables been included in the calculus of Textron's provision for losses during he fourth quarter of 2008, as they had been previously, Textron's provision for loan losses in the fourth quarter would have been tens, if not hundreds, of millions of dollars greater, as the fair value of such loans were *$293 million less* than the amount Textron had carried them at on its books during the fourth quarter of 2008.

290.    In addition, the amount of the Allowance was artificially suppressed during, at least, 2008, even though the Company' percentage of non-performing loans *doubled* during this time period:



---

[6]      Securities classified as "held for sale" are reported at their fair value.  Accordingly, no loan loss reserve is necessary.

291.  The relatively stable and low levels of the Allowance before the truth about the quality of Textron's loan portfolio began to emerge helped create the appearance of a healthy loan portfolio and that Textron's provision for loan losses was appropriately calculated.

292.  As noted in detail herein, the collateral values underlying the Company's loans, the general economic conditions and trends, and the economic trends in the highly elastic industries in which Textron's loans were significantly concentrated, each declined precipitously during, at least, 2008.  Moreover, the deterioration of the credit quality of Textron's loans was neither outside of the Company's control nor unforeseeable to management.  In fact, the opposite is true, as Textron employed a strategy of underwriting increasingly high-risk loans prior to and during 2008.

> Nonetheless, Defendants turned a blind-eye to these red flags and artificially understated the provisioning of Textron's Allowance by tens of millions of dollars during, at least, 2008.  This understatement of the provision for losses had a dollar-for-dollar impact on the Company's reported Allowance and its pre-tax income during the Class Period.  As a result of such improper manipulation, the Company's Allowance was materially understated and its pre-tax income was materially overstated during, at least, 2008.

**Additional Scienter Allegations**

293.  As alleged herein, Defendants acted with scienter in that they knew or disregarded with deliberate recklessness that the public documents and statements, issued or disseminated in the name of Textron, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants by virtue of their receipt of information reflecting the true strength of the Cessna backlog and TFC's portfolio, their control over, and/or receipt and/or modification of Textron's allegedly materially misleading statements and/or their associations with Textron which made them privy to confidential information concerning Textron, participated in the fraudulent scheme alleged herein.

294.    Defendants knew and/or disregarded with deliberate recklessness the falsity and misleading nature of the information Textron dispersed to investors.  The fraud alleged throughout this Consolidated Complaint could not have been perpetrated during the Class Period, as has occurred, without the knowledge and participation of the personnel at the highest level of the Company, including each of the Individual Defendants.

295.    As alleged herein, Defendants acted with scienter in that they knew or disregarded with deliberate recklessness that the public documents and statements, issued or disseminated in the name of Textron, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants by virtue of their receipt of information reflecting the true strength of the Cessna backlog and TFC's portfolio, their control over, and/or receipt and/or modification of Textron's allegedly materially misleading statements and/or their associations with Textron which made them privy to confidential information concerning Textron, participated in the fraudulent scheme alleged herein.

296.    Defendants knew and/or disregarded with deliberate recklessness the falsity and misleading nature of the information Textron dispersed to investors.  The fraud alleged throughout this Consolidated Complaint could not have been perpetrated during the Class Period, as has occurred, without the knowledge and participation of the personnel at the highest level of the Company, including each of the Individual Defendants.

297.    In addition to the foregoing and other facts alleged herein, the Individual Defendants, acted with the intent to deceive Textron investors, motivated in part, to perpetrate their fraudulent activities so they could sell their personally held shares for tens of millions of dollars in profits.

Thus, the Individual Defendants and other insiders directly profited from the fraudulent scheme alleged herein by selling 911,122 personally-held shares of Textron stock on the open market, generating proceeds of ***$56,414,131***, with many of these sales priced at or near that Class Period high of $73.38 per share on December 7, 2007.  Indeed, only a small fraction of the insider sales occurred at prices below $56 per share, despite the fact that the stock price fell all the way to $9.09 at the end of the Class Period.  With the exception of one sale made by one insider in August 2008, the remainder of the more than $56 million in insider sales occurred between the start of the Class Period and May 21, 2008 – prior to any of the partial revelations of Textron's true financial condition and future business prospects set forth herein.  Campbell, who resigned as President of Textron on January 16, 2009, and French, who resigned from Textron after the close of the Class Period, combined to sell 738,042 shares, making off with ***more than $45 million***.

298.    The illicit insider sales, according to documents filed with the SEC, are demonstrated in the charts below:[7]

Lewis B. Campbell:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|------|----------------------|-----------------|-------------|
| 7/20/2007 | 86,000 | $60.92-$61.48 | $5,257,455 |
| 4/28/2008 | 592,042 | $60.50-$61.55 | $36,224,117 |
| **TOTAL** | **678,042** | | **$41,481,572** |

---

[7]     On many of the sales dates listed herein, the Individual Defendants and other insiders made numerous trades on the same business day.  Rather than list each individual trade, Plaintiff has summarized the trades by date, and listed the price range at which the stock was sold on each date.

Theodore French:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 12/11/2007 | 20,000 | $72.65-$73.00 | $1,459,133 |
| 1/8/2008 | 20,000 | $62.95-$63.35 | $1,262,813 |
| 5/13/2008 | 20,000 | $61.42-$61.86 | $1,232,279 |
| **TOTAL** | **60,000** | | **$3,954,225** |

Kenneth C. Bohlen:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 8/15/2007 | 14,000 | $56.08 | $785,050 |
| 10/19/2007 | 26,800 | $66.15-$66.32 | $1,774,167 |
| 10/22/2007 | 21,816 | $66.00-$66.046 | $1,440,031 |
| 8/15/2008 | 12,000 | $42.64 | $511,680 |
| **TOTAL** | **74,616** | | **$4,510,928** |

John D. Butler:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 9/7/2007 | **10,000** | $57.05 | **$570,500** |

Mary L. Howell:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 10/19/2007 | **22,168** | $66.50-$67.70 | **$1,485,723** |

Terrence O'Donnell:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 10/30/2007 | **36,184** | $67.44-$68.00 | **$2,448,763** |

Richard L. Yates:

| Date | Number of Shares Sold | Price Per Share | Total Value |
|---|---|---|---|
| 10/29/2007 | 14,332 | $68.40-$68.57 | $981,681 |
| 2/15/2008 | 3,332 | $56.39 | $187,891 |
| 5/21/2008 | 12,448 | $63.42-$63.88 | $792,849 |
| **TOTAL** | **30,112** | | **$1,962,061** |

299.   In addition to the foregoing open market sales, the Individual Defendants and Company insiders also directly profited from the fraudulent scheme alleged herein by cashing in on "phantom stock units" and through payments of option exercises via share delivery.  In each instance, the Individual Defendants had the motive and opportunity to inflate, for their own personal financial benefit, the price of Textron common stock.

300.   The Company's "phantom stock units" could only be exchanged for cash, and were valued based upon the average trading price of Textron common stock for the ten-day period following vesting.  By way of example, if an insider had 1,000 phantom stock units that vested on December 1, 2007, and the average trading price of Textron common stock for the ten trading days after December 1, 2007 was $70.00, then on the following day (*i.e.*, the 11th trading day), that insider would be paid $70,000 cash by the Company.  Therefore, artificial inflation in the Company's stock price during the ten-day period would directly benefit the insider and increase the amount of cash she/he would receive.

301.   During the Class Period, the artificially inflated price of Textron stock directly benefitted the Individual Defendants and insiders, who exercised 136,973 phantom stock options and received proceeds of *$8,338,075*, as set forth below:

Lewis B. Campbell:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 1/30/2008 | 22,000 | $54.35 | $1,195,700 |
| 5/19/2008 | 75,301 | $63.53 | $4,783,872 |
| **TOTAL** | **97,301** | | **$5,979,572** |

Theodore French:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 1/30/2008 | **8,000** | $54.35 | **$434,800** |

Kenneth C. Bohlen:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 2/15/008 | **4,668** | $56.39 | **$263,228** |

John D. Butler:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 1/30/2008 | **4,668** | $54.35 | **$253,705** |

Mary L. Howell:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 7/24/2007 | 5,000 | $117.80 | $589,000 |
| 1/30/2008 | 4,668 | $54.35 | $253,705 |
| **TOTAL** | **9,668** | | **$842,705** |

Terrence O'Donnell:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 1/30/2008 | **4,668** | $54.35 | **$253,705** |

Richard L. Yates:

| Date | Phantom Stock Units | Price Per Unit | Proceeds |
|---|---|---|---|
| 1/15/2008 | 4,000 | $62.57 | $250,280 |
| 1/15/2009 | 4,000 | $15.02 | $60,080 |
| **TOTAL** | **8,000** | | **$310,360** |

302.    On top of the phantom stock unit transactions, the Individual Defendants and other insiders also benefitted from Textron's artificially inflated stock price through option exercises via share delivery.  In these transactions, an insider would use Textron common stock as currency to exercise vested options.  So, rather than paying the Company cash to exercise options, insiders could simply tender already held stock.  During the Class Period, the Individual Defendants and other insiders tendered artificially inflated common stock to exercise options to purchase Textron stock at

lower prices, thus generating an immediate financial benefit.  The Individual Defendants were motivated to artificially inflate the price of Textron stock because it would give them greater purchasing power when exercising options.  Put simply: the higher the artificial inflation, the fewer shares required to exercise the options, and the greater the immediate financial benefit to the Individual Defendants and other insiders.

303.    During the Class Period, the artificially inflated price of Textron stock directly benefitted the Individual Defendants and insiders who recognized proceeds of *$2,333,268* by delivering 39,830 artificially inflated shares so that they could exercise options at substantially lower prices, as set forth below:

Lewis B. Campbell:

| Date | Shares Delivered | Price | Proceeds |
|------|------------------|-------|----------|
| 2/12/2008 | 7,130 | $56.40 | $402,132 |
| 2/25/2008 | 5,552 | $57.36 | $318,462 |
| 5/5/2008 | 3,225 | $61.98 | $199,885 |
| **TOTAL** | **15,907** | | **$920,479** |

Theodore French:

| Date | Shares Delivered | Price | Proceeds |
|------|------------------|-------|----------|
| 2/12/2008 | 2,616 | $56.40 | $147,542 |
| 2/25/2008 | 1,875 | $57.36 | $107,550 |
| **TOTAL** | **4,491** | | **$255,092** |

Kenneth C. Bohlen:

| Date | Shares Delivered | Price | Proceeds |
|------|------------------|-------|----------|
| 2/12/008 | 1,383 | $56.40 | $78,001 |
| 2/25/2008 | 1,554 | $57.36 | $89,137 |
| **TOTAL** | **2,937** | | **$167,138** |

John D. Butler:

| Date | Shares Delivered | Price | Proceeds |
|---|---|---|---|
| 2/12/2008 | 1,593 | $56.40 | $89,845 |
| 2/25/2008 | 1,385 | $57.36 | $79,443 |
| **TOTAL** | **2,978** | | **$169,288** |

Mary L. Howell:

| Date | Shares Delivered | Price | Proceeds |
|---|---|---|---|
| 2/12/2008 | 1,548 | $56.40 | $87,307 |
| 2/25/2008 | 1,353 | $57.36 | $77,608 |
| **TOTAL** | **2,901** | | **$164,915** |

Terrence O'Donnell:

| Date | Shares Delivered | Price | Proceeds |
|---|---|---|---|
| 2/12/2008 | 1,593 | $56.40 | $89,845 |
| 2/25/2008 | 1,385 | $57.36 | $79,443 |
| **TOTAL** | **2,978** | | **$169,288** |

Richard L. Yates:

| Date | Shares Delivered | Price | Proceeds |
|---|---|---|---|
| 10/19/2008 | 6,107 | $65.50 | $400,000 |
| 2/12/2008 | 781 | $56.40 | $44,048 |
| 2/25/2008 | 750 | $57.36 | $43,020 |
| **TOTAL** | **7,638** | | **$487,068** |

304.    The combination of all of the Individual Defendants' insider trading activities totaled

***$67,085,474***.  Of that amount, Campbell walked away with $48,381,623 and French received

$4,644,117, for a total of ***$53,025,740*** during the Class Period.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

305.    At all relevant times, the market for Textron equity securities was an efficient market

for the following reasons, among other things:

(a)     Textron's equity securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market; and

(b)     Textron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

306.    As a result, the market for Textron equity securities promptly digested current information regarding Textron from all publicly-available sources and reflected such information in Textron's equity securities prices.  Under these circumstances, all purchasers of Textron equity securities during the Class Period suffered similar injury through their purchase of Textron's equity securities at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION

307.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of Textron stock and operated as a fraud or deceit on Class Period purchasers of Textron stock by misrepresenting the Company's business success and future business prospects, including but not limited to misrepresentations regarding the Company's true exposure to risky loans, the strength of its aircraft backlog, as well as its financial reporting.

308.    As a result of Defendants' fraudulent conduct as alleged herein, the prices at which Textron stock traded were artificially inflated, at varying levels, throughout the Class Period.  When Plaintiff and other members of the Class purchased their Textron stock, the true value of such stock was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

309.    During the Class Period, Defendants improperly concealed the true reasons behind Textron's financial performance and outlook, and future business prospects.  Consequently, the price

of its stock was artificially inflated throughout the Class Period.  Defendants also misrepresented the reasons behind Textron's reported results and made numerous false and misleading statements regarding many aspects of its business, including, but not limited to, the quantitative and qualitative "strength" of the Company's backlog, the Company's high financing standards, the purported quality of the Company's portfolio of finance receivables, as well as the impact declining markets would have on the Company's financial condition and future business prospects.  Later, however, when the truth regarding Textron's true financial circumstances leaked out through a series of partial disclosures, and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Textron securities fell as the prior artificial inflation was removed.  As a result of its purchases of Textron stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

310.   By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of Textron's business and prospects.  For example, Defendants' oft repeated mantra that the Company's "strong," multi-billion dollar backlog of customers would enable it to grow for years to come, and that it engaged in good underwriting practices and had a strong credit portfolio, caused and maintained the artificial inflation in the prices of Textron's stock throughout the Class Period, even as negative news reached the market, until the truth was finally revealed at the close of the Class Period.

311.   As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their Textron stock at artificially inflated prices during the

Class Period. Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

312. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause, of the damages and economic loss suffered by Plaintiff and other members of the Class, and maintained the artificial inflation in the prices of Textron's stock throughout the Class Period and until the truth leaked out and was partially revealed to the market, at which time the prior inflation came out of the stock. Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause, of Textron's stock trading at artificially inflated levels throughout the Class Period.

313. Through a series of partial disclosure events regarding the Company's financial outlook and future business prospects, which culminated in the Company revealing, among other things, material problems at Cessna related to order cancellations and deferrals – in contradiction to Defendants' Class Period statements regarding the quality and size of the Company's backlog – the artificial inflation came out of the prices of Textron's stock in fits and spurts.

314. These events and disclosures, set forth more specifically above, included several disclosure events by the Company, as well as market analyst criticisms of the veracity and integrity of Defendants' Class Period statements. For example, they included:

(a)     a partial revelation in a Textron press release on June 13, 2008 regarding reduced profit forecasts, which resulted in stock price declines totaling 10.2%;

(b)     questions regarding the credibility of Defendants on July 17, 2008, which cased a total stock decline of more than 12%;

(c)     an October 16, 2008 disclosure that TFC would downsize by $2 billion by exiting asset based lending and other product lines, resulting in an additional 7% stock decline;

128

(d)      an analyst report on October 21, 2008 downgrading Textron's stock and triggering a nearly 38% total stock decline; and

(e)      a December 22, 2008 revelation that TFC would exit all commercial lending activities (approximately $7.9 billion of TFC's managed receivable portfolio), except for captive financing, record hundreds of millions of dollars in charges, and make an approximately *$600 million* support payment to TFC by the end of 2008, which caused a more than 20% stock decline.

315.      Defendants, however, combated and mitigated the impact of these partial revelations in a further attempt to mislead the market's expectations for the Company by, among other things, declaring that Cessna's "record" backlog would support Textron's overall business and that the quality of the Company's portfolio reduced the Company's exposure to the struggling financial markets.  Defendants, for a time, were successful, limiting the declines in Textron stock and causing the stock price to remain artificially inflated.

316.      Nevertheless, the market's expectations were ultimately corrected on January 29, 2009, when Defendants described the full extent of delinquencies, reduced demand – signaling a severe weakness in the backlog – and the substantial increase to loan loss provisions.  The result on the trading price of Textron stock was catastrophic, as it fell by as much as *31%* to close at $9.09, representing decline of as much as *87%* from its Class Period high.  As the declines continued, the stock fell more than *91%* from its Class Period high, closing at $6.09 on February 5, 2009.

317.      The timing and magnitude of the declines in Textron stock negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic losses, *i.e.*, damages, suffered by Plaintiff and other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the price of

Textron stock, and their subsequent decline in value as Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed, market expectations were corrected, and the artificial inflation came out of Textron's stock.

318.   In addition, the price of Textron stock was a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances.  The market reactions to the partial disclosure of Textron's true financial condition and future business prospects were foreseeable to Defendants and well within the "zone of risk" concealed by Defendants' fraudulent conduct.

## NO SAFE HARBOR

319.   The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Textron who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## COUNT I

### For Violations of Section 11 of the Securities Act Against Textron, Campbell And French Arising From The Offering

320.     Plaintiff incorporates the allegations contained in ¶¶14-18, 20-21, 33-68, 70-84, 86, 88-93, 96, 100-06, 110-13, 115-18, 123-25, 129-30, 132, and 142.  For purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

321.     This claim is alleged against Textron, Campbell and French, and is brought on behalf of persons who purchased the Notes issued pursuant or traceable to the Offering.

322.     On December 4, 2007, Textron issued and sold $350,000,000 principal amount of its 5.60% Notes due 2017 (the "Notes") pursuant to a Registration Statement on Form S-3 (No. 333-113313), which was declared effective on August 4, 2004, and a Prospectus Supplement dated November 29, 2007 to a Prospectus dated August 4, 2004.  The Registration Statement was signed by Defendants Campbell and French among others.

323.     The Registration Statement and Prospectus, which was incorporated therein (collectively referred to as the "Registration Statement"), were negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

324.     As noted above, Textron filed the Registration Statement on Form S-3, which is a stream-lined registration statement for certain well-capitalized, widely followed issuers.  Such issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings – e.g., Forms 10-K and 10-Q.  Pursuant to Instruction 11(a) of Form S-3, an

131

issuer utilizing Form S-3 must disclose any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934.  Accordingly, an issuer utilizing Form S-3 is required to update the information in its periodic filings including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations" which is required to be disclosed in SEC periodic filings pursuant to Item 303(a) of Regulation S-K.  Under Item 303(a) an issuer is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

325.    Here, the Registration Statement negligently failed to disclose several "material changes" to Textron's continuing operations which were required to be disclosed pursuant to Instruction 11(a).  None of these "material changes" were disclosed in the SEC filings that Textron incorporated by reference in the Registration Statement and, therefore, the Registration Statement omitted to state material facts required to be stated therein in violation of Section 11 of the Securities Act.

326.    **Underwriting Standards**:  The Registration Statement failed to disclose that at the time of the Offering, Textron had lowered its underwriting standards in order to grow its business and the Company was originating significantly riskier loans.  Prior to the Offering, the Company was originating substantially more high risk loans than it ever had in its history, and those loans were defaulting at much higher rates.  Indeed, prior to the Offering:

- TFC had relaxed its lending standards in response to the increasingly competitive business environment;

- TFC was having a difficult time reselling loans to investors due to the poor loan quality in TFC's portfolio;

- Cessna Finance was approving loans for customers who had minimal cash flow and limited liquidity;

- Cessna Finance was declining far fewer risky loans than it had in the past, and approving borrowers who had been previously denied financing because they were not creditworthy;

- Cessna Finance had increased the amortization period for certain loans to 20 years, effectively putting Cessna Finance upside down by at least tens of thousands of dollars on the first year of those loans; and

- Cessna Finance had begun financing customer deposits.

327.   Following the close of the Offering, in a series of announcements, Textron ultimately exited the Company's Finance segment (save for one unit), an action which was directly attributable to the adverse trends that were not disclosed in the Registration Statement.

328.   On June 13, 2008, Textron disclosed that the Company's profit in its Finance segment would be significantly less than previously forecast.

329.   Then, on August 6, 2008, Textron announced that the combination of margin compression *over the past three years* – which the Company claimed was exasperated by the capital markets disruption that began in the Fall of 2007 – and an increase in loan losses, had hurt the Company's profitability.

330.   Thereafter, on October 16, 2008, Textron announced that it would downsize TFC by $2 billion by exiting several product lines, leading to losses of $169 million for goodwill impairment.

331.   On October 13, 2008, Fitch Ratings revised its outlook for Textron and TFC from Positive to Stable, citing constrained liquidity and rising default rates across TFC's asset portfolio, and on October 21, 2008, Morgan Stanley downgraded Textron from EqualWeight to UnderWeight, citing credit concerns at TFC.

133

332.    Then, on November 29, 2008, J.P. Morgan issued an analyst report indicating that Textron may need to raise an additional $1 billion in funding in 2009 to avoid TFC liquidity issues.

333.    Later, on December 22, 2008, Textron announced in an 8K filed with the SEC that its board had approved plans to exit the Finance segment's commercial lending activities except for "captive financing" activities related to product sales in the Company's manufacturing segments.

334.    Defendants were negligent in not disclosing the loosening of underwriting standards at Textron and the larger default risk in the Company's credit portfolio as these events constituted a "material change" to Textron's operations which was then having, and would have, an unfavorable impact on the Company's revenues and income from continuing operations and, therefore, was required to be disclosed in the Registration Statement. Indeed, the fact that Textron had these toxic loans on their books would have altered the total mix of information available to investors in the Offering as it would have provided valuable information concerning the significant risk undertaken by investors who contemplated purchasing Textron debt securities through the Offering.

335.    **Cessna Backlog**: The Registration Statement failed to disclose that at the time of the Offering, the order backlog at Cessna was vastly overstated. By the time of the Offering, Cessna's backlog consisted of many speculative, contingent orders founded on poor quality underwriting and 100% financing. Indeed, by November 4, 2008, Cessna had revised downward its Cessna Citation Jet production schedule. Then, on January 29, 2009, Textron announced that the Company had dramatically reduced its production plans for Cessna.

336.    As detailed herein, following the Offering, in a series of announcements, Textron revealed that it was reducing its demand forecast for Cessna, resulting in a negative impact to the Company's operating results. This negative trend, however, was in existence at the time of the Offering and was required to be disclosed in the Registration Statement but was not.

134

337.    On October 16, 2008, Defendants first revealed that an order downturn had occurred in the Company's Cessna division.

338.    Then on October 21, 2008, Morgan Stanley issued an analyst report indicating that "Cessna aircraft deferrals will climb next year for potential disappointing 2009 aircraft deliveries *vs.* guidance."

339.    On November 4, 2008, Textron issued a press release announcing that it was revising downward its Citation Jet production schedule, and on November 5, 2008, Defendants revealed that it was necessary for the Company to reevaluate production levels in 2009 to avoid significant variations and inefficiencies during the next couple years.

340.    Finally on January 29, 2009, Textron announced dramatic cuts to its Cessna production levels and an unprecedented level of deferrals and cancellations.

341.    Defendants were negligent in not disclosing that Cessna's backlog was not in fact firm as it was a "material change" to Textron's operations which was then having, and would have, an unfavorable impact on the Company's revenues and income from continuing operations and, therefore, was required to be disclosed in the Registration Statement.  Investors would have considered the fact that the orders in Cessna's backlog were founded on poor underwriting and 100% financing to have altered the total mix of information available to investors as it would have provided valuable information concerning Cessna and the benefits that Textron was deriving from that subsidiary.  Indeed, Textron itself recognized that the size and stability of its backlog was and is a leading indicator of the Company's future performance.

342.    Additionally, the Registration Statement contained a series of so-called risk disclosures that purported to warn investors of the risks associated with Textron and its operations. These risk disclosures, however, were not meaningful as they portrayed the risks as mere

possibilities when, at the time of the Offering, Textron was then being negatively impacted by the

risks.

343.   For example, the Prospectus purported to warn in a section titled "Risk Factors" that:

A key determinant of financial performance of our Finance group will be its ability to maintain the quality of loans, leases and other credit products in its finance asset portfolios. Portfolio quality may adversely be affected by several factors, including finance receivable underwriting procedures, collateral quality, geographic or industry concentrations or general economic downturns. Any inability by our Finance group to successfully collect its finance receivable portfolio and to resolve problem accounts may adversely affect our cash flow, profitability and financial condition.

344.   The Prospectus also purported to warn that:

Textron Finance has taken steps to eliminate non-core portfolios and focus on key markets. A key determinant of financial performance at Textron Finance will be its ability to maintain the quality of loans, leases and other credit products in the portfolios that remain and to continue to generate profitable new business. The level of credit losses we may experience at Textron Finance is heavily dependent upon economic factors, including debt service burden and interest rates. Weak economic conditions may result in higher than anticipated provisions for credit loss, which could adversely affect our financial performance.

345.   These statements were materially false and misleading because they portrayed the

inability to maintain the quality of loans, leases and other credit products in Textron's finance asset

portfolio as a possibility when, in fact, at the time of the Offering, the Company had already

loosened its underwriting standards significantly and consequently taken on a massive amount of

credit risk.

346.   Further, the Prospectus purported to warn that:

Aircraft customers, including sellers of fractional share interests, may respond to weak economic conditions by delaying delivery of orders or canceling orders. Weakness in the economy also may result in fewer hours flown on existing aircraft and, consequently, lower demand for spare parts and maintenance. Weak economic conditions also may cause reduced demand for used business jets or helicopters. We may accept used aircraft on trade-in that would be subject to fluctuations in the fair market value of the aircraft while in inventory. Reduced demand for new and used aircraft, spare parts and maintenance can have an adverse effect on our financial results of operations.

347.    This statement was materially false and misleading because it portrayed reduced and delayed demand for Textron aircraft as possibility when, in fact, at the time of the Offering, the Company was then already being negatively and materially impacted by an increasing level of customer cancellations and defaults.

348.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

349.    Textron, Campbell and French are strictly liable for the misstatements and omissions and for the damages that Plaintiff and other members of the Class have sustained thereby.  Textron, Campbell and French are responsible for the contents and dissemination of the Registration Statement and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

350.    Textron, Campbell and French issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, Textron, Campbell and French violated and/or controlled a person who violated Section 11 of the Securities Act.

351.    Plaintiff and other members of the Class acquired Notes pursuant to or traceable to the Registration Statement or Prospectus, and sustained damages thereby.  The Notes sold at an Offering price of $100.60 per unit.  By January 29, 2009, however, they had fallen to a price of $73.10 per unit and lost more than *27%* of their value.

137

## COUNT II

### For Violations of Section 15 of the Securities Act Against
### Campbell and French Arising From The Offering

352.     Plaintiff incorporates the allegations contained in ¶¶Plaintiff incorporates the allegations contained in ¶¶14-18, 20-21, 33-68, 70-84, 86, 88-93, 96, 100-06, 110-13, 115-18, 123-25, 129-30, 132, 142, and 322-351.  For purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct as these counts are based solely on claims of strict liability and/or negligence under the Securities Act of 1933.

353.     This claim is brought against Campbell and French, each of whom was a controlling person of Textron by virtue of his position as a director and/or senior officer of Textron and/or by virtue of his or her status as a major shareholder of the Company.

354.     Campbell and French each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Textron.  By reason of their positions within the Company and/or their stock ownership and/or because of their positions on Textron's Board of Directors, Campbell and French had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in Count I above.

355.     Campbell and French are strictly liable for the violations of Section 11 of the Securities Act through the false Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements made therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement .

138

356.     By virtue of the conduct alleged herein, Campbell and French are each liable to Plaintiff and the members of the Securities Act Class for violations of Section 15 of the Securities Act and the damages they suffered.

## COUNT III

**For Violations of Section 10(B) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

357.     This claim is alleged against Textron and the Individual Defendants.

358.     Plaintiff repeats and realleges the allegations set forth above in ¶¶1-319 as though fully set forth herein.

359.     During the Class Period, Textron and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Textron equity securities; and (iii) cause Plaintiff and other members of the Class to purchase Textron equity securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Textron and the Individual Defendants, and each of them, took actions set forth herein.

360.     These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's equity securities in an effort to maintain artificially high market prices for Textron's equity securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.   The Individual Defendants are also sued as controlling persons of Textron, as alleged below.

139

361.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, surveillance, financial condition and operational performance, so that the market prices of Company equity securities would be based on truthful, complete and accurate information.

362.     Textron and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Textron as specified herein.

363.     These Defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Textron's value and performance, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about Textron and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Textron equity securities during the Class Period.

140

364.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his/her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and c) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which each knew or disregarded with severe recklessness was materially false and misleading.

365.     Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing  Textron's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its equity securities.  As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he or she did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

366.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Textron's equity securities were artificially inflated, at varying levels, throughout the Class Period.  In ignorance of the fact that market prices of Textron equity securities were artificially inflated, and relying directly

or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the equity securities trade, and/or on the absence of material adverse information that was known to or disregarded with severe recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Textron equity securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines identified herein that released the artificial inflation from Textron's equity securities.

367.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, future prospects and intrinsic value of Textron, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Textron equity securities during the Class Period at the artificially inflated prices which they paid.

368.     By virtue of the foregoing, Textron and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

369.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's equity securities during the Class Period, as evidenced by, among other things, the stock price declines identified herein that released the artificial inflation from Textron's equity securities.

## COUNT IV

**For Violations of Section 20(A) of the Exchange Act**
**Against the Individual Defendants**

370.     This claim is alleged against the Individual Defendants.

142

371.     Plaintiff repeats and realleges the allegations set forth in ¶¶1-319 above as though fully set forth herein.

372.     Each of the Individual Defendants acted as a controlling person of Textron within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent financial reporting and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

373.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

374.     As set forth above, Textron and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's equity securities during the Class Period, as the artificial inflation dissipated from Textron equity securities.

143

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

144

DATED:  February 8, 2010

_____
                      */s/ Barry J. KUSINITZ*
                       BARRY J. KUSINITZ

BARRY J. KUSINITZ (# 1404)
155 South Main Street, Suite 405
Providence, RI  02903
Telephone:  401/831-4200
401/831-7053 (fax)
bkusinitz@bdglawyers.com

*Liaison Counsel*

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DAVID J. GEORGE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3367 (fax)

*Lead Counsel for Plaintiff*

145

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 8, 2010, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of

Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as

service of this document by electronic means.


*/s/ Barry Kusinitz*
Barry Kusinitz


146