UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Civil Action No. 09-cv-00367 |
| v. | : : | CLASS ACTION |
| TEXTRON INC., et al. | : : | |
| Defendants. | : : | |

**DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT**

Defendants Textron Inc., Textron Financial Corporation, Lewis B. Campbell, Ted R. French, Douglas Wilburne, Buell J. Carter, Jr., Thomas Cullen, and Angelo Butera move to dismiss Plaintiff's Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The grounds for Defendants' Motion to Dismiss are set forth in detail in their accompanying Memorandum of Law.

**Request for Oral Argument**

Defendants request oral argument and estimate that one hour would be appropriate for all parties.

Dated: April 9, 2010

DEFENDANTS
By their attorneys,


/s/ John A. Tarantino
JOHN A. TARANTINO (#2586)
jtarantino@apslaw.com
PATRICIA K. ROCHA (#2793)
procha@apslaw.com
NICOLE J. DULUDE (#7540)
ndulude@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza , 8th Floor
Providence, Rhode Island 02903
Tel:  401-274-7200
Fax: 401-351-4607

GIBSON, DUNN & CRUTCHER LLP
Mitchell A. Karlan (*Pro Hac Vice*)
Brian M. Lutz (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Civil Action No. 09-cv-00367 |
| v. | : : : | CLASS ACTION |
| TEXTRON INC., et al. | : : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

DEFENDANTS
By their attorneys,

GIBSON, DUNN & CRUTCHER LLP
Mitchell A. Karlan (*pro hac vice*)
Brian M. Lutz (*pro hac vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000

JOHN A. TARANTINO (#2586)
jtarantino@apslaw.com
PATRICIA K. ROCHA (#2793)
procha@apslaw.com
NICOLE J. DULUDE (#7540)
ndulude@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903
Tel:  401-274-7200
Fax: 401-351-4607

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

          A.    Textron And Its Business Segments .................................................. 3

          B.    The Individual Defendants ................................................................ 4

          C.    Cessna ............................................................................................. 5

               1.    Cessna's Business ............................................................... 5

               2.    Cessna's Performance During The Class Period .......................... 7

               3.    Plaintiff's Cessna-Related Allegations .......................................... 9

          D.    TFC ............................................................................................... 11

               1.    TFC's Business ................................................................... 11

               2.    TFC's Performance During The Class Period ............................. 14

               3.    Plaintiff's TFC-Related Allegations ............................................. 18

          D.    The Complaint ............................................................................... 19

ARGUMENT ...................................................................................................... 21

      I.    Plaintiff Fails To State A Claim Under Section 10(b) Against Any Defendant .. 21

          A.    Plaintiff Fails To Plead An Actionable Misstatement Or Omission ........ 23

                1.    The Alleged Misstatements And Omissions Concerning The Cessna Backlog Are Not Actionable ........................................... 23

                2.    The Alleged Misstatements And Omissions Concerning TFC's Portfolio Of Finance Receivables Are Not Actionable ............... 27

                       a.    The Alleged Omission Concerning TFC's Underwriting Standards Is Not Actionable ........................................... 28

                       b.    The Alleged Omission Concerning TFC's Marine Division Is Not Actionable .............................................................. 30

**Table of Contents**
**(Continued)**

Page

           c.     The Alleged Omission Concerning TFC's Alleged Exposure To The Sub-prime Housing Market Is Not Actionable ...................................................................... 31

     3.     General Allegations That Textron's Financial Statements Violated GAAP Cannot Establish A Securities Fraud Claim..................... 33

     4.     Puffery And Forward-Looking Statements Accompanied By Cautionary Language Are Not Actionable .................................. 35

   B.     The Complaint Fails To Plead A Strong Inference Of Scienter For Any Defendant ................................................................................. 38

     1.     Defendants' Positions In The Company And Their Alleged Access To Unidentified Information Cannot Establish A Strong Inference Of Scienter ................................................................................ 40

     2.     Allegations Derived From Confidential Witnesses Do Not Support A Strong Inference Of Scienter As To Any Defendant ............... 42

          a.     The Confidential Witnesses Fail To Establish That Any Defendants Knew Or Recklessly Disregarded That Their Statements In Question Were False Or Misleading......... 42

          b.     The Confidential Witnesses Lack Reliability Or Knowledge Concerning Any Alleged Fraud ...................................... 47

     3.     Plaintiff Has Failed To Plead A Strong Inference Of Scienter On The Basis Of Alleged Insider Trading ......................................... 50

     4.     Lack Of Scienter With Respect To Textron And TFC ............... 52

   C.     The Complaint Lacks Sufficient Allegations Of Loss Causation............ 53

  III.   The Section 20(a) Claim Of Control Person Liability Is Deficient .................... 57

CONCLUSION................................................................................................ 59

# TABLE OF AUTHORITIES

Page(s)

## Cases

*60223 Trust v. Goldman Sachs & Co.*,
   540 F. Supp. 2d 449 (S.D.N.Y. 2007) ................................................................. 55

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) ............................................................... 38, 39, 40

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) .................................................................................. 58

*Carney v. Cambridge Tech. Partners, Inc.*,
   135 F. Supp. 2d 235 (D. Mass. 2001) ................................................ 25, 31, 39, 41

*Chien v. Skystar Bio Pharma. Co.*,
   256 F.R.D. 67 (D. Conn. 2009) .......................................................................... 55

*City of Roseville Employees Ret. Syst. v. Horizon Lines, Inc.*,
   C.A. No. 08-969, 2009 WL 3837659 (D. Del. Nov. 13, 2009) .............................. 52

*Copland v. Grumet*,
   88 F. Supp. 2d 326 (D.N.J. 1999) ...................................................................... 57

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................... 52

*Day v. Staples, Inc.*,
   555 F.3d 42 (1st Cir. 2009) ................................................................................. 34

*Druskin v. Answerthink, Inc.*,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) .............................................................. 44

*Dura Pharma., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................. 22, 53, 54

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994) ................................................................................. 55

*Fitzer v. Sec. Dynamics Tech., Inc.*,
   119 F. Supp. 2d 12 (D. Mass. 2000) ...................................................... 42, 47, 51

*Geffon v. Micrion Corp.*,
   249 F.3d 29 (1st Cir. 2001) ................................................................... 24, 39, 50

*Greebel v. FTP Software, Inc.*,
   182 F.R.D. 370 (D. Mass. 1998) ........................................................................ 39

**Table of Authorities**
**(Continued)**

Page(s)

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)........................................................................ 38, 39, 50, 51, 57

*Gross v. Summa Four, Inc.*,
  93 F.3d 987 (1st Cir. 1996)........................................................................................... 33

*In re Alkermes Sec. Litig.*,
  C.A. No. 03-12091-RCL, 2005 WL 2848341 (D. Mass. Oct. 6, 2005).................................... 53

*In re Am. Express Co. Sec Litig.*,
  No. 02 Civ. 5533 (WHP) , 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ............................. 43

*In re Boston Tech., Inc. Sec. Litig.*,
  8 F. Supp. 2d 43 (D. Mass. 1998)................................................................. 25, 26, 30, 35, 38

*In re Brooks Automation, Inc. Sec. Litig.*,
  C.A. No. 06-11068-RWZ, 2007 WL 4754051 (D. Mass. Nov. 6, 2007) ................................ 39

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).......................................................................... 34, 45, 47, 48, 52

*In re Capstead Mortgage Corp. Sec. Litig.*,
  258 F. Supp. 2d 533 (N.D. Tex. 2003) ............................................................................. 30

*In re Galileo Corp. S'holders Litig.*,
  127 F. Supp. 2d 251 (D. Mass. 2001) .............................................................................. 41

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009) .............................................................................. 51

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) .......................................................................... 54, 55

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................................................... 51

*In re Peritus Software Servs., Inc. Sec. Litig.*,
  52 F. Supp. 2d 211 (D. Mass. 1999) ....................................................... 34, 39, 40, 42, 50, 52

*In re Progress Energy, Inc. Sec. Litig.*,
  371 F. Supp. 2d 548 (S.D.N.Y. 2005) .............................................................................. 25

*In re Segue Software, Inc. Sec. Litig.*,
  106 F. Supp. 2d 161 (D. Mass. 2000) .............................................................................. 32

**Table of Authorities**
**(Continued)**

Page(s)

*In re Sonus Networks, Inc. Sec. Litig.*,
  C.A. No. 04-10294-DPW, 2006 WL 1308165 (D. Mass. May 10, 2006) .......................... 26, 39

*In re Stone & Webster, Inc., Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003) ...................................................................... 4, 38, 57

*In re The First Marblehead Corp. Sec. Litig*,
  639 F. Supp. 2d 145 (D. Mass. 2009) ..................................................................... 30, 54, 56

*In re Tyco Int'l, Ltd.*,
  MDL Docket No. 02-md-1335-PB, 2007 WL 1687775 (D.N.H. June 11, 2007) ................... 58

*In re Viewlogic Syst. Sec. Litig.*,
  C.A. No. 95-10014-DPW, 1996 U.S. Dist. LEXIS 22371 (D. Mass. Mar. 13, 1996) ........ 40, 46

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996) ....................................................................................... 32

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) ................................................................................... 43

*Isham v. Perini Corp.*,
  665 F. Supp. 2d 28 (D. Mass. 2009) ............................................................ 23, 37, 50, 51, 53

*Kemp v. Universal Am. Fin. Corp.*,
  No. 05 Civ. 9883 (JFK), 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ............................. 44

*Konkol v. Diebold, Inc.*,
  590 F.3d 390 (6th Cir. 2009) .................................................................................. 46

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ............................................................................... 53, 54, 57

*Leykin v. AT&T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006) ..................................................................... 55

*Lirette v. Shiva Corp.*,
  27 F. Supp. 2d 268 (D. Mass. 1998) ....................................................................... 41

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
  652 F. Supp. 2d 576 (E.D. Pa. 2009) ...................................................................... 55

*Maldonado v. Dominguez*,
  137 F.3d 1 (1st Cir. 1998) ................................................................................. 39, 45, 50

**Table of Authorities**
**(Continued)**

Page(s)

*Malin v. XL Capital Ltd.*,
    499 F.Supp.2d 117 (D. Conn 2007) ................................................................. 43

*Mississippi Pub. Employees Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) ............................................................................ 40

*New Jersey Carpenters Pension & Annuity Funds v. Biogen Idec Inc.*,
    537 F.3d 35 (1st Cir. 2008) ................................................... 21, 44, 47, 52

*Panther Partners, Inc. v. Ikanos Comm., Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ......................................................... 25

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
    No. 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ................................. 45

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009) .......................................................... 24

*Roots-Partnership v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) ...................................................................... 33

*Scritchfield v. Paolo*,
    274 F. Supp. 2d 163 (D.R.I. 2003) ............................................................... 37

*SEC v. Durgarian*,
    477 F. Supp. 2d 342 (D. Mass. 2007) .......................................................... 52

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) .................................................................. 35, 36

*Sheinkopf v. Stone*,
    927 F.2d 1259 (1st Cir. 1991) ...................................................................... 58

*Stiegele v. Bailey*,
    C.A. No. 05-10677-MLW, 2007 WL 4197496 (D. Mass Aug. 23, 2007) .............................. 52

*Suna v. Bailey Corp.*,
    107 F.3d 64 (1st Cir. 1997) ........................................................................ 57

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*,
    No. Civ. 06-2674-PHX-RCP, 2010 WL 653440 (D. Ariz., Feb. 22, 2010) ......................... 58

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................. 22, 38

## Table of Authorities
### (Continued)

Page(s)

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)................................................................................ 32

*Vachon v. Baybanks, Inc.*,
  780 F. Supp. 79 (D. Mass. 1991) ......................................................... 34

*Van Ormer v. Aspen Tech., Inc.*,
  145 F. Supp. 2d 101 (D. Mass. 2000) ....................................... 21, 23, 35

*Wilson v. Microfinancial, Inc.*,
  C.A. No. 03-11883-RGS, 2006 WL 1650971 (D. Mass. June 13, 2006) ................................. 43

**Statutes**

15 U.S.C. § 78j(b) (2000) ....................................................................... 21

15 U.S.C. § 78u-4(b)(1) .......................................................................... 21, 27

15 U.S.C. § 78u-4(b)(2) .......................................................................... 22, 38

15 U.S.C. § 78u-4(b)(2) (1998) ............................................................... 22

15 U.S.C. § 78u-5(c)1(A) ........................................................................ 37

**Rules**

17 C.F.R. § 240.10b-5.............................................................................. 21

**Regulations**

Regulation S-K, Item 101(c)(1)(viii) ....................................................... 5

This is a purported class action brought by plaintiff Automotive Industries Pension Trust Fund, a shareholder of defendant Textron Inc. ("Textron"), alleging violations of the anti-fraud provisions of the federal securities laws by defendant Textron, its wholly-owned subsidiary Textron Financial Corporation ("TFC"), and various current and former officers of each company. Defendants move to dismiss the action under Rule 12(b)(6) of the Federal Rules of Civil Procedure because the complaint fails to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

The complaint tries to state a claim under the federal securities laws by focusing on two facts: The Textron stock price was high. Then it was low. The complaint then goes on to allege that the fluctuation in stock price resulted from nefarious actions and omissions by the Company directors and officers. The gravamen of this theory of liability is that a cause of action must exist because stock prices are not supposed to ever go down, only up.

The problem with this theory, of course, is that it ignores the myriad outside market forces acting upon the economy generally, the ebb and flow of supply and demand for goods and services, and risks inherent in the market. According to the plaintiff, a company's management and board must foresee every economic storm and shoal and then ensure that stock prices never drop. Consequently, if and when the company's stock price does drop, it can only happen because management was dishonest. There are two other significant and insurmountable problems with the plaintiff's theory: First, it is not based in reality. Second, it is not based in the law.

In late 2008 and early 2009, the world economy came dangerously close to failing. In the United States, the economy suffered its worst shocks since the Great Depression, events that were exacerbated by similar blows dealt to every other nation's economy. The market price of

Textron's stock, like the price of every traded security, dropped, as did prices for real estate, commodities and money.  Unemployment spiked.  The federal government was prompted to take actions unprecedented in their size and scope to avoid catastrophe.  Predictably, Textron's stock price moved in response to these massive economic pressures in a way that mirrors the price movement of comparable stock indices:



| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Textron Inc. | $100.00 | $106.24 | $131.68 | $203.35 | $ 40.75 | $ 55.71 |
| S&P 500 | 100.00 | 104.91 | 121.48 | 128.16 | 80.74 | 102.11 |
| S&P 500 A&D | 100.00 | 115.92 | 145.09 | 173.12 | 109.86 | 136.94 |
| S&P 500 IC | 100.00 | 96.18 | 104.47 | 109.01 | 52.87 | 58.24 |

*See* Textron, Annual Report (Form 10-K), at 15 (Feb. 25, 2010), Ex. 1.

What is remarkable, however, is that these historic and global events appear nowhere in the complaint, as if Textron operated in a vacuum unaffected by catastrophic world events and steep market declines.  Consistent with this unrealistic world view espoused by plaintiff, the complaint cannot withstand scrutiny for several reasons:

First, none of the statements alleged to be actionable was untrue at the time they were made.

Second, the statements that plaintiff claims were omitted from Textron's public disclosures were, in fact, repeatedly included.

Third, even if the complaint had alleged either false affirmative statements or material omissions, the complaint still fails to allege specific facts, as required by the 1995 amendments to the securities laws, to establish a strong inference that each defendant acted with fraudulent intent.

Fourth, the complaint fails to plead loss causation – a direct causal connection between the revelation of the alleged fraud and plaintiff's loss – which is an essential element of a claim under Section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act").

Finally, this case involves none of the basic earmarks of securities fraud: there was *no* restatement of earnings; *no* announcement of a regulatory investigation or fine; *no* announcement of a criminal investigation or lawsuit; *no* guilty pleas; *no* admissions of wrongdoing; and *no* news articles or analyst reports disclosing any wrongdoing.  In light of these and other deficiencies set forth below, the complaint falls well short of asserting specific facts that would establish a fraud claim.  Accordingly, the complaint must be dismissed.

## STATEMENT OF FACTS

### A.     Textron And Its Business Segments

Textron is one of the world's best known multi-industry companies, with a "global network of aircraft, defense, industrial and finance businesses."  Textron, Annual Report (Form 10-K), at 1 (Feb. 25, 2010), Ex. 1.[1]  According to its most recent Form 10-K, Textron and its

---

[1] All references in the form (Ex. __) are to the exhibits of the Lutz Declaration ("Lutz Decl.") accompanying this memorandum of law.

operating segments employ approximately 32,000 people worldwide.  *Id*.[2]  Textron is organized

under Delaware law and has its principal place of business in Providence, Rhode Island.

Textron, Annual Report (Form 10-K) (Feb. 25, 2010), Ex. 1.

Textron operates through five operating segments:  Cessna, Bell, Textron Systems,

Industrial and Finance (TFC).  *See* Textron, Annual Report (Form 10-K), at 1 (Feb. 25, 2010),

Ex. 1.  The allegations in the complaint concern two of Textron's segments – Cessna and TFC –

which, during the period in question, accounted for approximately 39% (Cessna) and 6% (TFC)

of Textron's overall revenue.  *See* Textron, Annual Report (Form 10-K), at 16 (Feb. 26, 2009),

Ex. 2.  Textron and TFC each are named defendants in this action.

### B.     The Individual Defendants

Six current or former officers of Textron and TFC, respectively, (the "Individual

Defendants") are named as defendants in this action: (1) Lewis B. Campbell, who served as

Textron's Chairman and Chief Executive Officer during the entire relevant period, and after

retiring as CEO in December 2009, now serves as the Company's non-executive Chairman

(¶ 20);[3] *see also* Press Release dated Sept. 23, 2009, Ex. 4; Textron, Annual Report (Form 10-

K), at 97 (Feb. 25, 2010), Ex. 1; (2) Ted R. French, who left Textron in 2009, having served as

Textron's Chief Financial Officer during the period in question (¶ 21); (3) Douglas Wilburne,

who serves as Textron's Vice President of Investor Relations, a position he held during the entire

---

[2]  On a motion to dismiss, courts may consider public documents, including a company's SEC filings.  *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 129 n.11 (D. Mass. 2003).

[3]  All paragraph references in the form (¶__) are to plaintiff's Consolidated Class Action Complaint.

relevant period (¶ 24); (4) Buell J. Carter, Jr., who served as TFC's President and Chief

Operating Officer during the entire period in question, and retired from that position in 2009

(¶ 22); (5) Thomas Cullen, who serves as TFC's Chief Financial Officer, a position he held

during the entire Class Period (¶ 23); and (6) Angelo Butera, who serves as TFC's Chief Credit

Officer, and is alleged to have been "at all relevant times, an executive of TFC."  ¶ 25.

### C.    Cessna

#### 1.    Cessna's Business

Cessna, one of the world's largest manufacturers of general aviation aircraft, sells aircraft

throughout the world primarily to businesses and high net-worth individuals.  *See* Textron,

Annual Report (Form 10-K), at 1 (Feb. 25, 2010), Ex. 1.  Customers who wish to purchase a

Cessna aircraft are required to sign a definitive purchase agreement and provide a nonrefundable

deposit.  *Id.* at 5.  Only after these two requirements are met is the customer's aircraft order

added to Cessna's "backlog," which reflects the aggregate value of all aircraft orders believed to

be firm that have not been filled.  *Id.*  For Cessna and countless other companies, the size of a

backlog is a useful, though not the only, indicator of current and future performance because,

insofar as customers follow through on their orders, the backlog will convert into revenue.[4]

Cessna customers may choose to cancel their orders, but if they do they forfeit any

nonrefundable deposits that already have been paid toward the new jet.  Accordingly, during the

---

[4] SEC rules require public companies like Textron to disclose its dollar amount of backlog on a quarterly basis, including, if material, by operating segment, along with, as Textron has done each quarter, an indication of the portion of the backlog not reasonably expected to be filled within the current fiscal year.  *See* Regulation S-K, Item 101(c)(1)(viii); Textron, Annual Report (Form 10-K), at 5 (Feb. 20, 2008), Ex. 3.

relevant period (July 2007 through January 2009) (the "Class Period"), Textron warned investors that:

> Aircraft customers, including sellers of fractional share interests, may respond to weak economic conditions by delaying delivery of orders or canceling orders. Weakness in the economy may result in fewer hours flown on existing aircraft and, consequently, lower demand for spare parts and maintenance. Weak economic conditions also may cause reduced demand for used business jets or helicopters. We may accept used aircraft on trade-in that would be subject to fluctuations in the fair market value of the aircraft while in inventory. Reduced demand for new and used aircraft, spare parts and maintenance can have an adverse effect on our financial results of operations.

Textron, Annual Report (Form 10-K), at 8 (Feb. 20, 2008), Ex. 3. Textron also warned investors throughout the Class Period that Textron's projections were subject to a series of risks, including "changes in aircraft delivery schedules or cancellation of orders." *Id.* at 7. Textron disclosed, or incorporated by reference, one or both of these warnings in its annual and quarterly SEC filings, in press releases, and in its conference calls with investors or investment analysts held during the Class Period.[5] Notwithstanding these disclosures, plaintiff alleges that defendants' statements about Cessna's backlog were false and misleading because the backlog contained orders that were at risk of being cancelled. *See*, *e.g.*, ¶¶ 6, 128-133, 137.

---

[5] *See* Earnings Call transcript dated July 19, 2007, at 1, Ex. 5; Press Release dated July 19, 2007, at 2, Ex. 6; Textron, Quarterly Report (Form 10-Q), at 22-23 (July 27, 2007), Ex. 7; Earnings Call transcript dated Oct. 18, 2007, at 1, Ex. 8; Press Release dated Oct. 18, 2007, at 3, Ex. 9; Textron, Quarterly Report (Form 10-Q), at 24 (Oct. 29, 2007), Ex. 10; Earnings Call transcript dated Jan. 24, 2008, at 1, Ex. 1; Press Release dated Jan. 24, 2008, at 3, Ex. 12; Earnings Call transcript dated Apr. 17, 2008, at 1, Ex. 13; Press Release dated Apr. 17, 2008, at 3, Ex. 14; Textron, Quarterly Report (Form 10-Q), at 23 (Apr. 25, 2008), Ex. 15; Earnings Call transcript dated July 17, 2008, at 1, Ex. 16; Press Release dated July 17, 2008, at 3, Ex. 17; Textron, Quarterly Report (Form 10-Q), at 23-24 (July 25, 2008), Ex. 18; Earnings Call transcript dated Oct. 16, 2008, at 1, Ex. 19; Press Release dated Nov. 4, 2008, at 1, Ex. 20; Textron, Quarterly Report (Form 10-Q), at 15-19, 34 (Oct. 29, 2008), Ex. 21; Press Release dated Dec. 22, 2008, at 2-3, Ex. 22; Earnings Call transcript dated Jan. 29, 2009, at 1, 4, Ex. 23; Press Release dated Jan. 29, 2009, at 3, Ex. 24.

## 2.      Cessna's Performance During The Class Period

During the vast portion of the period addressed in the complaint, Cessna achieved record performance levels on the strength of the economy and unprecedented customer demand, and the size of its backlog grew accordingly.  For example, for the second and third quarters of 2007, Textron announced that Cessna's backlog had increased to $10.4 billion and $11.9 billion, respectively, on strong demand.  ¶¶ 144, 151.

In January 2008, Textron reported its results for the fourth quarter of 2007.  ¶ 165. Cessna had achieved another record backlog of $12.6 billion, up 48% from the end of 2006.  *Id.* As Campbell stated during the earnings call, Cessna's delivery schedule was "completely booked out well into 2009," and based on this unprecedented demand, Cessna was projecting "continued uninterrupted growth at Cessna well into the next decade." ¶ 166.[6] Because Textron anticipated some "softening and maybe even a temporary downturn in the U.S. economy in 2008" (¶ 165), however, Cessna conducted a careful analysis of the cancellations and reduction in orders it had experienced during the post-9/11 period – the worst period in Cessna's history.  ¶ 167.  Although Textron did not anticipate that this "extreme" scenario would repeat itself ("if there's something coming at us, we can't see it"), Campbell noted that, "if it comes at us as hard as it did in '01, '02, '03, we firmly believe that we'll be able to meet the numbers that we talked about on the call here." ¶ 170.  This belief was driven in part by Cessna's "almost unusually low cancellations versus normal years" (¶ 170), and Cessna's stronger backlog and more diversified customer base as compared to the 2001-2003 period.  ¶ 167.

---

[6] Plaintiff has bolded and italicized in the complaint all statements that plaintiff claims were false or misleading.  This brief does not retain plaintiff's bolding and italicizing of these statements because they were not bolded and italicized in their original form.

Cessna's backlog increased to another all-time high – $14.5 billion – during the first quarter of 2008,[7] several months before the collapse of Lehman Brothers and the precipitous economic downturn.  ¶¶ 177-78.  Continued "solid global demand" meant that Textron's projections for increased aircraft deliveries over the following three years was "solidly intact." ¶ 178.  The following quarter, Textron reported another strong increase in the backlog – to $16 billion.  ¶ 195.  Campbell noted, however, that while Cessna's order flow and backlog remained strong, "[g]iven the current economic environment over the next several quarters, we do expect a slowing in orders at Cessna."  Earnings Call transcript dated July 17, 2008, at 4, Ex. 16.  Order rates were expected to fall below Cessna's 2009 delivery plan, and, after 2009, Campbell stated that "it is too early to call, as it will depend upon how the global economy develops over the next 18 months."  *Id.*  But Cessna's immediate-term outlook remained favorable, according to Campbell, because of the strength of the backlog, which had continued to hold up in the face of the weakening economy.  ¶ 197.  In fact, as Campbell reported during the July 17, 2008 earnings call, Cessna had a "very low number" of cancellations, and had received requests from just two customers to delay the delivery date on their aircraft, which Cessna had accommodated.  ¶ 201. Thus, according to Wilburne, Cessna was "tracking pretty well so far" in terms of cancellations, as compared to the 170 cancellations Cessna had received during the previous downturn.  ¶ 204.

In October 2008, one month following the collapse of Lehman Brothers, Textron announced its third quarter 2008 results.  With respect to Cessna, Campbell noted that, while the Company was fortunate to have a "large and robust backlog," which had dipped slightly from the

---

[7]   As disclosed in Textron's Form 10-Ks, Cessna did not expect to realize for several years the full amount of the reported backlog.  *See, e.g.*, Textron, Annual Report (Form 10-K), at 5 (Feb. 20, 2008), Ex. 3.

previous quarter to $15.6 billion (¶ 223), new orders were lower than expected, and Textron was taking a "wait and see attitude with respect to how demand develops from here."  ¶ 224. Campbell further explained that, in light of the economic uncertainty, it was "unusual" that Cessna had not begun to experience "noteworthy" cancellations, "[s]o things [were] pretty steady at the moment."  ¶ 226.  Cessna was talking to its customers, Campbell noted, to see whether any wanted to push back on their delivery dates so that Cessna could attempt to find other customers interested in moving forward to take their place.  ¶ 228.

In January 2009, as the global economy continued its precipitous decline in the months following the fall of Lehman Brothers, Campbell announced during an earnings call that, "[u]nfortunately, the economy is having an especially egregious impact on the business jet industry, including Cessna," and that Cessna had received 23 cancellations during the quarter and "an unprecedented number of deferrals."  ¶ 254.  Accordingly, Textron lowered its production forecast at Cessna to reflect the tumultuous economic environment.  *Id.*

### 3.   Plaintiff's Cessna-Related Allegations

Plaintiff does not allege that Textron falsely reported the size of Cessna's backlog of orders or that Textron lied about the strong demand for Cessna's products during virtually the entire Class Period.  Rather, plaintiff alleges that, notwithstanding Textron's repeated disclosure that Cessna customers could cancel their aircraft orders, almost every statement made by defendants during the Class Period about the quality of Cessna's backlog was false and misleading because orders comprising the backlog were "speculative" and "contingent," and therefore "subject to cancellation."  *See, e.g.*, ¶¶ 6, 128-133, 137.  According to plaintiff, orders in the backlog were at risk of being cancelled and should not have been included in the backlog because of the following:

1) Some customers whose orders were included in the backlog had been approved for financing despite their "sub-standard credit." *See, e.g.*, ¶¶ 71, 72, 128, 131, 173. Plaintiff identifies only one customer, Aero Toy Store, that allegedly received financing despite being "highly risky." ¶ 73.

2) Cessna Finance allowed customers of Cessna to finance their deposits. *See, e.g.*, ¶¶ 6, 71, 74, 134, 142. Plaintiff does not allege how many Cessna customers financed their deposits; what portion of the backlog included financed deposits; what percentage of deposits could be financed; or whether deposit financing was available from other lenders. Instead, plaintiff simply concludes that customers who financed their deposits "had zero economic incentive to follow through with their orders." ¶ 134. (Apparently, plaintiff's view is that the risk of losing a very large deposit constituted "zero incentive.")

3) Cessna had encouraged some customers who wanted to cancel their orders to instead delay the delivery date on those orders. *See, e.g.*, ¶¶ 6, 133. Plaintiff does not allege which customers were encouraged to defer rather than cancel; how many customers did so; when this allegedly occurred; or how the alleged attempt to preserve orders (and future revenue) rather than lose them rendered any of defendants' statements false.

Plaintiff also suggests that defendants' statements that Cessna had not experienced significant customer cancellations until January 2009 were false because Cessna customers had been cancelling their orders "throughout 2008." ¶ 132. The complaint contains not a single fact in support of this conclusory allegation. Indeed, while plaintiff claims that the backlog was compiled during Monday morning meetings of Cessna's sales and marketing staff, plaintiff does

*not* allege that the sales and marketing staff improperly added or failed to remove orders from the backlog at those meetings.  *See* ¶¶ 135-36.

### D.   TFC

#### 1.   TFC's Business

Like Textron, which owns 100% of TFC's stock, TFC is a corporation organized under the laws of Delaware, with its principal place of business in Providence, Rhode Island.  *See* TFC, Annual Report (Form 10-K), at 1, 3 (Feb. 20, 2008), Ex. 25.  TFC also files regular reports with the SEC.  TFC is a diversified commercial finance company that, during the period in question, provided financing to customers purchasing Textron and non-Textron products in a variety of industries.  *Id.* at 3.

During the relevant period, TFC's portfolio of finance receivables was distributed across industries as follows:

| Industry | % of Portfolio in 2007 | % of Portfolio in 2008 |
|---|---|---|
| General Aviation | 22 | 26 |
| Golf | 15 | 16 |
| Resort | 13 | 15 |
| Marine | 7 | 7 |
| Powersports | 5 | 5 |
| Manufactured Housing | 4 | 4 |
| Transportation | 4 | 4 |
| Recreational Vehicles | 5 | 4 |
| Outdoor Power Equipment | 3 | 3 |
| Finance Company Services | 3 | 2 |
| Information Technology Equipment | 2 | 1 |
| Real Estate | 2 | 1 |
| Other | 15 | 12 |

TFC, Annual Report (Form 10-K), at 47 (Feb. 26, 2009), Ex. 26.

TFC's business, like that of all lenders, depends on the ability of its borrowers to fulfill their debt obligations, which, in turn, is a function of the overall economic environment.  For

11

example, through its Distribution Finance business, TFC provides inventory financing to dealers across a variety of industries, including recreational vehicles, manufacturing equipment, and marine products.  If, in a difficult economy, consumer spending drops and certain dealers are unable to sell their merchandise to customers at favorable prices, those dealers, in turn, will have difficulty repaying their debt obligations to TFC.

Accordingly, throughout the relevant period, Textron warned customers of the following risks to TFC's business:

> **If our Finance group is unable to maintain portfolio credit quality, our financial performance could be adversely affected.**
>
> A key determinant of financial performance of our Finance group is its ability to maintain the quality of loans, leases and other credit products in its finance asset portfolios.  Portfolio quality may adversely be affected by several factors, including finance receivable underwriting procedures, collateral quality, geographic or industry concentrations, or general economic downturns.  Any inability by our Finance group to successfully collect its finance receivable portfolio and to resolve problem accounts may adversely affect our cash flow, profitability and financial condition.

Textron, Annual Report (Form 10-K), at 10 (Feb. 20, 2008), Ex. 3 (emphasis in original).

Textron also warned investors that its projections were subject to a variety of risks, including the following:

> (k) the occurrence of slowdowns or downturns in customer markets in which our products are sold or supplied or where Textron Financial Corporation offers financing; . . . (p) our ability to realize full value of receivables; . . . (s) Textron Financial Corporation's ability to maintain portfolio credit quality; [and] (t) Textron Financial Corporation's access to debt financing at competitive rates.

*Id.* at 7.[8]

---

[8]   In addition, in its 2007 annual report, Textron disclosed that:

[Footnote continued on next page]

Textron disclosed, or incorporated by reference, these warnings in its annual and quarterly SEC filings, in press releases, and in its conference calls with investors or investment analysts during the Class Period.[9]  Notwithstanding these disclosures, and defendants' repeated statements during the Class Period that TFC's portfolio was suffering under the weight of the softening economy, the crux of plaintiff's claim with respect to TFC is that defendants failed to disclose the vulnerability of TFC's portfolio in light of weakened underwriting standards and problems concentrated in two TFC divisions – the Marine division, which allegedly was saddled with aging inventory of decreasing value, and the Finance Company Receivables division, where a single loan allegedly exposed TFC to the sub-prime housing market.  *See, e.g.*, ¶¶ 3, 4, 5, 69, 70, 85-89, 100-124.

---

[Footnote continued from previous page]

> Our allowance for losses on finance receivables is intended to provide for losses inherent in the portfolio, which requires the application of estimates and significant judgment as to the ultimate outcome of collection efforts and realization of collateral values, among other factors.  **Therefore, changes in economic conditions or credit metrics, including past due and nonperforming accounts, or other events affecting specific obligors or industries may require additions or reductions to our reserves**.

Textron, Annual Report (Form 10-K), at 29 (Feb. 20, 2008), Ex. 3 (emphasis added).  Similarly, in each of TFC's quarterly and annual filings during the Class Period, TFC disclosed that

> [a]lthough management believes it has made adequate provision for anticipated losses on finance receivables, realization of these amounts remains subject to uncertainties.  Subsequent evaluations of portfolio quality, in light of factors then prevailing, including economic conditions, may require additional increases or decreases in the allowance for losses on finance receivables.

*See, e.g.*, TFC, Annual Report (Form 10-K), at 23 (Feb. 20, 2008), Ex. 25.

[9]  *See* footnote 5 above for list of all such disclosures; *see also* Earnings Call transcript dated Aug. 6, 2008, at 1, Ex. 27.

###### 2.    TFC's Performance During The Class Period

Some of the key benchmarks by which a finance company's performance is measured

are: (i) the percentage of finance receivables that are delinquent by more than 60 days (the

"delinquency rate"); (ii) the percentage of nonperforming assets (accounts that are three or more

months delinquent and that are not expected to perform as well as repossessed assets) as a

percentage of an overall portfolio of finance assets; and (iii) the amount of loan loss reserves set

aside on the company's financial statement to cover estimated losses.  *See, e.g.*, Textron,

Quarterly Report (Form 10-Q), at 20 (July 25, 2008), Ex. 18.  In 2006 and during the initial

portion of the Class Period, when the overall economy was strong, TFC experienced historically

strong measurements in these benchmarks.  For example, with its second quarter 2007 results,

Textron announced that TFC had achieved record earnings, with "all-time credit records for both

nonperforming assets and delinquent account percentages."  ¶ 145.

But as the economy began to soften in late 2007, and during the continued deterioration

throughout 2008, each of these key benchmarks worsened for TFC, which Textron repeatedly

disclosed to investors.  For example, in October 2007, Textron announced with its third quarter

results that TFC had "weathered the less friendly capital markets that developed this summer,"

(¶ 152) and had experienced a higher delinquency rate over the previous quarter.  ¶ 153.  Still,

with delinquencies relatively low, particularly by historical standards, and without a significant

increase in nonperforming assets, French stated that TFC's portfolio quality still appeared "very

good."  *Id.*

The following quarter, Textron announced that TFC had experienced declines in certain

lines of its Distribution Finance division, including Manufactured Housing and Marine, and

slower growth in the rest of the businesses in that division.  *See* Earnings Call transcript dated

Jan. 24, 2008, at 10, Ex. 11. During the earnings call, French stated that, in light of TFC's abnormally low charge-offs during 2007, he expected nonperforming assets to "tick up a little bit in '08." *Id.* Campbell also noted that TFC was well-positioned despite the downturn in the economy, in part because TFC was "not involved in sub prime or other misunderstood or high-risk products." ¶ 167. With TFC's delinquency rate and nonperforming assets remaining relatively low, French stated that portfolio quality continued to be strong. ¶ 168.

On February 20, 2008, Textron filed its annual report, which indicated that, during 2007, TFC's Asset-Based Lending division (which included the Finance Company Services business) and Distribution Finance division (which included the Marine business) had experienced an increase in nonperforming assets as compared to 2006, due to "weakening U.S. economic conditions, which began to have a negative impact on borrowers in certain industries." Textron, Annual Report (Form 10-K), at 23 (Feb. 20, 2008), Ex. 3. On the same day, TFC filed its own Form 10-K, which contained the following:

- "The collectability of our finance receivable portfolio remains one of our most significant business risks." TFC, Annual Report (Form 10-K), at 13 (Feb. 20, 2008), Ex. 3.

- "[R]ecent economic trends could have a negative impact on the profitability of our customers and we could experience a resulting increase in delinquency and non-performing assets." *Id.*

- TFC's loan loss provisions in its Distribution Finance division increased $20 million, which "corresponds with a similar increase in nonperforming assets as weakening U.S. economic conditions began to have a negative impact on borrowers in certain industries." *Id.* at 24.

On April 17, 2008, Textron announced its financial results for the first quarter of 2008. ¶ 178. During the earnings teleconference, Campbell noted that "the first quarter was worse than we had planned," resulting in TFC adjusting its outlook as the "general economy continues to soften moderately and corporate financing markets remained challenging." ¶ 179. French

reported that TFC had reported lower profit on an increase in loan loss reserves in the

Distribution Finance and Asset-Based Lending businesses, and a 0.5% increase in

nonperforming assets, again due to weakness in these two divisions.  ¶ 180.

In Textron's Form 10-Q filed eight days later, Textron announced that TFC had increased

its loan loss reserves by $22 million over the previous year, which was "primarily driven by a

$15 million reserve established for one account in the asset-based lending portfolio and

weakening portfolio quality in the distribution finance portfolio as general U.S. economic

conditions have impacted borrowers in certain industries."  Textron, Quarterly Report (Form 10-

Q), at 19 (Apr. 25, 2008), Ex. 15.  Net charge-offs and nonperforming assets also increased

during the quarter, again driven by the performance of these two divisions.  *Id.*  Textron

summarized its expectations for TFC as follows: "For the remainder of 2008, we expect

nonperforming assets and charge-offs to remain high relative to the strong portfolio quality

performance of 2007."  *Id.*

On June 13, 2008, prior to reporting its earnings for the second quarter of 2008, Textron

issued a press release announcing that its second quarter results would be lower than anticipated

due to a profit for TFC that was "significantly less than previously forecast."  ¶ 190.  According

to the press release, this lower profit was driven, in part, by higher levels of loss reserves taken

during the quarter.  *See* Press Release dated June 13, 2008, Ex. 28.

As the economy continued to weaken, more bad news followed the next month when

Textron announced its second quarter results.  TFC's profit had declined by $55 million from the

prior year, due in part to an increased provision for loan losses in certain businesses, including

Distribution Finance, a near doubling in delinquency rates, and an increase in the percentage of

nonperforming assets of nearly 0.5%.  ¶¶ 195, 198.  In light of this downturn, French stated that

TFC had reduced its outlook "to incorporate higher credit losses and continued pressure on interest margin."  ¶ 198.  He concluded with his belief that the revised forecast "properly reflects the additional stress our finance business will experience for the rest of the year."  *Id.*

In its SEC filing for the second quarter of 2008, Textron stated that, through the first half of the year, TFC had increased its loan loss provisioning by over $50 million as compared to the prior year, which amounted to a 418% increase from 2006.  *See* Textron, Quarterly Report (Form 10-Q), at 19 (July 25, 2008), Ex. 18.  This increase was due to increased loan losses in the Distribution Finance and the Golf businesses, and reflected the $15 million loss reserve taken for one account in the Asset-Based Lending division.  *Id.*

On August 6, 2008, TFC hosted a call with investment analysts to address TFC's "portfolio and expected performance."  ¶ 210.  TFC personnel discussed the challenges facing the business, including increased loss provisions and delinquencies, and the future outlook.  TFC projected an annual profit of $130 million, which, according to Cullen, was "not without some risk, and it really depends to some extent on your outlook for the economy."  ¶ 211.

The economy grew markedly worse.  On October 16, 2008, after the fall of Lehman Brothers,[10] Textron announced that its Board had decided that TFC would exit its Asset Based Lending and Structured Capital Divisions in light of the "volatility and disruption in the capital and credit markets," which had "reached unprecedented levels."  ¶ 221.  Campbell and French stated during an earnings call the same day that, due to the deterioration in the credit markets since September 2008, TFC would continue facing a difficult credit environment, and thus, had lowered its forecast for the rest of the year and for 2009.  ¶ 225.

---

[10]  *See* Earnings Call transcript dated Oct. 16, 2008, at 2, Ex. 19.

As the economy continued to plummet through the end of 2008, Textron announced on December 22, 2008 that, due to the "continued weakness in the economy and in order to enhance Textron's long-term liquidity position in light of continuing disruption and instability in the capital markets," Textron planned to exit over a two to four year period TFC's commercial lending businesses other than those businesses that supported customers making purchases of Textron-manufactured products.  ¶ 251.  French confirmed the following month that TFC had recorded a $133 million loan loss provision "to reflect general weakening in market conditions, declining collateral values, and the lack of liquidity available to our borrowers and their customers."  ¶ 254.  As French explained, "the world did change in the fourth quarter in a big way for us. . . . [O]ur business model blew up as a result of all the changes that have happened with the financial crisis."  ¶ 255.

### 3.      Plaintiff's TFC-Related Allegations

Plaintiff alleges that defendants' statements during the Class Period about TFC's portfolio were false and misleading because defendants failed to disclose that TFC had lowered its underwriting standards and that TFC had problems concentrated in two divisions – the Marine division and the Finance Company Services division.  *See, e.g.*, ¶¶ 3, 4, 5, 69, 70, 85-89, 100-124.  Had defendants disclosed this information, plaintiff suggests, the market would have understood the weakness of TFC's portfolio and its inability to weather the economic tsunami that struck at the end of 2008.  *See* ¶¶ 85-87.  Plaintiff makes no mention that Textron disclosed that a risk to TFC's performance was its ability to maintain portfolio quality, collateral quality and its ability to manage general economic downturns.  *See* Textron, Annual Report (Form 10-K), at 10 (Feb. 20, 2008), Ex. 3.  Nor does plaintiff mention Textron's disclosures throughout the Class Period that customer delinquencies and defaults were sharply increasing – particularly in

its Marine and Finance Company Services divisions – causing TFC to substantially increase its

loss reserves to cover losses.

Plaintiff further claims that TFC failed to increase its provision for loan losses during

2008 to cover losses that defendants should have anticipated, but instead maintained reserves at

"historic levels," which, according to plaintiff, violated Generally Applicable Accounting

Principles ("GAAP").  ¶ 287.  Again, plaintiff ignores public filings demonstrating, to the

contrary, that TFC *dramatically increased* its loss reserves in each quarter of 2008 over previous

levels of loss reserves established during 2005-2007.  For example, in the first quarter of 2008,

TFC's loss reserves were over 540% higher than the reserves taken in the first quarter of 2007,

300% higher than Q1 2006, and 225% higher than Q1 2005.  *See* TFC, Annual Report (Form 10-

K), at 69 (Feb. 26, 2009), Ex. 26; TFC, Annual Report (Form 10-K), at 57 (Feb. 21, 2007), Ex.

29.  Through the second quarter of 2008, TFC's loss reserves were 418% higher than the

reserves taken through the second quarter 2007, 837% higher than the reserves through Q2 2006,

and 515% higher than the reserves through Q2 2005.  *Id.*  Through the third quarter 2008, TFC's

reserves were 459% higher than the reserves taken through the third quarter of 2007, 561%

higher than the reserves through Q3 2006, and 439% higher than the reserves taken through Q3

2005.  *Id.*  These facts were timely and accurately disclosed, and plaintiff does not allege

otherwise.

### D. The Complaint

On August 13, 2009, an initial complaint in this action was filed against Textron and

certain of the Individual Defendants, on behalf of a purported class of those who purchased

Textron stock during the Class Period.

On February 8, 2008, plaintiff filed a consolidated class action complaint against Textron, TFC, and the Individual Defendants alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act") and Sections 11 and 15 of the Securities Act of 1933 (Count I and II of the complaint).  On April 5, 2010, the parties filed a stipulation and proposed order dismissing these counts and the Section 11 and 15 claims (Docket #55), which this Court entered by text order on April 6, 2010.

Plaintiff alleges that defendants knew that their statements during the Class Period about the Cessna backlog and TFC's portfolio were false, or that defendants recklessly disregarded the falsity of these statements.  With respect to defendants' knowledge, plaintiff relies principally on allegations purportedly derived from 23 so-called confidential witnesses.  None of these witnesses is alleged to have even mentioned by name four of the six Individual Defendants – Campbell, Wilburne, Cullen, and Butera.  The confidential witnesses are alleged to have provided information relating to just two defendants – French and Carter – but even these allegations lack any details as to what French and Carter knew, or more importantly, that these defendants were aware that their statements were false when made.  ¶ 119.  Plaintiff also alleges that stock sales by Campbell, French, and some non-defendants suggest an improper motive, but plaintiff does not allege that any of this trading was at all unusual or suspicious.

For each claim, plaintiff allegedly suffered harm when the "truth" concerning the weakness of TFC's portfolio and Cessna's backlog slowly leaked out to the market, causing Textron's stock price to decline in fits and spurts on various dates between June 2008 and January 2009 – the same period in which virtually every marketable security suffered significant losses as the global financial crisis took hold.  *See* ¶ 314.  Finally, on January 29, 2009, plaintiff alleges that "the truth was finally revealed" when Textron disclosed that it was scaling back

production plans at Cessna in response to the weak economic environment and increased

customer cancellations and deferrals, and that TFC's portfolio had continued to deteriorate

because its "business model largely blew up as a result of all the changes that have happened

with the financial crisis."   ¶¶ 254-57, 310.

      This motion to dismiss followed.

## ARGUMENT

### I.    Plaintiff Fails To State A Claim Under Section 10(b) Against Any Defendant

      To state a claim for securities fraud under Section 10(b) of the 1934 Act and Rule 10b-5,

a plaintiff must allege specific facts demonstrating (1) a material misrepresentation or omission;

(2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic

loss; and (6) loss causation.  *New Jersey Carpenters Pension & Annuity Funds v. Biogen Idec*

*Inc.*, 537 F.3d 35, 44 (1st Cir. 2008) (footnote and citation omitted); 15 U.S.C. § 78j(b) (2000);

17 C.F.R. § 240.10b-5.  The failure to establish *any* of these elements is fatal to a Section 10(b)

claim.

      Congress passed the Private Securities Litigation Reform Act ("PSLRA") to combat

abuses by counsel who file groundless securities fraud actions.  "The PSLRA, which was

designed to eliminate baseless suits filed when a company's stock drops, heightens the Rule 9(b)

standard by requiring that plaintiffs set forth 'each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omissions is made on information and belief, that the complaint state with

particularity all facts on which that belief is formed.'"  *Van Ormer v. Aspen Tech., Inc.*, 145 F.

Supp. 2d 101, 103 (D. Mass. 2000) (quoting 15 U.S.C. § 78u-4(b)(1)).

In addition, the PSLRA heightens the pleading standard for scienter, requiring that a plaintiff plead not merely a reasonable inference of scienter, but a "strong" one. 15 U.S.C. § 78u-4(b)(2) (1998). As the Supreme Court explained in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, an "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. 308, 314 (2007).

To plead loss causation,  a securities plaintiff must allege that a loss was caused by defendants' fraud rather than, for example, "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ." *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Absent facts suggesting a causal connection between the revelation of fraud and a drop in a company's stock price, the complaint fails to plead loss causation and must be dismissed.

As set forth below, the Section 10(b) claim must be dismissed because the complaint fails to plead with the required particularity that any of the statements identified in the complaint were false or misleading. Nor are any specific facts alleged giving rise to a strong inference of scienter with respect to any defendant, as there are no facts strongly suggesting that any defendant knew that their public statements were false or misleading at the time they were made. The Section 10(b) claim is separately deficient for failure to plead loss causation, as there are no facts in the complaint demonstrating that any alleged fraud, as opposed to the global economic recession, caused plaintiff's loss.

### A.  Plaintiff Fails To Plead An Actionable Misstatement Or Omission

As set forth below, none of the alleged misstatements or omissions gives rise to a securities fraud claim.[11]  Plaintiff's Section 10(b) claim must be dismissed on this basis.

### 1.  The Alleged Misstatements And Omissions Concerning The Cessna Backlog Are Not Actionable

Plaintiff challenges defendants' statements during the Class Period concerning Cessna's backlog.  According to plaintiff, defendants failed to disclose material facts about the customers whose orders comprised the backlog, which had the effect of hiding from the market the material weakness of Cessna's backlog.[12]  Plaintiff does not allege that Textron falsely reported Cessna's backlog numbers during the Class Period.  Instead, plaintiff alleges that almost every statement by defendants about Cessna's backlog during the Class Period was misleading because defendants failed to disclose that orders reflected in the backlog were not firm, but "speculative" and "contingent," and thus, "unlikely to be filled" and "subject to cancellation."  *See, e.g.*, ¶¶ 6, 128, 129, 131, 133, 134, 148.  According to plaintiff, defendants omitted the following information:

1) Cessna Finance had relaxed its underwriting standards so that the backlog included customers who had "sub-standard credit" (*see, e.g.*, ¶¶ 71, 72, 128, 131);

2) Since before the Class Period, Cessna Finance had allowed customers ordering Cessna aircraft to finance their deposits (*see, e.g.*, ¶¶ 6, 71, 74, 134, 142); and

---

[11]  For the benefit of the Court, and consistent with the practice in the First Circuit, the alleged misstatements and omissions are grouped in general categories below.  *See Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 38 (D. Mass. 2009) ("In accordance with the typical analysis in securities fraud cases within this circuit, the Court analyzes the allegedly fraudulent statements separately, grouping together similar statements where helpful." (citing *Van Ormer*, 145 F. Supp. 2d at 106 n.3)).

[12]  *See* ¶¶ 144-45, 151-52, 165-69, 177, 180, 182, 195, 197, 223-25, and 242.

3) Cessna had encouraged customers who wanted to cancel their orders to instead defer delivery on those orders. (*see, e.g.*, ¶¶ 6, 133).

Plaintiff, however, ignores Textron's disclosure during the Class Period that orders included in Cessna's backlog were subject to the risk that "[d]elays in aircraft delivery schedules or cancellation of orders may adversely affect our financial results." *See* Textron, Annual Report (Form 10-K), at 8 (Feb. 20, 2008), Ex. 3.  In particular, Textron repeatedly disclosed the following risk to Cessna's business:

> **Aircraft customers, including sellers of fractional share interests, may respond to weak economic conditions by delaying delivery of orders or canceling orders.**  Weakness in the economy may result in fewer hours on existing aircraft and, consequently, lower demand for spare parts and maintenance.  Weak economic conditions also may cause reduced demand for used business jets or helicopters.  We may accept used aircraft on trade-in that would be subject to fluctuations in the fair market value of the aircraft while in inventory.  **Reduced demand for new and used aircraft, spare parts and maintenance can have an adverse effect on our financial results of operations.**

*Id.* (emphasis added).

Investors were thus informed of the very risk that plaintiff alleges made defendants' statements about Cessna's backlog false and misleading:  that orders in the backlog might not result in completed sales because there is always a risk that customers might cancel their orders. *See Geffon v. Micrion Corp.*, 249 F.3d 29, 37 (1st Cir. 2001) (rejecting securities fraud claim based on alleged false statements about orders in backlog when, "[i]n the press releases and conference call at issue, Micrion referred repeatedly to a risk factor . . . which warned that the Read-Rite order could be cancelled or terminated at any time"); *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 125 (D. Mass. 2009) ("Defendant's explicit disclosure of the precise risk upon which Lead Plaintiff rests its claim is ground for

dismissal."); *Panther Partners, Inc. v. Ikanos Comm., Inc.*, 538 F. Supp. 2d 662, 671 (S.D.N.Y. 2008) (omission not actionable when risk disclosure "clearly identifies the risk later realized").

Moreover, the alleged omissions concerning Cessna's deposit financing and encouraging customers to defer rather than cancel orders also are not actionable because plaintiff fails to offer any specific allegation as to how these alleged non-disclosures made any statement about Cessna's backlog false or misleading.  *See Carney v. Cambridge Tech. Partners, Inc*., 135 F. Supp. 2d 235, 242 (D. Mass. 2001) ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." (quoting *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998))).

With respect to deposit financing, the complaint is bereft of allegations concerning, for example: (i) how many Cessna customers financed their deposits; (ii) the portion of the backlog that was comprised of orders from customers who financed deposits; (iii) the portion of customer deposits that could be financed; and (iv) the extent to which lenders besides Cessna Finance offered deposit financing.  Rather than provide any such details, plaintiff relies on the single allegation from Confidential Witness ("CW") 9 that, if a customer financed a deposit, "it meant that they could not afford the aircraft regardless of what financing they received."  ¶ 49.  This conclusory opinion from a single confidential witness lacks any details demonstrating *how* the alleged non-disclosure of deposit financing made any statement by defendants false or misleading.  *See In re Progress Energy, Inc. Sec. Litig*., 371 F. Supp. 2d 548, 553 (S.D.N.Y. 2005) (dismissing securities action because "it is simply not the case that the omission of this information made statements that were disclosed materially misleading"); *In re Sonus Networks,*

*Inc. Sec. Litig.*, C.A. No. 04-10294-DPW, at *20 n.22 (D. Mass. May 10, 2006) (rejecting "conclusory allegations" from confidential witness).

Plaintiff's claim that Cessna failed to disclose that it had encouraged customers to delay rather than cancel their orders is equally devoid of any factual support, and is contrary to plaintiff's own allegations.  According to plaintiff, Textron disclosed in July 2008 that Cessna had allowed two customers to push back their delivery dates (¶ 201), and in October 2008, that "the Cessna team is out proactively talking to everyone in the order book for '09 deliveries right now to get a sense, as early as possible, if anyone is going to come forward and ask us to push something out . . . ."  ¶ 228.  Insofar as plaintiff's theory is that Cessna was enabling customers to delay their orders prior to these disclosures, plaintiff does not allege when Cessna made these requests (only that they were made "during the Class Period") (¶ 55); which customers were encouraged to defer rather than cancel; or how many customers deferred delivery rather than cancel their orders.  Nor does plaintiff even attempt to explain how a business practice that, as plaintiff alleges, was designed to preserve orders rather than lose them, was a material omission that made defendants' statements about the backlog false or misleading.[13]  *See Boston Tech.*, 8 F. Supp. 2d at 53.

---

[13] Plaintiff claims that a statement by Wilburne – that as of July 17, 2008, Cessna had only two cancellations and was ahead of the pace of cancellations as compared to the last downturn in the aviation market – was false or misleading because of the alleged non-disclosure that "during the class period" Cessna encouraged customers to defer, rather than cancel their orders.  ¶¶ 204-05.  As explained above, this alleged omission is immaterial, but even assuming materiality, there is no factual basis to find that Cessna had begun encouraging customers to delay delivery rather than cancel on July 17, 2008 – the date of Wilburne's statement.  *See* ¶ 55 (alleging that Cessna encouraged customers to defer, rather than cancel, "during the class period," not as of a particular date).  As explained below, there is nothing in the complaint suggesting that Wilburne was aware that his statement was somehow false or misleading.  Accordingly, this alleged statement is not actionable.

For these reasons, plaintiff has failed to plead an actionable misrepresentation or omission relating to the Cessna backlog.[14]

### 2. The Alleged Misstatements And Omissions Concerning TFC's Portfolio Of Finance Receivables Are Not Actionable

In violation of the PSLRA's requirement of "specify[ing] each statement alleged to have been misleading and the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), plaintiff asserts that virtually every statement about TFC during the Class Period was false or misleading because defendants failed to disclose material risks to TFC's portfolio.  The complaint makes little effort to match a specific omission to a specific alleged misstatement.  Instead, the complaint alleges three basic omissions that allegedly made statements concerning the strength of TFC's portfolio false or misleading:

1) TFC's portfolio was built upon weak underwriting standards (*see, e.g.*, ¶¶ 3, 4, 69, 70, 85-87);

2) TFC's Marine division was saddled with aging inventory of deteriorating value (*see, e.g.*, ¶¶ 5, 100-114); and

3) TFC had made a bad loan in its Finance Company Services division, which exposed TFC's portfolio to the sub-prime housing market (*see, e.g.*, ¶¶ 88-99).

---

[14] Plaintiff claims that another Wilburne statement – that Cessna customers "aren't allowed to sell a slot" to other potential buyers – was an actionable misstatement.  *See* ¶ 204.  Plaintiff does not allege that this was a false statement, and it is therefore not actionable.  Instead, plaintiff claims (67 paragraphs earlier in the complaint), that, according to one confidential witness, "it was definitely known in 2007 and 2008" that "customers were actually buying 'delivery positions' with no intention of actually purchasing an aircraft from Cessna."  ¶ 137.  Even if this wholly conclusory allegation, which makes no reference to Wilburne or any other defendant, were true, it still does not suggest that Wilburne's statement of Cessna's policy was false or misleading.

The crux of plaintiff's claim is that these omissions hid material risks in TFC's portfolio that defendants knew would eventually materialize and result in increased customer defaults.  As discussed below, none of these alleged omissions is actionable.

**a.      The Alleged Omission Concerning TFC's Underwriting
Standards Is Not Actionable**

Plaintiff ignores Textron's explicit disclosures throughout 2008 that the quality of TFC's portfolio was declining, that delinquencies were increasing, and that, as a result, TFC had increased its loan loss reserves substantially from 2007 levels.  For example, TFC disclosed in its Form 10-Q filing for the first quarter of 2008 that:

- "Nonperforming assets as a percentage of finance assets increased to 1.84% at March 31, 2008 compared to 1.34% at year-end 2007 . . . ."

- "Weakening U.S. general economic conditions have also resulted in an increase in charge-offs in the Distribution Finance portfolio.  We expect nonperforming assets and charge-offs to remain higher for the remainder of 2008 as compared to the strong portfolio quality performance of 2007."

- "The increase in the provision for losses during the first quarter of 2008 [to $27 million, from $5 million in Q1 2007] was primarily driven by a $15 million reserve established for one account in Asset-Based Lending and weakening portfolio quality in Distribution Finance as general U.S. economic conditions have impacted borrowers in certain industries."

TFC, Quarterly Report (Form 10-Q), at 17, 22 (Apr. 25, 2008), Ex. 30.  Similarly, in its Form 10-Q for the second quarter of 2008, TFC disclosed continuing challenges to its portfolio:

- "Nonperforming assets as a percentage of finance assets increased to 2.31% at June 30, 2008 compared to 1.34% at year-end, and 60+ days contractual delinquency as a percentage of finance receivables was 0.61% at June 30, 2008 compared to 0.43% at year-end 2007 . . . .  In addition, nonperforming assets and net charge-offs increased in the Distribution Finance segment reflecting weakening U.S. economic conditions.  We expect nonperforming assets and charge-offs to remain higher for the remainder of 2008 compared to the strong portfolio performance of 2007.  As a result of this trend, we have increased our Allowance for losses on finance receivables by $37 million during the first six months of 2008."

TFC, Quarterly Report (Form 10-Q), at 18 (July 25, 2008), Ex. 31.  In its Form 10-Q for the third

quarter of 2008, the drumbeat of challenges facing TFC's portfolio continued:

- "Portfolio quality statistics weakened during the first nine months of 2008 compared to year-end 2007.  Nonperforming assets as a percentage of finance assets increased to 2.67% at September 30, 2008 compared to 1.34% at year-end, and 60+ days contractual delinquency as a percentage of finance receivables was 1.06% at September 30, 2008 compared to 0.43% at year-end 2007.  The increase in nonperforming assets is primarily the result of one troubled account in the Asset-Based Lending segment and one troubled account in the Golf Finance segment; however, nonperforming assets and net charge-offs also increased significantly in the Distribution Finance segment reflecting weakening U.S. economic conditions.  We expect nonperforming assets and charge-offs to remain higher for the remainder of 2008 compared to the strong portfolio performance of 2007.  As a result of this trend, we have increased our Allowance for losses on finance receivables by $48 million or 54% during the first nine months of 2008."

TFC, Quarterly Report (Form 10-Q), at 21 (Oct. 29, 2008), Ex. 32.

Thus, investors were apprised throughout 2008 that TFC had substantially increased its

loan loss reserves in response to deterioration in the quality of its portfolio and an increase in

delinquencies – disclosures that are fundamentally at odds with plaintiff's theory that defendants

hid from investors problems at TFC.

Moreover, during each analyst call and in each press release that plaintiff alleges

contained false and misleading statements, Textron disclosed that its financial results were

contingent upon TFC's "underwriting procedures" and its ability to "maintain portfolio credit

quality."  Textron, Annual Report (Form 10-K), at 10 (Feb. 20, 2008), Ex. 3.  In particular, the

following disclosure was incorporated by reference into every earnings press release and

earnings call identified in the complaint:

**If our Finance group is unable to maintain portfolio credit quality, our financial performance could be adversely affected.**

A key determinant of financial performance of our Finance group is its ability to maintain the quality of loans, leases and other credit products in its finance asset portfolios. **Portfolio quality may adversely be affected by several factors, including finance**

**receivable underwriting procedures**, collateral quality, geographic or industry concentrations, or general economic downturns.  **Any inability by our Finance group to successfully collect its finance receivable portfolio and to resolve problem accounts may adversely affect our cash flow, profitability and financial condition.**

*Id.* (emphasis in second paragraph added).  In other words, investors were informed that TFC's portfolio quality depended on its finance receivable underwriting procedures and the value of the collateral securing TFC's loans and leases, and that Textron's financial results would suffer in the event of a general economic downturn or if TFC's clients were unable to stay current on their debt obligations.

Simply stated, Textron or TFC disclosed the very risks to TFC's portfolio that plaintiff claims were omitted.  *See In re The First Marblehead Corp. Sec. Litig*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed."); *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 555 (N.D. Tex. 2003) (dismissing securities claim based on alleged material omission of risks associated with mortgage securities when "the relevant public filings . . . adequately warned investors of exactly the risks Plaintiffs contend were not disclosed").

> **b.      The Alleged Omission Concerning TFC's Marine Division Is Not Actionable**

The alleged omission relating to aging inventory in TFC's Marine division also is not actionable because it is unsupported by any specific facts giving rise to a disclosure obligation. *See Boston Tech.*, 8 F. Supp. 2d at 53 ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.").  In particular, the complaint contains no facts demonstrating that the alleged

problems in this division made statements concerning TFC's overall portfolio false or misleading.

Plaintiff alleges that the Marine division – which amounted to a mere 7% of TFC's portfolio of finance receivables – was facing undisclosed problems of aging inventory of depleting value. *See* TFC Annual Report (Form 10-K), at 47 (Feb. 26, 2009), Ex. 26; ¶¶ 100-114. What plaintiff fails to mention, however, is that TFC disclosed, beginning in January 2008, that it was experiencing problems in its Marine division and increasing loss reserves due to challenges in its Distribution Finance segment, which included Marine. *See* Earnings Call transcript dated Jan. 24, 2008 at 10, Ex. 11; Textron Annual Report (Form 10-K), at 23 (Feb. 20, 2008), Ex. 3. Plaintiff also offers no basis for concluding that the problems in the Marine division posed a material threat to the health of TFC's overall portfolio or that TFC had failed to adequately reserve for known losses in that division. There is nothing in the complaint concerning the size of TFC's Marine lending business relative to the overall TFC portfolio; the amount of impaired or troubled assets in that division; how the marine business had performed compared to TFC's other divisions; or how problems in this division would impact TFC's overall portfolio performance. In other words, there is no basis to conclude that defendants made material omissions with respect to the Marine division. *See Carney*, 135 F. Supp. 2d at 242 (no duty to disclose immaterial information).

### c.     The Alleged Omission Concerning TFC's Alleged Exposure To The Sub-prime Housing Market Is Not Actionable

Plaintiff's allegation that Textron failed to disclose another risk to TFC's portfolio – that TFC allegedly was exposed to the sub-prime housing bubble – is similarly devoid of merit. Plaintiff alleges that TFC made bad loans through its Finance Company Services division to

lenders who would finance real estate projects.   ¶ 88.   But, again, plaintiff makes no effort to plead the significance of this single business to TFC's overall portfolio, or that problems in this single division gave rise to a disclosure obligation.   The reason for plaintiff's  diversionary pleading tactic is clear:  the Finance Company Services division comprised only 2-3% of TFC's overall portfolio.  *See* TFC, Annual Report (Form 10-K), at 41 (Feb. 20, 2008), Ex. 25.  *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996) ("[t]he failure to disclose that a loan portfolio is likely to be impaired by some *de minimis* amount may be 'relevant' in that it is the type of information that investors care about, but of such 'dubious significance' as to be 'trivial,' and 'hardly conducive to informed decisionmaking,' so that to reasonable shareholders, such omission must be immaterial as a matter of law" (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976))); *see also In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000) (alleged overstatement of revenue immaterial when overstatement amounted to 2.6% of annual revenue).

Moreover, Textron is not alleged to have masked problems on the single troubled loan in this division that is described in the complaint – a $50-60 million loan to an entity called Assured.  ¶ 93.  Instead, TFC took a loss on this loan, which it disclosed in SEC filings.  ¶ 95; *see also* TFC, Quarterly Report (Form 10-Q), at 22 (Apr. 25, 2008), Ex. 30.  Thus, there are no facts alleged that defendants made any material omission with respect to the Finance Company Services division.

For all these reasons, plaintiff has failed to plead an actionable omission with respect to TFC.

### 3.   General Allegations That Textron's Financial Statements Violated GAAP Cannot Establish A Securities Fraud Claim

Plaintiff further alleges, without any supporting facts, that during 2008, Textron's financial statements were not in compliance with GAAP because Textron failed to set adequate reserves for losses associated with TFC's finance receivables, thereby overstating Textron's net income.  ¶ 269.  According to plaintiff, TFC failed to increase its loss reserves in 2008 to account for losses that it should have anticipated, and instead, "maintained the Company's provisioning at its historic levels."  ¶ 287.  These allegations, which lack any particularized details and rely on a flat misrepresentation of the facts, do not give rise to a securities fraud claim.

For example, the complaint lacks specificity as to the amount of loss reserves that Textron should have taken to cover losses in its TFC division ("tens of millions of dollars") or when any such reserves should have been set ("during, at least, 2008").  ¶ 292.  Plaintiff's failure to plead these essential facts is fatal to a securities fraud claim on the basis of any alleged GAAP violation.  *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996) (dismissing 10b-5 claim based on alleged GAAP violation when plaintiff "failed to allege any particulars to support his general allegation of inflated earnings . . . .  Specifically, he has not alleged the amount of the putative overstatement or the net effect it had on the company's earnings."); *see also Roots-Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (allegation that company "failed to establish adequate reserves for its excessive and outdated inventory" does not establish securities fraud where there is no allegation of "how great the reserves should have been").

Plaintiff also misstates the facts when it alleges that TFC maintained reserve levels in 2008 at "historic levels."  ¶ 287.  As the chart below (drawn from public filings) indicates, TFC significantly *increased* reserves for its finance receivables in each fiscal quarter of 2008 at a pace that far exceeded Textron's historic reserve levels – facts that are wholly inconsistent with an

33

inference of fraud.  *See Vachon v. Baybanks, Inc.*, 780 F. Supp. 79, 80-81 (D. Mass. 1991)

(company's "substantial" increase in reserves prior to announcing loss negates inference that

defendant was fraudulently withholding negative information).



*See* TFC Annual Report (Form 10-K), at 69 (Feb. 26, 2009), Ex. 26; TFC Annual Report (Form

10-K), at 57 (Feb. 21, 2007), Ex. 29.

Thus, plaintiff's attempt to attach liability on the basis of conclusory allegations that

Textron failed to increase loss reserves – when, in fact, Textron did exactly that – falls well short

of pleading a securities fraud claim.[15]

---

[15]  Even if plaintiff were able to allege facts sufficient to demonstrate that Textron's financial
statements – which were never restated and which were reviewed by independent auditors –
violated GAAP, this alone still would not amount to securities fraud.  *See Day v. Staples,
Inc.*, 555 F.3d 42, 57 (1st Cir. 2009) ("that a company's books are out of compliance with
GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b-5" (quoting
*In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002) )); *In re Peritus Software Servs.,
Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 223 (D. Mass. 1999)  ("A host of courts have held that a

[Footnote continued on next page]

### 4. Puffery And Forward-Looking Statements Accompanied By Cautionary Language Are Not Actionable

Many of the challenged statements are non-actionable puffery or forward-looking statements that fall squarely within the PSLRA's safe harbor provision.  These statements, therefore, cannot support a securities fraud claim.[16]

It is well accepted that puffery, or "exaggerated, vague, or loosely optimistic statements about a company are not actionable . . . .  The rule covers loose optimism about both an issuer's *current* state of affairs and its *future* prospects."  *Boston Tech.*, 8 F. Supp. 2d at 54 (emphasis in original); *see also Van Ormer v. Aspen Tech., Inc.*, 145 F. Supp. 2d 101, 107 n.5 (D. Mass. 2000) (statements of non-actionable corporate puffery include "[w]e are very pleased with our performance" and "defendant . . . confirmed that he was 'comfortable' with analyst's earnings estimate").  "Rosy affirmation[s] commonly heard from corporate managers," such as we "expect another year of strong growth" or "the company is on target toward achieving the most profitable year in its history," are "numbingly familiar" and not actionable.  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217-18 (1st Cir. 1996) (internal quotation marks and citations omitted).

To take just a few examples from the complaint, plaintiff alleges that the following statements give rise to a securities fraud claim:

---

[Footnote continued from previous page]
  mere failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter.").

[16]  Statements contained in the following paragraphs must be dismissed as corporate puffery or protected forward-looking statements: ¶¶ 144, 145, 151, 152, 162, 165, 166, 167, 168, 169, 170, 171, 178, 179, 180, 181, 191, 196, 198, 199, 200, 203, 204, 210, 211, 212, 214, 215, 223, 224, 226, 232, 234, 242, and 243.

(i) we are "bullish on our Company as we move to complete another solid year of delivering solid earnings growth and outstanding total shareholder returns" (¶ 152);

(ii) "our outlook at Textron remains very positive" (¶ 169);

(iii) "[w]e have tremendous growth ahead of us with excellent visibility" (¶ 180); and

(iv) "we remain comfortable with next year's production plan at this point." ¶ 224.

These statements, and many others like them in the complaint, are general statements of corporate optimism and amount to "mere 'puffing' or sales talk upon which no reasonable person could rely." *Shaw*, 82 F.3d at 1217 n.32.

Textron repeatedly cautioned investors that its discussion of "strategies, goals, [and] outlook" and its "project[ions] of revenues, income, returns or other financial measures" were forward-looking statements "subject to risks and uncertainties that may cause actual results to differ materially from those contained in the statements." *See, e.g.*, Textron, Quarterly Report (Form 10-Q), at 23 (Apr. 25, 2008), Ex. 15.[17]

Nonetheless, plaintiff asserts that virtually every projection made by defendants during the Class Period was actionable under the securities laws. For example, plaintiff identifies the

---

[17] In each of the press releases, and during each of the earnings calls, in which defendants are alleged to have made false or misleading statements, investors were directed to the risk factors set forth in Textron's SEC filings, including that: (a) changes in worldwide economic and political conditions that impact demand for our products . . . (k) the occurrence of slowdowns or downturns in customer markets in which our products are sold or supplied or where Textron Financial Corporation offers financing; (l) changes in aircraft delivery schedules or cancellation of orders; . . . (p) our ability to realize full value of receivables; . . . (s) Textron Financial Corporation's ability to maintain portfolio credit quality; (t) Textron Financial Corporation's access to debt financing at competitive rates . . . ." Textron, Annual Report (Form 10-K), at 6-7 (Feb. 20, 2008), Ex. 3; s*ee also* Textron Press Release dated July 19, 2007, at 2, Ex. 6; Earnings Call transcript dated July 19, 2007, at 1, Ex. 5.

following forward-looking statements (and dozens others like these) as giving rise to a securities fraud claim:

> (i) "So as we see it, order and demand [for Cessna products] will continue strong for the foreseeable future and we're expecting an increase in deliveries in 2009 as well" (¶ 145);
>
> (ii) "We believe that a significant amount of our enterprise is relatively unaffected by the economy, and that we are well-positioned for this environment" (¶ 167); and
>
> (iii) "Given the strength of demand for our innovative products and our progress in execution improvement thus far, we are raising our earnings and cash flow outlook for the year."  ¶ 144.

Insofar as these and similar projections identified in the complaint are not deemed puffery (which is non-actionable), they are protected under the safe harbor provision in Section 21E of the PSLRA and the "bespeaks caution" doctrine, each of which preclude liability for forward looking statements accompanied by cautionary language.  *See* 15 U.S.C. § 78u-5(c)1(A); *Isham v. Perini Corp.,* 665 F. Supp. 2d 28, 39 (D. Mass. 2009) (projections accompanied by disclosure of risks relating to "customer cancellations," "economic downturns" and that "construction projects could be delayed, suspended or terminated" were protected forward-looking statements); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 178 (D.R.I. 2003) (statements cautioning "putative investors of a whole host of risks that attended investing in [defendant], accompanied by prominent and straightforward warnings discounting the weight of phrases . . . such as 'intend,' 'anticipate,' 'believe,' 'estimate,' 'project,' or 'expect,'" were protected by the bespeaks caution doctrine).[18]

---

[18] Only two alleged misstatements in the complaint are attributed to Cullen, and each is a protected forward-looking statement: (i) "On the other hand, we don't believe we will see

[Footnote continued on next page]

**B.     The Complaint Fails To Plead A Strong Inference Of Scienter For Any Defendant**

The complaint also must be dismissed for the separate and independent reason that it lacks any facts, let alone particularized facts as required under the PSLRA, giving rise to a strong inference of scienter on the part of any defendant.  The PSLRA "imposes a rigorous pleading standard on allegations of scienter," *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008), requiring plaintiffs to plead "with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  15 U.S.C. § 78u-4(b)(2).  "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6)."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195 (1st Cir. 1999).  As the Supreme Court has held, a "strong inference" of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  In other words, to survive a motion to dismiss, a securities plaintiff must plead facts supporting a "'highly likely' inference that the defendant acted with the required state of mind."  *In re Stone & Webster Sec. Litig.*, 414 F.3d 187, 195 (1st Cir. 2005) (citation omitted).

A plaintiff may satisfy the scienter requirement by pleading specific facts giving rise to a strong inference of either "conscious intent to defraud or 'a high degree of recklessness.'"  *ACA*

---

[Footnote continued from previous page]

    charge-offs in the range we experienced in 2002, simply because the composition of our portfolio is significantly different and we avoided most of the pitfalls that are plaguing many other financial institutions"; (ii) "Overall, we feel 130 million is a fair estimate for the full year, but it's not without some risk, and it really depends to some extent on your outlook for the economy."  ¶ 211.  On this basis alone, Cullen must be dismissed from this case.  *See Boston Tech.*, 8 F. Supp. 2d at 60-61.

*Fin. Guar. Corp.*, 512 F.3d at 58 (citation omitted).  Recklessness requires far more than showing that a defendant acted with negligence.  *See Geffon*, 249 F.3d at 35-36.  Rather, a plaintiff must show that the defendant's conduct was "an extreme departure from the standards of ordinary care."  *Greebel*, 194 F.3d at 198.  Moreover, "[t]he First Circuit has clearly held that 'even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors.'"  *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 229 (D. Mass. 1999) (citing *Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998)).  Scienter also must be separately pled for each defendant.  *See Sonus Networks*, 2006 WL 1308165, at *13 ("In evaluating this Complaint, I consider whether scienter is pleaded sufficiently against Sonus and each individual Defendant independently."); *In re Brooks Automation, Inc. Sec. Litig.*, C.A. No. 06-11068-RWZ, 2007 WL 4754051, at *9 (D. Mass. Nov. 6, 2007) ("Plaintiffs must also meet their obligation to plead specific factual allegations regarding each defendant's knowledge of or participation in" alleged fraud); *Greebel v. FTP Software, Inc.*, 182 F.R.D. 370, 374 (D. Mass. 1998), *aff'd* 194 F.3d 185 (1st Cir. 1999).

It is insufficient for a plaintiff to plead that a defendant "must have known" that his or her statements were false when made.  "[T]he pleading of scienter may not rest on a bare inference that a defendant 'must have had' knowledge of the facts."  *Maldonado*, 137 F.3d at 9-10 (dismissing securities fraud claim based on allegations that defendants "must have known" of the alleged fraud) (internal quotation marks and citation omitted).  Nor will a strong inference of scienter lie on the allegations that a defendant would have known of the fraudulent statements merely because of his or her role in a company.  *See Carney*, 135 F. Supp. 2d at 255 ("attributing knowledge to a defendant merely because of the defendant's status in a corporation" insufficient

to support fraud claim).  Instead, a plaintiff must "allege sufficient facts to raise a strong

inference that the relevant speakers knew, at the time of speaking, that their statements were

false or misleading."  *Peritus Software*, 52 F. Supp. 2d at 228 (citation omitted); *see also*

*Mississippi Pub. Employees Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 86 (1st Cir. 2008)

("Securities actions raise questions of what corporate managers knew and when they knew

it.").[19]

Plaintiff relies on three sets of allegations in an effort to establish scienter: (1) allegations

regarding the Individual Defendants' positions as officers of Textron and TFC and their access to

unspecified corporate "information" (*see* ¶ 28); (2) allegations purportedly derived from

confidential witnesses (*see, e.g.*, ¶¶ 39-63); and (3) the allegations of stock sales during the Class

Period by Campbell, French, and "other insiders" not named as defendants in this action.

¶¶ 297-304.  Each of these attempts to establish a strong inference of scienter fails, as the

complaint lacks a single allegation that any defendant knew or recklessly disregarded that the

statements in question were false or misleading.

### 1. Defendants' Positions In The Company And Their Alleged Access To Unidentified Information Cannot Establish A Strong Inference Of Scienter

"[A]llegations of scienter consist[ing] solely of general inferences that the defendants, by

virtue of their positions within the company, 'must have known' about the company's problems

---

[19]  *See also ACA Fin.*, 512 F.3d at 62 (statements not materially misleading when there was
"nothing in the amended complaint to establish that the defendants were aware of facts, at the
time they made their predictions, that would have made those predictions unreasonable"); *see
also In re Viewlogic Syst. Sec. Litig.*, C.A. No. 95-10014-DPW, 1996 U.S. Dist. LEXIS
22371, at *19 (D. Mass. Mar. 13, 1996) ("In order to survive a motion to dismiss, the
complaint must identify facts or circumstances that indicate that the defendants knew that the
various statements were false" when made).

when they undertook allegedly fraudulent actions . . . are 'precisely the types of inferences which th[e] court, on numerous occasions, has determined to be inadequate' to withstand the special pleading requirements in securities fraud cases." *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (citation omitted).  Nor do general allegations that the defendants were privy to unspecified internal corporate information suffice.  *See Carney*, 135 F. Supp. 2d at 255; *In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 261 (D. Mass. 2001).

To make the required showing that defendants knew that their statements were false or acted with gross recklessness for the truth when making their public statements, successful plaintiffs "typically identify internal reports, memoranda or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time." *Carney*, 135 F. Supp. 2d at 251 (quoting *Boston Tech.*, 8 F. Supp. 2d at 57 (dismissing securities claim when "[n]ot a single report, memorandum, meeting minute, or like item is referred to or specified in the Complaint")); *Lirette*, 27 F. Supp. 2d at 283 (dismissing securities claim when plaintiff "has not directed the Court to any particular documents drafted by, or available to, the defendants that would indicate the defendants' knowledge of [the company's] problems").

Plaintiff here, however, relies on the same vague and boilerplate allegations that courts consistently reject – that defendants, as senior executives of Textron, had access to unspecified adverse "information," and that these defendants "knew or recklessly disregarded" that this "information" was being "concealed" from investors.  *See* ¶ 28; *Carney*, 135 F. Supp. 2d at 255 ("This kind of pleading, attributing knowledge to a defendant merely because of the defendants' status in the corporation, generally fails as a method of meeting the rigorous requirements for pleading scienter.").  Plaintiff fails to identify a single document or report made available to any

defendant that would demonstrate that defendants knew or recklessly disregarded that their statements were false or misleading.

Thus, plaintiff's generalized allegations about what defendants knew or should have known through unidentified reports and by virtue of their positions in the Company cannot establish a strong inference of scienter. *See Peritus Software*, 52 F. Supp. 2d at 228 (allegation that defendants had "actual knowledge" of false statements or omissions based on positions in company lacks "sufficient facts to raise a strong inference that the relevant speakers knew, at the time of speaking, that their statements were false or misleading").

> ### 2. Allegations Derived From Confidential Witnesses Do Not Support A Strong Inference Of Scienter As To Any Defendant
>
> #### a. The Confidential Witnesses Fail To Establish That Any Defendants Knew Or Recklessly Disregarded That Their Statements In Question Were False Or Misleading

In an effort to meet its burden of establishing a strong inference of scienter, plaintiff purports to rely on information obtained from various "confidential witnesses" who are alleged to have been former employees of one or more of Textron's divisions. These witnesses, however, fail to provide the essential information that must be alleged with particularity in order to establish a strong inference of scienter:  that the defendants, at the time they made the statements in question, were aware of information that made their statements false or misleading.

For confidential source allegations to give rise to a strong inference of scienter, a complaint must establish that the information evidencing fraud and allegedly known by the confidential witnesses was communicated to, or otherwise known by, the defendants. *See Fitzer v. Sec. Dynamics Tech., Inc.*, 119 F. Supp. 2d 12, 24-25 (D. Mass. 2000) (refusing to infer scienter on the basis of confidential witness statements when no allegation that information known by witnesses was communicated to or known by defendants); *see also Wilson v.*

*Microfinancial, Inc.*, C.A. No. 03-11883-RGS, 2006 WL 1650971, at *5 (D. Mass. June 13, 2006) (rejecting as basis for scienter allegation from confidential witness that defendants "knew" of false statements that was "unsupported by any facts").[20]

While plaintiff purportedly obtained information from 23 confidential witnesses, the complaint is bereft of allegations that any of the information allegedly known by these witnesses was communicated to or known by the Individual Defendants.  Instead, these witnesses are alleged to have provided the type of general and unparticularized allegations that courts consistently find cannot give rise to any inference of scienter, let along a strong one.  For example, the complaint contains the following allegations:

> CW 5 also believes that the speculative nature of many of the orders reported in the Company's backlog *was likely known internally by Textron executives* well before the customers actually refused delivery of the completed aircraft.  (¶ 137) (emphasis added)

* * * * *

> CW 22 described how *it was definitely known* in 2007 and 2008 that orders in the backlog were speculative and that customers were actually buying "delivery positions" with no intention of actually purchasing an aircraft from Cessna.  (*Id.*) (emphasis added)

* * * * *

---

[20] *See also Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 542 (5th Cir. 2008) (concluding no strong inference of scienter alleged when "the complaint does not indicate how or when the officers became aware of what the confidential sources allegedly knew"); *In re Am. Express Co. Sec Litig.*, No. 02 Civ. 5533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (finding no strong inference of scienter pled when plaintiffs "failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period"); *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 141 (D. Conn 2007) (no strong inference of scienter when "none of the CWs present[ed] any evidence that they communicated any of the alleged problems . . . to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues").

> CW 12 had conversations with *director-level personnel* who conceded that Cessna was
> definitely losing more orders week-to-week than it was replacing with new orders.
> (¶ 138) (emphasis added)

These generalized allegations, which are not even directed at a particular defendant (it

was "definitely known" *by whom*?), plainly do not give rise to a strong inference of scienter with

respect to any Individual Defendant.  *See New Jersey Carpenters*, 537 F.3d at 53 n.18 (rejecting

as a "bald assertion [that] gets plaintiffs nowhere" the allegation from a confidential source that

many of the problems with a particular pharmaceutical "were the result of executives at Biogen

being excessively aggressive in getting the drug to the market"); *see also Kemp v. Universal Am.*

*Fin. Corp.*, No. 05 Civ. 9883 (JFK), 2007 WL 86942, at *13 (S.D.N.Y. Jan. 10, 2007) (rejecting

"mere opinions of confidential witnesses that . . . Defendants must have known" of alleged

fraud); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004) (allegations

from confidential witness did not support finding of scienter because they did not "specifically

allege that they 'told' any Defendant" the relevant information, "only that it was 'generally

known' – that is not sufficient").

The only defendants who are alleged to have been identified by name by the confidential

witnesses are French and Carter, but the allegations with respect to these defendants fall well

short of the specificity required to establish a strong inference of scienter.[21]  As to French, the

only allegation in the complaint that even touches on what he allegedly knew is that:

> CW 21 stated French definitely knew about the economic dynamics
> negatively impacting TFC's different market segments, as well as TFC

---

[21] There are no allegations in the complaint derived from any confidential witness that even
mention defendants Campbell, Wilburne, Cullen, or Butera.  Consequently, and obviously,
plaintiff has failed to show a strong inference of scienter as to these defendants based on the
confidential witness allegations.

itself.  CW 21 based this conviction from having known French for many
years.  At the very least, CW 21 understood that Carter briefed French on
a quarterly basis as to TFC's economic condition.

¶ 119.  In other words, French allegedly was aware of TFC's overall business performance and

the challenging economic environment in which it was operating.  But this allegation in no way

suggests that French knew that his statements about TFC's portfolio, performance, and outlook

were false when made.  *See, e.g.*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian*

*Imperial Bank of Commerce*, No. 08 Civ. 8143 (WHP), 2010 WL 961596, at *10 (S.D.N.Y. Mar.

17, 2010) ("[K]nowledge of a general economic trend does not equate to harboring a mental state

to deceive, manipulate, or defraud.").  Indeed, CW21 is not even alleged to have had personal

knowledge as to what French knew.  At most, this allegation amounts to "French must have

known" that his statements were false and misleading, which, under clear First Circuit precedent,

cannot give rise to a strong inference of scienter.  *See Maldonado*, 137 F.3d at 9-10.

With respect to Carter, plaintiff alleges, based on information purportedly provided by

confidential witnesses, that (i) Carter was aware of aging inventory problems in TFC's Marine

division because he "had access to" reports concerning acquisitions in the Marine division and

participated in calls and monthly meetings with executives in that division (¶¶ 57, 61, 107, 108,

119); and (ii) Carter was aware of the troubled loan to Assured in the Finance Company Services

division (¶ 98).[22]  The question is whether these allegations demonstrate a strong inference that

---

[22] CW21, who allegedly provided information concerning Carter's attendance at monthly
Marine division meetings, is not even alleged to have participated in these meetings.  *See,
e.g.*, ¶¶ 61, 108, 119.  This witness therefore lacks the "strong basis of knowledge" required
before a court may credit a confidential witnesses' statements.  *In re Cabletron Sys., Inc.*, 311
F.3d 11, 30 (1st Cir. 2002).

Carter knew that his public statements alleged in the complaint were false or misleading.  Carter

is alleged to have made the following misstatements on August 6, 2008:

> "We went into this downturn with excellent portfolio quality, which positioned us better to be able to deal with the problem in front of us";
>
> "Finally through July our credit statistics are tracking to or slightly better than our current outlook"; and
>
> "We have no reason to believe at this point that we're not going to come out the other side stronger than we went in, and we're trying to position that while we're working on solving our problems."

¶¶ 213, 215.

Plaintiff offers no explanation, because none exists, as to how the confidential witness

allegations concerning the Marine division and the Assured loan (which TFC had taken as a loss

eight months prior to Carter's statements) strongly suggest that Carter knew that his statements

were false or misleading.  Indeed, plaintiff offers no allegation concerning the content of the

monthly meetings or any facts suggesting that Carter would have learned at these meetings

specific information that made his public statements false or misleading.  *See Konkol v. Diebold,*

*Inc.*, 590 F.3d 390, 398-99 (6th Cir. 2009) (rejecting claim that attendance at weekly and

monthly meetings to discuss company's financial performance and results supported strong

inference of scienter when no allegation that fraudulent scheme discussed at meetings).[23]  These

---

[23] *See also In re Viewlogic*, 1996 U.S. Dist. LEXIS 22371, at *22 (rejecting claim that attendance at weekly sales meetings at which "double counting" was allegedly reported gave rise to strong inference of scienter when "plaintiffs do not point to any facts which indicate that the defendants' knowledge [on date of alleged misstatement] about any of these problems was such that they could be held to know that the entire business was no longer on plan").

generalized allegations, which bear no relation to Carter's actual alleged misstatements, clearly do not give rise to a strong inference that Carter knew his statements were false when made.

**b.**    **The Confidential Witnesses Lack Reliability Or Knowledge Concerning Any Alleged Fraud**

The confidential witnesses in this case also lack the "basic earmarks of credibility" courts require of confidential sources. *New Jersey Carpenters*, 537 F.3d at 51-52 (noting courts must take a "hard look" at confidential source allegations "to evaluate their worth"). The First Circuit requires confidential source allegations to contain a "strong basis of knowledge" in order to establish the witnesses' reliability. *In re Cabletron Sys.*, *Inc.*, 311 F.3d 11, 30-31 (1st Cir. 2002); *see also Fitzer*, 119 F. Supp. 2d at 39 (dismissing securities claim based on allegations from confidential witnesses when sources "do not appear to [the] Court to have been in a position to know the overall financial situation of the corporation. Nor can they say when management received or learned of" allegedly undisclosed information).

Here, each confidential source lacks the requisite degree of reliability.[24]  For example, none of the confidential witnesses who purportedly provided information concerning Cessna's backlog is alleged to have had any role in compiling or managing the backlog.[25]  These

---

[24] When plaintiffs rely on confidential witnesses to establish scienter, courts must scrutinize the "level of detail provided by the confidential sources" to ascertain whether the sources themselves are reliable. *New Jersey Carpenters*, 537 F.3d at 51 (quoting *In re Cabletron*, 311 F.3d at 29-30). Plaintiff repeatedly attributes allegations in the complaint to "information provided by several confidential witnesses," but in many cases does not specify which confidential witness purportedly provided what information. *See, e.g.*, ¶¶ 78, 118, 137. This pleading tactic is improper and prevents the court from ascertaining the specificity of the allegations or the reliability of the source.

[25] These witnesses are CW3, CW5, CW6, CW7, CW10, CW11, CW12, CW13, CW14, CW15, and CW16.

47

witnesses lack the requisite degree of knowledge required of confidential witnesses. *In re Cabletron*, 311 F.3d at 29-30.[26]

The only confidential witness who is alleged to have had any knowledge concerning the compilation of the backlog is CW15, who allegedly "has knowledge concerning internal sales and marketing meetings, as well as weekly Monday morning sales and marketing staff meetings," at which members of Cessna's sales and marketing department determined which orders would be included in the backlog. ¶¶ 55, 135. However, CW15 is not alleged to have attended those meetings, and, critically, there is no allegation that at these meetings, the sales and marketing staff improperly added or failed to remove orders from the backlog. *See* ¶¶ 135-36. Thus, CW15 not only lacks the requisite first-hand knowledge concerning the compilation of the backlog, but provides no factual basis for suggesting that the backlog in fact was overstated.[27]

---

[26] For example, CW3 is alleged to have been a "Production Superintendent and Production Foreman" involved in "strategic decision-making regarding production." ¶ 43. CW6 is alleged to have been a "Brand Manager for Customer Experience" who managed "how the Cessna brand was perceived." ¶ 46. CW7 is alleged to have been a "Master Scheduler" and "Flight Mechanic" during the Class Period. ¶ 47. CW10 and CW11 are alleged to have been Cessna engineers. CW12 was, according to the complaint, a "Purchasing Specialist in Cessna's supply chain organization." ¶ 52. CW22 is alleged to have been a "Business Finance Partner" who helped "manage[e] the production of Cessna aircraft." ¶ 62. And three witnesses who purportedly provided information concerning Cessna's backlog (CW5, CW13, CW14) are alleged to have been former employees of Cessna Finance – a division of TFC, not Cessna – and thus would not have had any role vis-à-vis Cessna's backlog. ¶¶ 45, 53, 54.

Moreover, there are no allegations in the complaint attributed to CW4, who is alleged to have been a "Document Specialist at Cessna Finance," or CW7, a former Master Scheduler and Flight Mechanic. ¶¶ 44, 47. Nor are there allegations directly attributable to CW6, a former "Brand Manager for Customer Experience at Cessna," CW10, a former Manufacturing Engineer and Cessna, or CW11, a former Cessna Industrial Engineer. ¶¶ 46, 50, 51.

[27] Many of the confidential witnesses are alleged to have provided information that bears no relation to plaintiff's securities fraud claim. For example, plaintiff alleges that, according to

[Footnote continued on next page]

Nor were any of the confidential witnesses who purportedly provided information relating to TFC allegedly in a position to know what the Individual Defendants knew, let alone that their statements were false. *See* ¶¶ 56-63. None of the former TFC employee confidential witnesses are alleged to have discussed with any of the Individual Defendants any information that would have revealed to these defendants that their statements were false or misleading. And none of these confidential witnesses identified a single document or report provided to the Individual Defendants that would have demonstrated the falsity of their statements.

Indeed, the only confidential witness who comes close to having any contact with an Individual Defendant is CW21, who allegedly worked in TFC's Distribution Finance Division. ¶¶ 61, 119. As discussed above, CW21, based on "having known French for many years," allegedly said that "French definitely knew about the economic dynamics negatively impacting TFC's different market segments, as well as TFC itself." ¶ 119. In other words, CW21 is not alleged to have had any personal knowledge that French knew that his statements were false or misleading, but instead, it is alleged he believed that French understood how the economy affected TFC's divisions – a far cry from the type of allegations from a confidential witness that courts find establishes a strong inference scienter. *See Sonus Networks*, 2006 WL 1308165, at *21 (rejecting as basis for strong inference of scienter allegations from confidential witness not alleged to have personal knowledge of defendant's involvement in alleged fraud).

---

[Footnote continued from previous page]
CW16, an account executive in a TFC division in Columbus, Ohio, TFC's appliance lending business slowed in that office beginning in 2006 when appliance retailers struggled with the declining housing market. ¶ 124. From CW8, plaintiff alleges that TFC closed a Horsham, Pennsylvania facility in October 2008, even though the decision to do so was made six months earlier, and that in 2006, Textron acquired an inventory finance business from Electrolux that was "rolled" into TFC's technology finance business. ¶¶ 48, 123. The information allegedly obtained from these and other confidential witnesses is entirely irrelevant to this case.

Thus, none of the confidential witnesses offers a factual basis for finding a strong inference of scienter with respect to any defendant.

### 3.    Plaintiff Has Failed To Plead A Strong Inference Of Scienter On The Basis Of Alleged Insider Trading

Plaintiff attempts to plead scienter by alleging that Campbell, French, and certain "other insiders" engaged in insider trading.  *See* ¶¶ 297-304.  While in certain circumstances unusual stock trading prior to the revelation of unfavorable company news may suggest a defendant's improper motive, standing alone, allegations of insider trading cannot establish a strong inference of scienter.  *Isham*, 665 F. Supp. 2d at 38.[28]  The "mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough.  At a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, *well beyond the normal patterns of trading by those defendants*."  *Greebel*, 194 F.3d at 198 (emphasis added) (internal citation and footnote omitted); *see also Peritus Software*, 52 F. Supp. 2d at 224 ("[The plaintiff] . . . bears the burden of showing that sales by insiders were in fact unusual or suspicious in amount or timing.").

Here, there is not a single allegation that the trading by Campbell, French or the "other insiders" was out of the ordinary.  Plaintiff does not allege, for example, that the sales were

---

[28] The First Circuit does not "categoriz[e] . . . patterns of facts as acceptable or unacceptable to prove scienter," but instead "analyze[s] the particular facts alleged in each individual case to determine whether the allegations [are] sufficient."  *Greebel*, 194 F.3d at 196.  At the pleading stage, a mere allegation that defendants had the motive and opportunity to make false or misleading statements is insufficient to support a "strong inference" of scienter.  *Id.* at 197 (citing *Maldonado*, 137 F.3d at 10 n.6).  "[A] plaintiff must allege some additional misconduct from which a jury can draw a reasonable inference of intentional deception."  *Geffon,* 249 F.3d at 36.

either "unusual" or "made before a big 'event' unknown to the public." *See Greebel*, 195 F.3d at

207.  Although the complaint sets forth the number of shares sold or options exercised during the

Class Period by each alleged "insider," the complaint "provide[s] no information on sales by

corporate insiders at times outside the Class period, so there is no comparison point." *Isham*,

665 F. Supp. 2d at 38 (citing *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 25 (D.

Mass. 2000) (no strong inference of scienter pled where plaintiff presented no information about

pre-class period trading practices)).  Similarly, while plaintiff makes much of the *proceeds* the

Individual Defendants allegedly received from their sales, plaintiff does not allege how much

*profit* was realized by any defendant.  *See, e.g., In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.

Supp. 2d 261, 270-71 (S.D.N.Y. 2009) (trading not unusual where plaintiff alleged that insider

sales amounted to $96 million in gross proceeds during the Class Period, but "fail[ed] to allege

any facts relating to the amount of profit the Individual Defendants garnered from their sales").[29]

   The alleged sales by French, moreover, cannot as a matter of law give rise to an inference

of scienter because each of his sales were made in accordance with a 10b5-1 plan, "pursuant to

which corporate executives sell a predetermined amount of stock at pre-established dates to

avoid liability for insider trading."  *City of Roseville Employees Ret. Syst. v. Horizon Lines, Inc.*,

---

[29] Campbell is alleged to have sold more stock than the other insiders identified in the
complaint, but again, there is no allegation that Campbell's trading was suspicious or
unusual.  Indeed, Campbell's last alleged sale of shares was in April 2008, nearly nine
months before the full "truth" is alleged to have been disclosed to the market. ¶ 298; *see In re
Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("Trades made a
short time before a negative public announcement are suspiciously timed.").  Campbell's
stock sales therefore do not give rise to an inference of scienter. *See Greebel*, 194 F.3d at
207 ("Although the total sum involved was large, the district court correctly concluded that
plaintiffs produced no evidence that the trading was out of the ordinary or suspicious.").

C.A. No. 08-969, 2009 WL 3837659, at *16-17 (D. Del. Nov. 13, 2009).[30]  Indeed, "the

presence of a trading plan rebuts an inference of scienter and supports the reasonable inference

that stock sales were pre-scheduled and not suspicious."  *Stiegele v. Bailey*, C.A. No. 05-10677-

MLW, 2007 WL 4197496, at *13 (D. Mass Aug. 23, 2007).

Moreover, even if the complaint alleged sufficient facts giving rise to a plausible

inference that either French or Campbell had engaged in unusual trading – which clearly it does

not – this alone would not establish scienter on the part of Textron.  In the First Circuit, improper

trading by a single insider does not establish scienter on the part of the corporation.  *New Jersey*

*Carpenters*, 537 F.3d at 55-56.  Finally, plaintiff's inclusion of alleged trading by "other

insiders" at Textron is unavailing, as the complaint, again, contains not a single allegation that

the trading by these individuals was unusual in timing or amount.  *See Peritus Software*, 52 F.

Supp. 2d at 224 n.5.

For all of these reasons, the complaint lacks sufficient facts giving rise to any inference of

scienter on the basis of stock sales.

### 4.    Lack Of Scienter With Respect To Textron And TFC

As set forth above, the complaint lacks sufficient allegations to support a strong inference

of scienter with respect to any Individual Defendant, and thus, fails to plead scienter with respect

to the corporate defendants, Textron and TFC.  "The scienter of corporate entities . . . is

'ascertained through the mental state of [their] management.'"  *SEC v. Durgarian,* 477 F. Supp.

2d 342, 357 (D. Mass. 2007) (citation omitted); *see also In re Cabletron,* 311 F.3d at 40 ("The

---

[30]  *See, e.g.*, Textron, Statement of Changes in Beneficial Ownership (Form 4) (May 14, 2008),
Ex. 33.  *See also Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 n.7 (D. Mass. 2004) (court
may take judicial notice of Form 4 filings on motion to dismiss).

scienter alleged against the company's agents is enough to plead scienter for the company."); *Isham*, 665 F. Supp. 2d at 36 (no strong inference of scienter absent pleading of scienter for corporate officers).  Here, because the complaint is devoid of facts giving rise to a strong inference of scienter with respect to the Individual Defendants, the complaint also fails to establish scienter for Textron and TFC.

### C.      The Complaint Lacks Sufficient Allegations Of Loss Causation

Plaintiff also has failed to plead loss causation – a necessary element of a Section 10(b) claim.  To plead loss causation, it is not enough to plead that plaintiff purchased shares of Textron stock at an inflated price or simply that Textron's stock price fell.  *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Rather, to adequately allege loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks and citation omitted); *In re Alkermes Sec. Litig.*, C.A. No. 03-12091-RCL, 2005 WL 2848341, at *11 (D. Mass. Oct. 6, 2005).

As the Supreme Court has held, "the logical link between the inflated purchase price and any later economic loss is not invariably strong . . . [because] that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together, account for some or all of that lower price."  *Dura*, 544 U.S. at 343.  Thus, to plead loss causation, "plaintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price," and "ascribe some rough proportion of the whole loss to [the alleged] misstatements."  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F.

Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting *Dura*, 544 U.S. at 343); *see also Lentell*, 396 F.3d at 177.

Plaintiff has failed to meet its pleading burden.  Plaintiff purports to establish loss causation through indiscriminate, conclusory assertions such as "when the truth regarding Textron's true financial circumstances leaked out . . . and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Textron securities fell as the prior artificial inflation was removed."  ¶ 309.  But nowhere does plaintiff even attempt to quantify the proportion of Textron's stock drop attributable to fraud, rather than other factors, such as the cataclysmic economic environment during the period in which Textron's stock price fell.  Indeed, plaintiff categorically denies, without any factual support or analysis, that the most significant economic crisis since the Great Depression was responsible for even a penny of the decline in Textron's stock price.  *See* ¶ 317 ("The timing and magnitude of the declines in Textron stock negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.").

Courts have not hesitated to dismiss securities complaints based on similar failures to account for intervening causes of a company's stock price decline.  In the recent *First Marblehead* decision, for example, the court concluded that the plaintiff had failed to plead loss causation, when, among other things, "[defendant's] drop in share price coincided with a significant downturn in the credit markets."  *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164-65 (D. Mass. 2009) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27

F.3d 763, 772 (2d Cir. 1994))); *see also Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 593-94 (E.D. Pa. 2009) (dismissing securities claim when plaintiff failed to plead that loss was caused by fraud rather than collapse of real estate and mortgage markets, which caused mortgage backed securities to suffer dramatic losses; "Plaintiffs make no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the 'significant declines in market value' for mortgage-backed securities.") (citation omitted); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 365 (S.D.N.Y. 2003) (dismissing claim for failure to plead loss causation when "plaintiffs' allegations utterly fail[ed] to take into account the intervening cause of the Internet market collapse").[31]

---

[31] *See also 60223 Trust v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) ("The complaint does not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation.  The court concludes that the complaint does not adequately plead loss causation."); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (The complaint "does not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse – nor any way to separate the effect of the misstatements (if there was any) from the general collapse or other causes."), *aff'd*, 216 F. App'x 14 (2d Cir. 2007); *Chien v. Skystar Bio Pharma. Co.*, 256 F.R.D. 67, 73 (D. Conn. 2009) ("[A]lmost three years had passed since [plaintiff] had purchased his shares, during which time several large Wall Street firms had collapsed, a mortgage crisis had unfolded, and the stock market had entered a period of precipitous decline.  In such a situation, it was impossible to show that the alleged fraud perpetrated in September 2005 was the cause of [plaintiff's] loss.").

Indeed, Textron's stock price trajectory during the period in question mirrors the price movement of comparable stock indices, as set forth in Textron's most recent Form 10-K:



| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Textron Inc. | $100.00 | $106.24 | $131.68 | $203.35 | $ 40.75 | $ 55.71 |
| S&P 500 | 100.00 | 104.91 | 121.48 | 128.16 | 80.74 | 102.11 |
| S&P 500 A&D | 100.00 | 115.92 | 145.09 | 173.12 | 109.86 | 136.94 |
| S&P 500 IC | 100.00 | 96.18 | 104.47 | 109.01 | 52.87 | 58.24 |

*See* Textron, Annual Report (Form 10-K), at 15 (Feb. 25, 2010), Ex. 1.[32]  The similarity in the stock price pattern between Textron and comparable company stocks is yet additional evidence (which plaintiff does not, and cannot, refute) that the general market downturn, rather than any alleged fraud, caused the decline in Textron's stock price.

Thus, while plaintiff has pled in conclusory fashion that defendants' "false statements directly or proximately caused, or were a substantial contributing cause, of the damages and economic loss suffered by Plaintiff and other members of the Class," (¶ 312), what plaintiff has failed to plead is "*facts* which, if proven, would show that its loss was caused by the alleged

---

[32]  The chart compares how $100 invested in Textron performed over a 5-year period relative to indices of comparable companies.  These indices are the Standard & Poor's ("S&P") 500 Stock Index, the S&P 500 Aerospace & Defense ("A&D") Index and the S&P 500 Industrial Conglomerates ("IC") Index.  *See* Textron, Annual Report (Form 10-K), at 15 (Feb. 25, 2010), Ex. 1.  *See also In re First Marblehead Corp.*, 639 F. Supp. 2d at 165 n.167 (court may take judicial notice of stock price when assessing sufficiency of loss causation allegations).

misstatements as opposed to intervening events." *Lentell*, 396 F.3d at 174 (emphasis added) (internal quotation marks and citation omitted).  Plaintiff's failure to plead facts suggesting that all or an ascertainable portion of the fall in Textron's stock price was caused by the alleged concealment of information about Textron – rather than the near unprecedented financial turmoil that drove down the price of nearly every marketable security – is fatal to the Section 10(b) claim.

## III.    The Section 20(a) Claim Of Control Person Liability Is Deficient

Plaintiff alleges that each of the Individual Defendants is liable under Section 20(a) of the 1934 Act as a control person of Textron.  Section 20(a) "asserts the liability of persons exercising control for violations of law by a controlled entity." *In re Stone & Webster Sec. Liig.*, 414 F.3d 87, 194 (1st Cir. 2005).  For a Section 20(a) claim to survive dismissal under Rule 12(b)(6), a plaintiff must plead facts that would establish:  "(i) an underlying violation of the same chapter of the securities laws by the controlled entity . . . ; and (ii) control of the primary violator by the defendant." *Id.*  Here, because plaintiff failed to establish an underlying 10b-5 violation, the Section 20(a) claim also must be dismissed. *See, e.g.*, *Greebel,* 194 F.3d at 207; *Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir. 1997).

Even if plaintiff were able to establish a primary violation, however, the Section 20(a) claim still must be dismissed with respect to Carter, Butera, Cullen and Wilburne because the complaint fails to plead any facts plausibly suggesting that these defendants were control persons of Textron within the meaning of Section 20(a).  For example, there are no allegations that the current and former TFC employees (Carter, Butera and Cullen) were control persons of Textron, nor could there be, since officers of a subsidiary are not control persons of the parent. *See Copland v. Grumet*, 88 F. Supp. 2d 326, 335 (D.N.J. 1999) (denying leave to amend 20(a) claim

to add officers of subsidiary when "at best" plaintiffs' allegations could only show that the officers of the subsidiary controlled the subsidiary, not that they controlled the parent defendant); *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, No. Civ. 06-2674-PHX-RCP, 2010 WL 653440, at *21-22 (D. Ariz., Feb. 22, 2010); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) ("Unless there are facts that indicate that the controlling shareholders were actively participating in the decisionmaking processes of the corporation, no controlling person liability can be imposed."). Nor is there a single allegation suggesting that Wilburne, who is not alleged to have signed Textron's public filings, controlled Textron. *See, e.g., Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir. 1991) ("For [defendant] to be liable . . . there must be 'significantly probative' evidence that the [defendant] exercised, directly or indirectly, meaningful hegemony over the . . . venture . . . .") (internal citation omitted).

In sum, plaintiff's conclusory statement that "each of the Individual Defendants had direct involvement in the day-to-day operations of the Company," (¶ 373) is simply not enough to establish control under the federal securities laws. *See In re Tyco Int'l, Ltd.*, MDL Docket No. 02-md-1335-PB, 2007 WL 1687775, at *8 (D.N.H. June 11, 2007).

## CONCLUSION

For the foregoing reasons, this Court should grant the defendants' motion to dismiss the complaint with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Dated:   April 9, 2010

DEFENDANTS
By their attorneys,

/s/  John A. Tarantino
JOHN A. TARANTINO (#2586)
jtarantino@apslaw.com
PATRICIA K. ROCHA (#2793)
procha@apslaw.com
NICOLE J. DULUDE (#7540)
ndulude@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903
Tel:  401-274-7200
Fax: 401-351-4607

-and-

Mitchell A. Karlan *(pro hac vice)*
Brian M. Lutz *(pro hac vice)*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Tel:  212-351-4000

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April, 20010, I served a true copy of the within pleading *via electronic means (ECF)* on:

*Liaison Counsel for Plaintiffs:*
Barry J. Kusinitz, Esq.
155 South Main Street, Suite 405
Providence, RI 02903
bkusinitz@bdglawyers.com

*Lead Counsel for Plaintiffs*:
Samuel H. Rudman, Esq.
srudman@csgrr.com
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

David J. George, Esq.
DGeorge@csgrr.com
Coughlin Stoia Geller Rudman & Robbins LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

*And by ECF to:*

Mark B. Morse, Esq.
mark@morselawoffice.com
The Law Office of Mark B. Morse
420 Angell Street
Providence, RI 02906

Peter N. Wasylyk, Esq.
pnwlaw@aol.com
1307 Chalkstone Avenue
Providence, RI 02908

Raymond A. Marcaccio, Esq.
ram@om-rilaw.com
Oliverio & Marcaccio LLP
55 Dorrance Street, Suite 400
Providence, RI 02903

Danielle S. Myers, Esq.
Coughlin Stoia Geller Rudman & Robbins
655 W. Broadway, Suite 1900
San Diego, CA 92101

Mitchell M.Z. Twersky, Esq.
Ximena R. Skovron, Esq.
Abraham, Fruchter & Twersky LLP
One Penn Plaza, Suite 2805
New York, NY 10119

Robert M. Roseman, Esq.
Spector Roseman Kodroff & Willis P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

100826077_8.DOC

/s/ Nicole J. Dulude

*531447_1*