UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) | Civil Action No. 09-cv-00367 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TEXTRON INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II.  STATEMENT OF FACTS .......................................................................................3

    A.  Background ...................................................................................................3

    B.  Textron Attempts to Grow Its Business by Lowering Its Standards ......................5

    C.  Textron Reports "All-Time High" Increase to Its Cessna Backlog.......................7

    D.  In Truth, Textron's Cessna Backlog Was Materially Overstated ..........................8

    E.  Textron's Decision to Loosen Underwriting and Lending Standards
       Adversely Impacts Other Lines of Its Business....................................................10

    F.  The Truth Is Revealed Through a Series of Partial Disclosures...........................11

III.  ARGUMENT ..........................................................................................................14

    A.  Legal Standards............................................................................................14

    B.  The Complaint Alleges Actionable Misstatements.............................................16

        1.  Defendants' Risk Warnings Were Insufficient.........................................19

        2.  Defendants Had a Duty to Disclose the Omitted Information..................22

        3.  Plaintiff Adequately Alleges GAAP Violations ......................................25

        4.  Defendants' Statements Were Not Meaningless Puffery...........................27

        5.  The PSLRA's Safe Harbor and the Related Bespeaks Caution
           Doctrine Do Not Apply.......................................................................29

    C.  The Complaint Adequately Pleads Scienter .....................................................30

        1.  The Pleading Standard for Scienter ........................................................30

        2.  Plaintiff's Scienter Allegations Are Cogent and Compelling...................31

           a.  Defendants' Public Statements Reveal Their Knowledge of
               Cessna's Backlog and TFC's Underwriting Practices.................32

           b.  Defendants Are Presumed to Know Facts Impacting the
               Critical Aspects of Textron's Business.......................................33

c.     Defendants Are Presumed to Know the Basis of
       Information They Relay to the Market ..........................................36

d.     Defendants' Truthful Revelations Were Made in Close
       Proximity to Their Misrepresentations ..........................................38

e.     The Departures of French and Carter Are Indicative of
       Wrongdoing ..................................................................................39

f.     Defendants Were Sufficiently Motivated to Issue Material
       Misrepresentations ........................................................................40

g.     GAAP Violations Support a Strong Inference of Scienter ............42

h.     Plaintiff's Confidential Witness Accounts Support a Strong
       Inference of Scienter ....................................................................43

i.     The Complaint Sufficiently Pleads Scienter as to Textron
       and TFC ........................................................................................45

D.     The Complaint Adequately Pleads Loss Causation ...............................47

       1.     Plaintiff Need Not Disprove Opposing Theories for Why Textron's
              Stock Price Declined ..............................................................................47

       2.     Plaintiff Provided "Fair Notice" of Its Theory of Loss Causation ............52

E.     Plaintiffs State a Claim for Violations of §20(a) ..................................54

IV.    CONCLUSION ................................................................................................55

# TABLE OF AUTHORITIES

## CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008)................................................................................14, 15, 31

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)..................................................................... *passim*

*Ark. Pub. Emple. Ret. Sys. v. GT Solar Int'l, Inc.*,
   2009 U.S. Dist. LEXIS 93820 (D.N.H. Oct. 7, 2009) .....................................21

*Asher v. Baxter Int'l, Inc.*,
   377 F.3d 727 (7th Cir. 2004) ........................................................................29

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ........................................................20, 23, 29, 37

*Chalverus v. Pegasystems, Inc.*,
   59 F. Supp. 2d 226 (D. Mass. 1999) ............................................................42

*Chien v. Skystar Bio Pharm. Co.*,
   256 F.R.D. 67 (D. Conn. 2009)......................................................................50

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) ...............................................................34

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................ *passim*

*Fitzer v. Sec. Dynamics Techs., Inc.*,
   119 F. Supp. 2d 12 (D. Mass. 2000) .............................................................43

*Freudenberg v. E*Trade Fin. Corp.*,
   2010 U.S. Dist. LEXIS 46053 (S.D.N.Y. May 11, 2010) ........................ *passim*

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008)............................................................24

*Gerber v. Bowditch*,
   2006 U.S. Dist. LEXIS 27552 (D. Mass. May 8, 2006) .................................32

*Goldberg v. Household Bank, F.S.B.*,
   890 F.2d 965 (7th Cir. 1989) ........................................................................54

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999).........................................................................38

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)........................................................................20, 30

*In re Able Labs. Sec. Litig.*,
    2008 WL 1967509 (D.N.J. March 24, 2008).....................................................42

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).....................................................22

*In re Burlington Coat Factory Sec. Litig.*,
    114 F. 3d 1410 (3d Cir. 1997)........................................................................25

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ................................................................... *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................28, 36, 37, 49

*In re Credit Suisse-AOL Sec. Litig.*,
    465 F. Supp. 2d 34 (D. Mass. 2006) ...............................................................48

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) .........................................................................48

*In re First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) .............................................................50

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008)........................................................32, 49

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001)..............................................................15

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................................46

*In re Lernout & Hauspie Sec. Litig.*,
    208 F. Supp. 2d 74 (D. Mass. 2002) ...............................................................43

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................42

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003)..............................................................50

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) .............................................................43

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)...........................................................28, 37, 46, 51

*In re Nash Finch Co. Sec. Litig.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) ......................................................................30

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................................45

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
   51 F. Supp 2d 1 (D. Mass. 1999) .............................................................................26

*In re PeopleSoft, Inc., Sec. Litig.*,
   2000 U.S. Dist. LEXIS 10953 (N.D. Cal. May 26, 2000) .......................................34

*In re PerkinElmer, Inc. Sec. Litig.*,
   286 F. Supp. 2d 46 (D. Mass. 2003) ........................................................................24

*In re Scottish Re Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y., 2007).....................................................................36

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) .......................................................................34

*In re Sepracor, Inc., Sec. Litig.*,
   308 F. Supp. 2d 20 (D. Mass. 2004) ........................................................................30

*In re Sipex Corp. Sec. Litig.*,
   2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) .........................................................40

*In re Smith & Wesson Holding Corp. Sec. Litig*,
   604 F. Supp. 2d 332 (D. Mass. 2009) ...........................................................14, 27, 29

*In re StockerYale Secs. Litig.*,
   453 F. Supp. 2d 345 (D.N.H. 2006).................................................................14, 49

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005).............................................................................16, 30

*In re Tommy Hilfiger Sec. Litig.*,
   2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. July 20, 2007) ........................................52

*In re Tyco Int'l, Ltd., Multidistrict Litig.*,
   2007 U.S. Dist. LEXIS 42401 (D.N.H. June 11, 2007)...........................................16

*In re Tyco Int'l Ltd., Multidistrict Litig.*,
   2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ...........................................26

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)............................................................28

*In re Wash. Mut., Inc. Sec.*,
    2009 U.S. Dist. LEXIS 99727 (W.D. Wash. Oct. 27, 2009) .............................38

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)......................................................52

*In re Worldcom, Inc. Sec. Litig.*,
    2005 WL 2319118 (S.D.N.Y. Sept. 21, 2005)..................................................53

*Kafenbaum v. GTECH Holdings Corp.*,
    217 F. Supp. 2d 238 (D.R.I. 2002)...........................................................41, 54

*King County v. IKB Deutsche Industriebank AG*,
    2010 U.S. Dist. LEXIS 43203 (S.D.N.Y. Apr. 26, 2010)..................................49

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 162 (2d Cir. 1995)...............................................................49, 50

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)..............................................................50

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................53

*Lucia v. Prospect St. High Income Portfolio*,
    36 F.3d 170 (1st Cir. 1994)...............................................................................23

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009) ...............................................................50

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..............................................................35, 38, 45

*Maldonado v. Dominguez*,
    137 F.3d 1 (1st Cir. 1998)................................................................................32

*Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008).......................................................................15, 31

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)..............................................................................44

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................33

*Ong v. Sears, Roebuck & Co.*,
   2006 U.S. Dist. LEXIS 73801 (N.D. Ill. Sept. 27, 2006) ................................48

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) .......................................................................40

*Roeder v. Alpha Indus., Inc.*,
   814 F.2d 22 (1st Cir. 1987).........................................................................22

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)........................................................................21

*Rosen v. Textron, Inc.*,
   321 F. Supp. 2d 308 (D.R.I. 2004)........................................................ *passim*

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003)..............................................................28

*Sekuk Global Enters. v. KVH Indus.*,
   2005 U.S. Dist. LEXIS 16628 (D.R.I. Aug. 11, 2005)............................ *passim*

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996).......................................................................38

*Sheinkopf v. Stone*,
   927 F.2d 1259 (1st Cir. 1991).....................................................................55

*Silverman v. Motorola, Inc.*,
   2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ..............................................49

*Steiner v. MedQuist Inc.*,
   2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006) .................................54

*Stumpf v. Garvey*,
   2005 U.S. Dist. LEXIS 19154 (D.N.H. Sept. 2, 2005)............................32, 48

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997).........................................................................16

*Swack v. Credit Suisse First Boston*,
   383 F. Supp. 2d 223 (D. Mass. 2004) ...............................................17, 20, 22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008)........................................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................31, 34, 37, 46

*Wieland v. Stone Energy Corp.*,
    2007 U.S. Dist. LEXIS 76636 (W.D. La. Aug. 17, 2007) .................................................22

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78j(b) ...........................................................................................................14

15 U.S.C. §78u-4(b)(1) ..................................................................................................16

17 C.F.R. §240.10b-5 .....................................................................................................14

Federal Rule of Civil Procedure 8(a)(2) .......................................................................47

Federal Rule of Civil Procedure 9(b) ..................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ...............................................................15, 48

Lead Plaintiff Automotive Industries Pension Trust Fund ("Plaintiff") submits this memorandum of law in opposition to the motion to dismiss ("Motion" or "Def. Mem.") Plaintiff's Consolidated Class Action Complaint for Violation of Federal Securities Laws ("Complaint") filed by Defendants Textron Inc. ("Textron" or the "Company"), Textron Financial Corporation ("TFC"), Lewis B. Campbell ("Campbell"), Ted R. French ("French"), Buell J. Carter, Jr. ("Carter"), Thomas Cullen ("Cullen"), Douglas Wilburne ("Wilburne") and Angelo Butera ("Butera") (collectively, "Defendants").

## I.   PRELIMINARY STATEMENT

Like most securities defendants these days, Defendants ask this Court to absolve them from liability for the wrongdoing alleged in the Complaint because Textron operated during a time of considerable financial instability in the U.S. economy.  The precipitous decline in Textron's stock price was not the result of any fraudulent conduct, they contend, but rather unforeseen economic circumstances impacting the market as a whole.  The problem with this retelling is that it is completely at odds with Defendants' statements during the July 19, 2007 through January 29, 2009 class period (the "Class Period") as well as the detailed allegations (supported by confidential witnesses) in the Complaint.

Indeed, the Complaint explains that Defendants deliberately and covertly compromised TFC's historically prudent underwriting and lending standards in order to grow the Company's various lines of business, including Cessna Aircraft Company ("Cessna"), a segment which accounted for approximately 40% of Textron's revenues during the Class Period.  And grow the business they did, as Cessna reported quarter-after-quarter of "all-time high" Cessna backlogs, which would provide for "continued uninterrupted growth at Cessna well into the next decade."  In fact, according to Defendants, Cessna's backlog – a key metric for the Company and the market representing definitive purchase orders and paid deposits – was so "strong" and so "unprecedented"

during the Class Period that Textron's core business was well insulated from the downturn in the economy.

What investors did not know, however, was that, due to the undisclosed decision to lower TFC's standards, Cessna's backlog became nothing more than a "house of cards." In this regard, lower standards led to deals with risky and otherwise unqualified customers that were eager to take advantage of TFC's offer of 100% financing and overly extended repayment terms. Similarly, Cessna began accepting orders from international middlemen who did not have an identifiable buyer, but merely hoped to secure one in the future. Not surprisingly, as the U.S. economy tanked throughout the Class Period, Cessna experienced rising cancellations and deferrals as sketchy customers backed out of their deals and speculative customers never materialized.

And the problems associated with TFC's lax underwriting and lending practices were not limited to Cessna's backlog. To be sure, TFC significantly expanded the scope of its lending to risky borrowers operating in leisure and other related industries that were heavily dependent on a good economic climate. While this move grew the size of TFC's finance receivables in the short term, it also substantially increased the overall risk exposure in Textron's credit portfolio — for which loan loss reserves were woefully inadequate. As the economy declined, Textron's credit portfolio suffered massive losses as borrowers defaulted on their loan obligations.

Accordingly, the Complaint alleges that Defendants' Class Period statements concerning, *inter alia*, the "depth and strength" of Cessna's backlog, TFC's "prudent" underwriting, and the "excellent" credit quality of TFC's loan portfolio were materially false and misleading when made. The market slowly learned the truth about Textron's business through a series of partial disclosures, *beginning* with unexpectedly poor financial results and reduced guidance and *ending* with Textron's startling announcements that TFC's operations would be shut down and production plans for Cessna

jets would be dramatically reduced.  Following each of these adverse disclosures, Textron's stock price dropped sharply on heavy trading volumes.

With this in mind, the Complaint more than adequately satisfies the heightened pleading standards established by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b).  It details the falsity of Defendants' statements with particularity, provides specific facts that, when viewed cumulatively, demonstrate Defendants' scienter, and adequately notifies Defendants of the causal link between their misrepresentations and the claimed losses. Defendants' efforts to strike down the particularized allegations in the Complaint are unpersuasive and should be disregarded.  As a result, this Court should deny the Motion.

## II.    STATEMENT OF FACTS

### A.    Background

Founded in 1923, Textron is a multi-industry company whose principal activity is to provide aircraft, industrial and finance solutions.  Textron operates through five business segments:  (1) Bell Helicopter Textron, Inc.; (2) Cessna; (3) TFC; (4) Textron Systems Corporation; and, (5) Textron Industrial.  ¶¶2, 64.[1]

Accounting for a significant portion of the Company's revenues – approximately 40% in 2008 – Cessna is a designer and manufacturer of business jets, utility turboprops and single engine piston aircraft.  ¶64.  Given Cessna's importance to the Company's financial condition, Defendants recognize that the market regularly monitors its reported backlog, a key metric measuring the dollar amount of aircraft orders in Cessna's pipeline, as an indicator of the Company's overall financial health.  ¶¶125-126.  To be sure, a "strong" backlog signals to the market that Textron will have a

---

[1]    All citations to "¶__" herein refer to paragraphs of the Complaint.

foreseeable stream of revenue as firm orders are converted into delivered aircrafts. *Id*. According to the Company, Cessna orders are included in the backlog only if a definitive purchase order is signed and a non-refundable deposit is paid. ¶¶6, 143.

To facilitate the purchase of Cessna aircrafts, which are quite expensive, Textron utilizes TFC, a wholly owned, commercial finance company that provides customers with various financing options, through its Aviation Finance division,[2] for the purchase of new and used Cessna business jets and other aircrafts. ¶65. Indeed, TFC's financing business was of critical importance to Textron's operations as, in 2007 alone, it transmitted $1.2 billion in revenues from product sales to Textron and held another $8.5 billion in finance receivables. ¶66.

Because it heavily depends on the relationship with TFC, Textron pledged extensive financial support to ensure that TFC could always satisfy its financial obligations. ¶¶67-68. More specifically, Textron and TFC entered into a Support Agreement by which Textron would pay TFC, on a quarterly basis, an amount sufficient to ensure that TFC's pre-tax earnings, before extraordinary items and fixed charges, will not be less than 125% of TFC's fixed charges. ¶¶9, 67. Textron also agreed to maintain TFC's consolidated shareholder's equity at an amount not less than $200 million, and pursuant to the Support Agreement, Textron must directly or indirectly own 100% of TFC's common stock. ¶67. In addition, the Support Agreement contained a third-party beneficiary provision entitling TFC's lenders to enforce the Support Agreement provisions against Textron. *Id*. Due to TFC's purported financial success prior to and during most of the Class Period, Textron never had to make any payments to TFC under the Support Agreement. ¶67.

---

[2]     Within the Aviation Finance division, the Cessna Finance segment is devoted specifically to the sale and financing of Cessna jets. ¶¶64-65.

**B.      Textron Attempts to Grow Its Business by Lowering Its Standards**

Prior to the start of the Class Period, Textron, under the leadership of Campbell, made a strategic decision to vastly grow the size of its business by expanding the scope of its customer base. ¶¶4, 69, 70.  Rather than lowering prices or increasing marketing efforts, though, Textron believed that it could accomplish this goal by loosening TFC's underwriting and lending standards so that the Company could attract new customers that, in the past, could not qualify for financing. ¶¶6, 70.  The loosening of underwriting standards in this manner represented a marked departure from the Company's historical practices, which relied on solid and prudent underwriting to reduce the risk of customer defaults on Company products that were, by their very nature, extremely costly to manufacture.  ¶71.

Textron commenced this growth plan by cleansing TFC of those embedded personnel who would not readily embrace the departure from historically stringent lending practices.  ¶72.  Indeed, under management's direction, by 2006, Textron replaced numerous Cessna Finance personnel with employees who were more willing to execute the Company's plans to loosen underwriting and lending standards.  *Id.*  Thus, with a compliant workforce in place, the Company implemented several concrete steps to aggressively grow Cessna's business.  ¶71.

First, TFC extended financing to high risk domestic companies that historically did not qualify, and would never have been approved, for financing.  ¶¶73, 79.  Although TFC ordinarily had looked to borrowers with "high assets and strong cash flow," it now extended credit to borrowers with "marginal cash" and assets, as well as poor "debt to income" ratios.  ¶79.  For example, although Textron previously refused to do business with a Fort Lauderdale, Florida company called Aero Toy Store because it was perceived as "sleazy" and "unreliable," the Company, under TFC's new policies, provided Aero Toy Store with $60 million in financing to

purchase Cessna planes, which was larger than any line of credit extended to any other dealer in the United States.  ¶73.

Second, beginning in April 2007, TFC agreed to sell planes to customers that did not even have sufficient cash to pay the requisite non-refundable deposit.  ¶74.  For these customers, TFC provided financing for 100% of the purchase price of an aircraft, which included the "non-refundable" deposit as well as the outstanding balance.  ¶6.  This new practice of financing deposits, which represented a significant departure from the Company's long-time standards, had the effect of increasing the Company's risk because these customers had no real economic stake in the transaction and could cancel the order with little, if any, financial consequence.  ¶¶6, 74, 142.

Third, in conjunction with financed deposits, TFC provided customers with loans that contained overly generous repayment terms.  ¶76.  While, in the past, TFC offered only its highest rated customers – those with high net worth and liquidity – favorable credit terms based on a 12-year amortization schedule, it revamped those loan terms so that virtually all customers, regardless of their credit category, would receive loans with a 20-year amortization schedule.  *Id*.  By allowing customers an extra 8 years within which to pay off their loans, TFC significantly increased its risk of customer default as the loan periods would outlast the useful life of the plane.  ¶¶76, 79.

Fourth, from 2007 through 2008, TFC accepted substantially more international orders from Authorized Sales Representatives ("ASRs") who, at the time of the order, typically did not have an identifiable buyer and were not required to pay TFC a deposit.  ¶¶6, 129.  These speculative orders, representing approximately 70% of the Company's reported backlog in the first half of 2008, were placed by ASRs with the hope that, during the long manufacturing process, they could eventually find a buyer for the aircrafts.  ¶¶129-30.  If, however, an ASR could not find a legitimate buyer, the Company would be stuck with the finished aircraft.  *Id*.

## C.    Textron Reports "All-Time High" Increase to Its Cessna Backlog

Not surprisingly, Defendants' concerted efforts to grow its Cessna business by lowering credit standards and lending criteria proved successful.  Almost immediately, Cessna Finance employees experienced a dramatic drop – 90% – in the number of loans that they declined.  ¶77. And, in those instances where loans were declined, supervisors reviewed and then overrode the preliminary decision.  *Id.*  Consequently, Cessna Finance began "putting up huge numbers," despite the fact that it was assuming a tremendous amount of undisclosed risk.  ¶¶77, 79.

Thus, by the start of the Class Period, the Company began reporting sizeable increases in its Cessna backlog, which it attributed to "the continued strong demand for their jets."  ¶¶144-45.  In fact, in its July 19, 2007 earnings report, the Company reported a $1.4 billion quarter-over-quarter increase in the size of its Cessna backlog, contributing to a "all-time record high" of $10.4 billion. ¶144.  In the subsequent earnings call, Campbell was effusive over these results, exclaiming that the Company was "essentially sold out of next year's delivery plan" and that "order and demand will continue strong for the foreseeable future and we're expecting an increase in deliveries in 2009 as well." ¶145.  The market naturally took notice, as analysts following the Company were encouraged by the fact that "the company is not seeing any impact from financial market turbulence in demand." ¶¶147, 150, 156, 161.

As the Class Period progressed, Defendants continued to report "all-time record highs" for its Cessna backlog with quarterly increases regularly exceeding $1 billion.  ¶¶151-52.  In discussing the strength of this backlog and its impact on Textron's bottom line, Campbell touted that "[t]he next few years in the business jet market look to be awesome," and "[i]f we were running on a very low backlog, I'd be nervous, but the converse is true.  I'm bullish on Cessna's growth and contribution to EPS and topline growth well into the next decade."  ¶162.  Campbell made similar comments in

Textron's 2007 fourth quarter earnings release and subsequent analyst call on January 24, 2008

regarding the impact of the decline in the U.S. economy on the Company's Cessna business:

> While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial. Even with the softer U.S. economy, we expect another banner year of business jet orders exceeding current year deliveries. Given that our jet backlog already extends well into 2009, this bodes well for continued, uninterrupted growth well into the next decade at Textron.

¶¶165-71.  In fact, despite the economic downturn, Textron reported that it had received an

"unusually low" number of cancellations.  ¶170.  Again, analysts were impressed, reporting that the

"Textron provided an analysis that shows that a US downturn would have little impact on [Cessna's]

segment performance over the next few years."  ¶174.

These (and other) false statements throughout the Class Period concerning Cessna's "very

deep" and "unprecedented backlog" based on "unabated" demand and TFC's "prudent underwriting"

had the desired impact on Textron's stock price.  ¶¶165, 167, 171, 177-78.  Indeed, following almost

every positive public statement about the Company's financial condition, Textron's stock price rose

on abnormally high trading volumes.  ¶¶147, 157, 163, 172, 175, 185, 189.  As a result, investors

purchased Textron's stock price at artificially inflated levels until the truth about Defendants' fraud

was disclosed to the market.  *See* ¶308.

### D.      In Truth, Textron's Cessna Backlog Was Materially Overstated

Despite their public assurances, Defendants knew that Textron's Cessna backlog was nothing

more than a "house of cards."  ¶142.  Due to the conscious decision to loosen underwriting and

lending standards, the Cessna backlog was composed of orders that were inherently speculative,

contingent or otherwise subject to cancellation by customers that had little, if any, financial

obligation to complete the transaction.  ¶128.  In other words, contrary to what was stated in SEC

filings, the orders in the Cessna backlog were anything but firm.  ¶¶131, 134.

Thus, it was no surprise to Defendants that, as the global economy declined prior to and during the Class Period, Textron's Cessna backlog experienced considerable deterioration as high risk customers (*i.e.*, those Textron courted using undisclosed lax underwriting criteria) abandoned their deals and prospective customers never materialized.  ¶¶131-32.  By the end of 2007, Textron customers were clamoring to cancel their orders or, at a minimum, sell their "delivery position" to other Cessna customers in violation of Company policy.  ¶137.  In response, Cessna's sales force contacted wavering customers to give them the "hard sell" and persuade them to defer their delivery date – sometimes by several years – rather than cancel the orders outright.  ¶¶6, 133.  In this way, Textron could retain the deferred orders and maintain the appearance that the reported backlog was what Textron said it was.  ¶133.

Nonetheless, while it publicly reported startling increases in Cessna's backlog, Textron was actually losing more orders on a week-to-week basis than it was replacing with new orders, as reflected on the weekly-prepared Master Schedule and as discussed at weekly sales meetings. ¶¶131, 135-36, 138-40.  Other Company reports showed that, by the summer of 2008, the number of finished, but undelivered, aircrafts "got bigger and bigger," *i.e.*, "doubling" and "tripling," at an alarming rate.  ¶141.  These aircrafts, known as "white tails" since they were not yet adorned with personalized customer markings, were stacking up at the Company's facilities because so many customers refused to take delivery of their orders or were delinquent in their milestone payments. ¶¶132, 140.  Thus, with cancellations and deferrals soaring throughout the Class Period, Defendants' statements extolling the strength and size of Cessna's backlog were materially false and misleading when made.

E.      **Textron's Decision to Loosen Underwriting and Lending Standards Adversely Impacts Other Lines of Its Business**

Although the loosening of underwriting and lending standards had its greatest impact on Textron's Cessna business, the policy shift also impacted TFC's financing activities in leisure-related industries, including golf course construction, vacation timeshare development and recreational vehicles. ¶¶5, 80. While loosened standards led to tremendous business growth in the short-term, Textron substantially increased its risk exposure to markets driven by discretionary spending of consumers, which would (and did) cause material losses during an economic downturn when spending dried up and loan defaults increased. ¶¶81-82. These practices contradicted Defendants' Class Period statements highlighting the soundness of the Company's underwriting standards and the strong credit quality of its lending portfolio. ¶¶145, 152-53, 167-68, 179-81.

Most notably, it was TFC's financing of "real estate rehab companies" – companies involved in repairing distressed homes and then "flipping" them for a profit – that carried the most risk. ¶¶88-99. As the real estate market showed serious signs of decline in 2006 and 2007, TFC's competitors began to exit the real estate rehab business due to the extremely high levels of risk involved in such lending. ¶91. By contrast, TFC, buoyed by its lenient underwriting criteria, increased its lending activity in this industry during this time period to the tune of $300-400 million, thereby expanding this line of business by approximately 60%. ¶92. Not surprisingly, though, the continued deterioration of the real estate market forced TFC to write-off the bulk of these loans due to borrower defaults as the value of their real estate developments collapsed (*e.g.*, Assured). ¶¶93-99. But rather than record these losses when they arose, Textron managed its losses by spreading them out over an extended period of time in violation of Generally Accepted Accounting Principles ("GAAP"). ¶¶5, 265-92.

TFC's extensive foray into the marine industry was similarly fraught with peril. ¶¶100-15. Prior to 2007, TFC's Marine division had extended considerable financing to boat dealers so that they could purchase inventory. ¶101. By 2007, as the marine industry experienced a severe downturn coinciding with the downturn of the real estate market, dealers became inundated with aging inventory that could not be sold without drastic discounts. ¶¶102-09. Instead of taking meaningful steps to alleviate the problems posed by this aging inventory, Textron exacerbated its risk profile by purchasing several marine loan portfolios from GE Capital, which were comprised of GE Capital's most troubled and problematic marine accounts. ¶¶110-11, 120. When dealers could not move their aged inventories (50% of which were over 12 months old), and eventually defaulted on their loans from TFC, Textron suffered significant losses. ¶¶113-14, 119, 121-22. As Defendants became aware of these losses throughout 2007 and 2008, however, they did not cause Textron to increase its bad debt reserves, in violation of GAAP. ¶¶5, 265-92.

**F.     The Truth Is Revealed Through a Series of Partial Disclosures**

Beginning in mid 2008, Textron could no longer hide the serious deterioration in its business and, through a series of partial disclosures, revealed adverse facts that caused the market to question the veracity of Defendants' Class Period statements. As the market learned the true facts previously concealed by Defendants' fraud, Textron's stock price dropped precipitously on high trading volumes. It reacted in this manner despite Defendants' efforts to temper the declines with positive news about the Company's operations.

For example, in public statements on June 13, 2008, July 17, 2008 and August 6, 2008, Textron announced significant financial difficulties impacting TFC, which included reduced guidance, reduced profits and increased loan loss provisions. ¶¶10, 190-91, 195-204, 210-15. On each occasion, however, Defendants drowned out this negative news with ebullient pronouncements concerning "strong demand and performance at Cessna," which led to a "very strong" backlog and

raised production targets for 2009 and beyond. ¶¶191, 195-97, 199-201, 203, 212. Nonetheless, driven by market analysis questioning the "credibility" of the Company's management, investors punished Textron's stock price with material declines on unusually high trading volumes. ¶¶192, 206-07, 216, 219.

Then, on October 16, 2008, Textron shocked the market with news that it planned to substantially downsize TFC's operations by exiting certain lines of business through the liquidation of approximately $2 billion in managed finance receivables. ¶¶10, 221-22. Based on this plan and related impairment charges, Textron disclosed that, pursuant to the Support Agreement, it expected to pay TFC a capital contribution in the amount of approximately $200 million – which represented the first time that such a payment would be made under the Support Agreement. ¶¶10, 67, 221-22. While Defendants' continued to tout Cessna's "very large and robust backlog," they also revealed that the backlog was "down about $400 million sequentially from the prior quarter" and that an increasing number of existing customers had approached the Company with financing problems and requests to push back their delivery dates. ¶¶224-25. Over the following days, Textron's stock price dropped steadily, as market analysts downgraded the Company's stock due to expectations that problems at TFC and Cessna would continue. ¶¶235, 238-39.

Just weeks later, on November 4, 2008, Textron contradicted prior statements regarding the strength and visibility of Cessna's backlog, informing the market that it was reducing production levels for its jets through at least 2009. ¶¶11, 240. Defendants explained that this decision was based on communications with customers concerning the "availability of customer financing" and the "degree of deferrals" expected for the upcoming year. ¶¶242-44. Characterizing this announcement as a "negative surprise," analyst J.P. Morgan reported that the downward revision of Cessna's production was "another hit to already low level of credibility [for Textron Management]."

¶241.  In response to this news, Textron's stock price dropped from $18.64 to $16.16 over the course of two days.  ¶246.

On December 22, 2008, Textron announced that TFC would exit "all of the commercial finance business," with certain minor exceptions.  ¶¶12, 251.  In addition to the liquidation of approximately $7.9 billion of managed receivables and the recording of millions of dollars in restructuring charges, Textron estimated that its capital contribution to TFC under the terms of the Support Agreement would reach $600 million.  *Id.*  Following this release, Textron's stock price fell by more than 20% on a 141% increase in trading volume.  ¶252.

Finally, by January 29, 2009, Defendants were no longer able to conceal the full extent of the alleged fraud.  Textron reported an "egregious impact" on Cessna's business attributable to low order volume, cancellations and "an unprecedented number of deferrals."  ¶¶12, 254.  According to the Company, these developments caused "dramatically reduced" production plans "to ensure we reflect our current view of customer demand to minimize our finished goods inventory."  ¶254.  French added:  "the first quarter is going to be our most difficult at Cessna, as we anticipate less than 80 deliveries due to the inability to efficiently replace lost deliveries that affected the quarter."  *Id.*  Moreover, the Company reported further erosion to TFC's business resulting in a report of $133 million in loan loss provisions and an expectation of "substantial charge-offs" in 2009.  ¶¶254, 256.

This final devastating piece of news drove Textron's stock price down to shocking levels.  From January 28, 2009 through February 5, 2009, Textron's stock price dropped from $13.30 to $6.09 on tremendous trading volume.  ¶¶13, 258.  In fact, by February 5, 2009, the stock suffered a total decline of more than 91% from its Class Period high, resulting in billions of dollars in investor losses.  ¶¶13, 259.

The axe fell swiftly, as the Company reported, on February 9, 2009, the resignation of French and the retirement of Carter. ¶262. The market, however, was suspect of the stated reasons for these departures, noting that "[s]omeone has to take the blame for Textron's troubles – and it looks like Chief Financial Officer Ted French and Chief Operating Officer Buell Jay Carter of Textron Financial are stuck with the bull's eye." *Id*.

## III.   ARGUMENT

### A.   Legal Standards

"Confronted with a motion to dismiss, the court must accept all well-pled factual allegations as true and draw all reasonable inferences in Plaintiffs' favor." *In re Smith & Wesson Holding Corp. Sec. Litig*, 604 F. Supp. 2d 332, 339 (D. Mass. 2009).[3] "A motion to dismiss for failure to state a claim upon which relief can be granted requires the court to conduct a limited inquiry, focusing not on whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re StockerYale Secs. Litig.*, 453 F. Supp. 2d 345, 349 (D.N.H. 2006). "In order to survive a motion to dismiss, a complaint must allege a plausible entitlement to relief." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).

Under §10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. "For a complaint to state a claim for securities fraud under section 10(b) and Rule 10b-5, it must plead six elements: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the

---

[3]   Citations and footnotes are omitted, and emphasis is added, unless otherwise noted.

purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Advest*, 512 F.3d at 58.

In addition to the well-settled Rule 12(b)(6) standards, "[s]ecurities fraud allegations also must meet the standards of Federal Rule of Civil Procedure 9(b) and the PSLRA, which imposes heightened pleading requirements on private securities litigation." *Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). Unfortunately, as a result of these heightened pleading requirements, "motions to dismiss in securities fraud cases have become all too common where the procedural posture of the case renders most of the defendants' arguments futile. Many motions to dismiss ask the court to engage in judgment calls which are better made by the trier of fact." *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001). This is particularly true in light of securities defendants' efforts to place the blame for alleged misconduct on the recent decline of the U.S. economy. *Freudenberg v. E*Trade Fin. Corp.*, 2010 U.S. Dist. LEXIS 46053, at *2-3 (S.D.N.Y. May 11, 2010) ("Defendants, including the Defendants in this action, urge that the losses incurred were the result of a 'worldwide economic catastrophe' and that the complaints set forth a case of fraud by hindsight rather than the violation of the securities laws. Because the issue in this action is what the Defendants knew and when they knew it, a securities violation has been adequately alleged.").

Consequently, "[a]lthough the pleading requirements under the PSLRA are strict, they do not change the standard of review for a motion to dismiss." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002); *Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 317 (D.R.I. 2004) ("Notwithstanding the foregoing heightened pleading requirements, this Court must remain mindful . . . that the strict pleading requirements of the PSLRA do not alter the standard of review for a motion to dismiss.").

### B.    The Complaint Alleges Actionable Misstatements

The PSLRA imposes heightened pleading requirements on plaintiffs alleging false and misleading statements: "any private securities complaint alleging that the defendant made a false or misleading statement must specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1).  According to the First Circuit, this means that a "complaint making [fraud] allegations must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997).  In other words, a complaint must satisfy the "PSLRA's clarity-and-basis requirements."  *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 194 (1st Cir. 2005).

When considering these requirements, "the First Circuit has adopted a fact-specific individual case analysis."  *Sekuk Global Enters. v. KVH Indus.*, 2005 U.S. Dist. LEXIS 16628, at *22-23 (D.R.I. Aug. 11, 2005); *In re Tyco Int'l, Ltd., Multidistrict Litig.*, 2007 U.S. Dist. LEXIS 42401, at *15 (D.N.H. June 11, 2007) ("For purposes of satisfying the particularity requirement, each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").  In this regard, "[a] securities fraud complaint will survive a motion to dismiss even when some questions remain unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA."  *Textron*, 321 F. Supp. 2d at 317.  Thus, while the PSLRA's pleading standards are "rigorous," they "do not require a plaintiff to plead evidence" to survive a motion to dismiss.  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002).

In their motion, Defendants clamor that the Complaint "fails to plead with the required particularity that any of the statements identified in the complaint were false or misleading."  Def. Mem. at 22.  To the contrary, over the course of the Class Period here, Plaintiffs allege Defendants made numerous material misrepresentations and omissions concerning the strength and quality of

16

Textron's Cessna backlog and portfolio, which was attributable to TFC's lenient underwriting and lending practices. These allegations, supported by numerous corroborative confidential witnesses, easily satisfy the heightened pleading standards of the PSLRA and Rule 9(b).

*First*, the Complaint identifies numerous statements where Defendants misled the market about the "depth and strength of the backlog," including statements that: (1) Cessna is experiencing "continued strong demand for their jets;" (2) "Cessna's backlog hit another all-time high . . . ;" (3) "we are particularly well positioned given our strong aircraft . . . backlog;" (4) "[g]iven that our jet backlog already extends well into 2009, this bodes well for continued, uninterrupted growth well into the next decade at Textron;" (5) Cessna has an "unprecedented backlog" due to a "better diversified" customer base; (6) Cessna has "unusually low cancellations"; (7) "demand also continues unabated at our Cessna unit," and (8) Cessna's backlog provides for "tremendous growth" and "excellent visibility." *See, e.g.*, ¶¶145, 151, 165, 167, 170, 171, 179, 180. In addition, the Complaint alleges that the Company's Cessna backlog figures were materially misleading. ¶¶144, 151, 165, 177.

These and other related statements were false and misleading because Textron artificially created the "strong" demand for its Cessna jets by loosening TFC's underwriting and lending practices to accommodate a wider and riskier customer base. ¶¶69-76. While the Cessna backlog was supposedly filled with firm orders from low risk customers, TFC's revised practices allowed the backlog to be filled with orders from historically unqualified customers that, in many instances, required 100% financing (which included the "non-refundable" deposit) and overly generous repayment terms <u>or</u> orders from international ASRs that hoped to find, but did not yet have, an identifiable buyer. ¶¶73-74, 76, 79, 129-30. Thus, Cessna's backlog during the Class Period was inherently speculative, contingent and unstable. ¶¶128, 131, 134. Not surprisingly, despite

17

Defendants' backlog "visibility" into the next decade, Textron experienced an alarming number of cancellations and indefinite deferrals as the U.S. economy soured and customers with known financial issues walked away from their deals or simply never materialized. ¶¶131-33, 135-41, 168.

*Second*, and relatedly, the Complaint also alleges that Defendants falsely assured the market that TFC's commercial lending activities left the Company "well positioned" due to TFC's "history of prudent underwriting."  ¶165.  In fact, Defendants misrepresented that:  (1) TFC "maintained excellent credit quality within our portfolio;" (2) Textron's loan loss provision "has been fairly stable;" (3) TFC was "not involved in sub prime or other misunderstood or high-risk products;" (4) "[p]ortfolio quality continues to be absolutely excellent;" (5) TFC "had record revenues and profits while maintaining excellent credit quality;" (6) "we expect strong credit quality based on the products lines we're in, the creditworthiness of our customers, and the structures of our loans;" (7) "we're reasonably confident in our outlook reflecting the high quality of asset classes in our portfolio and the rigor of our traditional strong conservative underwriting process;" and, (8) "our risk at TFC is manageable."  *See*, *e.g.*, ¶¶146, 152, 167-69, 179.  The Complaint further alleges that the Company falsely reported its loan loss provisions in violation of GAAP.  ¶¶265-92.

These and other similar statements were false and misleading because the lax underwriting and lending standards that allowed Textron to overstate Cessna's backlog also permeated through other lines of TFC's business.  ¶¶80-82.  By lowering those standards (but never disclosing the decision to lower them), TFC dramatically expanded its commercial lending activities to include risky borrowers in industries that were heavily dependent on customers with large amounts of discretionary income, such as golf course construction, time share development, real estate rehabilitation and marine recreational vehicles.  ¶¶88-115.  As the U.S. economy declined, and discretionary spending dried up, TFC's borrowers defaulted on their loan obligations, causing

massive losses.  ¶¶81-82, 113, 114, 119, 121-22.  Within months, Textron abandoned TFC's business.  ¶251.

Accordingly, because the Complaint pleads the falsity of Defendants' statements with the particularity required by the PSLRA,[4] Defendants' grab-bag of "legal" challenges should be disregarded.

### 1.     Defendants' Risk Warnings Were Insufficient

Defendants first claim that misstatements concerning Cessna's backlog and TFC's lax underwriting and lending practices are not actionable because "[i]nvestors were . . . informed of the very risks" involving those aspects of Textron's business.  Def. Mem. at 24-25, 28-30.  But their reliance on generic risk warnings provides no cover from the Complaint's detailed allegations. Indeed, given the nature of Defendants' misrepresentations, the risk warnings contained in Defendants' SEC filings and elsewhere were particularly meaningless.

In this regard, the Complaint alleges that, throughout the Class Period, Defendants repeatedly touted the "strength" of its Cessna backlog, which would provide "for continued, uninterrupted

---

[4]     Chief among the various source materials referenced in the Complaint, Plaintiff relies on numerous confidential witnesses who provided their personal knowledge of Textron's operations prior to and during the Class Period.  The First Circuit recognizes that a plaintiff may plead its case using confidential witnesses provided that "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Cabletron,* 311 F.3d at 29-31 (adopting the "moderate view" of the Second Circuit).  Plaintiff easily satisfies this standard.  In a lengthy section of the Complaint, Plaintiff identifies 23 confidential witnesses on which they rely, describing their title, length of employment and responsibilities.  ¶¶39-64.  Then, throughout the remainder of the Complaint, Plaintiff attributes specific statements about Textron's operations to specific confidential witnesses. *See* ¶¶70-143.  Accordingly, Plaintiff's reliance on such confidential witnesses to supply the particularity required by the PSLRA is appropriate in this action. *In re Cabletron*, 311 F.3d at 30 ("Overall, the accumulated amount of detail the sources provide tends to be self-verifying; these are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge of them.").

growth well into the next decade." *See* ¶165. They made these statements despite knowing, according to the Complaint, that the Cessna backlog was filled with orders from high risk or otherwise nonexistent customers that had little, if any, obligation to complete the transaction once the economy declined. ¶¶72-79, 129-43. As such, boilerplate warnings that customers *may* cancel their Cessna orders due to weak economic conditions hardly contain the "degree of intensity and credibility" necessary to warn investors of the serious and foreseeable risks impacting the Company's backlog throughout the Class Period. *See*, *e.g.*, *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) ("While some facts regarding the maintenance of the Disney Stores were known, many were not. Disclosures such as the 'ratcheting down' of the Disney Stores remodeling efforts did not fully reveal the numerous breaches of the License Agreement that occurred during 2006-2007."); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004) (court found that "the market knew of general problems, but not the nature or extent of the conflict at Credit Suisse. Whether the extent of the market's knowledge about conflicts at Credit Suisse sufficed to render Wolfenberger's omissions immaterial is a fact-specific question that is rarely an appropriate basis for dismissal.").

The Ninth Circuit's recent decision in *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), is on point. There, the plaintiffs claimed that the defendants' publicly reported backlog was misleading because it contained orders for work that had been halted by the company's customers. *Id*. at 984. Pointing to certain risk warnings in the company's SEC filings, the defendants argued that "reasonable investors . . . would grasp that stopped work was included in backlog. *Id*. at 985-86. The Ninth Circuit disagreed:

> The passage [in the SEC filing] . . . speaks entirely of as-yet-unrealized risks and contingencies. ***Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether.***

*Id.* at 986.

Similarly, the Complaint alleges that, while Defendants emphasized that TFC's "history of prudent underwriting" allowed it to "maintain[] excellent credit quality within [its] portfolio," they knew that loosened underwriting and lending practices significantly increased the Company's risk exposure and rendered its loan loss reserves inadequate. ¶¶152, 158, 165, 173. Thus, warning investors about the ***probability*** that financial performance may be adversely affected by poor "portfolio credit quality" does little to inform them about material facts ***actually*** impacting the Company during the Class Period. *Ark. Pub. Emple. Ret. Sys. v. GT Solar Int'l, Inc.*, 2009 U.S. Dist. LEXIS 93820, at *35 (D.N.H. Oct. 7, 2009) ("GT Solar's generalized statements about potential lost customers and sales did not specifically warn against the implication that it would very soon lose its biggest customer for DSS furnaces and, with it, most of that product's sales."); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (risk warnings are insufficient where they "provide[] no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Even more problematic is Defendants' attempt to rely on warnings related to a general economic downturn. That is because Defendants drowned out the effectiveness of these risk warnings with forceful representations that the Company's business was unaffected by the decline of the U.S. economy during the Class Period. *See, e.g.*, ¶165 ("While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial"); ¶167 ("We believe that a significant amount of our enterprise is relatively unaffected by the economy, and that we are well positioned for this environment."). The existence of such mixed messages, and the impact they had on the market, are not appropriate for resolution at

the motion to dismiss stage.  *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *43 ("The 'current financial crisis' is not necessarily an absolute defense if it is alleged that defendants have misled the public as to the quality of their holdings."); *Wieland v. Stone Energy Corp.*, 2007 U.S. Dist. LEXIS 76636, at *35 (W.D. La. Aug. 17, 2007) ("Thus, although as of October 6, 2005 the market knew of the general problems regarding Stone's proved reserve estimates, there are factual issues concerning whether the full extent and effect of those problems was known at that time.").

### 2.      Defendants Had a Duty to Disclose the Omitted Information

Defendants next suggest that that they had no duty to disclose the allegedly omitted information described in the Complaint concerning Cessna's backlog and the impact of TFC's loosened underwriting and lending practices.  More specifically, they claim that nothing regarding the financing of customer deposits or the encouraging of customers to delay orders "made any statement about Cessna's backlog false and misleading.  Def. Mem. at 25-26.  They also claim that facts relating to problems associated with marine inventory and "real estate rehab" projects are immaterial because these activities represent only a small portion of the Company's business.  Def. Mem. at 30-32.  Neither of these contentions has merit.

*First*, once a corporation has elected to speak about a certain matter, Rule 10b-5 mandates that its speech must be truthful, accurate, and complete.  *See Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 (1st Cir. 1987) ("When a corporation does make a disclosure — whether it be voluntary or required — there is a duty to make it complete and accurate.  If a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.").  Further, "even an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it -- or other statements made -- materially misleading."  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008);

*see also Lucia v. Prospect St. High Income Portfolio*, 36 F.3d 170, 174 (1st Cir. 1994) ("[T]he fact

that a statement is literally accurate does not preclude liability under federal securities laws.").

There is no dispute that, throughout the Class Period, Defendants repeatedly spoke to the

market about the "depth and strength" of Cessna's "unprecedented" backlog. *See, e.g.*, ¶¶167, 171.

But their statements on these issues were anything but truthful and complete. Instead, as described

above, Textron's "all-time high" backlog figures were based on, *inter alia*, (1) orders from

historically unqualified customers that could not afford to pay, and thus needed financing for, the

"non-refundable" deposit; and (2) orders from customers that, rather than cancel their order

completely, agreed, at Cessna's insistence, to defer delivery for an indefinite period of time.  ¶¶73-

79, 125-43.[5]  These concealed facts, among the others described in the Complaint, demonstrate that

the strength of Cessna's backlog was vastly overstated.  *Berson*, 527 F.3d at 987 ("But once

defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't

mislead investors as to what that backlog consisted of. We cannot say, as a matter of law, that

defendants fulfilled this duty."); *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *14-15 ("If a

company, like E*TRADE here, puts the topic of the cause of its financial success at issue, then it is

obligated to disclose information concerning the source of its success, since reasonable investors

would find that such information would significantly alter the mix of available information.").[6]

---

[5]    Defendants assert that Plaintiff's allegations regarding the failure to disclose the existence of customers   deferrals "is contrary to plaintiff's own allegations."   Def. Mem. at 26.   This is misguided.  Although Defendants eventually admitted, in July 2008, that "two" customers requested a deferral of their delivery date, the Complaint expressly alleges that this disclosure was "too little, too late" as Defendants knew or should of known of these customer problems well before that time.

[6]    Defendants further complain that Plaintiff fails to provide sufficient facts describing the circumstances under which customers requested that Textron defer their delivery date.  Def. Mem. at 25.  But the excruciating level of detail demanded by the Defendants is not required by the PSLRA. *See Textron*, 321 F. Supp. 2d at 317 ("A securities fraud complaint will survive a motion to dismiss

*Second*, although the Marine division and the Finance Company Service division accounted for a small percentage of TFC's portfolio of finance receivables, this ignores the fact that, in assessing materiality, courts must consider "the entire context of the alleged omission," instead of looking strictly at a numerical impact.  *See In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54 (D. Mass. 2003) ("The concept of 'materiality' is not necessarily tied to a specific fraction of a company's profits, and the fact that a misrepresentation pertained to a relatively small portion of the company's business does not automatically establish that the misrepresentation was not material."); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 n.5 (S.D.N.Y. 2008) ("issues of materiality should [not] be considered in strict terms of the omission's relative percentage impact on a company's total assets or revenue.  There is no bright-line rule that if an omission or misstatement falls below a certain percentage of a company's total assets or revenue that it is automatically rendered immaterial-rather a court will assess the entire context of the alleged omission.").

And, in any event, Defendants misconstrue the nature of these allegations.  That is, they do not represent separate claims for relief; rather, allegations emanating from the Marine division, the Finance Company Services division or any other division within TFC are submitted as concrete examples that TFC's underwriting and lending activities, as a whole, were not "prudent" and the overall credit quality of TFC's portfolio was not "excellent."  Such facts would certainly be material to a reasonable investor.  *Textron*, 321 F. Supp. 2d at 318 ("After alleging that a statement or representation is untrue, whether the statement is 'material' under § 10(b) is determined under the

---

even when some questions remain unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA."); *Sekuk Global*, 2005 U.S. Dist. LEXIS 16628, at *23 ("While these accounts do not contain exhaustive factual descriptions of the activities recounted, when considered together, they reinforce one another and provide sufficient particularity to satisfy the heightened pleading standards of Rule 9 and the PSLRA.").

'reasonable investor' standard: i.e., the question asked is whether a reasonable investor would have viewed the nonpublic information as having significantly altered the total mix of information made available to those making the investment decision."); *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *20 ("Furthermore, material misrepresentations include those concerning a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.").

### 3.   Plaintiff Adequately Alleges GAAP Violations

Defendants next complain that Plaintiff's GAAP allegations[7] are insufficient because they "lack any particularized detail and rely on a flat misrepresentation of fact."  Def. Mem. at 33-34. Once again, however, Defendants overstate the PSLRA's pleading requirements.   To plead violations of GAAP, a plaintiff must set forth the applicable accounting principles and explain how they were violated.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F. 3d 1410, 1422 (3d Cir. 1997) (holding that, to state claims of accounting fraud with particularity, plaintiff must set forth the applicable accounting principles and explain how they were violated).

Here, the Complaint does just that.  *See* ¶¶265-92.  Plaintiff alleges that Textron violated GAAP – specifically, SFAS 5, SFAS No. 114 and SAB 102 – by failing to properly account for expected losses for impaired loans in TFC's loan portfolio.  More specifically, because TFC engaged in risky lending to borrowers in industries that were heavily dependent on a robust economy, Textron should have established large loss reserves or allowances at the beginning of the Class Period once they knew that those borrowers would default as the economy declined.  ¶269.  They did not do so, according to the Complaint, because Defendants wanted to avoid making huge capital

---

[7]     "GAAP embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time."  *Sekuk Global*, 2005 U.S. Dist. LEXIS 16628, at *25.

contributions to TFC for as long as possible.  ¶¶271-75.  Only at the end of the Class Period did

Textron reveal that it had substantially increased its allowances for loan losses – and even then it was

insufficient to cover TFC's expected losses.  ¶¶288-92.

Defendants contend that these allegations are based on a "flat misrepresentation of the facts"

because Textron "significantly increased reserves for its finance receivables."  Def. Mem. at 33-34.

This argument, however, ignores the allegations of the Complaint.   The Complaint alleges that

Textron failed to sufficiently increase its loss reserves in 2008 given what Defendants knew about

the poor quality of the loan receivables.  Moreover, the Complaint alleges that, in the fourth quarter

of 2008, Textron reclassified $1.7 billion of finance receivables as being "held for sale."  By doing

so, Textron avoided having to take a charge for those receivables and avoided having to increase its

loss reserves by tens, if not hundreds, of millions of dollars more, as the fair value of such loans

were $293 million less than the amount Textron had carried them at on its books during the fourth

quarter of 2008.  ¶ 289.  Thus, although Textron may have increased its loan loss reserves over an

extended period of years, which was not surprising given its increased loan volume, the Complaint

sufficiently alleges that during 2008 the Company's loan loss reserves were materially understated in

violation of GAAP.

Defendants' other argument fares no better.  Plaintiff is not required to plead the exact

amount of the reserve understatement in order to sufficiently allege GAAP violations.  *Aldridge*, 284

F. 3d at 79-82 (failure of the complaint to document precise amounts of overstatements of revenue

not fatal); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp 2d 1, 26-27 (D. Mass. 1999)

(complaint survives PSLRA scrutiny despite failure of the complaint to document precise amount of

overstatement of inventory or to tie knowledge of inventory to specific defendants); *In re Tyco Int'l*

*Ltd., Multidistrict Litig.*, 2004 U.S. Dist. LEXIS 20733, at *30 (D.N.H. Oct. 14, 2004) (PSLRA does

not require identification of specific amounts by which various accounts were misstated where the complaint otherwise provides a detailed description of the fraud schemes).[8]

Accordingly, these GAAP allegations demonstrate that Textron's financial results were false and misleading when made.  Plaintiff identifies the specific GAAP rules that Defendants violated and sufficiently describe precisely how they were violated.  Nothing more is required at the motion to dismiss stage.  *In re Cabletron*, 311 F.3d at 32 (court found complaint sufficient to satisfy the PSLRA even though the plaintiff failed to identify "the precise dates of transactions, the names used for phony customers, the identities of corporate personnel involved, the specific products warehoused, or the exact dollar amounts of individual fraudulently recorded sales").

### 4.    Defendants' Statements Were Not Meaningless Puffery

Characterizing some of their statements as "non-actionable puffery," Defendants contend that "general statements of corporate optimism" alleged in the Complaint "cannot support a securities fraud claim."  Def. Mem. at 35-36.  While their brief is unspecific, to the extent that Defendants challenge those statements relating to Cessna's "strong" demand and "unprecedented" backlog, the puffery argument falls flat.  *See, e.g.*, *In re Smith & Wesson*, 604 F. Supp. 2d at 342 (rejecting puffery argument, court found that "***Defendants' statements regarding the strength of past demand and 'backlog' orders are definite and important to a potential investor***").

---

[8]    In passing, Defendant suggest that they did not violate GAAP because Textron's financial statements "were never restated" and "were reviewed by independent auditors."  Def. Mem. at 34 n.15.  This is of no moment.  The First Circuit has specifically rejected identical assertions.  *Aldridge,* 284 F.3d at 83 ("The company argues that because it has never restated any of its financials or otherwise indicated any error in the 1998 financial statements, and because its financial statements were audited by an independent accounting firm, no inference of accounting error, and so no inference of scienter, can be drawn.  We disagree. . . .  To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.").

Similarly, Defendants' statements concerning "prudent" underwriting and "excellent" portfolio quality are, when analyzed in context, statements of present fact that are "capable of objective verification," and not subject to dismissal. *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *43-44 ("[M]isstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery' where, as alleged here, they were misrepresentations of existing facts."); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (in context, misstatements regarding "integrity" and "independence" were "neither 'vague' nor 'non-specific' pronouncements that were incapable of 'objective verification.'"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) ("[T]he CAC adequately alleges that Countrywide's practices so departed from its public statements that even 'high quality' became materially false or misleading; and that to apply the puffery rule to such allegations would deny that 'high quality' has any meaning."); *Textron*, 321 F. Supp. 2d at 320 ("Read in context, Campbell's discussion of the V-22 is more than mere puffery: it is a statement heralding the tilt-rotor technology, the size of the contract with the military, the 'on schedule' delivery dates and the direct relationship between the V-22 and Textron's ability to increase its profit - an ability that was arguably weakened following the report of the Panel finding that the Osprey 'not operationally suitable.'").[9]

---

[9]     At a minimum, "[w]hether the opinion or 'soft information' is indeed actionable depends on all relevant circumstances of the particular case, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) ("The contextual approach to assessing the applicability of the puffery defense . . . makes clear that a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum . . . The statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning.").

### 5. The PSLRA's Safe Harbor and the Related Bespeaks Caution Doctrine Do Not Apply

Defendants further argue that many of their false and misleading statements are inactionable because they were "forward-looking statements" accompanied by meaningful cautionary language, and thus fall under the PSLRA's "safe harbor" or the related bespeaks caution doctrine. Def. Mem. at 36-37. But these defenses do not provide Defendants with the broad immunity they now seek.

As an initial matter, Defendants' argument for safe harbor protection is premature. *See Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (reversing trial court's granting of motion to dismiss). As the Court found in *Asher*, because the language of safe harbor is so malleable, it is unsuitable to apply on a motion to dismiss. *Id*. ("There is no reason to think – at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery – that the items mentioned in [Defendants'] cautionary language were those" that were realized when the truth emerged.); *see also Brumbaugh*, 416 F. Supp. 2d at 251-52 ("Ultimately, because reasonable minds could disagree as to whether the mix of information in the allegedly actionable document is misleading, the first prong of the statutory safe harbor provision cannot provide basis for dismissal as matter of law.").

Moreover, neither the PSLRA's safe harbor nor the bespeaks caution doctrine apply to statements of present or historical fact. *In re Smith & Wesson*, 604 F. Supp. 2d at 341 ("Defendants' forward-looking statements fall within the statutory safe harbor, but any statements of present or historical fact do not."). And since statements concerning a company's backlog are not "forward looking," Defendants' reliance on those defenses is misplaced. *Berson*, 527 F.3d at 990 ("But, as Applied Signal uses the term, 'backlog' isn't a 'projection' of earnings or a 'statement' about 'future economic performance.' Applied Signal's backlog is, instead, a snapshot of how much work the company has under contract right now, and descriptions of the present aren't forward-looking.").

29

Even if the Court were to entertain Defendants' safe harbor or bespeaks caution arguments, Defendants cannot seriously contend that their statements were accompanied by ***meaningful*** cautionary language. *In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) ("Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection."). As described above, the general warnings contained in Textron's SEC filings were insufficient to place investors on notice of the risk inherent in their investment, particularly in light of strong allegations that the very "risks" that Defendants "warned" about were already adversely impacting the Company when the allegedly false statements were made. *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false and misleading, then their forward-looking statements were not protected by the safe harbor."); *Children's Place*, 580 F. Supp. 2d at 226 (forward-looking statements "are not protected where defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality.").

### C.    The Complaint Adequately Pleads Scienter

#### 1.    The Pleading Standard for Scienter

In a securities fraud action, a plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud. *Aldridge*, 284 F.3d at 84. To allege scienter, the PSLRA directs that a complaint must, with respect to each act or omission alleged, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *In re Stone & Webster*, 414 F.3d at 195. The First Circuit has interpreted this provision to require a recitation of facts supporting a "highly likely" inference that the defendant acted with the required state of mind. *Aldridge*, 284 F.3d at 82.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court articulated the standards for pleading a "strong inference" of scienter under the PSLRA:  "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324; *see also id.* at 326 ("In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"); *id.* ("A plaintiff alleging fraud in a §10(b) action, we hold today, must plead facts rendering an inference of scienter ***at least as likely*** as any plausible opposing inference.").  In each of these formulations, the Supreme Court effectively held that "ties" go to the plaintiff.  *See*, *e.g.*, *Advest*, 512 F.3d at 59 ("[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff.").

Explicitly rejecting a higher standard advocated by the *Tellabs* defendants, the Supreme Court further concluded that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324; *see also In re Cabletron*, 311 F.3d at 38 ("The inference . . . must be reasonable and strong, but need not be irrefutable.").  To be sure, instead of a "most plausible of competing inferences" standard, *Tellabs* now instructs courts reviewing securities fraud complaints "not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 324, 326; *see also Brumbaugh*, 416 F. Supp. 2d at 252 ("In making the scienter determination, a court must evaluate 'the totality of the circumstances.'").

### 2.    Plaintiff's Scienter Allegations Are Cogent and Compelling

In the First Circuit, "a plaintiff can demonstrate scienter by showing that defendants either consciously intended to defraud, or that they acted with a high degree of recklessness." *Miss. Pub. Emples. Ret. Sys.*, 523 F.3d at 85.  "Accordingly, while scienter can be established through direct

evidence of 'conscious wrongdoing,' a plaintiff may also combine various facts and circumstances indicating fraudulent intent — including those demonstrating motive and opportunity — to satisfy the scienter requirement." *Stumpf v. Garvey*, 2005 U.S. Dist. LEXIS 19154, at *35 (D.N.H. Sept. 2, 2005).  At a minimum, recklessness requires a plaintiff to allege, "with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d 1, 9 n. 4 (1st Cir. 1998); *see also In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) ("A securities fraud claim predicated upon recklessness or conscious misbehavior must allege the defendants' knowledge of facts contradicting their public statements, their failure to review information that they were obligated to monitor, or their ignorance of clear and obvious signs of fraud.").

As an opening salvo, Defendants assert that the Complaint "lacks any facts, let alone particularized facts as required under the PSLRA, giving rise to a strong inference of scienter on the part of any defendant."  Def. Mem. at 38.  Such hyperbole ignores the allegations in the Complaint and should be disregarded.

### a.   Defendants' Public Statements Reveal Their Knowledge of Cessna's Backlog and TFC's Underwriting Practices

Because it is rare that a plaintiff can obtain direct evidence of a defendant's state of mind, particularly in the absence of any discovery, "[a] plaintiff may prove scienter through indirect and circumstantial evidence." *Gerber v. Bowditch*, 2006 U.S. Dist. LEXIS 27552, at *34 (D. Mass. May 8, 2006).  In this case, a strong inference of scienter may be inferred from repeated Class Period admissions by Campbell and French that they, personally, were intimately involved in both Cessna's backlog and TFC's underwriting and credit exposure:

- French on the Cessna backlog: "[w]e've taken this backlog and torn it apart, and we've modeled a scenario where order in-take rates fall - and remember we've looked at every downturn in general aviation since the second world war, and this downturn post-9/11 is bar far the worst of all of those." (¶171);

- Campbell on the Cessna backlog: "[w]hen someone places an order, not only do they have to put down a nonrefundable deposit but also we require an understanding of where they are going to get their financing, and knowing that, then, that database is really valuable as we can then look across the entire spectrum of customers and then have some understanding which customers might have the most difficulty. We also know their net worth, et cetera, so we have a pretty good understanding about this." (¶229);

- Campbell: "I spend a lot of time at Cessna . . . ." (¶127);

- French on credit exposure at TFC: "[w]e're going out to the field to every account in the whole financial company services group during the second quarter. . . . [w]e probably had two full day credit committee meetings that have only looked at these accounts, so we think we have our hands around it." (¶181); and

- French on TFC's portfolio: "[w]e spent the latter part of this quarter, as we started to see some things coming up, doing some very deep dives into some of our businesses, and really all our businesses, and doing it with some independent reviews where we send people from different businesses in to look at other people's businesses as opposed to their own to try to get an unbiased, unvarnished view of what can happen." (¶200).

Thus, these unequivocal admissions, coupled with particularized allegations that statements concerning Cessna's backlog and TFC's financial problems were materially misleading, undercut any claim that Campbell or French were unaware of the true facts impacting Textron's business. *Aldridge*, 284 F.3d at 83 ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (a plaintiff can adequately allege scienter by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate").

### b.   Defendants Are Presumed to Know Facts Impacting the Critical Aspects of Textron's Business

Notwithstanding Defendants' admissions, a strong inference of scienter can also be inferred here because the alleged misrepresentations relate to crucial activities impacting Textron's business during the Class Period – TFC's decision to loosen underwriting and lending practices in order to

artificially boost its Cessna backlog.  *See, e.g.*, *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (officers of a company can be assumed to know of facts "critical to a business's core operations or to an important transaction that would affect a company's performance").  That is, courts have repeatedly drawn the inference that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers."  *In re PeopleSoft, Inc., Sec. Litig.*, 2000 U.S. Dist. LEXIS 10953, at *10 (N.D. Cal. May 26, 2000); *see also Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at*72-73 ("It is also alleged that Defendants' misstatements concerned a 'core' operation - EGAM's mortgage-based investments which E*TRADE depended upon for much of its financial results establish scienter."); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) ("As to the allegation that the Ionics Defendants knowingly or recklessly failed to reveal this fraudulent scheme in disclosures to the investing public, it can be inferred that top executives at Ionics were aware of a scheme involving systemically fraudulent sales practices, given the importance of the Aqua Cool sale to Ionics' business that year.").

On remand from the Supreme Court, the Seventh Circuit in *Tellabs* recognized it is "exceedingly unlikely" that top executives did not know facts about the corporation's "most important products," particularly where they communicated with the market about those products:

> The 5500 and the 6500 were Tellabs's most important products. The 5500 was described by the company as its 'flagship' product and the 6500 was the 5500's heralded successor. They were to Tellabs as Windows XP and Vista are to Microsoft. That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity.
>
>       *           *           *
>
> And at the top of the corporate pyramid sat Notebaert, the CEO. The 5500 and the 6500 were his company's key products. Almost all the false statements that we quoted emanated directly from him. Is it conceivable that he was unaware of the

problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709, 711 (7th Cir. 2008) ("*Tellabs II*").

Here, Defendants cannot legitimately dispute that the relationship between TFC's financing activities and Cessna's aircraft backlog was of vital importance to the Company's overall operations during the Class Period. According to the Company, Cessna accounted for approximately 40% of the Company's 2008 revenues, and 74% of the Company's loan portfolio was secured by Cessna and Bell aircraft. ¶¶64, 212. In addition, TFC's finance receivables represented more than 40% of the Company's total assets during the Class Period. ¶270.

Moreover, throughout the Class Period, Campbell, French and the other individual defendants repeatedly emphasized to the market the importance of Cessna's backlog and TFC's underwriting practices to Textron's bottom line. For example, on a January 24, 2008 SEC filing, the Company stated, "[w]hile we expect softening and maybe even a temporary downturn in the U.S. economy, *we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial.*" ¶165. On a conference call later that day, Campbell stated, "*I think what is really misunderstood is the depth and strength of our backlog.*" ¶171. On an April 17, 2008 conference call, French stated, "*[o]rders is not really going to be the driver. It is backlog.*" On a July 17, 2008 conference call, Campbell stated, "*we come to our third factor, and it's one we cannot overemphasize. And that is the size and resiliency of our current backlog. At 3.5 times our '08 production, this provides tremendous balance.*" ¶197.

Indeed, these defendants consistently represented to the market that the Company's aircraft backlog and prudent loan underwriting gave them good visibility for the Company's overall future business prospects notwithstanding any potential downturn in the economy. On the January 24,

35

2008 conference call, Campbell stated, "*we have good revenue visibility based on our solid growing backlogs…*" ¶167.   On an April 17, 2008 conference call, Campbell stated, "*we're reasonably confident in our outlook reflecting the high quality of asset classes in our portfolio and the rigor of our traditional strong conservative underwriting process.*" ¶179.   On a July 17, 2008 conference call, Campbell stated, "*[the Cessna] backlog gives us complete confidence to raise production next year.*"   ¶196.   Later on that same call, Campbell stated, "*I've never felt better about our backlog and that bodes well for our future, as well.*"   ¶199.   On an August 6, 2008 conference call, Carter stated, "*[w]e went into this downturn with excellent portfolio quality, which positioned is better able to deal with the problem in front of us.*"   ¶213.

As such, given the importance of Cessna and TFC to Textron's business (including the potential enormous exposure that Textron had to TFC pursuant to the Support Agreement), the strong inference is that Textron's top executives knew about truthful adverse facts existing during the Class Period relating to Cessna's backlog, TFC's portfolio, and the Company's precarious financial position, as well as the fact that such issues were negatively impacting the Company's financial performance.   *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y., 2007) ("It is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the transactions' consequences on the Company's deferred tax assets.").

### c.   Defendants Are Presumed to Know the Basis of Information They Relay to the Market

The Complaint further establishes the scienter of Textron's executives based on how they, in their high-ranking positions at the Company, interacted with the investing public.  The district court in *In re Countrywide*, 588 F. Supp. 2d at 1191, recently set forth the following principles governing a position-based inference of scienter:

36

(1) a defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis; (2) all particularized allegations about a defendant's activities and statements should be considered before making a position-based inference, just as in any *Tellabs* analysis; and (3) position alone creates a strong inference of scienter only in the extraordinary case where it is 'absurd to suggest' that a defendant did not know.

In fact, as discussed below, this is precisely one of those cases where it is "absurd to suggest" that the Individual Defendants, "by virtue of their positions, would not have knowledge of developments in core operations or important transactions." *Id.*

As discussed above, Campbell and French repeatedly assured the market that they were personally involved in in-depth analyses of both Cessna's backlog and TFC's underwriting and credit exposure. *See, e.g.,* ¶¶127, 171, 181, 200, 229. These and other similar statements demonstrate that, at a minimum, these defendants should have been aware of the adverse impact of loosened credit standards on the Company's Cessna backlog. *Berson,* 527 F.3d at 987-88 ("[P]laintiffs alleged particular facts (the stop-work orders) that support the inference that the backlog statements were misleading when made. These facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them."); *Moody's,* 599 F. Supp. 2d at 515 ("Plaintiff's allegations are sufficient to show that McDaniel had 'information suggesting that their public statements were not accurate.' These allegations are sufficient to allege that McDaniel had the requisite scienter.").

Moreover, the Complaint demonstrates that Campbell, French and others were the Company's designated representatives for communicating with the market about Textron and TFC's operations. In numerous conference calls and other presentations, they spoke thoroughly and intelligently with market analysts, often responding to complex questions about Cessna's backlog, TFC's capital position, and related financial results. *See, e.g.,* ¶¶197, 200, 211-13. Given their role as Company spokespersons who made the misrepresentations here, it is "exceedingly unlikely" that

these Defendants were "unaware of the problems" affecting the Company and were "merely repeating lies fed to [them] by other executives of the company." *Tellabs II*, 513 F.3d at 711; *In re Wash. Mut., Inc. Sec.*, 2009 U.S. Dist. LEXIS 99727, at *22 (W.D. Wash. Oct. 27, 2009) ("Killinger's own statements about risk management show his detailed knowledge about the processes. These allegations show his actual knowledge of the risk management problems of which Plaintiffs complain.").

### d. Defendants' Truthful Revelations Were Made in Close Proximity to Their Misrepresentations

According to the First Circuit, among the tell-tale evidence of a defendant's scienter is the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224-25 (1st Cir. 1996) ("On the facts as alleged in this case, we think that the proximity of the date of the allegedly misleading statements and omissions to the end of the ongoing quarter (and the date of eventual disclosure) provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge."). Here, there can be little dispute that, after months of bold statements extolling Cessna's backlog and TFC's lending standards, Defendants shocked the market with adverse news about these aspects of Textron's business.

Indeed, as late as July 17, 2008, Campbell stated that Cessna's "story remains extremely strong," despite the "current economic environment." ¶196. In fact, based on the "size and resiliency" of Cessna's backlog, with demand so great that "there's significant interest among customers to move up in their position," Campbell indicated that the Company planned to increase production for 2009. ¶¶196-97. Yet, just a few months later, on October 16, 2008, Textron reported that Cessna's backlog was "down about $400 million sequentially from the prior quarter" due to an

increasing number of customer financing issues and requested delivery deferrals. ¶225. And just a few weeks after that, on November 4, 2008, Textron announced that it was scaling back its production schedules for Cessna jets based on those customer financing issues. ¶240. By the end of the Class Period, in a move that left analysts "scratching their heads," Textron revealed "drastically reduced" production plans at Cessna based on increased cancellations and "an unprecedented number of deferrals." ¶¶254, 261.

Likewise, on April 17, 2008, Campbell expressed that he was "reasonably confident" in TFC's outlook due to "the high quality of asset classes in our portfolio and the rigor of our traditional strong conservative underwriting process," which made TFC's risk "manageable." ¶179. By June 13, 2008, however, Textron reported that TFC's profits had decreased by "$55 million due to an increased provision for losses." ¶195. On August 6, 2008, as losses mounted and reserves were increased, Defendants tried to assure the market that TFC's credit risks were under control and the declining economy actually presented "opportunities" for a "strong finance company" like TFC. ¶¶210-214. Just over two months after that announcement, Textron announced that it would downsize TFC's operations and liquidate approximately $2 billion of TFC's assets. ¶¶221-22. By the end of the Class Period, TFC's stunning fall was complete, as the Company disclosed that TFC's operations would be shut down. ¶¶251, 254.

### e. The Departures of French and Carter Are Indicative of Wrongdoing

Following on the heels of startling revelations that it was abandoning virtually all of TFC's commercial lending activities and dramatically reducing its Cessna production levels, Textron announced the resignation of French and the retirement of Carter. ¶262. The market, however, was circumspect of the reasons for, and timing of, these departures, noting that "someone has to take the blame for Textron's troubles – and it looks like [French] and [Carter] are stuck with the bull's eye."

¶262.[10]   Under such circumstances, courts are willing to infer scienter from conveniently timed

executive departures because "[s]uch house-cleaning and reforms do not follow innocent mistakes.

Rather, they customarily, even if not invariably, follow systemic and fraudulent abused of internal

financial controls."  *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17,

2005); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("For example, the fact

that a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances,

provide grounds for inferring that the business was performing poorly on 'Day One.'").

### f.    Defendants Were Sufficiently Motivated to Issue Material Misrepresentations

The First Circuit has also recognized that, "[a]s part of the mix of facts [combined to show

scienter], the plaintiff may allege that the defendants had the motive ('concrete benefits that could be

realized by the false statements and wrongful nondisclosures') and opportunity ('the means and

likely prospect of achieving concrete benefits by the means alleged') to commit the fraud."

*Aldridge*, 284 F.3d at 82.   "[W]hile mere allegations of motive and opportunity alone may be

insufficient, together with additional factual support, evidence of motive and opportunity may

establish a strong inference of scienter." *Id*.  In the Complaint, Plaintiff alleges two distinct motives

for Defendants' wrongdoing.

First, Defendants were motivated to conceal the serious and worsening erosion of TFC's

business to avoid the payment of substantial capital contributions to TFC pursuant to the Support

Agreement.  As described above, Textron was a party to several agreements with TFC, including the

Support Agreement that required Textron to provide extensive financial support to TFC to ensure

---

[10]     Additionally, on January 21, 2009, the Company announced that Campbell would step down
at Textron's President, but would continue as CEO and Chairman of the Board.  ¶253.

that TFC could continuously meet its obligations. ¶¶9, 67. As the value of TFC's immense portfolio of finance receivables declined considerably during the Class Period, due to the impact of TFC's risky decision to loosen its underwriting and lending practices, Defendants knew that Textron would be forced to pay TFC hundreds of millions of dollars in capital contributions, and sought to hide this news from the market for as long as possible. However, when Defendants could no longer conceal that TFC was in shambles, Textron revealed a comprehensive plan to exit virtually all of TFC's financing activities, which included an expected payment to TFC of approximately $600 million. Defendants' undeniable motivation to conceal this devastating news from investors supports a strong inference of scienter in this case. *See Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 247 (D.R.I. 2002) ("[P]laintiffs have alleged a strong inference that defendants were motivated to conceal their identification and correction of the software problem both to preserve their $ 40 million contract with the Lottery Commission, which would have been placed in jeopardy as a result of their past misconduct, and to avoid paying an $ 84.9 million refund to Camelot if Camelot lost its operating license for reasons attributable to GTECH.").

Second, on a more personal level, Plaintiff's scienter allegations are bolstered by claims that Defendants and other key Company insiders engaged in unusual and suspicious insider trading. *See In re Cabletron*, 311 F.3d at 39-40 ("Stock sales by insiders can supply evidence of scienter."). The Complaint explains that, during the Class Period, Company insiders profited by selling 911,122 personally-held shares of Textron stock on the open market, generating proceeds of ***$56,414,131***, with many shares priced at or near the Class Period high of $73.38 per share. ¶¶297-98. In addition to the foregoing open market sales, Company insiders directly profited from the fraudulent scheme by cashing in on phantom stock units and through payments of option exercises via share delivery to the tune of an additional ***$10,671,343.*** ¶¶299-303. All told, Defendants and others netted

*$67,085,474* during the Class Period from their insider trading activities, with Campbell and French pocketing *$53,025,740* of that total.  ¶304.

Contrary to Defendants' complaints, Plaintiff alleges that these stock sales were unusual in amount and suspiciously timed in that almost all of the trades were executed when Textron's stock price was trading at artificially inflated levels and before any partial disclosures of the Textron's true financial condition reached the market.  Moreover, the inference of scienter attributable to French from his stock sales is not negated by his participation in a 10b5-1 trading plan, particularly where this affirmative defense raises facts questions regarding his "good faith" that cannot be resolved at the motion to dismiss stage.  *See In re Able Labs. Sec. Litig.*, 2008 WL 1967509 at *27 n. 40 (D.N.J. March 24, 2008).  Accordingly, coupled with other cogent and compelling allegations of scienter, Plaintiff's insider trading allegations add to the inference of scienter.  *See In re Cabletron*, 311 F.3d at 40 (the insider trading "suggest further motive for securities fraud, and they combine with other aspects of the complaint to produce a strong inference of scienter overall.").

### g.  GAAP Violations Support a Strong Inference of Scienter

While simple misapplication of accounting rules alone does not create a strong inference of scienter, "[s]ignificant GAAP violations also could provide evidence of scienter."  *In re Cabletron*, 311 F.3d at 39.  In this regard, "'[a]ccounting shenanigans' are among the characteristic types of circumstances which may demonstrate scienter for securities fraud."  *Id.*; *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234 (D. Mass. 1999) ("Rather, the Court must determine whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter."); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (strong inference of scienter may be drawn from alleged accounting improprieties because "[a]fter all, books do not cook themselves.").

42

Here, Plaintiff alleges that, despite knowing that TFC's lenient underwriting and lending practices had substantially increased Textron's credit risk, Defendants failed to adequately reserve for expected losses that were incurred as the economy declined.  ¶¶265-92.  By the end of the Class Period, though, when Defendants could no longer conceal the problems adversely impacting their business, Textron was forced to increase its loan loss provisions by $133 million "to reflect general weakening in market conditions, declining collateral values and the lack of liquidity available to borrowers and their customers."   ¶254.   Moreover, the Complaint alleges that Defendants reclassified nearly $1.7 billion of finance receivables as being "held for sale" so that they could avoid an even bigger increase.  ¶289.  Given the magnitude of the understatement of loss reserves and the relative straightforwardness of the accounting rules at issue, Plaintiff's detailed allegations that Defendants' violated GAAP further adds to the strong inference of scienter in this action.  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) ("when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").

### h. Plaintiff's Confidential Witness Accounts Support a Strong Inference of Scienter

Defendants do not dispute that particularized allegations of former employees "add to the inference of scienter" required under the PSLRA.  *See, e.g., In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 87 (D. Mass. 2002).  Yet, Defendants go to great lengths to denigrate Plaintiffs' use of confidential witnesses.  Def. Mem. at 32-35.  In so doing, they raise fact-based arguments going to the credibility of Plaintiffs' confidential witnesses, not whether they are properly identified.  *See, e.g., Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 21 (D. Mass. 2000) (questions concerning the credibility of unnamed sources "are questions that go to the weight of the[]

evidence").  While these witnesses may not have directly interacted with Textron's executives on every issue, it does not follow that their accounts must be discounted.  *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 52 (1st Cir. 2008) ("And we see no reason to exclude consideration of [confidential source allegations] from the evaluation of whether plaintiffs' strong inferences of scienter are at least as plausible as defendants' inferences."); *Sekuk Global*, 2005 U.S. Dist. LEXIS 16628, at *21 ("The consistency of these accounts reinforces the potential veracity of their allegations.").

For example, CW 19, identified in the Complaint as a former Senior Vice President of TFC, described Carter's involvement in "real estate rehab loans" and, most notably, TFC's $60 million loan to Assured.  ¶99.  This witness explained that Carter was aware of the details of the Assured loan, the insufficient $19 million write-off arising from Assured's default, the decision to fire the individual responsible for the loan, and subsequent decision to refrain from doing any new deals and from communicating directly with clients.  ¶¶88-99.

Similarly, CW 21, identified in the Complaint as a former Senior Vice President of Field Services for TFC's Distribution Finance group, detailed aging inventory problems experienced by TFC's Marine Division.  ¶119.  This witness stated that Carter was knowledgeable of these aging inventory problems through his participation on regular conference calls and monthly meetings where those issues were discussed and analyzed.  ¶¶107-08.  The witness further explained that Carter regularly briefed French on TFC's economic condition.  ¶119.

Thus, these witnesses describe, based on personal knowledge, operations at Textron that were completely at odds with Defendants' public statements.  As such, these witness accounts, which are corroborated by each other and by other sources described in the Complaint, meaningfully contribute to the scienter calculus.  *In re Cabletron*, 311 F.3d at 30 ("Overall, the accumulated amount of detail

the sources provide tends to be self-verifying; these are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge of them. In addition, the number of different sources helps the complaint meet the standard. Their consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees, possibly disgruntled.").

### i.   The Complaint Sufficiently Pleads Scienter as to Textron and TFC

Several courts have recently indicated that a plaintiff may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *Tellabs II*, 513 F.3d at 710 ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.").  This would arise in situations where, as here, a company's internal practices are far out of line with the company's public statements.  *Tellabs II*, 513 F.3d at 710 (court found that "a strong inference of corporate scienter" would be pled where "so dramatic an announcement" about the company's affairs "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."); *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008). ("The allegations are sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different--the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching.").

Here, the Complaint details a staggering disconnect between Defendants' Class Period public statements and Textron's and TFC's internal operations.  In addition to particularized confidential

witness statements, Defendants' own end of Class Period revelations reveal the significant difference between what Defendants were telling the market and what was actually occurring at Textron and TFC.  Accordingly, these collective facts are more than sufficient to establish scienter on the part of Textron and TFC, even if the Court finds scienter lacking as to any of the Company's top executives. *In re Moody's*, 599 F. Supp. 2d at 516 ("Plaintiffs allege other statements indicating that Moody's was cognizant that its public representations did not conform to reality. . . .  They have alleged specific statements indicating that various top officials knew that Moody's independence, ratings, and methodology had been comprised.  Consequently, the allegations of the AC sufficiently plead Moody's scienter."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005). ("[N]othing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter . . . . Plaintiffs have alleged the existence of specific JPM Chase communications that indicate that JPM Chase officers, including the Vice Chairman, a Vice President and a Managing Director, had knowledge that the Mahonia transactions were not bona fide trades.  That knowledge may properly be attributed to the corporate defendant.").

*    *    *

Under *Tellabs*, the Court must view Plaintiff's allegations cumulatively and holistically to determine whether they sufficiently allege a strong inference of scienter. 551 U.S. at 325-26.  That said, even if, as Defendants claim, Plaintiff's scienter allegations may be individually inadequate, the Court should conclude that, when considered collectively, they are more than sufficient to survive dismissal at this stage of the proceedings.  *Sekuk Global*, 2005 U.S. Dist. LEXIS 16628, at *47 ("Accordingly, when considered in the light most favorable to Plaintiffs, the complaint, with its allegations of motive and large-scale fraudulent practices, creates a strong inference of scienter.").

This is especially true in this case where Defendants do not even attempt to offer a plausible opposing inference that would contradict the strong inference of scienter raised by Plaintiff.

### D.     The Complaint Adequately Pleads Loss Causation

A plaintiff bringing a §10(b) claim must allege loss causation, which is a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) ("*Dura*"). At the motion to dismiss stage, this requires a plaintiff to do nothing more than "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 347. Importantly, the Supreme Court rejected any heightened pleading standard for loss causation, affirming that the "ordinary pleading rules" of Rule 8(a)(2) provide a "simple test" that should not "impose a great burden upon a plaintiff." *Id*. at 346-47.

In challenging the Complaint's loss causation allegations, Defendants contend that Plaintiff failed to address the impact of intervening factors on Textron's stock price decline, which, in their view, was caused solely by the "cataclysmic economic environment" and not any fraud committed by Defendants. Def. Mem. at 53-57. This argument are meritless, and inappropriate for resolution at this stage of the proceedings. As set forth below, the Complaint sufficiently pleads loss causation through a series of partial disclosures providing Defendants with "fair notice" of Plaintiff's theory of loss through a "short and plain statement of the claim showing that the pleader is entitled to relief." *Dura*, 544 U.S. at 337; *Sekuk Global*, 2005 U.S. Dist. LEXIS 16628, at *51 ("As they have alleged that the price of KVH stock dropped after the truth regarding Defendants' misrepresentations became known, this Court finds that they have met their burden of pleading loss causation.").

### 1.     Plaintiff Need Not Disprove Opposing Theories for Why Textron's Stock Price Declined

Defendants' contention – that Plaintiff must "attempt to quantify the proportion of Textron's stock drop attributable to fraud, rather than other factors, such as the cataclysmic economic

environment during the period in which Textron's stock price fell" – is based on a complete

misreading of *Dura*.  Def. Mem. at 53-54 (citing language from *Dura* regarding "changed economic

circumstances" and "changed investor expectations").  In short, Defendants confuse what Plaintiff

must **plead** with what Plaintiff must **prove** on the issue of loss causation.  *See*, *e.g.*, *Ong v. Sears*,

*Roebuck & Co.*, 2006 U.S. Dist. LEXIS 73801, at *56 (N.D. Ill. Sept. 27, 2006) ("The court declines

to read into this language [in *Dura*] a holding that a plaintiff can only allege causation by ruling out

all other factors that may have contributed to a security's lower resale price. . . . The Court's

discussion of the potential for other factors contributing to a declining share price provides a

rationale for requiring a plaintiff to tie that decline to a defendant's wrongful conduct").

Indeed, *Dura* does not require Plaintiff, at the motion to dismiss stage, to differentiate which

portion of investors losses were the result of intervening factors as opposed to Defendants'

fraudulent misrepresentations.  *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 55 (D. Mass.

2006) ("[I]solating the myriad causal factors [that] affect stock price is a factual question that should

be decided at trial, with the help of qualified experts.  It is not an issue appropriate for a motion to

dismiss."); *Stumpf*, 2005 U.S. Dist. LEXIS 19154, at *46 ("Even if, as defendants maintain, there

had been an intervening event that interrupted the chain of causation, such a determination is a

matter of proof after discovery, either at summary judgment or at trial, and is not to be decided here

on a Rule 12(b)(6) motion to dismiss.").  In fact, to plead loss causation, Plaintiff need only allege

that Defendants' misrepresentations were a "substantial cause of the investment's decline in value,"

not the sole cause.  *In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005).

Further, this Court need not blindly accept Defendants' efforts to blame Textron's problems

on "the most significant economic crisis since the Great Depression" (Def. Mem. at 54):

> It is not the Court's role to speculate on the causes of the current economic situation.
> However, it is the Court's task to manage this litigation efficiently and avoid

wasteful arguments.  For the past year, almost all Defendants have recited -- at hearings and in their papers -- that an 'unprecedented' external 'liquidity crisis' caused all (or most) of Countrywide's decline. . . .

It is true, the dramatic market shifts will raise complicated questions on damages.  It will be the fact-finder's job to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or insufficiently linked forces.

The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments.  The CAC's allegations invite the cogent and compelling inference that Countrywide's deteriorating lending standards were causally linked to at least some of the macroeconomic shifts of the past year.  The CAC alleges that reasonable people may differ about how much of situation is attributable to Countrywide and its industry.  For example, it quotes Treasury Secretary Paulson as having said, '[T]his turbulence wasn't precipitated by problems in the real economy.  This came about as a result of some bad lending practices.'

The issue at present is whether the alleged securities violations caused a loss.  Not how much of the loss the alleged violations proximately caused.

*In re Countrywide*, 588 F. Supp. 2d at 1173-74; *In re StockerYale*, 453 F. Supp. 2d at 359 ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price . . . will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal"); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *15 (N.D. Ill. Sept. 23, 2008) ("There is no requirement at the pleading stage that a plaintiff 'affirmatively rule out those other factors in its complaint; rather that burden arises at trial'"); *In re IMAX*, 587 F. Supp. 2d at 486 ("[D]efendants will be entitled to interpose their defense of intervening facts . . . at trial").

Nonetheless, Defendants cite several recent cases – emanating from *Dura* and the Second Circuit's decision in *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 162 (2d Cir. 1995) – for the proposition that the mere existence of a global economic downturn absolves them of any liability for securities fraud.  Def. Mem. at 54-55.  But that is not the law.  Rather, as recently discussed in *King County v. IKB Deutsche Industriebank AG*, 2010 U.S. Dist. LEXIS 43203, at *21 (S.D.N.Y. Apr. 26,

2010), "[n]either *Dura* nor *Lentell* . . . imposes on plaintiff the heavy burden of pleading 'facts

sufficient to *exclude* other non-fraud explanations.'" (emphasis in original). Rejecting the overly

broad reading of *Lentell* espoused by the defendants, the district court concluded:

> To hold that plaintiffs failed to plead loss causation solely because the credit crisis
> occurred contemporaneously with Rhinebridge's collapse would place too much
> weight on one single factor and would permit S&P and Moody's to blame the asset-
> backed securities industry when their alleged conduct plausibly caused at least some
> proportion of plaintiffs' losses.

*Id.* at *25. In fact, a closer examination of Defendants' authorities suggests that they do not provide

blanket immunity for securities fraud based on external economic factors, but rather the dismissals

were based on a failure to plead the requisite causal connection between the alleged

misrepresentations and the loss as required by *Dura*.[11]

---

[11]    *See In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164-65 (D. Mass. 2009)
(court found that, because "First Marblehead provided adequate disclosures," which "negate[d] any
theory that there was a concealed fraud or risk to be disclosed to the market," the stock price drop
was explained by "a significant downturn in the credit markets" and "First Marblehead's preexisting
pattern of stock declines."); *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp.
2d 576, 593-94 (E.D. Pa. 2009) (court held that "[w]e are satisfied that the one-and-a-half year time
period between the alleged misrepresentation and the injury, combined with the market downturn in
the mortgage industry . . . is sufficient to undermine the inference of a nexus between Defendants'
misrepresentations and the performance of the Junior Certificates."); *In re Merrill Lynch & Co.
Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 364 (S.D.N.Y. 2003); ("plaintiffs have not
alleged that there was any link between the allegedly overly optimistic ratings and the financial
troubles of 24/7 or Interliant that led to their financial demise in the wake of the bursting bubble, nor
any facts demonstrating that they were the cause."); *60223 Trust v. Goldman Sachs & Co.*, 540 F,
Supp. 2d 449, 461 (S.D.N.Y. 2007) (court found no loss causation where "the gradual loss of value
[of the stock price] occurred during the time when the alleged false and misleading comments of an
optimistic nature were being issued."); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y.
2006) (court held that the complaint's "assertion" of a "causal link between the alleged
misrepresentation and the liquidity crisis" is "too general and conclusory to support an inference that
defendants' fraud proximately caused the decline in stock prices."); *Chien v. Skystar Bio Pharm.
Co.*, 256 F.R.D. 67, 73 (D. Conn. 2009) (in case where plaintiff was sanctioned for filing frivolous
complaints, court noted that plaintiff "could not explain to the Court how Defendants' fraud could
possibly have caused Mr. Chien's loss if the stock prices actually rose after the fraud was allegedly
exposed").

In any event, Defendants' fact-based arguments would be somewhat believable (although still premature) but for the fact that they are plainly incorrect. For example, contrary to their present position that Textron's price decline was the result of "the general economic downturn," Defendants repeatedly insisted, during the Class Period, that Textron's business was "unaffected" by the economic turmoil and "well-positioned" to succeed in that environment. *See, e.g.*, ¶154 (French: "recent financial market turmoil . . . had a very minimal impact on [Textron's] ability to access capital markets at either TFC or the corporate level."); ¶167 (Campbell: "a significant amount of our enterprise is relatively unaffected by the economy, and that we are well-positioned for this environment."). These (and other) false statements included in the Complaint completely undercut Defendants' ability to pass the blame for its misconduct on external economic circumstances.

And Defendants' effort to compare Textron's stock price movements to certain stock indices is even more baffling. Def. Mem. at 2, 56. Far from a "mirror" image, Defendants' artfully crafted chart clearly demonstrates that Textron's stock price behaved quite differently from comparable company stocks.[12] In any event, this type of comparison, ordinarily supported by expert testimony, is inappropriate for resolution at the motion to dismiss stage. *See, e.g.*, *In re Moody's*, 599 F. Supp. 2d at 513-14 (comparing stock prices, "the Court cannot conclude that there was an industry-wide downturn, and the question of loss causation due to an intervening event is reserved for trial.").

---

[12]     According to the chart, a $100 investment in Textron in 2004 was worth $55.71 by the end of the Class Period, *a 44.29% loss*. Def. Mem. at 56. By contrast, during the same time period, a $100 investment in the S&P 500 was worth $102.11 (*a 2.11% gain*), and a $100 investment in the S&P 500 A&D index was worth $136.94 (*a 36.94% gain*). *Id.* Looking just at the Class Period years, **and again using Defendants' own data**, a $203.35 investment in Textron in 2007 was worth $55.71 in 2009 (*a 72.6% loss*). *Id.* By contrast, a $128.16 investment in the S&P 500 during that same time period was worth $102.11 in 2009 (*a 20.32% loss*), and a $173.12 investment in the S&P 500 A&D index during that same time period was worth $136.94 (*a 20.89% loss*). *Id.*

### 2.    Plaintiff Provided "Fair Notice" of Its Theory of Loss Causation

Labeling the Complaint's allegations as "indiscriminate" and "conclusory," Defendants further assert that Plaintiff has failed "to plead facts suggesting that all or an ascertainable portion of the fall in Textron's stock price was caused by the alleged concealment of information about Textron." Def. Mem. at 54, 57. This, quite frankly, ignores the allegations in the Complaint.

In this regard, in compliance with *Dura*, the Complaint alleges a series of partial disclosures,[13] spanning from June 2008 through January 2009, which indicated how the truth about the Company's overstated Cessna backlog and TFC's concealed risk exposure became generally known to investors and corrected market expectations regarding Textron's stock price. ¶¶307-18; *see In re Winstar Commc'ns*, 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006) ("The Supreme Court spoke in terms of the 'relevant truth' and the 'truth' making its way into the market place."). These disclosures include:

- June 13, 2008, July 17, 2008 and August 6, 2008 disclosures discussing significant financial difficulties impacting TFC, including reduced guidance, reduced profits and increased loan loss provisions, which caused "a lot of head scratching" and "credibility issues" for market analysts (¶¶190, 195, 206, 210);

- October 16, 2008 disclosures announcing (1) Textron's plans to substantially downsize TFC's operations by exiting certain lines of business, which would trigger a $200 million support contribution from Textron to TFC, and (2) Cessna's backlog was "down about $400 million sequentially from the prior quarter" due to an increasing number of customer financing issues and requested delivery deferrals (¶¶221-23);

---

[13]    A "partial disclosure" of the "truth" arises where some truthful information is revealed to the market, but defendants fail to reveal, ignore or otherwise deny the full extent of the problems. *See In re Tommy Hilfiger Sec. Litig.*, 2007 U.S. Dist. LEXIS 55088, at *8 (S.D.N.Y. July 20, 2007) (in concluding that plaintiff pled loss causation, court noted that "the truth here was revealed not in a neat and tidy single disclosure, but occurred through a series of disclosing events.").

- November 4, 2008 disclosures stating a reduction in Cessna production levels based on communications with customers concerning the "availability of customer financing" and the "degree of deferrals" expected for the upcoming year, which was characterized as a "negative surprise" by analysts (¶¶240-41);

- December 22, 2008 disclosures that TFC would exit "all of the commercial finance business," triggering a revised capital contribution to TFC of approximately $600 million (¶251); and

- a January 29, 2009 final disclosure of "dramatically reduced" Cessna production plans attributable to low order volume, cancellations and "an unprecedented number of deferrals." (¶254).

More than disclosing mere bad news, these partial disclosures revealed, chronologically over a period of eight months, a series of increasingly disturbing reports that are **directly related** to Plaintiff's allegations concerning the weakness of Cessna's backlog and TFC's risky underwriting and lending practices.  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) ("[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation.").  It does not matter that Defendants did not admit any fraud; the issue is whether the market viewed these public revelations as corrective events, which signaled that the Company's prior representations were not entirely true or accurate.  *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005) (to satisfy loss causation under *Dura*, plaintiff must "establish that his losses were attributable to **some form of revelation** to the market of the wrongfully concealed information").

In sum, Plaintiffs' loss causations allegations amply satisfy *Dura*'s "simple test."  The Complaint alleges adverse news leaked out into the market – tempered, in large part, by Defendants'

positive spin[14] – concerning the severe erosion of Textron's Cessna backlog and the shuttering of TFC's business. It describes how numerous market participants reacted to these progressively worsening disclosures, and it details the effect of these disclosures on the price of Textron's common stock. Nothing more is required at the pleading stage.

### E.  Plaintiffs State a Claim for Violations of §20(a)

Defendants finally contend Plaintiff's §20(a) claim should be dismissed because Plaintiffs fail to plead: (1) a primary violation under §10(b); and (2) their culpable participation in the fraud. Def. Mem. at 57-58. This is meritless. Without rehashing the arguments discussed above, Plaintiff has alleged primary violations under §10(b), including sufficient allegations that Textron's top executives acted with the requisite scienter and actually controlled Textron's operations. Accordingly, the Court should sustain Plaintiffs' control person liability claims under §20(a). *See*, *e.g.*, *Kafenbaum*, 217 F. Supp. 2d at 251.

More specifically, as to Carter, Butera and Cullen, Defendants ignore the fact that TFC is a defendant in this action, and made its own fraudulent public statements during the Class Period.[15]

---

[14]    More particularly, the Complaint alleges that, on several occasions, Defendants mitigated drops in the stock price with immediate, positive information about other aspects about the Company's operations. Consequently, Plaintiffs specifically plead that this type of positive "spin" impacted the price of Textron's Freddie's securities. *See Steiner v. MedQuist Inc.*, 2006 U.S. Dist. LEXIS 71952, at *67 (D.N.J. Sept. 29, 2006) (holding that where negative disclosures were offset by positive news masking the negative effect on the stock price, loss causation was not defeated); *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 966 (7th Cir. 1989) ("Yet a firm that lies about some assets cannot defeat liability by showing that other parts of its business did better than expected, counterbalancing the loss.").

[15]    Defendants' argument that Plaintiffs have not alleged facts that Wilburne was a control person within the meaning of Section 20(a) is also without merit. *See* Def. Mem. at 57. As Textron's Vice President of Investor Relations, Wilburne was the point person for all communications from the Company and controlled the flow of information from the Company to the market. Thus, any argument that Wilburne was not involved in controlling the day to day operations of the Company is disingenuous.

The Complaint establishes that Carter, Butera and Cullen all had a controlling hand in TFC. ¶29-30. Carter, Butera and Cullen were each senior executive officers of TFC and controlled and disseminated the information relating to TFC that was released to the market. ¶22-23, 25. As TFC stands accused of securities fraud, Carter Butera and Cullen – the executives who controlled TFC – can be found liability under Section 20(a). *See Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir. 1991) ("For [the defendant] to be liable ... there must be 'significantly probative' evidence that the [defendant] exercised, directly or indirectly, meaningful hegemony over the ... venture ....").

## IV.    CONCLUSION

As discussed herein, Plaintiffs have pled their claims pursuant to §§10(b) and 20(a) of the Exchange Act consistent with Rule 8, Rule 9(b) and the PSLRA.  Accordingly, Defendants' motion to dismiss should be denied in its entirety.

DATED:  May 24, 2010

*/s/ Barry J. Kusinitz*
BARRY J. KUSINITZ

BARRY J. KUSINITZ (# 1404)
155 South Main Street, Suite 405
Providence, RI  02903
Telephone:  401/831-4200
401/831-7053 (fax)
bkusinitz@bdglawyers.com

Liaison Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DAVID J. GEORGE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Lead Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 24, 2010, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of

Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as

service of this document by electronic means.

_/s/ Barry J. Kusinitz_
BARRY J. KUSINITZ