UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**City of Roseville Employees'**
**Retirement System**

     **v.**                      Case No. 09-cv-00367-PB

**Textron, Inc. et al.**


## MEMORANDUM AND ORDER

This is a securities fraud class action in which the plaintiffs claim that Textron, Inc. and several of its senior officers made a series of statements about the company's financial condition that were actionably misleading because they omitted important qualifying information. Because I determine that plaintiffs have failed to plead sufficient facts to support their contention that the statements at issue were misleading, I grant the defendants' motion to dismiss.


## I.   BACKGROUND[1]

Textron is a conglomerate that manufactures and sells helicopters, airplanes, light transportation vehicles, and lawn

---

[1] Plaintiffs rely on a variety of publicly available documents such as quarterly reports and press releases. Defendants have attached complete copies of many of those documents to their motion to dismiss, and plaintiffs have not challenged their authenticity. Thus, those documents effectively merge into the pleadings, and I may rely on them in this Memorandum and Order without converting the motion to dismiss into one for summary judgment. Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007).

care machinery. It is also a major parts supplier to the automotive industry and it has a large commercial finance business. The company operates through five segments: Bell Helicopter Textron, Inc. ("Bell"), Cessna Aircraft Company ("Cessna"), Textron Financial Corporation ("TFC"), Textron Systems Corporation, ("Systems"), and Textron Industrial ("Industrial"). Consolidated Class Action Compl. for Violation of Fed. Sec. Laws ("Consolidated Compl."), Doc. No. 43, ¶ 2.[2]

In addition to Textron and TFC, plaintiffs have named several individual defendants. Lewis B. Campbell was the Chief Executive Officer ("CEO") of Textron during the Class Period. ¶ 20. Ted. R. French was Textron's Executive Vice President and Chief Financial Officer ("CFO"), as well as TFC's President and CFO. ¶ 21. Buell J. Carter also served as TFC's President, as well as its Chief Operating Officer ("COO"). ¶ 22. Cullen was TFC's Executive Vice President and CFO. ¶ 23. Douglas Wilburne was Textron's Vice President of Investor Relations. ¶ 24. Angelo Butera was an executive of TFC and most recently TFC's Chief Credit Officer. ¶ 25.

Plaintiffs focus their complaint on a series of statements that the defendants made concerning TFC's loan portfolio and Cessna's backlog of ordered aircraft.

---

[2] All citations in the background discussion are to the Consolidated Complaint unless otherwise noted.

## A. TFC's Loan Portfolio

TFC is a wholly-owned subsidiary of Textron. ¶ 19. It is a "diversified commercial finance company" that operated in six segments during the period covered by this lawsuit: (a) Aviation Finance, which financed the purchase of new and used aircraft; (b) Asset-Based Lending, which provided revolving credit to businesses secured by their receivables, inventory, related equipment, and real estate; (c) Distribution Finance, which provided inventory finance programs for dealers of both Textron products and products manufactured by other companies; (d) Golf Finance, which financed golf course properties and golf and lawn care machinery purchases; (e) Resort Finance, which extended credit to developers of timeshare resorts; and (f) Structured Capital, which provided long-term leases for expensive equipment and real estate. ¶ 65.

Plaintiffs allege that at some point prior to the beginning of the class period on July 19, 2007, defendants altered their loan underwriting practices in several different ways that dramatically increased TFC's portfolio of high risk loans. Among other things, plaintiffs allege that TFC changed underwriting standards in its Cessna Finance subdivision by: extending credit to aircraft purchasers who had previously been denied credit (¶ 73); financing 100% of buyers' deposits (¶¶ 6, 74, 335); lengthening the amortization schedules on its aircraft

3

loans from 12 to 20 years (¶¶ 71, 76); and financing purchases
of aircraft manufactured by other companies (¶ 75).  It also
allegedly began to finance riskier loans in its Golf Finance and
Resort Finance segments (¶¶ 81-84) and began to make loans that
were secured by older inventories than it had previously used as
collateral (¶¶ 100-124).  Finally, it made between $300 million
and $400 million in loans to "real estate rehab" companies.  ¶
88.  On at least one occasion, it made a $50-$60 million loan to
a rehab company that depended on high-risk and possibly sub-
prime borrowers to purchase the properties in which the company
had invested.  ¶¶ 93-96.

Notwithstanding these changed lending practices, the
defendants made a variety of public statements that touted the
quality of TFC's loan portfolio both before and during the class
period.  For example, Campbell claimed in a January 24, 2008
conference call that TFC's underwriting process was
"conservative."  ¶ 179.  On November 5, 2008, Campbell stated
that "based on our rigorous underwriting standards and multiple
levels of asset assurance and recovery, we believe our credit
losses will be manageable."  ¶ 243.  In his own public
statements French repeatedly noted the strength of TFC's
portfolio, for example characterizing it as "very good" on
October 18, 2007, "absolutely excellent" on January 24, 2008,
and "very strong" on October 16, 2008.  ¶¶ 153, 168, 232.

Carter noted in a public statement on August 6, 2008 that TFC "went into this downturn with excellent portfolio quality, which positioned us better to be able to deal with the problem in front of us." ¶ 213.[3]

Textron's conference calls and public statements also incorporated references to qualifying statements that were made in SEC filings. For example, Textron advised investors that "[p]ortfolio quality may be adversely affected by several factors, including finance receivable underwriting procedures, collateral quality . . . or general economic downturns." Textron Annual Report (Form 10-K), Doc. No. 57-3, at 10 (Feb. 20, 2008). It also qualified its statements by noting that "[a]ny inability by our Finance group to successfully collect its finance receivable portfolio and to resolve problem accounts may adversely affect our cash flow, profitability and financial condition." Id. Thus investors were generally informed that TFC's portfolio quality was dependent on the overarching condition of the economy, as well as on TFC's underwriting procedures and its ability to collect on its receivables portfolio. The defendants did not, however, disclose any specific changes in TFC's underwriting practices.

---

[3] A chart of the statements concerning TFC's loan portfolio that plaintiffs claim were misleading is attached as Appendix A.

**B.**   **The Cessna Backlog**

Cessna, a manufacturer and distributor of civilian aircraft, is also a wholly-owned subsidiary of Textron and accounted for approximately 40% of Textron's 2008 revenues. ¶ 64.

All customers seeking to purchase an aircraft from Cessna during the Class Period were required to make non-refundable deposits, and Textron's stated policy was that orders were not included in its aircraft backlog until "non-refundable" deposits were made.  ¶ 148.  Plaintiffs allege, however, that in April of 2007, Cessna Finance began providing up to 100% financing for these deposits.  ¶¶ 6, 335.  According to one confidential witness, the sheer expense of a Cessna aircraft meant that if customers needed financing for the deposits, they could not afford the aircraft itself under any circumstances.  ¶ 49.

Additionally, plaintiffs allege that an increasingly significant portion of Textron's backlog during the Class Period was made up of international orders placed by Authorized Sales Representatives ("ASRs").  ¶ 129.  ASRs operated similarly to car dealerships in that they ordered aircraft without an identified end-user, essentially reserving aircraft for future delivery in the hope that they could eventually be sold to customers.  Id.  According to several confidential witnesses, the speculative nature of these orders, combined with deposit

financing and looser standards at Cessna Finance, meant that backlogged orders were highly susceptible to cancellation. ¶ 137. Customers were essentially buying "delivery positions" that could be sold to other customers with no intention of actually purchasing an aircraft, even though Textron publicly denied that delivery positions could be sold. Id.

Finally, when customers did want to cancel orders, Textron would often attempt to persuade them to instead push back delivery by several years, thereby keeping the order in its backlog. ¶ 133. Despite these alleged changes, confidential witnesses claim that cancelled and deferred orders began to increase in 2008, and finished but undelivered planes began to pile up. ¶¶ 140-42. None of the alleged changes in the policy described above were disclosed to the market. ¶ 148.

As with TFC, however, the defendants routinely incorporated qualifying statements into their public statements regarding the Cessna backlog. In particular, Textron repeatedly disclosed that "[a]ircraft customers. . . may respond to weak economic conditions by delaying delivery of orders or canceling orders." E.g., Textron, Annual Report (Form 10-K), at 8 (Feb. 20, 2008). Textron also warned its investors on multiple occasions that the backlog projections were subject to potential "changes in aircraft delivery schedules or cancellation of orders." Id.

Notwithstanding those warnings, plaintiffs identify a number of times prior to and throughout the Class Period when Textron and its executives pointed to its backlog of Cessna orders as a sign of the company's financial strength. For example, in a December 12, 2007 article, Reuters quoted Campbell as stating "[i]f we were running on a very low backlog, I'd be nervous, but the converse is true. I'm bullish on Cessna's growth . . . well into the next decade." ¶ 162. After the economic downturn began in earnest, Campbell reassured investors on October 16, 2008 by noting that "[w]hen someone places an order, not only do they have to put down a nonrefundable deposit but also we require an understanding of where they are going to get their financing." ¶ 229. On a January 24, 2008 conference call, French noted the "depth and strength" of the backlog and asserted that even a "radical" falloff in orders would still leave the company with 20 months of backlog. ¶ 171. Finally, throughout 2008 the defendants made various statements indicating that, for the most part, customers were not seeking to cancel orders. E.g. ¶¶ 167, 201-204, 233, 244.[4]

At the same time, however, the defendants did indicate that some cancellations and deferrals were occurring or could be expected in the Cessna division during the Class Period. In

---

[4]  A chart of the statements concerning Cessna's loan portfolio that plaintiffs claim were misleading is attached as Appendix B.

July 2008, Campbell disclosed that two customers had been allowed to defer their Cessna orders rather than cancel them. ¶ 201. Similarly, in October 2008, French commented that "the Cessna team is out proactively talking to everyone in the order book for '09 deliveries right now to try to get a sense, as early as possible, if anyone is going to come forward and ask us to push something out." ¶ 228.

## C. **The Crisis Unfolds**

On June 13, 2008 Textron disclosed that profit in its finance segment would be "significantly less than previously forecast." ¶ 190. Nevertheless, Campbell stated on the same day that "[d]espite further softening in our commercial finance business, 2008 is shaping up to be another very good year for Textron overall as we continue to see strong demand and performance at Cessna, Bell Helicopter and Textron Systems." ¶ 191. Textron stock declined approximately 10% over the next two trading days. ¶ 192.

On July 17, 2008, Credit Suisse issued an analyst report noting the inconsistent reports regarding Textron's financial stability. ¶ 206. Over the next two days Textron's stock price dropped by more than 12%. ¶ 207. Then, on August 6, 2008, Textron announced that profitability at TFC was continuing to fall. Defendants French, Cullen, and Butera explained that a sudden increase in loan losses was decreasing profits at TFC,

and that loss provision reserves were being increased. ¶¶ 210-212. Textron's stock closed down approximately 1.8% on August 7, 2008.

On October 16, 2008, Textron announced in an SEC filing that, due to the global economic downturn, it planned to downsize TFC by $2 billion by exiting several product lines. ¶ 221. Textron also announced that it would make an approximately $200 million support payment to TFC in the first quarter of 2009. Id. Finally, the company disclosed for the first time that an order downturn had occurred in the Cessna division, although in a press release Textron continued to highlight the strength of the Cessna backlog as a source of financial stability. ¶¶ 223-224. At a conference call the same day, Campbell reiterated that there had been "very little cancellation" of Cessna orders. ¶ 230. Textron stock dropped nearly 7% over the next two trading days following this announcement. ¶ 235. Less than a week later, Morgan Stanley downgraded Textron stock from Equal-weight to Underweight. ¶ 238. Textron stock dropped from an October 20, 2008 close of $18.81 to $11.69 on October 23, 2008, a loss of almost 38%. ¶ 239.

This pattern continued on November 4, 2008, when Textron revised downward Cessna's jet production schedule. ¶ 240. Defendants continued to represent the strength of the company

overall and of the backlog in particular, with Campbell noting on November 5, 2008 that "we believe our record aerospace and defense backlog and pending customer orders of nearly $30 billion will provide a cushion and ballast to weather the uncertainties we face as we go forward." ¶ 242. Campbell also denied that Cessna was experiencing any more order cancellations than in 2007 or 2006. ¶ 244. Finally, Campbell characterized TFC as having a "rigorous underwriting philosophy" and "conservative" funding strategy. ¶ 243.

On December 22, 2008, Textron announced in an 8K filing with the SEC that TFC would exit almost all commercial lending activities and that Textron would make a $600 million support payment to TFC. ¶ 251. The next day Textron stock fell from $15.34 to close at $12.20, a fall of more than 20%. ¶ 252.

As these events took place, Textron took steps to increase its loan loss reserves in each quarter of 2008. According to public SEC filings, Textron increased its reserves for its finance receivables in the first quarter of 2008 by $27 million. See TFC Annual Report (Form 10-K), Doc. No. 57-26, at 69 (Feb. 26, 2009). Over the next three quarters of 2008, Textron further increased its loan loss reserves by 40, 34, and 133 million dollars, respectively. Id. By comparison, the quarterly loan loss provisions in 2007 had been in the amounts of 5, 11, 6, and 11 million dollars. Id.

Finally, on January 29, 2009, the last day of the Class Period, Textron reported that there had been substantial cuts to Cessna's production levels due to high levels of deferrals and cancellations of orders. ¶ 254. Defendants attributed the discrepancy between predictions for TFC and Cessna in 2007 and 2008 and actual earnings to the onset of the broader economic recession. ¶ 255. The price of Textron stock declined further to close at $9.09. ¶ 258. This represented an 87% loss from its Class Period high. ¶ 259. Plaintiffs also allege that the individual defendants in this case profited by selling over 900,000 personally-held shares of Textron stock, almost all of which were sold between the beginning of the Class Period and May 21, 2008, when the stock was near its Class-Period high. ¶ 297.

## II. <u>PROCEDURAL HISTORY</u>

This suit was filed in the District of Rhode Island on August 13, 2009, alleging violations of various federal securities laws. On February 8, 2010 the plaintiffs filed a four-count consolidated class action complaint asserting a number of claims against Textron and the individual defendants. Counts I and II, which alleged that the defendants violated §§ 11 and 15 of the Securities Act, were dismissed by agreement. Count III alleges that Textron and the individual defendants

violated § 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, by defrauding the market through a series of material misrepresentations and omissions concerning Textron and its subsidiaries.  Count IV alleges that the individual defendants violated § 20(a) of the Exchange Act.

Defendants have moved to dismiss Counts III and IV pursuant to Fed. R. Civ. P. 12(b)(6).  Their principal contention is that the claims do not pass muster under the stringent pleading requirements of the Private Securities Litigation Reform Act "PSLRA").

### III.  <u>STANDARD OF REVIEW</u>

As with any motion to dismiss a claim filed pursuant to Fed. R. Civ. P. 12(b)(6), I accept as true all well-pleaded facts in support of the claim and make all reasonable inferences in the plaintiffs' favor.  <u>E.g.</u>, <u>Blackstone Realty LLC v. Fed. Deposit Ins. Corp.</u>, 244 F.3d 193, 197 (1st Cir. 2001).  To survive a motion to dismiss, a complaint must allege facts sufficient to demonstrate "a plausible entitlement to relief." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559 (2007).  The PSLRA, 15 U.S.C. §78u-4(b), establishes additional strict pleading standards for plaintiffs asserting claims for securities fraud under the Exchange Act and Rule 10b-5, as is

the case here. 15 U.S.C. § 78u-4(b)(1)-(2); See In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 191 (1st Cir. 2005).

The PSLRA mandates that a complaint asserting securities fraud pursuant to the Exchange Act and Rule 10b-5 must (1) "specify each statement alleged to have been misleading;" (2) specify "the reason or reasons why the statement is misleading;" and (3) "if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). These requirements are not relaxed even when "the fraud relates to matters peculiarly within the knowledge of the opposing party." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999) (quoting Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985)) (applying the Fed. R. Civ. P. 9(b) pleading standards, which the First Circuit regards as "congruent and consistent" with the PSLRA) (internal quotation marks omitted).

The PSLRA also imposes an additional pleading requirement related to the scienter, or the state of mind, required for liability under the Exchange Act and Rule 10b-5. See 15 U.S.C. § 78u-4(b)(2). Specifically, the plaintiff must plead facts giving rise to a "strong inference" that "defendants consciously intended to defraud, or that they acted with a high degree of recklessness." N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 44 (1st Cir. 2008). While

14

Congress did not define what qualifies as a "strong inference" under the PSLRA, the Supreme Court has held that a strong inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). Scienter must be examined by looking at the complaint as a whole, and I must weigh "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." New Jersey Carpenters, 537 F.3d at 45 (internal quotation marks omitted).

## IV.  ANALYSIS

Plaintiffs contend that the defendants violated the federal securities laws by making a series of misleading statements concerning Textron's financial condition. These statements fall into two broad categories. The first includes statements concerning the quality of TFC's loan portfolio, which plaintiffs claim were misleading because they were not accompanied by disclosures of the extent to which TFC had altered its underwriting standards. The second includes statements concerning the quality of Cessna's backlog of aircraft orders, which plaintiffs claim were misleading because defendants did not simultaneously disclose adverse information about the

backlog.  Most of the challenged statements are evaluative in

nature[5] and the rest are simple statements of fact.  Plaintiffs'

---

[5]  A statement of opinion, such as that the quality of a loan
portfolio is "excellent," can only be actionable if either the
speaker did not actually hold the opinion or if the statement
implies a statement of fact that is itself false or misleading.
See ACA Financial Guarantee Corp. v. Advest, Inc., 512 F.3d 46,
61 n.11 (1st Cir 2008); In Re Credit Swiss First Boston Corp.,
431 F.3d 36, 47 (1st Cir. 2005) (overruled on other grounds by
Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314
(2007)).

Here, reading the complaint as a whole, it is clear that
the principle argument relied on by plaintiffs is that the
opinion statements by the defendants were actionable because
they implied misleading facts.  The PSLRA requires plaintiffs to
plead specifically why each allegedly actionable statement is
false and misleading, 15 U.S.C. § 78u-4(b)(1), and plaintiffs do
not specifically allege in their complaint that the opinions
were not actually held by the speakers, making only general
allegations that the defendants knew or should have known that
TFC's portfolio was "at risk" or "not well insulated and
protected" and that the backlog was "artificially inflated."
E.g., Consolidated Compl. ¶¶ 186, 194, 248.

Even if plaintiffs were to re-cast their complaint as
alleging that the defendants made statements of opinion that
they did not hold, it would still fail.  Courts have held that
this kind of subjective falsity analysis "essentially merge[s]"
with the scienter requirement of the PSLRA.  Credit Suisse, 431
F.3d at 48.  Plaintiffs argue primarily that scienter may be
inferred based on the positions of the defendants within the
company and because the omissions themselves involved important
aspects of Textron's business.  These general allegations are
not sufficient to meet the PSLRA's heightened scienter
requirements.  See Carney v. Cambridge Technology Partners,
Inc., 135 F. Supp. 2d 235 (D. Mass. 2001) (noting that
"attributing knowledge to a defendant merely because of the
defendant's status in a corporation[] generally fails as a
method of meeting the rigorous requirements for pleading
scienter").  This is particularly true in light of my holding in

theory of the case is that both types of statements are actionable because, by omitting information regarding changes in TFC's lending standards and Cessna's treatment of airplane orders, defendants left misleading impressions concerning the company's reporting of its final condition.

Defendants argue that the plaintiffs have failed to state viable claims because they have not sufficiently alleged that the omissions they rely on made the statements at issue misleading. The First Circuit's recent opinion in Hill v. Gozani, 638 F.3d 40 (1st Cir. 2011) provides the analytical framework that I use in evaluating defendants' argument.

In Hill, a medical device manufacturer marketed a new device by representing that doctors could bill for procedures performed with the device using standardized "neurology codes" used by insurers for different "specialty-driven" procedures. Id. at 46. Accordingly, non-specialist doctors using these codes to bill for procedures performed with the new device would be entitled to compensation at higher than normal rates, which was an important aspect of the defendants' marketing plan. Id.

---

this Memorandum and Order that the omissions relied on by plaintiffs were not actually misleading. See City of Dearborn Heights Act 345 Police & Fire Retire. Sys. v. Waters Corp., 632 F.3d 751, 758 (1st Cir. 2011)(holding that to adequately plead scienter plaintiffs must show that "defendants knew or should have known that their failure to disclose those facts presented a danger of misleading").

at 47.  If it became clear that the neurology codes could no longer be used to bill for procedures using the new device, profit margins would fall in doctors' offices, and sales of the device would plummet.  Id. at 46.  The complaint charged that defendants reported revenue results that were based on sales of the new device and made various statements concerning third-party reimbursements that were fraudulent because they were made without disclosing that:

> (1) the company declined to apply for a new code even
> though the reimbursement specialists had informed it
> that it was necessary; (2) sales personnel were
> advising physicians on the use of the neurology codes;
> (3) reimbursement specialists had advised that use of
> the neurology codes was fraud; and (4) there was a
> serious risk that insurers would not allow [procedures
> using the new device] . . . to be reimbursed under
> neurology-based CPT codes.

Id. at 56 (internal quotation marks and alterations omitted).

In affirming the dismissal of the complaint, the court of appeals in Hill explained that a statement will not be deemed to be misleading under the federal securities laws based upon the omission of material information unless the omitted information leaves the disclosed information "so incomplete as to mislead." Id. at 57 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc)).  The court then conceded that the complaint alleged that the defendants had omitted material information from their disclosures and went on to perform a separate analysis as to whether the omission of that information

made the defendants' public statements misleading, contrasting the facts in that case with several earlier decisions.  The court noted that in Lormand v. U.S. Unwired, Inc., 565 F.3d 228 (5th Cir. 2009), the omission of a company's decision to extend services to customers with sub-prime credit without requiring safeguards was misleading where the company was touting the benefits of the program even while the defendants "fully understood the near-certainty of financial disaster to come." Hill, 638 F.3d at 59.  Turning to In re Cabletron Systems, Inc., 311 F.3d 11 (1st Cir. 2002), the court noted that in that case as well, company officials "saw disaster looming on the horizon," and took the additional step of engaging in a series of fraudulent practices such as falsifying sales records and delaying the reports of liabilities to cover up the impending financial collapse.  Hill, 638 F.3d at 59.

The court then contrasted these cases with the facts that were then before it and determined that the omissions at issue were not misleading.  The court distinguished Lormand by noting that "there is simply nothing in the complaint to suggest that . . . the danger posed by the reimbursement strategy was, at the time the statement was made, a near certainty of ruin."  Id.  Similarly, it observed that, unlike in Cabletron, there was no

allegation of "a comprehensive scheme to disguise negative information." Id.[6]

Plaintiffs' allegations concerning TFC's loan portfolio are even less compelling than the allegations of fraud found wanting by the First Circuit in Hill. Construing the Consolidated Complaint generously, the most that can be made of the omitted information is that: (1) TFC had recently relaxed its underwriting standards in its various business segments; and (2) the company's relaxed underwriting standards increased the riskiness of the company's loan portfolio by an unspecified amount. While securities investors have a voracious appetite for information, and they would undoubtedly have wanted to know every available fact concerning TFC's underlying standards, I am unpersuaded by the plaintiffs' contention that the omission of this information made the disclosed statements misleading. The Consolidated Complaint does not attempt to identify the relative

---

[6]  Four days after the First Circuit issued its opinion in Hill, the Supreme Court decided Matrixx Institutions Inc. v. Siracusano, 131 S. Ct. 1309 (2011). In Matrixx, the Court ruled that omitted information of adverse incident reports concerning one of a defendant's products could qualify as material information under the securities laws even though the number of reports was not statistically significant. Id. at 1322. Several weeks later, in responding to a claim that Hill should be reheard in light of Matrixx, the court concluded for reasons fully explained in its opinion that Hill was in no way inconsistent with Matrixx. Hill v. Gonzani, No. 10-1048, 2011 WL 2566143, at *11 (1st Cir. May 26, 2011). Thus, Hill remains the most recent binding precedent on this issue and I apply it in my analysis.

percentage of loans that were subject to the new loan underwriting standards, it does not describe the new standards except in general terms, and it does not explain except in a conclusory way why the company's loan loss reserves were inadequate given the risks that the company had assumed.[7] Moreover, there is little evidence identified in the Consolidated Complaint of a scheme such as the one identified in Cabletron to conceal a looming disaster by falsifying corporate records. In short, this case is nothing like those in which the court of appeals has allowed a sufficient securities fraud case to be based on misleading omissions.

---

[7] Plaintiffs' conclusory assertion that the company's loan loss reserves were not reported in accordance with Generally Accepted Accounting Principles ("GAAP") does nothing to clarify plaintiffs' position, because it is so generally pleaded that it will not support their contention that defendants' alleged omissions made their disclosed statements misleading. Instead of providing specific allegations describing Textron's past loan loss provisions or what amount of loan loss provisions would have been sufficient to satisfy GAAP in this case, the plaintiffs simply allege that Textron inappropriately maintained its provisioning at "historic levels." Consolidated Compl. at ¶ 287. These general allegations, which are factually incorrect in any event because public SEC filings illustrate that Textron dramatically increased its loan loss reserves throughout 2008, see TFC Annual Report (Form 10-K), Doc. No. 57-26, at 69 (Feb. 26, 2009), are insufficient to plausibly establish that Textron's accounting practices violated GAAP, see Greebel v. FTP Software, 194 F.3d 185, 205 (1st Cir. 1999) (rejecting a claimed GAAP violation because "[t]he allegations in the complaint do not include such basic details as the approximate amount by which revenues and earnings were overstated").

I do not doubt that a company's evaluative statements about its loan portfolio can be actionably misleading when the company's officers do not hold the opinions that they offer to the investing public.  Nor do I question the basic proposition that an evaluative statement can support a securities fraud claim when it implies facts that are misleading because of omitted information.  However, as the court recognized in Hill, "[i]t does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise; a company must reveal only those facts that are needed so that what was revealed would not be so incomplete as to mislead."  638 F.3d at 57 (internal quotation marks and emphasis omitted).  The alleged omissions concerning TFC's loan portfolio fail to qualify under this standard.

Although plaintiffs' allegations concerning the backlog present a closer case, they too are insufficient to support a claim that defendants' alleged omissions made their disclosed statements misleading.  Defendants repeatedly touted the existence of the backlog as an important indicator of Cessna's future prospects and the company's publicly disclosed policy was that it did not accept orders without a non-refundable deposit.  Under these circumstances, it is reasonable to assume that many investors might have wanted to know that Cessna had begun financing deposits.  However, as I have explained, a company is

not liable for securities fraud merely because it fails to disclose information that investors might consider useful in evaluating the company's disclosures.  The only evidence that plaintiffs plead to support their contention that the failure to disclose the financing of the deposits made defendants' touting of the backlog misleading is a single conclusory statement from a confidential source that the need for financing for a deposit demonstrated that the purchaser lacked sufficient funds to complete the purchase.  This type of statement is simply insufficient to support plaintiffs' claim that the disclosed statements were misleading.  See N.J. Carpenters, 537 F.3d at 53 n.18 (rejecting as a "bald assertion" that "gets plaintiffs nowhere" an opinion from a single confidential witness that executives had been excessively aggressive in getting a drug to market).

Plaintiffs also complain that defendants went to great lengths to conceal the weaknesses in its backlog by deferring an unspecified number of customer orders and failing to disclose an unspecified number of customer cancellations.  The record reveals, however, that defendants made disclosures on this subject during the Class Period and I cannot conclude that the disclosures that were made were in any way misleading given the limited information supplied by the plaintiffs in support of their claims.

23

Finally, included sporadically throughout the Consolidated Complaint are a handful of non-evaluative statements that plaintiffs appear to allege were actually false when made. Because it is conceivable that plaintiffs could attempt to base their claims solely on these statements, I address them separately. Specifically, the Consolidated Complaint notes that defendants Campbell and Wilburne stated in July of 2008 that there had only been two cancellations of ordered aircraft at Cessna, and in September of 2008 Campbell said that financing had fallen through for "less than a handful" of customers. Consolidated Compl., ¶¶ 201-04, 226. Campbell also stated in November 2008 that "we aren't seeing any more cancellations than we did last year or the year before at this time." Id. at ¶ 244. Finally, French stated in October 2008 that, while the weakening economy was having some financial impacts on Cessna, "it's not on new jet deliveries." Id. at ¶ 233.

The Consolidated Complaint contains statements by two confidential witnesses ("CW") that plaintiffs claim contradict these statements: according to CW 3, the former Production Foreman/Production Superintendent for Cessna, "delinquencies and cancellations [at Cessna Finance] increased during 2008, particularly during late summer 2008." Id. at ¶ 140. CW 3 stated further that by "fall 2008" finished but undelivered planes were "piling up." Id. Similarly, CW 5, a former Senior

24

Business Partner, "recalled cancellations increasing in late summer 2008." Id., ¶ 141.

A careful look at the timeline reveals that neither of the above confidential witnesses actually contradicts the identified statements by Campbell, Wilburne, and French. Neither witness provides a concrete number of cancellations for any time period, and the vague allegations of an "increase" in cancellations sometime in "late summer" or "fall" is simply not specific enough to plausibly demonstrate that statements made in July, September, and October, were false, as those statements could have predated the later onrush of cancelled orders described by the confidential witnesses. Even the latest statement, made by Campbell in November regarding cancellations relative to previous years, cannot be said to be false without additional information, absent from the complaint, describing the number of cancellations in those earlier years.

With regards to TFC, the plaintiffs allege that Campbell falsely claimed Textron was "not involved in sub-prime or other misunderstood or high-risk" products. Plaintiffs argue that this statement was false when made because TFC was at the time financing "real estate rehab companies," which involves providing financing to an entity that, in turn, lends the money to contractors who buy properties in states of disrepair, refurbish the property, and sell it to individual purchasers.

Consolidated Compl. at ¶ 59.  Plaintiffs argue that because "[o]ne of the significant risks with these kinds of loans is that the individual purchasers are often sub-prime borrowers," Textron had indirectly become "reliant" on the ability of sub-prime borrowers to purchase and finance properties.  Id. at ¶¶ 88-89.  This in turn made Campbell's statement false.

Plaintiffs are attempting to connect too many dots. Financing entities that in turn finance contractors that in turn may or may not sell property to customers who could be sub-prime borrowers is simply too indirect an involvement in sub-prime products to make Campbell's statement affirmatively false. Because plaintiffs have failed to plead sufficient facts to support a conclusion that the statements at issue were false, they have failed to adequately plead those claims as well.[8]

In summary, when I examine the Consolidated Complaint as a whole and construe the complaint in the light most favorable to

_____

[8] Even if any of the above statements were actually false when they were made, they represent a tiny portion of plaintiffs' case.  Out of over 100 statements alleged to be misleading because of omitted information, plaintiffs point to only a handful of statements that could have been affirmatively false. Even interpreting plaintiffs' allegations generally, the statements describing the lack of cancelled orders could, at most, have affected only a miniscule fraction of the Cessna backlog, which at the time was over $15 billion.  With regard to TFC, plaintiffs identify only one loan involving real estate rehab companies in their complaint: a $50-60 million deal to loan money to a company known as Assured.  In the context of a multi-billion-dollar company such as Textron, even false statements involving such a minute percentage of its overall activities would be immaterial as a matter of law.

the plaintiffs, I conclude that plaintiffs have failed to sufficiently plead that the statements on which their claims are based were false or misleading when made.

### V.   CONCLUSION

For the reasons stated in this Memorandum and Order, plaintiffs' complaint does not state a viable claim for relief under § 10(b).  Because plaintiffs' § 20(a) claim is premised on the existence of an actionable claim under § 10(b), it too fails to state a claim for relief.  Defendants' motion to dismiss (Doc. No. 56) is granted.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge
Sitting by Designation

August 23, 2011

cc:  Counsel of Record